Filing # 64799734 E-Filed 11/30/2017 03:08:01 PM

| ☐ IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA. |
| ☐ IN THE COUNTY COURT IN AND FOR MIAMI-DADE COUNTY, FLORIDA. |

| DIVISION<br>☒ CIVIL   ☐ OTHER<br>☐ DISTRICTS | SUMMONS 20 DAY CORPORATE SERVICE<br>(a) GENERAL FORMS | CASE NUMBER<br>2017-027434-CA-01 |
| --- | --- | --- |
| PLAINTIFF(S)<br>AIRPLAY ADVENTURES, LLC<br>a Hawaiian limited<br>liability company | VS.  DEFENDANT(S)<br>ESJ JI OPERATIONS, LLC,<br>a Florida company | SERVICE<br>MW 1098<br># 12-6-17<br>440 pm |

THE STATE OF FLORIDA:

To Each Sheriff of the State:

**YOU ARE COMMANDED** to serve this summons and copy of the complaint or petition in this action on defendant(s): ___ESJ JI OPERATIONS, LLC, a Florida company, whose registered agent is:

    **ESJ ASSET MANAGEMENT LLC**

    19950 W. Country Club Drive, Suite 800

    Aventura, FL 33180

Each defendant is required to serve written defense to the complaint or petition on
Plaintiff's Attorney: ___John Arrastia, Esq.

whose address is: ___Genovese Joblove & Battista

    100 SE 2nd Street, #4400

    Miami, FL 33131

within 20 days " **Except when suit is brought pursuant to s. 768.28, Florida Statutes, if the State of Florida, one of its agencies, or one of its officials or employees sued in his or her official capacity is a defendant, the time to respond shall be 40 days. When suit is brought pursuant to 768.28, Florida Statutes, the time to respond shall be 30 days."** after service of this summons on that defendant , exclusive of the day of service, and to file the original of the defenses with the Clerk of this Clerk Court either before service on Plaintiff's attorney or immediately thereafter. If a defendant fails to do so, a default will be entered against that defendant for the relief demanded in the complaint or petition.

| **HARVEY RUVIN**<br><br>**CLERK of COURTS** | Gonelle Brown  164659<br><br>DEPUTY CLERK | DATE<br>12/6/2017 |
| --- | --- | --- |

## AMERICANS WITH DISABILITIES ACT OF 1990
## ADA NOTICE

**"If you are a person with a disability who needs any accommodation in order to participate in this proceeding, you are entitled, at no cost to you, to the provision of certain assistance. Please contact the Eleventh Judicial Circuit Court's ADA Coordinator, Lawson E. Thomas Courthouse Center, 175 NW 1st Ave., Suite 2702, Miami, FL 33128, Telephone (305) 349-7175; TDD (305) 349-7174, Fax (305) 349-7355 at least 7 days before your scheduled court appearance, or immediately upon receiving this notification if the time before the scheduled appearance is less than 7 days; if you are hearing or voice impaired, call 711."**

CLK/CT. 314 Rev. 02/16


EXHIBIT
A

Clerk's web address: www.miami-dadeclerk.com

# FORM 1.997. CIVIL COVER SHEET

The civil cover sheet and the information contained in it neither replace nor supplement the filing and service of pleadings or other documents as required by law. This form must be filed by the plaintiff or petitioner for the use of the Clerk of Court for the purpose of reporting judicial workload data pursuant to section 25.075, Florida Statutes. (See instructions for completion.)

## I. CASE STYLE

IN THE CIRCUIT COURT OF THE <u>ELEVENTH</u> JUDICIAL CIRCUIT,
IN AND FOR <u>MIAMI-DADE</u> COUNTY, FLORIDA

Case No.:_____
Judge: _____

<u>Airplay Adventures, LLC, John Arrastia</u>
Plaintiff

vs.

<u>ESJ JI Operations, LLC</u>
Defendant

## II. TYPE OF CASE

- ☐ Condominium
- ☒ Contracts and indebtedness
- ☐ Eminent domain
- ☐ Auto negligence
- ☐ Negligence – other
  - ☐ Business governance
  - ☐ Business torts
  - ☐ Environmental/Toxic tort
  - ☐ Third party indemnification
  - ☐ Construction defect
  - ☐ Mass tort
  - ☐ Negligent security
  - ☐ Nursing home negligence
  - ☐ Premises liability – commercial
  - ☐ Premises liability – residential
- ☐ Products liability
- ☐ Real Property/Mortgage foreclosure
  - ☐ Commercial foreclosure $0 - $50,000
  - ☐ Commercial foreclosure $50,001 - $249,999
  - ☐ Commercial foreclosure $250,000 or more
  - ☐ Homestead residential foreclosure $0 – 50,000
  - ☐ Homestead residential foreclosure $50,001 - $249,999
  - ☐ Homestead residential foreclosure $250,000 or more
  - ☐ Non-homestead residential foreclosure $0 - $50,000
  - ☐ Non-homestead residential foreclosure $50,001 - $249,999

- ☐ Non-homestead residential foreclosure $250,00 or more
- ☐ Other real property actions $0 - $50,000
- ☐ Other real property actions $50,001 - $249,999
- ☐ Other real property actions $250,000 or more

- ☐ Professional malpractice
  - ☐ Malpractice – business
  - ☐ Malpractice – medical
  - ☐ Malpractice – other professional
- ☐ Other
  - ☐ Antitrust/Trade Regulation
  - ☐ Business Transaction
  - ☐ Circuit Civil - Not Applicable
  - ☐ Constitutional challenge-statute or ordinance
  - ☐ Constitutional challenge-proposed amendment
  - ☐ Corporate Trusts
  - ☐ Discrimination-employment or other
  - ☐ Insurance claims
  - ☐ Intellectual property
  - ☐ Libel/Slander
  - ☐ Shareholder derivative action
  - ☐ Securities litigation
  - ☐ Trade secrets
  - ☐ Trust litigation

## COMPLEX BUSINESS COURT

This action is appropriate for assignment to Complex Business Court as delineated and mandated by the Administrative Order.  Yes ☒ No ☐

III.   **REMEDIES SOUGHT** (check all that apply):
- ☐  Monetary;
- ☒  Non-monetary declaratory or injunctive relief;
- ☐  Punitive

IV.   **NUMBER OF CAUSES OF ACTION: (    )**
(Specify)

1

V.   **IS THIS CASE A CLASS ACTION LAWSUIT?**
- ☐  Yes
- ☒  No

VI.   **HAS NOTICE OF ANY KNOWN RELATED CASE BEEN FILED?**
- ☒  No
- ☐  Yes – If "yes" list all related cases by name, case number and court:

VII.   **IS JURY TRIAL DEMANDED IN COMPLAINT?**
- ☐  Yes
- ☒  No

---

I CERTIFY that the information I have provided in this cover sheet is accurate to the best of my knowledge and belief, and that I have read and will comply with the requirements of Florida Rule of Judicial Administration 2.425.

Signature s/ John Arrastia      FL Bar No.: 72461
    Attorney or party                                                                 (Bar number, if attorney)

John Arrastia   11/29/2017
    (Type or print name)                                                            Date

Filing # 64691531 E-Filed 11/28/2017 05:27:50 PM

IN THE CIRCUIT COURT IN AND FOR
THE ELEVENTH JUDICIAL CIRCUIT
IN AND FOR MIAMI-DADE COUNTY,
FLORIDA

AirPlay Adventures LLC, a
Hawaiian
limited liability company,

COMPLEX BUSINESS DIVISION

     Plaintiff,

CASE NO.   2017-027434-CA-01

vs.

ESJ JI Operations LLC, a
Florida company

     Defendant.

_____/

### **Complaint for Declaratory Judgment**

     Plaintiff AirPlay Adventures, LLC ("AirPlay"), a foreign company, sues Defendant ESJ

JI Operations, LLC ("ESJ Jungle Island"), a Florida limited liability company for declaratory and

supplemental relief pursuant to Chapter 86 of the Florida Statutes and alleges the following:

### ***Summary and Introduction***

     Plaintiff is a company affiliated with, operated by, and staffed by industry leaders in the

business of designing, building, and operating ziplines and other aerial adventure attractions.  In

September 2015, Plaintiff entered into a contract, called the License Agreement, with the then-

owner of Jungle Island on Watson Island, to create an extensive zipline with seven towers, eight

bridges, and eight individual ziplines over that interactive zoological park, with plans for future

adventure attractions.  In or about 2016, the owner was in the process of selling Jungle Island to

Defendant ESJ Jungle Island.

     By September 2016, Plaintiff had obtained designs, engineered plans, engaged a general

contractor, and applied for the necessary building permits.  In December 2016, the owner, in

[11972-001/2802397/1]

1

conjunction with Defendant as a potential buyer, made major design changes to the zipline project, eliminating a tower, a bridge and its associated entry structure, and two ziplines.   This was the first substantive redesign of the project.

AirPlay continued work on the project with the necessary peer review and engineering, along with preconstruction planning with the subcontractors and other work that could be done before the final permit was issued.

On April 5, 2017, Defendant closed on the acquisition of Jungle Island and, as a successor-in-interest, was bound by the License Agreement.

Shortly afterwards, on April 14, 2017, Defendant issued a stop work order to Plaintiff because Defendant wanted to relocate one of the zipline towers in the project.   Almost two months later, on June 9, 2017, Defendant finally issued a notice to proceed but did not make a decision about the relocation of the tower – a critical aspect to the project – until another two months later on August 14, 2017.   Further, Defendant refused to pay for the hundreds of thousands of dollars of changes to the project that it had insisted upon after assuring AirPlay that it would not have to pay for these costs.

On September 6, 2017, Defendant's agent suspended work on Jungle Island due to Hurricane Irma.   As a result of that storm, Jungle Island is still closed as of the filing of this action.

Meanwhile, Defendant, as the new owner, continued to strong-arm Plaintiff in an attempt to rewrite the License Agreement to add what Defendant wanted and delete what it found inconvenient. For example, Defendant claimed that the contact entitled it to payment and performance bonds from AirPlay, but those conditions were never contemplated by the contract. Defendant, on the other hand, did not like the specific and unequivocal contract provisions that

[11972-001/2802397/1]

2

GENOVESE JOBLOVE & BATTISTA, P.A.
100 S.E. SECOND STREET • 44TH FLOOR • MIAMI, FLORIDA 33131 • TELEPHONE: (305) 349-2300 • FACSIMILE: • (305) 349-2310

provided Plaintiff with exclusivity and protected Plaintiff with non-disparagement and confidentiality provisions – so Defendant just ignored the provisions.

At the same time that Defendants claimed to be negotiating an amendment in good faith, they sought out competing builders to create other adventure attractions that infringed on Plaintiff's contracted exclusivity. Not stopping there, Defendants sought out other prospective replacements for Plaintiff, disparaging Plaintiff's work and divulging Plaintiff's confidential information.

Thus, although the building permit was issued on June 9, 2017, Defendant had not decided on the redesign it wanted until August 13, 2017 – which was three weeks before Hurricane Irma stopped construction. Then, Defendant issued another stop work order on October 18, 2017, the same day the post-Irma construction crews arrived. Despite the stop work order preventing AirPlay from performing any work, 30 days later Defendant purported to terminate the License Agreement, claiming that AirPlay had failed to perform.

In reality, Defendant manufactured excuses to claim a breach of the License Agreement because AirPlay refused to rewrite the existing agreement and accept the onerous costs associated with the delays and redesigns occasioned by Defendant.

Plaintiff is ready, willing, and able to perform and has always intended to perform but for the stop order and purported termination.

Plaintiff seeks a declaration of rights from this Court as to the obligations and rights of the parties to the License Agreement, including but not limited to the following: the impact of the stop work orders and owner-required redesigns on the ability to perform pursuant to the License Agreement; the impact of Hurricane Irma on the ability to perform; whether the owner

[11972-001/2802397/1]

3

GENOVESE JOBLOVE & BATTISTA, P.A.
100 S.E. SECOND STREET • 44TH FLOOR • MIAMI, FLORIDA 33131 • TELEPHONE: (305) 349-2300 • FACSIMILE: • (305) 349-2310

waived any claim to breach of default through its own conduct; and whether valid material reasons existed for termination.

## Parties and Jurisdiction

1.    Plaintiff Air Play Adventures, LLC is a Hawaii limited liability company performing services in Miami-Dade County, Florida.

2.    Defendant ESJ JI Operations LLC is a Florida limited liability company with a principal place of business in Miami-Dade County, Florida.    The manager of that limited liability company is ESJ Capital Partners, LLC, with a principal place of business in Miami-Dade County, Florida.

3.    The subject matter of this declaratory judgment action is located in Miami-Dade County, Florida.

4.    Venue is proper because the contract at issue concerns performance and issues solely in Miami-Dade County.

5.    The amount at issue in this action exceeds $750,000.

## CHRONOLOGY OF FACTS

### *The License Agreement*

6.    Jungle Island is an interactive zoological park on Watson Island, built on land leased from the City of Miami.

7.    AirPlay is in the business of designing, building and operating zipline tours and other aerial attractions. The key personnel and design/build team heavily involved in this at Jungle Island are Qualified Course Professionals in the areas of design, installation, inspection, and training and testing as set forth by the Association of Challenge Course Technology ("ACCT"), which is an ANSI Accredited Standards Developer.  The proposed attraction would

[11972-001/2802397/1]

4

GENOVESE JOBLOVE & BATTISTA, P.A.
100 S.E. SECOND STREET • 44TH FLOOR • MIAMI, FLORIDA 33131 • TELEPHONE: (305) 349-2300 • FACSIMILE: • (305) 349-2310

be regulated by the Florida Department of Agriculture, Bureau of Fair Rides, which applies ASTM F24 Standard for Amusement Rides and Devices. One of the key personnel of AirPlay's team for Jungle Island sits on the ASTM F24 committee that develops those standards, another having sat on the board of directors of ACCT for six years. The Structural Peer Reviewer is the chair of Subcommittee F24.24 on Design and Manufacture and the Engineer of Record is the Chair of Subcommittee F24.61 on Adventure Attractions.

8.      On September 21, 2015, AirPlay entered into that certain License Agreement ("License Agreement") with Parrot Jungle and Gardens of Watson Island, Inc. and PJG Watson, LLC, the owner of Parrot Jungle at Watson Island, to build a zipline tour and aerial adventure attractions at what is now known as Jungle Island. A copy of the License Agreement is attached as Exhibit 1.

9.      Generally speaking, the zipline tour contemplated would consist of several free-standing but interrelated towers between which ziplines would be strung over Jungle Island to provide an exhilarating but safe aerial experience over different areas of the park. The towers would be connected by bridges and accessed by a base camp that would recreate an abandoned archeological explorer's camp straight out of a moviemaker's imagination.

10.     The License Agreement provided as follows:

a.      AirPlay would "purchase, install, operate and maintain outdoor ziplines and adventure park obstacle courses" at Jungle Island. *See* Agreement at Recitals "C";

b.      In return, AirPlay was granted the "exclusive right to operate Adventure Rides and Ziplines" at Jungle Island. *See id.* at Section 1, "License" generally and subsection (c)(i), specifically.

[11972-001/2802397/1]

5

GENOVESE JOBLOVE & BATTISTA, P.A.
100 S.E. SECOND STREET • 44TH FLOOR • MIAMI, FLORIDA 33131 • TELEPHONE: (305) 349-2300 • FACSIMILE: • (305) 349-2310

c.      The License Agreement is "binding on, and inure to the benefit of, any successor or either party . . .." *Id.* at Section 17(c).

11.    The License Agreement identified the zipline tour, adventure park, and swimming cenote[1] in its Exhibit A.  The zipline tour would consist of seven towers and eight ziplines.

12.    Because of the complexity and life safety issues relating to the construction, including those caused by the owner, Parrot Jungle Gardens, the project did not move forward as quickly as anticipated.  For example:

a.      Only on April 27, 2016, did Parrot Jungle Island receive the Accessibility Waiver from the State of Florida Building Commission that it had submitted for the ziplines.  *See* email correspondence dated March 1, 2016 and attached as Exhibit 2. Obtaining this waiver was Parrot Jungle Island's responsibility.

b.      Shortly afterwards, a geotechnical firm was engaged to evaluate the suitability of the site for the proposed ziplines.  On May 11, 2016, that company recommended the use of "pile-type" foundations instead of conventional foundations due to the nature and condition of the soil and silt at the site on Watson Island.  *See* Subsurface Exploration Report dated May 11, 2016, attached as Exhibit 3.

c.      By June 6, 2016, AirPlay engaged the company to design and install the specialized "micropile" foundations for the zipline towers. *See* June 6, 2016 correspondence to Hayward Baker, attached as Exhibit 4.

---

[1] For the purpose of these proceedings, a "cenote" is a man-made reproduction of a natural freshwater swimming hole made by the collapse of porous rock, like a sinkhole.

[11972-001/2802397/1]

6

GENOVESE JOBLOVE & BATTISTA, P.A.
100 S.E. SECOND STREET • 44TH FLOOR • MIAMI, FLORIDA 33131 • TELEPHONE: (305) 349-2300 • FACSIMILE: • (305) 349-2310

d. Through June and July 2016, AirPlay worked with Hayward Baker and K2 Engineering to design and construction plans of the of the zipline and foundations, including structural peer review, revisions, and analysis of geotechnical reports.

e. Not until August 5, 2016 did Parrot Jungle Island request a letter of interpretation permitting the installation of a zip line tour attraction at the facility from the Miami Dade County Office of Code Cooperation & Public Hearing. *See* August 5, 2016 Correspondence requesting Letter of Interpretation from the managing director of Parrot Jungle Island, attached as Exhibit 5.

f. On August 12, 2016 the final structural engineering peer review report was received, a copy of which is attached as Exhibit 6. Immediately, a letter of intent was issued on behalf of AirPlay to the general contractor for the construction of the zip line tour at Parrot Jungle Island, a copy of which is attached as Exhibit 7. Two days later, a Final Building Permit Application form was completed, a copy of which is attached as Exhibit 8. That permit was filed on September 8, 2016, a copy which filing is attached as Exhibit 9.

g. At AirPlay's urging, Parrot Jungle Island responded to the City of Miami's inquiries regarding the Permit deficiencies and on October 28, 2016, the Permit cleared environmental resources concerns. A copy of the Permit comments is attached as Exhibit 10.

13. At no point in time did Parrot Jungle Island claim that AirPlay had breached or defaulted on the License Agreement.

GENOVESE JOBLOVE & BATTISTA, P.A.
100 S.E. SECOND STREET • 44TH FLOOR • MIAMI, FLORIDA 33131 • TELEPHONE: (305) 349-2300 • FACSIMILE: • (305) 349-2310

## Defendant Becomes Involved in Jungle Island

14.     By this point, ESJ Jungle Island Operations had become involved in the possible acquisition of Parrot Jungle Island at Watson Island, LLC's interest in Jungle Island. Accordingly, as the soon-to-be-owner, ESJ Jungle Island became more and more involved in communicating with and directing AirPlay with respect to the ongoing zipline project.

15.     Upon information and belief, in contrast to AirPlay, ESJ Jungle Island and its parent and affiliate companies and key personnel had zero experience in owning or operating a zoological theme park, adventure or aerial attractions, or zipline tours.

16.     On December 7, 2016, AirPlay met at the office of its general contractor, Weber Group, and representatives of ESJ Jungle Island.  Even though it was not yet the owner, at that meeting ESJ Jungle Island requested major changes to the zip line tour design, which resulted in the elimination of Tower 1 of the project, a bridge entry, and two associated zip lines.  This was a significant redesign which would take the project from seven towers to six and eight ziplines to six.  In addition, the proposed redesign would eliminate the planned access to the tour registration and start areas, equipment storage area, and AirPlay office space.

17.     Despite these material changes to the building plans, at about that time, Elie Mimoun, the Chief Operation Officer of ESJ Jungle Island's manager, ESJ Capital Partners, was quoted in the newspaper stating that "Once we get building permit approval we'll break ground first thing out of the gate" for the zipline tour.   According to him, the first phase of improvements would be completed in 18 to 24 months, which could not possibly have been prior to May to December of 2018.  A copy of the newspaper article is attached as Exhibit 11.

18.     Irrespective of Mr. Mimoun's optimism, ESJ Jungle Island would not close on the Jungle Island acquisition until April 2017.

[11972-001/2802397/1]

8

GENOVESE JOBLOVE & BATTISTA, P.A.
100 S.E. SECOND STREET • 44TH FLOOR • MIAMI, FLORIDA 33131 • TELEPHONE: (305) 349-2300 • FACSIMILE: • (305) 349-2310

19.     In the interim, AirPlay continued to move forward with the project, which included the following major steps:

a.      On January 25, 2017, a walkthrough of the project was conducted with ESJ Jungle Island owner's representative for the construction, Amicon Management, and the bidders and subcontractors responsible for surveying, excavation, concrete, dewatering, and micropile foundations.  This was immediately followed with a recap and schedule authored by Amicon Management.  A copy of the recap is attached as Exhibit 12.  Plainly, ESJ Jungle Island was fully aware of the proposed pace of process.

b.      The January 25, 2017 walkthrough was followed up with a February 7, 2017 meeting among AirPlay, ESJ Jungle Island, the general contractor Weber, and AirPlay's owner's representative Amicon.  Pursuant to ESJ Jungle Island's request, that resulted in an accelerated construction schedule and phasing plan, copies of which are attached as Composite Exhibit 13.

c.      On February 16, 2017, AirPlay executed the engineering work order to modify the scope of services to reflect the significant changes to the project upon which ESJ Jungle Island insisted, including the removal of towers, bridges, and ziplines, as well as reconfiguration and redesign of the remaining zipline tour project.  A copy of the Scope of Work for Additional Services is attached as Exhibit 14.

d.      The next day, on February 17, 2017, a revised, updated and expedited project schedule was issued.  A copy is attached as Exhibit 15.  It contemplated a final permit approval by March 22, 2017.

[11972-001/2802397/1]

9

GENOVESE JOBLOVE & BATTISTA, P.A.
100 S.E. SECOND STREET • 44TH FLOOR • MIAMI, FLORIDA 33131 • TELEPHONE: (305) 349-2300 • FACSIMILE: • (305) 349-2310

e.   On February 24, 2017, AirPlay submitted a revised operations area concept per ESJ Jungle Island and Parrot Jungle Island of Watson Island LLC, a copy of which is attached as Exhibit 16.

### *The First Discussion About Amending the License Agreement*

20.   Meanwhile, on February 23, 2017, AirPlay met with ESJ Jungle Island to identify some areas it wished to discuss regarding a possible amendment of the License Agreement to address three issues: a) removing the cenote[1] and water slides; b) the absence of photo and retail rights; and c) finalization of the list of insurance requirements.   ESJ Jungle Island agreed to review the License Agreement with its insurance advisor and supply a final list of insurance requirements.

21.   AirPlay's requests regarding the insurance requirements is notable, because ESJ Jungle Island ignored AirPlay's repeated requests but would later claim that AirPlay did not provide the proper insurance coverages.

22.   As ESJ Jungle Island continued working on closing its acquisition on Jungle Island, it ignored pursuing the amendment of the License Agreement.

### *ESJ Jungle Island Closes on the Acquisition: Still No Construction Permit*

23.   On April 5, 2017, ESJ Jungle Island closed on the acquisition of Jungle Island. As of that date, a final permit had not been issued for construction.

24.   On April 7, 2017, AirPlay sent ESJ Jungle Island detailed correspondence on necessary items and actions to expedite immediate construction.   A copy of that email is attached as Exhibit 17.

### _Owner Changes the Project to Accommodate a Potential Vendor that Was Never Hired_

25.     On April 12, 2017, during an onsite meeting at Jungle Island, AirPlay was told that the long-planned Tower 6 location was suddenly incompatible with the proposed concept for the Beach Club at Jungle Island.  The proposed Beach Club was a private beach that ESJ Jungle Island wanted to commercialize as a high-end, exclusive amenity of Jungle Island.   At that time, ESJ Jungle Island was in discussions with a possible vendor, Rivera Management, to operate the Beach Club and related concessions.

26.     Upon information and belief, that potential vendor told ESJ Jungle Island that it did not want the zipline tower located on the beach as had been planned and that it had to be moved.  ESJ Jungle Island adopted that position and told AirPlay to move Tower 6 and the associated ziplines.

27.     Tower 6, at the far section of the property and over the beach, would support the two longest ziplines, offering the most excitement and thrill to patrons.  Tower 6 was an integral and inter-related component of the project.  Any change to Tower 6 would also impact the towers to which it was connected, thereby requiring substantial re-engineering of a large portion of the overall project.

28.     AirPlay told Jungle Island that relocating the tower would add considerable time and cost to the project, and that AirPlay would not bear the burden of these additional costs. John Dunlap -- the CEO of the company hired to operate Jungle Island for ESJ Jungle Island – responded to AirPlay that ESJ Jungle Island had the money and that AirPlay would not be required to pay for the relocation of Tower 6.

[11972-001/2802397/1]

11
GENOVESE JOBLOVE & BATTISTA, P.A.
100 S.E. SECOND STREET • 44TH FLOOR • MIAMI, FLORIDA 33131 • TELEPHONE: (305) 349-2300 • FACSIMILE: • (305) 349-2310

### *ESJ Jungle Island Stops Work While It Broods Over Redesigning the Project*

29.      Two days later, on April 14, 2017, ESJ Jungle Island, through Matthew Fuller, the Chief Investment Officer of ESJ Jungle Island's manger, ESJ Capital Partners, verbally issued a Stop Work Order to AirPlay because of ESJ Jungle Island's potential desire to relocate Tower 6. A copy of the Stop Work Order is attached as Exhibit 18.   This Stop Work Order was issued two days after the subcontractors for the installation of the foundations had completed onsite joint pre-construction planning and one week before drilling was to commence for those foundations.   Mr. Fuller acknowledged the increased costs and delayed timeline and further agreed that ESJ Jungle Island would be responsible for those costs.

30.      AirPlay expressed to Elie Mimoun, as agent and participant on behalf of ESJ Jungle Island, that AirPlay was not happy about this, it would "blow" the summer opening, and it was going to have a negative financial impact. The Stop Work Order was not lifted.

31.      On April 27, 2017, at ESJ Jungle Island's request, AirPlay indicated that it is its clear preference not to move Tower 6. A copy of that correspondence is attached as Exhibit 19.

32.      On May 8, 2017, AirPlay participated in an onsite meeting with ESJ Jungle Island and other participants regarding the location or relocation of Tower 6.   In the follow-up email, AirPlay specifically requested that ESJ Jungle Island issue a Notice to Proceed.  A copy of the email is attached as Exhibit 20.

33.      On May 10, 2017, AirPlay submitted a maximum target budget for approval by ESJ Jungle Island and the prospective vendor/operator of the Beach Club that had insisted on the change. A copy of the email is attached as Exhibit 21.  The cost would have been hundreds of thousands of dollars just based on the work stoppage and remobilization, the redesign and reengineering of Tower 6 and Tower 3, cables, and foundations, and the actual fabrication.

[11972-001/2802397/1]

12

GENOVESE JOBLOVE & BATTISTA, P.A.
100 S.E. SECOND STREET • 44TH FLOOR • MIAMI, FLORIDA 33131 • TELEPHONE: (305) 349-2300 • FACSIMILE: • (305) 349-2310

*__AirPlay Continues to Insist that the Agreement of the Pending Issues be Committed to Writing__*

34.     AirPlay continued to insist that ESJ Jungle Island address the pending issues in an amendment to the License Agreement or otherwise in writing before AirPlay proceeded with construction.  In response, ESJ Jungle Island told AirPlay to prepare a draft notice to proceed of ESJ Jungle Island's approval.

35.     On June 6, 2017, AirPlay provided a draft notice to proceed that also acknowledged: the costs and delays associated with the stop work order; the modifications of the project were estimated to add $500,000 to the project; and that AirPlay would not be liable for the costs that ESJ Jungle Island has requested. A copy of the draft notice to proceed and cover letter is attached as Exhibit 22.

36.     On June 7, 2017,  ESJ Jungle Island rejected the draft notice to proceed, indicating that these issues required an amendment to the License Agreement and proposed a discussion later that month.  *See id.*  This was the first mention of change costs being included in an amendment.

*__The Building Permit is Issued in June 2017 and Owner Issues a "Vanilla" Notice to Proceed__*

37.     On June 9, 2017 – three months after ESJ Jungle Island had expected it – the Master Building Permit was finally issued.  That same day, ESJ Jungle Island issued a very plain, nondescript Notice to Proceed to AirPlay, a copy of which is attached as Exhibit 23.

38.     On June 14, 2017, AirPlay again requested a list of required insurance coverages because ESJ Jungle Island had failed to provide requested specifics.  A copy of the June 14, 2017 email is attached as Exhibit 24.

39.     After months of requests, on June 15, 2017, the Owner's insurance broker finally provided AirPlay with the list of required coverages in order for AirPlay and its contractors and

[11972-001/2802397/1]

13

GENOVESE JOBLOVE & BATTISTA, P.A.
100 S.E. SECOND STREET • 44TH FLOOR • MIAMI, FLORIDA 33131 • TELEPHONE: (305) 349-2300 • FACSIMILE: • (305) 349-2310

vendors to comply with the previously-unidentified requirements and be allowed onsite to perform the work. A copy of the email correspondence is attached as Exhibit 25

40.     Notably, the requirements provided by the insurance broker included payment and performance bonds, which are not insurance nor mentioned anywhere in the License Agreement.

### *Owner's Elie Mimoun: "I Don't Want to Pay To Move Your Fucking Tower"*

41.     Apparently, ESJ Jungle Island moved too quickly and relied too heavily on the unsigned, prospective operator of the Beach Club, revising the entire zipline tour and delaying the project based on the opinions of a vendor that ESJ Jungle Island never hired nor contracted.

42.     Upon information and belief, ESJ Jungle Island had intended on assessing the Beach Club operator with the cost of the redesign and move of Tower 6 – upon which it had insisted. For this reason, AirPlay had submitted the proposed budget of May 10 to both ESJ Jungle Island and that prospective vendor. Without the vendor, ESJ Jungle Island would have to pay those redesign and associated costs as the party insisting on the changes.

43.     Despite the original design having been substantially changed *twice* in the previous months, on June 23, 2017 at an in-person meeting regarding the amendment to the License Agreement, Elie Mimoun, on behalf of ESJ Jungle Island, indicated for the first time that Owner did not intend to pay for the changes or the Tower 6 move, stating, "I don't want to have to pay to move your fucking tower."

44.     AirPlay responded that it would consider assuming the costs of the tower move based on the final amendment revisions and terms.

45.     The parties decided that Mr. Mimoun would send a draft amendment to AirPlay for its comments.

[11972-001/2802397/1]

14

GENOVESE JOBLOVE & BATTISTA, P.A.
100 S.E. SECOND STREET • 44TH FLOOR • MIAMI, FLORIDA 33131 • TELEPHONE: (305) 349-2300 • FACSIMILE: • (305) 349-2310

***The Project Stalls Again As ESJ Jungle Island***
***<u>Cannot Decide  Where it Wants to Move Tower 6</u>***

46.     On July 14, 2017, ESJ Jungle Island questioned AirPlay regarding the status, specifically including why the engineering had not been completed. Among other items, AirPlay responded that it would not proceed with construction until the issues related to the Tower 6 move were resolved.  A copy of the email is attached as Exhibit 26.

47.     At this point, ESJ Jungle Island had not instructed AirPlay with a final decision on where it wanted Tower 6 or whom would pay for the changes.

48.     On August 2, 2017, AirPlay sent over a revised and tentative construction schedule that provided for the installation of the zipline tour project  by November 2017.   This was less than six months after the permit final approval and the lifting of ESJ Jungle Island's Stop Work Order and included the significant redesign upon which ESJ Jungle Island insisted but did not want to pay for.

49.     At this point in time, ESJ Jungle Island had still not told AirPlay where it wanted Tower 6 as the days ticked by into weeks.   A copy of the email is attached as Exhibit 27.

50.     Ironically, despite not giving AirPlay any direction, Elie Mimoun expressed a loss of confidence in AirPlay, despite his absolute inability to make a decision on where to put Tower 6 and proceed with the project.

51.     On August 6, 2017, AirPlay wrote to ESJ Jungle Islands representative, Matthew Fuller, a senior executive of ESJ Capital Partners, LLC. In the email, AirPlay asked for ESJ to make a decision as to where it wanted Tower 6. That email reflected the mixed signals ESJ Jungle Island provided to AirPlay, with different senior level representatives taking different positions: one insisting on moving Tower 6 and another indicating the potential of not moving

[11972-001/2802397/1]

15

GENOVESE JOBLOVE & BATTISTA, P.A.
100 S.E. SECOND STREET • 44TH FLOOR • MIAMI, FLORIDA 33131 • TELEPHONE: (305) 349-2300 • FACSIMILE: • (305) 349-2310

the tower and proceeding with established project plans.  A copy of the email is attached as Exhibit 28.

### *On Behalf of ESJ Jungle Island, the Weber Group Stalls Airplay*

52.     Although the Weber Group was and continued to be AirPlay's general contractor on the zipline tour project, at that point in time it was also attempting to win the overall contract from ESJ Jungle Island for all anticipated renovations.

53.     During this same period that AirPlay was waiting for ESJ Jungle Island to make a decision on the location of Tower 6, on August 1, 2017 AirPlay telephoned the Weber Group regarding Mr. Mimoun's request that the Weber Group provide assistance and approval regarding AirPlay's revised licensed areas in relation to the Master Plan that Weber was developing for ESJ Jungle Island.   This was followed up with an email, a copy of which is attached as Exhibit 29.

54.     The Weber Group did not respond nor deliver any information.

55.     On August 9, 2017, AirPlay follows up with the Weber Group.  A copy of the communication is attached as Exhibit 30.  Still, the Weber Group did not respond.

### *ESJ Jungle Island Finally Makes a Decision on Tower 6 and the Design of the Project*

56.     On August 13, 2017, ESJ Jungle Island finally issued a notice to proceed with the selected  Tower 6  location.    In  that  email,  ESJ  Jungle  Island  acknowledged  that  the remobilization could not occur before September 5, 2017 and the expected completion date would be February 2018.  The email string is attached as Exhibit 31.

### *ESJ Starts to Address the Addendum and Uses it to Entirely Re-Write the Deal*

57.     Finally, on August 15 and 16, the Weber Group responded to AirPlay regarding the license areas as defined in the master plan for the facility.  Copies of the emails and documents are attached as Composite Exhibit  32.  As a result, on August 18, 2017, AirPlay

[11972-001/2802397/1]

GENOVESE JOBLOVE & BATTISTA, P.A.
100 S.E. SECOND STREET • 44TH FLOOR • MIAMI, FLORIDA 33131 • TELEPHONE: (305) 349-2300 • FACSIMILE: • (305) 349-2310

provided ESJ Jungle Island with the project phase addendums for use in the amendment.  *See* emails and documents attached as Composite Exhibit 33.

58.     After AirPlay requested ESJ's proposed amendment to the License Agreement, on August 23, 2017, ESJ Jungle Island producds the first draft.  *See* emails and draft attached as Composite Exhibit 34.  The parties discussed the amendment with revisions and comments.

### *Hurricane Irma Closes Jungle Island*

59.     On September 6, 2017, ESJ Jungle Island emailed is owner's representative, Amicon, advising that work would be suspended due to Hurricane Irma.  Any further work would be subject to post-storm evaluation.   A copy of that email is attached as Exhibit 35. This notice was issued <u>one day</u> after the September 5th date that AirPlay had indicated was the first possible date that contractors could be remobilized after the lifting of ESJ Jungle Island's last Stop Work Order.

60.     Hurricane Irma caused significant damage to Jungle Island.  It is still closed as of the filing of this action.

61.     By September 24, 2017, AirPlay updated ESJ Jungle Island about its efforts to get a post-storm mobilization date from the contractors as well as trying to address the lack of physical access within the park, such that surveyors could not even do their job.    In that email, AirPlay asked ESJ Jungle Island for a team dedicated to clearing the facility of downed trees to permit the surveyors to do their job.  A copy of the email is attached as Exhibit 36

### *ESJ Jungle Island Tries to Strong-Arm AirPlay and Re-Write the Deal*

62.     On September 27, 2017, the parties met in person to discuss the amendment revisions.  AirPlay expresses its positions, including that:

     a.     It would not agree to ESJ Jungle Island's efforts to remove AirPlay's exclusivity from the License Agreement.  Nonetheless, Mr. Mimoun confirmed that ESJ Jungle Island had contacted AirPlay's Engineer of Record to determine if Airplay's project could be built by someone else.

     b.     The amendment should provide some protection to AirPlay in the event that ESJ Jungle Islands defaults with the master landlord, the City of Miami.  The need for this assurance was buttressed by Mr. Minoum's response that he had "no idea" if ESJ Jungle Island and its affiliated companies were in good standing or in default with the lease with the City of Miami.

     c.     There is no authority for ESJ Jungle Island to require a performance bond;

     d.     AirPlay would not commit to a Phase 3 because a potential phase 3 had not been defined; and

     e.     ESJ Jungle Island's plan to bring in a competing company called Ninja Lounge to build attractions at the facility would be a breach of AirPlay's contractual exclusivity.

     63.     ESJ Jungle Island responded to AirPlay by writing new terms into the deal, including:

     a.     If AirPlay wanted the exclusivity that existed in the License Agreement, it would have to immediately escrow the funds for all phases of the project, even those for which construction was not planned for years;

     b.     ESJ Jungle Island would not provide AirPlay with any representations in the event of its default under the lease with the City of Miami;

[11972-001/2802397/1]

18

GENOVESE JOBLOVE & BATTISTA, P.A.
100 S.E. SECOND STREET • 44TH FLOOR • MIAMI, FLORIDA 33131 • TELEPHONE: (305) 349-2300 • FACSIMILE: • (305) 349-2310

c.      If AirPlay wanted the project that NinjaLounge was proposing, AirPlay would need to escrow the funds for that project.

### *ESJ Jungle Island Ignores AirPlay's Contractual Exclusivity*

64.    On October 3, 2017, ESJ Jungle Island asked AirPlay to work with the general contractor to develop some estimates for projects in the facility that would be prepared by Ninja Lounge – the same company AirPlay contended was infringing on its exclusivity.  A copy of the October 4, 2017 follow-up emails referencing this conversation is attached as Composite Exhibit 37.  A review of its website shows that NinjaLounge is in the business of aerial obstacle courses http://ninjalounge.com/ninja-lounge-north-miami/warrior-courses/; aerial harness free ropes courses  http://ninjalounge.com/ninja-lounge-north-miami/2-ropes-courses/;  and  climbing activities http://ninjalounge.com/ninja-lounge-north-miami/2-climbing-activities/ .

65.    The Licensee Agreement provides that AirPlay would have the "exclusive right to operate Adventure Rides . . .."  License Agreement at 1(c)(i).  Under that contract, Adventure Rides is defined to mean "any attraction that is aerial in nature including . . . net bridges . . ropes courses . . . challenge courses . . . climbing and rock walls  . . .."  *Id.*  at Schedule 1 "Definitions".

### *AirPlay Declines to Accept Owner's Amendments and Intends to Proceed with Original Deal*

66.    After weeks of trying to overcome ESJ Jungle Island's heavy-handedness in negotiations on the proposed amendment, on October 12, 2017, AirPlay wrote to ESJ Jungle Island and indicated that it would not abandon its contractual rights to exclusivity or agree to ESJ Jungle Island's insistence on drastic amendments to the License Agreement.  A copy of the email is attached as Exhibit 38.

67.    AirPlay noted in the email that ESJ Jungle Island, its park operator, contractor, and owner's construction representative had all openly discussed with AirPlay that ESJ Jungle

[11972-001/2802397/1]

19
GENOVESE JOBLOVE & BATTISTA, P.A.
100 S.E. SECOND STREET • 44TH FLOOR • MIAMI, FLORIDA 33131 • TELEPHONE: (305) 349-2300 • FACSIMILE: • (305) 349-2310

Island had been actively negotiating with operators regarding the installation of attractions that would directly compete with AirPlay's products within the park. *Id.*

68.     In that email, AirPlay also indicated that it would proceed and perform pursuant to the License Agreement. That would include a strict insistence on AirPlay's contractual right to exclusivity, non-disparagement, and confidentiality.  *Id.*

### *ESJ Jungle Island Commits Its Unfounded Accusations to Paper*

69.     At this time, on October 17, 2017, ESJ Jungle Island wrote AirPlay providing a "notice of breach".  A copy is attached as Exhibit 39.  Ironically, ESJ Jungle Island's counsel claimed that AirPlay had failed to meet construction deadlines or act with a sense of urgency, despite the documented facts.

70.     Continuing with the unfounded and spurious allegations, ESJ Jungle Island claimed that AirPlay has failed to comply with insurance requirements, pay contractors, and provide schedules.  Obviously misunderstanding the contract, ESJ Jungle Island also claimed that AirPlay had failed to provide "proof of funds" or "payment and performance bonds", none of which is required by the License Agreement.

### *ESJ Jungle Island Issues a Stop Work Order*

71.     On October 18, 2017, the construction team arrived in Miami to complete the base camp portion of the zipline tour, per ESJ Jungle Island's previous request.

72.     On that same day, ESJ Jungle Island's attorney issued a stop work order. A copy of the email is attached as Exhibit 40.   The basis of this "stop order" – the insurance requirements of the subcontractors was a pretext and, to the extent any issue existed, it was entirely ESJ Jungle Island's making.

GENOVESE JOBLOVE & BATTISTA, P.A.
100 S.E. SECOND STREET • 44TH FLOOR • MIAMI, FLORIDA 33131 • TELEPHONE: (305) 349-2300 • FACSIMILE: • (305) 349-2310

### *ESJ Jungle Island Manufactures a "Notice of Default"*

73.     On October 23, 2017, AirPlay provided ESJ Jungle Island with updated certificates of insurance, in addition to the ones provided to ESJ Jungle Island in August 2017. A copy of the transmittal email is attached as Exhibit 41.

74.     The next day, ESJ Jungle Island purported to issue a "Notice of Default" and demanded cure within 30 days.  A copy of the correspondence is attached as Exhibit 42.

75.     Of course, ESJ Jungle Island did not explain how it expected AirPlay to actually try to construct the zipline tour in light of ESJ Jungle Island's refusal to lift the stop work order or issue a notice to proceed.

76.     Similarly, the remainder to the Notice of Default claims to impose obligations upon AirPlay, none of which are contractual obligations under the License Agreement.

### *Owner: We Move Forward "If I Get Everything I Want."*

77.     The inconsistencies and pretextual nature of ESJ Jungle Islands claims ultimately became clear at an October 25, 2017 meeting between the parties.

78.     At that meeting, Mr. Mimoun personalized this business transaction and stated that the only way the project would move forward is if "I get everything I want."

### *Owner Purports to Terminate License Agreement*

79.     Jumping the gun before the expiration of the 30 day period, on November 20, 2017, ESJ Jungle Island issued a notice of termination of the license agreement.  A copy of that correspondence is attached as Exhibit 43.

[11972-001/2802397/1]

21
GENOVESE JOBLOVE & BATTISTA, P.A.
100 S.E. SECOND STREET • 44TH FLOOR • MIAMI, FLORIDA 33131 • TELEPHONE: (305) 349-2300 • FACSIMILE: • (305) 349-2310

## ISSUES FOR WHICH AIRPLAY SEEKS DECLARATORY RELIEF

80.     AirPlay seeks a construction of the License Agreement, as applied to the facts, with a declaration of rights and supplemental relief as to the following issues and any other issues arising out of such agreement:

a.     **Whether Rent is Due**: Defendant claims a default under the License Agreement because rent was due commencing July 2017.  AirPlay, however, contends that rent should not have commenced because of the redesigns by Defendant, the stop work order that prevented construction, and the Defendant's inability to decide on the location of Tower 6.

b.     **Whether Hurricane Irma Constitutes Force Majeure:**  Defendant contends that AirPlay failed to timely construct on the project after the August 13 decision as to where it wanted Tower 6, claiming that Airplay failed to meet construction deadlines or act with a sense of urgency.  AirPlay contends that as it was scheduled to mobilize, but that Defendants ceased construction due to Hurricane Irma.  Then post-hurricane efforts were temporarily hampered due to the debris at Jungle Island that prevented access.  Just as importantly, and as AirPlay had warned ESJ Jungle Island before the storm, multiple subcontractors were adversely affected by the hurricane and were not available for immediate mobilization after Hurricane Irma.   On October 17, 2017, Defendant claimed that AirPlay was in breach and AirPlay contends that Hurricane Irma and its aftermath constituted force majeure.

c.     **Whether the Contract Requires a Payment or Performance Bond:** Defendant claims that AirPlay defaulted under the License Agreement because it did not

[11972-001/2802397/1]

22

GENOVESE JOBLOVE & BATTISTA, P.A.
100 S.E. SECOND STREET • 44TH FLOOR • MIAMI, FLORIDA 33131 • TELEPHONE: (305) 349-2300 • FACSIMILE: • (305) 349-2310

provide a payment of performance bond.  AirPlay contends that there is no obligation to provide a payment or performance bond under the License Agreement.

        d.      **Whether the License Agreement Requires AirPlay to have Paid for the Redesign of the Zipline Tour, the move of Tower 6, and the associated expense based on Defendant's Request for Redesign to Accommodate the Beach Club:** Defendant contends that AirPlay should pay for the hundreds of thousands of dollars of costs, including delay, occasioned by its 11th hour decision to redesign the zipline tour, move Tower 6, redesign Tower 3, and then fail to  definitively identify for months where Defendant wanted Tower 6.   AirPlay believes that the additional cost and expense should not be borne by it, because this was a discretionary and unnecessary decision by Defendant that was never originally contemplated, permitted, designed, or engineered.

        e.      **.Whether the Delays and Stop Work Orders Attributable to Defendant Acts to Continue the Time of Performance of AirPlay:**  Defendant contends that AirPlay did not timely perform.   AirPlay interprets any obligation to perform and deadline to perform within the context of Defendant's stop work orders, decision to redesign the project, failure to select the final form of the redesign, failure to pay for the redesign and costs, and other acts and omissions that caused delay.  AirPlay contends it has timely performed to the extent that it was permitted and not hampered by Defendant and any deadlines should be extended to account for Defendant's delays.

        f.      **Whether Defendant Had an Obligation to Establish Commercially Reasonable Insurance Requirements for the Contractors and Subcontractors and then Communicate those Clearly and in a Timely Fashion to Airplay:**  Defendant contends that AirPlay's contractors and subcontractors did not provide certificates of

GENOVESE JOBLOVE & BATTISTA, P.A.

100 S.E. SECOND STREET • 44TH FLOOR • MIAMI, FLORIDA 33131 • TELEPHONE: • (305) 349-2300 • FACSIMILE: • (305) 349-2310

insurance with the appropriate coverages. AirPlay contends that Defendant failed to timely, accurately, and clearly communicate commercially reasonable insurance requirements to ensure compliance. AirPlay contends that Defendant's failures, overreaching, and late performance resulted in any confusion concerning the insurance coverage required.

g.     **Whether AirPlay had ever relinquished its contractual rights of exclusivity, non-disparagement, and confidentiality**: Defendant contends that the License Agreement did not provide AirPlay with exclusivity and took actions in contravention of AirPlay's exclusivity. AirPlay seeks a declaration that such exclusivity was and continues to be in full force and effect. Upon information and belief AirPlay believes that Defendant has disparaged it to contractors, other vendors, competitors, and similar third parties. Similarly, AirPlay believes that Defendant has shared its confidential information with potential competitors and vendors in an effort to intrude on AirPlay's exclusivity. AirPlay seeks a declaration that the non-disparagement and confidentiality provisions have been and remain in full force and effect.

h.     **Whether Defendant's Stop Work Orders were Commercially Reasonable and Necessary within the Context of the License Agreement**: Defendant issued two work orders, which it claims were appropriate. The first was issued because Defendant was contemplating a redesign of the project based on the comments of a potential and yet-uncontracted-for beach club operator. Even though the stop work order was lifted, Defendant did not make a clear decision on the project until August 14, 2017. The second was issued on October 18, the day that construction crews arrived after being

[11972-001/2802397/1]

24

GENOVESE JOBLOVE & BATTISTA, P.A.
100 S.E. SECOND STREET • 44TH FLOOR • MIAMI, FLORIDA 33131 • TELEPHONE: (305) 349-2300 • FACSIMILE: • (305) 349-2310

mobilized the month after Hurricane Irma. There was no commercially reasonable basis for the stop work orders and were nothing more than Defendant's capriciousness.

i.     **Whether Defendant Performed under the License Agreement with Good Faith and Fair Dealing:** All Florida contracts must be performed with good faith and fair dealing. AirPlay contends that Defendant has not acted with good faith in a fair and commercially reasonable manner. Instead it has acted without regard to AirPlay's rights or Defendant's obligations under the License Agreement.

## Need for Declaratory Relief

81.    There is a bona fide, actual, present, practical need for the declaration.

82.    The declaration deals with the present, ascertained, or ascertainable state of facts or present controversy as to state of facts.

83.    Plaintiff's privileges and rights are dependent upon the facts or the law applicable to the facts.

84.    Plaintiff and Defendant have, or reasonably may have, an actual, present, adverse, and antagonistic interest in the subject matter of this Declaration, either in fact or law.

85.    The antagonistic and adverse interests of Plaintiff and Defendant are all before the Court by proper process.

86.    The relief sought is not merely the giving of legal advice by the courts or the answer to questions propounded by curiosity.

## Demand for Attorney's Fees

87.    To the extent that the License Agreement provides for the award of attorneys' fees and expenses for this Declaratory Judgment Action, AirPlay seeks an award of attorneys'

fees, costs, and expenses as contemplated by the contract. AirPlay has retained undersigned counsel and is obligated to pay a reasonable fee and associated expenses.

WHEREFORE, AirPlay Adventures LLC, a Hawaiian limited liability company, seeks a declaration as to its rights pursuant to Chapter 86, Florida Statutes, as related to Defendant ESJ JI Operations LLC, a Florida company, pursuant to that certain License Agreement, any supplemental relief, attorney's fees, costs, and such other relief that this Court deems just and equitable.

Dated: November 28, 217

Respectfully Submitted,

**GENOVESE JOBLOVE & BATTISTA, P.A.**

_s/ John Arrastia_____
John Arrastia,
Jarrastia@gjb-law.com
Fla. Bar No. 0072461
Paul Battista
Genovese Joblove & Battista, P.A.
100 S.E. 2nd Street, Ste. 4400
Miami, FL 33131
Tel: (305)349-2300
Fax: (305) 428-8832

[11972-001/2802397/1]

26
GENOVESE JOBLOVE & BATTISTA, P.A.
100 S.E. SECOND STREET • 44TH FLOOR • MIAMI, FLORIDA 33131 • TELEPHONE: (305) 349-2300 • FACSIMILE: • (305) 349-2310

# EXHIBIT 1

**EXECUTION COPY**

<u>LICENSE AGREEMENT</u>

THIS LICENSE AGREEMENT (this "<u>Agreement</u>") is made as of September 21, 2015 (the "<u>Effective Date</u>"), by and among AIR PLAY ADVENTURES, LLC, a Hawaii limited liability company, GOZIP, LLC, a Hawaii limited liability company (joint and severally, the "<u>Licensee</u>") each with a business address of 216 Dickenson Street, Lahaina, Hawaii, 96761, PARROT JUNGLE AND GARDENS OF WATSON ISLAND, INC., a Florida corporation ("<u>PJG Inc.</u>"), and PJG WATSON, LLC, a Florida limited liability company ("<u>PJG LLC</u>", and collectively with PJG Inc., the "<u>Owner</u>"), each with a business address of 1111 Parrot Jungle Trail, Miami, Florida 33132.

<u>RECITALS</u>

A.   PJG, Inc., is the leasehold land owner of certain real property commonly known as the "Jungle Island" (hereinafter the "Facility" or "Facility Premises"), located at 1111 Parrot Jungle Trail, Miami, Florida 33132, by virtue of its interest as the current tenant under that certain Lease and Development Agreement dated September 2, 1997, by and between the City of Miami, Florida, a municipal corporation of the State of Florida (the "City"), as landlord, PJG Inc., as tenant, as amended by (i) that certain Modification to Lease and Development Agreement dated April 14, 2000; (ii) that certain Modification to Lease and Development Agreement dated August 13, 2002; (iii) that certain Third Modification to Lease and Development Agreement dated October 29, 2008 (the "Third Modification to Master Lease") and (iv) that certain Fourth Modification to Lease and Development Agreement dated June 24, 2009 (collectively, the "Master Lease").

B.   Licensee is an affiliate of GoZip, LLC, a Hawaii limited liability company, which is an established third party provider of zip line tours throughout the United States.

C.   Owner and Licensee desire for Licensee to purchase, install, operate and maintain outdoor ziplines and adventure park obstacle courses and related equipment in the above ground designated areas of the Facility Premises as described in <u>Exhibit A</u> attached hereto (the "<u>License Areas</u>") and to construct certain related structure improvements within the License Areas.

D.   Owner is willing to grant to Licensee a license to use the License Areas (as such term may be amended from time to time pursuant to this Agreement) for the purpose stated herein, subject to the terms and requirements of this Agreement.

E.   Capitalized terms in this Agreement shall have the meanings ascribed to such terms in these Recitals and in <u>Schedule 1</u> hereto.

NOW THEREFORE, based upon the foregoing recitals, the mutual promises made herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, the parties hereto agree as follows:

1.   <u>**License.**</u> Owner hereby grants to Licensee the right to operate within the License Areas only for the use stated herein and subject to the provisions and conditions of this Agreement, including the following:

(a)   <u>Zipline and Adventure Structures.</u> During the Term of this Agreement, Licensee will have access to the License Areas and may install the Structures within the License Areas (as such term may be

amended from time to time), all in accordance with the procedures set forth in this Agreement and the zoning laws, rules and regulations applicable to the Facility Premises.

(b)     Design Concept and Owner Approval.     The design and number of Zipline, Adventure Rides and their Structures for each Phase shall be mutually agreed upon by the parties and approved by Owner in accordance with Section 3(a) herein.

(c)     Rights, Use Requirements and Restrictions.

(i)     Licensee shall have the exclusive right to operate Adventure Rides and Ziplines on the Facility Premises.

(ii)     Licensee's rights under this Agreement are subject to all covenants, restrictions, easements, agreements, reservations and encumbrances upon, and all other conditions of title to the License Areas. Licensee shall also have the exclusive right to install and operate, including operating for revenue, water slides, cabanas and other water attractions at the swimming Cenote depicted and denoted on the attached Exhibit "B" as the "Exclusive Zone".

(iii)     Licensee's rights under this Agreement are subject to all present and future building restrictions, regulations, zoning laws, ordinances, resolutions and orders of any local, state or federal agency, now or hereafter having jurisdiction over the License Areas or the Licensee's use of the License Areas.

(iv)     Licensee may use the License Areas only for constructing, installing, operating, maintaining, and repairing the Adventure Rides and Ziplines and Structures and the Exclusive Zone and no other use.

(v)     Except for the Structures, Licensee must not install any signs in the License Areas other than required safety warning signs or any other signs as are requested or approved by Owner, and Licensee bears all costs pertaining to the erection, installation, maintenance, and removal of all signs. Owner shall not unreasonably withhold or delay approval of any signage within the License Areas provided that any such requested signage is consistent with the signage and general advertising aesthetics of the Facility as determined by Owner.

(vi)     Licensee must at all times use its commercially reasonable best efforts to minimize any impact that its use of the License Areas will have on other uses of the Facility Premises.

(vii)     Licensee may not remove, damage, or alter in any way any improvements or property of Owner upon the License Areas, whether currently existing or installed in the future, without Owner's prior written approval.

(viii)     Licensee must repair any damage or alteration to the License Areas to the same condition that existed before the damage or alteration, which approval shall not be unreasonably withheld, conditioned or delayed.

(ix)     Licensee has non-exclusive right for ingress and egress, seven days a week, 24 hours a day, for the construction, installation and maintenance of the Structures, which right will be so as to not unreasonably interfere with Owner operations.  In the event that construction of the Structures require interference of the regular business operations of Owner or any of its third party vendors or contactors located on the Facility Premises, Owner shall make commercially reasonable efforts to provide for a construction schedule agreeable to all interested parties to permit such construction.

2

(d) <u>Limitation on Grant</u>. This Agreement grants to Licensee a license to use the License Areas as provided herein. The parties do not by this instrument intend to create a lease, easement, or other real property interest or vest with Licensee any real property interest in the License Areas and nothing express or implied in this Agreement grants Licensee any right or authority to enter, occupy, or use any property that is not solely owned by Owner and fully described herein.

(e) <u>Rights Reserved.</u>

(i) Licensee acknowledges that its use of the License Areas is subject and subordinate to Owner's use of the License Areas. Licensee agrees that Owner's use of License Areas, including for any event held at the Facility, shall have precedence over any construction, installation and maintenance activities by Licensee. However, notwithstanding the foregoing, Owner shall use commercially reasonably efforts to provide thirty (30) days advance written notice of any such Owner's use to the extent feasible and will in all instances provide Licensee with no less than two (2) business days' advance written notice of any such Owner's use, Owner's use will not otherwise interfere with the operation, of the Adventure Rides and Ziplines, and Owner will protect and preserve Licensee's equipment and materials during such use. Owner shall be liable for any damages incurred by Licensee due to Owner's use of the License Areas not caused by Licensee or any of its employees or agents.

(ii) If License Areas are installed with or shall be installed with any fire, emergency or communication equipment in or near the License Areas, the Licensee will take reasonable measures to avoid interference problems between the Structures and Owner's equipment. Licensee will not install, operate or allow its agents, employees, or contractors to use any equipment, methodology or technology that may interfere with the optimum effective use or operation of Owner's fire, emergency or other communication equipment, methodology or technology (i.e., voice or other data receiving and/or transmitting equipment) that is presently in use or may be in use in the future. If such interference does occur, the Licensee must immediately discontinue using the equipment, methodology or technology that causes the interference until corrective measures are taken which must be made at no cost to Owner. Owner and the Licensee will use their best reasonable efforts to resolve immediately any interference problems, but if an interference problem is unavoidable, Owner's right to use Owner's own equipment remains paramount to any use of the License Areas by the Licensee and Licensee has the right to terminate this Agreement without penalty. In the event that such interference does occur and the Licensee installed equipment is related to the legitimate safety need or best safety-practices of Licensee, then Owner shall make commercially reasonable for a period of 30 days efforts to provide for a resolution mutually agreeable Owner, Licensee and any other interested parties to allow such equipment to remain.

(iii) Owner may, at all times, enter upon the License Areas for any lawful purpose, provided the action does not unreasonably interfere with the Licensee's use or occupancy of the License Areas. Without limiting the generality of the foregoing, Owner and any furnisher of utilities and other services may, at their own cost, (A) enter upon the License Areas at any time to make repairs, replacements or alterations that, in the opinion of Owner or the furnisher of utilities and other services, may be necessary or advisable and from time to time to construct or install over, in, or under the License Areas systems or parts, and (B) in connection with any maintenance, use the License Areas for access to other parts in and around the License Areas; provided that in the exercise of these rights of access, repairs, alterations or new construction, Owner does not unreasonably interfere with the use and occupancy of the License Areas by the Licensee, including any obstruction of or other interference or functionality of the Adventure Rides and Ziplines. The exercise of any of the foregoing rights by Owner or others does not constitute an eviction of the Licensee, nor be made the grounds for any abatement of license fees, or any claim for damages. Notwithstanding the foregoing, Owner shall at all times comply with Licensee's instructions, rules and regulations relating to safety or security in, on or around any Zipline Structure of which Owner shall have been provided notice of from Licensee.

(iv)     In the event of a major renovation or improvement of the Facility which requires temporary or permanent removal of certain Structures, or any Adventure Ride or Zipline shall be incompatible with the major renovation or improvement of the Facility, Owner shall have the right to (A) terminate this Agreement upon at least one hundred eighty (180) days' prior written notice of termination, or (B) temporarily suspend the license granted pursuant to this Agreement until the completion of such renovation, upon at least one hundred twenty (120) days' prior written notice of suspension, so as to allow the re-installation of the Structures in the Licensed Area or some other mutually agreeable location on the Facility Premises upon renovation completion, at Owners sole cost.  In the event of either of the foregoing, Licensee shall remove said Structures in accordance with <u>Section 2(d)</u> hereof.  In the event of a removal or suspension of the license granted hereunder with respect to all or a portion of the Adventure Rides or Ziplines, Owner shall reimburse Licensee, within thirty (30) days of Licensee's surrender of the Facility in accordance with the terms of this Agreement, any non-reimbursable license, permit and other fees paid to the City of Miami or other governmental agency in connection with the removed Adventure Rides and/or Ziplines on a pro-rated basis for the period of suspension (for the Adventure Rides and/or Ziplines which have been removed or temporarily suspended). In the event of a termination of the license granted hereunder pursuant to subparagraph (A) of this Section 1(iv), Owner shall reimburse Licensee, within thirty (30) days of Licensee's surrender of the Facility in accordance with the terms of this Agreement, any non-reimbursable license, permit and other fees paid to the City of Miami or other governmental agency on a pro-rated basis for the period after the date of termination plus, provided Licensee is not in material default of this Agreement (beyond any applicable notice and cure period), the Breakage Fee.

2.     **<u>Term.</u>**

     (a)     <u>License Period</u>. This Agreement shall be effective as of the Effective Date and shall continue until the end of the Term.

     (b)     <u>Approvals</u>.  Licensee must obtain all Approvals necessary for the installation and use of the Project in accordance with the specification set forth herein.  In the event the City of Miami (or other appropriate governmental authority) denies the permitting application for the first Phase (as defined below) of the Project, and such decision in non-appealable or is not appealed within thirty (30) days of notification to Licensee or Owner of such denial, then this Agreement will automatically terminate and the parties shall have no further liability to each other, except such obligations that may expressly survive termination of this Agreement.  In the event that the Approvals for any subsequent Phase is denied, and such decision in non-appealable or is not appealed within thirty (30) days of notification to Licensee or Owner of such denial, then the Commitment Amount and the license fees pursuant to <u>Section 5</u> hereof shall be adjusted accordingly, as reasonably determined by Owner and approved by Licensee. Each party agrees to immediately deliver copies of any notices or correspondence from event the City of Miami (or other appropriate governmental authority) related hereto to the other party.

     (c)     <u>Renewal Option</u>.  Provided that (i) Licensee is not in default or breach of this Agreement at such time, and (ii) the original Structures has/have been replaced, repaired or updated in accordance with <u>Section 3(d)</u> of this Agreement before the ninetieth (90th) calendar day preceding the end of the Term (the "<u>Renewal Deadline</u>"), Licensee shall have a one (1) time right to renew and extend this Agreement for a period of five (5) years by providing written notice to Owner of such election to renew no less than ninety (90) days prior to the end of the Term.  In such event, the Term shall extend for a period of five (5) years from the end of the date on which the Term would have ended and all other terms and conditions of the Agreement shall remain unchanged.

     (d)     <u>Surrender of Possession</u>.  Upon the expiration or termination of this Agreement (exclusive of any temporary suspension of this Agreement by Owner pursuant to <u>Section 1(e)(iii)</u> above), the

4

Licensee's right to occupy the License Areas and to exercise the privileges and rights granted by this Agreement automatically cease, and it must surrender and leave the License Areas in good condition, normal wear and tear excepted. Except as otherwise provided herein, all Equipment and Personal Property remains the property of Licensee, and the Licensee may, at any time during the thirty (30) day period after the expiration or termination of this Agreement, remove same from the License Areas so long as Licensee is not in default of any of its obligations under this Agreement. Licensee must repair, at its sole cost, any damage caused by the removal of the Structures. Notwithstanding anything to the contrary in this Agreement, if this Agreement is terminated due to a Licensee default or in the event any Equipment and Personal Property not removed by the Licensee within the thirty (30) day period set forth in this paragraph, then either, at Owner's election, (i) the Structures and/or all Equipment and Personal Property shall become a part of the License Areas and ownership and title of all such Equipment and Personal Property shall automatically vest in Owner, or (ii) Owner shall remove and dispose of such property and Licensee shall reimburse Owner for all cost and expense incurred in connection with such removal and disposal. Licensee shall acquire and be the lawful owner of all Equipment and Personal Property and shall not be permitted to pledge, encumber, transfer, assign or otherwise hypothecate the Equipment and Personal Property, or any portion thereof, without the prior written consent of Owner. Any such encumbrance or hypothecation shall be deemed void ab initio. This paragraph shall survive the expiration or earlier termination of this Agreement.

(e)     Hold-over. In the event Licensee continues to occupy the License Areas after the expiration or termination of this Agreement, such hold-over does not constitute a renewal or extension of this Agreement, and the Licensee must pay Owner twice the minimum amount of revenue share payments due to Owner in the last month of the Agreement pursuant to Section 5 hereof, with each month fully accruing after the first day of the month regardless of the actual number of days Licensee holds over during the month, plus any payment obligation, accrued during the hold-over.

3.     **Construction of the Structures.**

(a)     Construction Conditions. Licensee shall be solely responsible for the payment of all necessary capital, labor, materials, equipment, start-up requirements and other expenses (including, but not limited to, initial design, Adventure Ride and Zipline acquisition, installation costs, government and permit fees) for the Project on the Facility Premises, in accordance with the following terms and conditions:

(i)     It is anticipated that the Project shall be built in three phases (Phase I, II and III) as further described in Exhibit C attached hereto (each a "Phase" and collectively, the "Phases").

(ii)     Professionally prepared plans and drawings for the each Phase shall be prepared by Weber Group Inc. and presented to Owner for written approval prior to the application of any required permits or approvals or prior to the commencement of construction of each Phase of the Project. Such plans and drawings will be designed so as to present uniformity of design, function, appearance and quality throughout and consistent with other improvements located in or near the License Areas. Such plans for Phase 1 shall be submitted to Owner by Licensee within thirty (30) days after the Effective Date.

(iii)     Licensee shall submit the proposed Construction Documents to Owner (each a "Plan Submission") beginning with thirty (30) days after the Effective Date for Phase 1, and within ninety (90) days from the Commencement Date for Phase II and within two hundred and seventy (270) days from the Commencement Date for Phase III. Owner shall, in its sole but reasonable discretion, approve or disapprove of each Plan Submission within ten (10) days after Owner's receipt of any such Plan Submission. If Owner disapproves all or any part of a Plan Submission, Owner shall notify Licensee setting forth in reasonable detail the reasons for such disapproval, and Licensee shall submit new or

corrected plans for Owner's approval within twenty (20) days following receipt of Owner's disapproval notice. In the event Owner does not respond within such ten (10) day period, such Plan Submission shall be deemed approved. The foregoing provisions relating to the approval or disapproval and submission of corrected plans shall continue to apply until any such plans have been approved by Owner. Owner's review of any Plan Submission or the granting of any consent or approval thereof shall not constitute a release from any obligation that Licensee has under this Agreement.

(iv)    Licensee shall submit (or cause its general contractor to submit) its application for construction permits to the appropriate governmental authority within thirty (30) days after the Owner's approval (or deemed approval), pursuant to the preceding subparagraph (iii) above, of the Plan Submission for each Phase of the Project. Licensee shall promptly provide Owner with copies of any Permit Approval received by Licensee.

(v)    Licensee and any chosen general contractor, contractors and subcontractors shall possess all qualifications, all licenses required under all applicable laws and commercially sufficient expertise required for the performance of the Project (or any Phase). The Project will be performed in a professional and workman-like manner and shall comply and observe all applicable laws, codes, rules and regulations applicable to the Project (or any Phase).

(vi)    The Licensee shall be responsible for obtaining all necessary Approvals and shall be responsible for the costs and expense thereof. Owner agrees to provide in a timely manner all reasonable information and permissions requested by Licensee and cooperate with all reasonable requirements to obtain any necessary Approvals. The Licensee shall provide the Owner with copies of all such permits and Approvals. No construction activities related to Project may commence before all required Permit Approvals have been obtained and the completion of all requirements of such permits.

(vii)    While performing any demolition, removal or construction work in connection with the Project, the Licensee shall not engage in any action (A) that constitutes a violation of any applicable law, order, ordinance, rule, regulation or code of any government authority, (B) that may cause injury to persons unless applicable safety regulations and standards are observed, (C) that may deface or injure property located on the Facility that is not subject to the Project, (D) that permits an unreasonably objectionable noise or odor to be emitted or permit anything to be done on property where the Facility is located tending to create a health, environmental or safety hazard or nuisance or cause any penalty to the Owner. The Licensee shall erect and maintain all reasonable or necessary safeguards for protection of persons and property, including safety barriers to and warnings of dangers and hazards, which safeguards and notices shall remain in place until completion of the work in accordance with this Agreement.

(viii)    Prior to commencement of construction and at all times during the duration of the Project, Licensee, at its sole expense, shall obtain and carry during all Builders Risk coverage construction activities in an amount to be determined by Owner. Owner shall be named additional insured on policy and Licensee will provide Owner with a certificate of insurance evidencing the coverage no less than two (2) days prior to the commencement of each Phase of the Project for Owner review and approval. Such certificate of insurance shall provide Owner with thirty (30) days prior written notice of termination, and ten (10) days' notice of cancellation for non-payment.

(ix)    Licensee must timely pay for all labor, materials and work, and all professional and other services related to the Project. Licensee shall hold harmless, defend and indemnify Owner (and all of its members, shareholders, partners, principals, officers, employees and agents) from any claims, liabilities, expenses (including attorneys' fees, expenses and litigation costs), or judgments arising from Licensee's work of the Project or any other improvements or construction, including, without limitation, materials used or stored for said improvements, or the material, equipment, operations/activities of

6

Licensee's contractors and subcontractors. Licensee shall also hold harmless, defend and indemnify Owner (and all of its members, shareholders, partners, principals, officers, employees and agents) against any and all claims, liabilities, expenses (including attorneys' fees, expenses and litigation costs) and financial losses arising from any non-compliance with state, county and federal laws, codes and permits in connection with the Project and Licensee's work. This paragraph shall survive expiration or any termination of this Agreement.

(x)    No Hazardous Materials shall be handled upon, about, above or beneath any portion of the Facility Premises or the property on which the Licensed Area is located by or on behalf of the Licensee without the prior written consent of the Owner. Notwithstanding the obligation of the Licensee to indemnify the Owner pursuant to this Agreement, the Licensee shall, at its sole cost and expense, promptly take all actions required by any federal, state or local governmental agency or political subdivision, or necessary for the Owner to make full use of any portion of the property, which requirements or necessity arise from the handling of Hazardous Materials by the Licensee, or another on its behalf, upon, about, above or beneath any portion of the Licensed Area or the property on which the Licensed Area is located.

(xi)    Licensee will not do or be empowered to do any act which encumbers or may encumber Owner's title or which subjects the Facility (or any part thereof) or the land upon which the Facility is located (the "Land") to any lien arising from the Project or this Agreement. Licensee must immediately remove and cause to be fully released any and all liens or encumbrances which are filed against the Facility Premises as a result of any act or omission of Licensee or Licensee's agents, contractors or subcontractors. If Licensee fails to remove and cause to be fully released any such lien within thirty (30) days following Licensee's receipt of notice thereof, then Owner may, but is not obligated to, remove such lien, and Licensee shall pay all costs of removal or bonding the lien to Owner upon demand. Licensee shall never, under any circumstances, have the power to subject the interest of Owner in the Facility or the Land to any mechanic's, materialmen's, or construction liens of any kind. In order to comply with the provisions of Chapter 713.10, Florida Statutes, it is specifically provided that neither Licensee nor anyone claiming by, through or under Licensee, including, but not limited to, contractors, subcontractors, materialmen, mechanics and/or laborers, shall have any right to file or place any mechanics', materialmen's or construction liens of any kind whatsoever upon the Facility Premises, the Land, or improvements thereon, and any such liens are hereby specifically prohibited. All parties with whom Licensee may deal are put on notice that Licensee has no power to subject Owner's interest to any mechanics', materialmen's or construction lien of any kind or character, and all such persons so dealing with Licensee must look solely to the credit of Licensee, and not to Owner's interest or assets. IN ADDITION, THE INTEREST OF OWNER OR THE GROUND LESSOR OF THE LAND IN THE FACILITY PREMISES AND THE LAND SHALL NOT BE SUBJECT TO LIENS FOR IMPROVEMENTS TO THE FACILITY PREMISES AND/OR THE LAND MADE BY LICENSEE, NOTWITHSTANDING ANY APPROVAL BY OWNER OF ANY CONTRACT(S) WITH ANY CONTRACTOR(S) OR SUBCONTRACTOR(S), AND/OR OWNER'S APPROVAL OF ANY SUCH IMPROVEMENT(S) AND/OR PLANS. PRIOR TO ENTERING INTO ANY CONTRACT FOR THE CONSTRUCTION OF ANY ALTERATION OR IMPROVEMENT, LICENSEE SHALL NOTIFY THE CONTRACTOR(S) AND/OR SUBCONTRACTOR(S) MAKING IMPROVEMENTS TO THE FACILITY PREMISES AND/OR THE LAND OF THE FOREGOING PROVISION, AND LICENSEE'S KNOWING OR WILLFUL FAILURE TO PROVIDE SUCH NOTICE TO THE CONTRACTOR(S) AND/OR SUBCONTRACTOR(S) SHALL RENDER THE CONTRACT BETWEEN OWNER AND   CONTRACTOR(S) AND/OR SUBCONTRACTOR(S) OR ANY CONTRACT BETWEEN CONTRACTOR AND ANY SUBCONTRACTOR VOIDABLE AT THE OPTION OF OWNER. Licensee agrees that in no event shall a notice of commencement be recorded in the public records of Miami-Dade County, Florida against the Facility in connection with the construction of the Project or any work performed or related to this Agreement.

7

(xii)   The Licensee shall protect and preserve existing utilities on and serving the Facility and shall provide for disconnects of same as necessary. The Licensee shall preserve all Facility utilities, water distribution systems and wastewater collection systems at their respective service connections.

(xiii)   The Licensee shall remove all waste materials, rubbish and equipment upon completion of the Project, and shall leave the Project site in a generally orderly condition. Licensee must keep as-built records of the Licensee's Improvements and furnish copies of records to Owner, at no cost to Owner, upon completion of the improvements and any changes to the same.

(b)   Adventure Rides and Ziplines Capital Investment Requirement. Licensee represents and covenants that it shall expend capital of not less than the Commitment Amount towards the design and construction costs of the Project including all permits and governmental approval fees, engineering and design fees, construction labor costs, Adventure Ride and Zipline equipment and, and/or all other direct construction and start-up costs and expenses for the Adventure Rides and Ziplines (exclusive of operational costs after the respective Approvals for each Phase have been obtained). The Commitment Amount is a minimum capital commitment by the Licensee in the completion of the Structures, and Licensee shall bear any and all costs in excess of the Commitment Amount. Licensee shall provide Owner with financial summaries and evidence of the Capital Investment spent in connection with the Project on a periodic monthly basis during the construction period of each Phase for Owner's review and approval. Licensee shall comply with any and all requests from Owner regarding evidence of the Capital Investment expenditures within ten (10) day of Licensee's receipt of such notice. In the event of Licensee's failure to meet the Commitment Amount or failure to comply with the information and documentation requests hereto, then the license fees pursuant to Section 5 hereof shall be adjusted accordingly, as reasonably determined by Owner and approved by Licensee. In the event Licensee fails to provide such approval, Owner shall have the option to immediately terminate this Agreement upon notice of default to Licensee with no amounts (for reimbursement or otherwise) due and owing to Licensee (irrespective of anything to the contrary anywhere else in this Agreement) in connection with such termination. The Capital Investment shall commence to amortize, on a straight-line 365-day basis for the period of time remaining in the Term, on the earlier of June 1, 2017 or the date all required Approvals for the open of business of Phase 3 have been issued by the appropriate governmental authorities. (By way of example, assuming the Term commences on June 1, 2016 and Capital Investment amortization commences on June 1, 2017, the amortization of the Capital Investment for the 9 year period remaining on the Term shall be $37,037.04 per month or $1,217.66 per day.)

(c)   Cenote Pool at Flamingo Way Capital Investment Requirement. As part of Phase III of the Project, the flamingo pool currently located on the Facility Premises shall be converted into a cenote swimming pool and incorporated as part of the adventure attraction (the "Cenote Pool Conversion"). In addition to the Commitment Amount, Licensee shall be responsible for payment the first $250,000.00 of all costs and expenses incurred in connection with the Cenote Pool Conversion, as well as one-half of all amounts in excess of $500,000.00 but less than $1,000,000.00 (collectively, the "Licensee Cenote Investment") such that Licensee's aggregate contribution amount towards the Cenote Pool Conversion shall not exceed $500,000.00. Owner shall be responsible for payment the second $250,000.00 of all costs and expenses incurred in connection with the Cenote Pool Conversion, one-half of all amounts in excess of $500,000.00 but less than $1,000,000.00 and for all other required costs and expenses incurred in connection with the Cenote Pool Conversion. Licensee shall recapture the Licensee Cenote Investment pursuant to Section 5(b) hereof.

(d)   Refresh/Replacement of Structures. At the commencement of the eight (8th) year of the Term, the parties shall mutually and reasonably evaluate the state and condition of the Structures and the competitive need for required repair, replacement or updating of the Structures based on (i) the condition

8

of the Structures, and (ii) advances in the Zipline marketplace within the United States. In the event Owner determines, in its sole discretion, that it is necessary for the Structures or Adventure Rides and Ziplines to be repaired, replaced, or updated to a certain standard or specification as the parties may mutually agree, then Licensee shall have the option, in order to maintain its renewal option pursuant to Section 2(c) of this Agreement, to implement such new or updated Structures prior to the Renewal Deadline, at its sole cost and expense, in accordance with such agreed upon standards and specification and otherwise in accordance with the terms and conditions of this Agreement. In the event no mutually agreed upon replacement or update of the Structures is completed by the Renewal Deadline, then this Agreement shall expire by its terms at the expiration of the Term, unless otherwise renewed by the parties in writing.

**4.     Licensee's Operations.**

(a)     Scope of Services. Licensee agrees, and Owner consents, to provide the Services on the Facility during the Term hereof.  Use of the Licensed Area shall be limited to such uses expressly provided for in this Agreement.

(b)     Personnel. At all times during the Term hereof, Licensee must at all times have on-call and at Owner's access an active, qualified, and experienced representative to supervise the Structures, and who is authorized to act for the Licensee in matters pertaining to all emergencies and the day-to-day operation of the Adventure Rides and Ziplines and Structures. Licensee will provide the Owner with the names, addresses, and 24-hour telephone numbers of all such persons in writing. Licensee may elect to arrange with Owner for the use of Owner's personnel, at Owner's discretion.

(c)     Utilities and Other Expenses. Licensee shall be responsible for and shall pay to Owner: (i) all charges imposed upon Owner for any increased operating expenses specifically related to the Adventure Rides and Ziplines or the Structures or for services requested or used by Licensee (for example, increased electrical charges in the event separate metering for the Structures is unavailable), (ii) any amounts due imposed upon Owner as a direct result of Licensee's acts or omissions or specifically and solely charged as a result of the Structures or the operations thereof, (iii) any increase in the cost for Owner's insurance premiums in the event such increase is due to this Agreement and the operations hereunder, and (iv) the direct costs associated with Owner's coordination (including cost of labor, general contracts, etc.) in the construction of the Project. All such amounts shall be paid by Licensee to Owner on the first (1ᵗʰ) day of each month during the Term for the immediately succeeding month if such charges are recurring charges of identical amount (or within fifteen (15) days after Owner renders a bill therefore to Licensee if such charges are one-time non-recurring charges or non-identical in amount). Notwithstanding anything to the contrary herein, if available, Licensee shall implement, at its own cost and expense, separate electrical metering for the Project and the Structures in its own name, and pay all amounts billed in connection with such utilities in a timely manner and not permit any such billed amounts to become delinquent.

(d)     Attraction Pricing. The parties shall mutually determine the pricing for the Adventure Rides and Zipline, Cenote and Exclusive Zone attractions pursuant to the Pricing Guidelines set forth, and each party may request discounts to select groups and free rides, as applicable and as mutually agreed upon by the parties.

(e)     Hours of Operation. Licensee shall provide the Services and be open to the public at the Facility Premises during the normal operating days and hours of the Facility, unless agreed to otherwise between the parties.

(f)    Collection of Revenue.   Owner shall exclusively handle collection of all Attraction Gross Revenue (as defined below) from third party customers.

5.    **License Fees and Other Payments.**

(a)    Monthly License Fee Payments.   On the fifth (5th) of each month during the Term commencing in the month immediately succeeding the month in which Phase I Rent Commencement Date occurs, Owner shall withhold from its collection of Attraction Gross Revenue (or Licensee shall pay to Owner in the event of no or insufficient revenues from the attractions) the following license fees:

(i)    During the Phase I Rent Period, the greater of (A) thirty percent (30.0%) of Attraction Net Revenue from the immediately preceding calendar month, or (B) $16,666.67.

(ii)    During the Phase II Rent Period, the greater of (A) thirty percent (30.0%) of Attraction Net Revenue from the immediately preceding calendar month, or (B) $33,333.33.

(iii)    During the first eighteen (18) months of the Phase III Rent Period, the greater of (A) thirty-three and one-half percent (33.5%) of Attraction Net Revenue from the immediately preceding calendar month, or (B) $50,000.00.

(iv)    After the first eighteen (18) months of the Phase III Rent Period, (A) if the Attraction Gross Revenue is less than $4,500,000.00 for the immediately preceding 12-month period, the greater of (x) twenty-eight percent (28%) of Attraction Net Revenue from the immediately preceding calendar month, or (y) $50,000.00, or (B) if the Attraction Gross Revenue is at least $4,500,000.00 00 for the immediately preceding 12-month period, three and one-half percent (33.5%) of Attraction Net Revenue from the immediately preceding calendar month.

Commencing after Phase I Rent Period, the balance of Attraction Net Revenues for the immediately preceding month (if any) shall be distributed from Owner to Licensee on the fifth (5th) day of each month during the Term.  Owner shall make commercially reasonable best efforts to make such distributions to Licensee on a bi-monthly basis, provided that such periodic distributions are operationally feasible without increased cost or expense to Owner or the operations of the Facility.

(b)    Recapture of Licensee Cenote Investment.  Notwithstanding the foregoing Section 5(a) above, during any period of time during the Term for which a license fee payment of thirty-three and one-half percent (33.5%) of Attraction Net Revenues is owned to Owner, provided that Licensee is not in monetary default under this Agreement, Licensee shall be credited three and one-half percent (3.5%) of such fees per month until such time as the Licensee Cenote Investment has been recaptured in full by Licensee.

(c)    City Rent and Revenue Adjustments.  Owner shall be responsible for the collection and payment of any rent or subrent due in connection with this Agreement to Ground Lessor pursuant to the Ground Lease (the "City Rent").  Notwithstanding the foregoing or anything to the contrary in this Agreement, in the event that City Rent increases from its current rate of 5.00% of all Attraction Gross Revenues, then the revenue share license fee payable to Owner pursuant to Section 5(a) above shall be incrementally increased to cover such additional City Rent; provided however that the City Rent shall not increase above six percent (6%) of all Attraction Gross Revenues.

(d)    Manner of Payment.  Except the extent the payments set forth in Section 5(a) may be deducted from Owner's collection of Attraction Gross Revenue, any and all other payments due hereunder shall be paid to Owner upon demand and without deduction or set-off, in lawful money of the

United States of America via check at Owner's address, or to such other address as Owner may from time to time designate in writing, or via wire transfer to such bank account as Owner may from time to time designate in writing. All licensee fees and other payment obligations due under this Agreement such shall survive expiration or termination of this Agreement.

6.    **Florida Sales and Use Tax.**

(a)    Licensee shall be responsible for computing any applicable State of Florida sales and use tax, and any local option surtax which may be levied or due in connection with this Agreement or any sales to third parties in connection herewith (the "Florida Sales and Use Tax"), and for separately making any and all applicable payments of Florida Sales and Use Tax to the State of Florida (or any other applicable governmental authority) in accordance with applicable law.

(b)    Licensee shall indemnify and hold Owner harmless from any and all liability or obligation related to the Florida Sales and Use Tax and shall not permit any obligation related thereto to become a lien on the Facility Premises (or any portion thereof).

7.    **Environmental Matters.**    Licensee will not use or permit in the Facility any flammable or explosive material, toxic substances, environmentally Hazardous Materials or other items hazardous to persons or property. Licensee will not use the Facility in any manner that (a) invalidates or is in conflict with any fire, insurance, life, safety or other codes or policies covering the Land or the Facility, or (b) increases the rate of any fire or other insurance being maintained with respect to the Land or the Facility. If any insurance premium is higher than it otherwise would be due to Licensee's failure to comply with the provisions of this paragraph, Licensee shall reimburse Owner immediately on demand the amount constituting that part of Owner's insurance premiums that are charged because of Licensee's said failure. Licensee will not use the Facility nor permit the Facility to be used in violation of any Environmental Regulations (as defined below). Licensee assumes sole and full responsibility for, and will remedy at Licensee's sole cost, any and all such violations caused by Licensee.

8.    **Termination.**

(a)    Termination by Owner. In addition to any other grounds for termination set forth in this Agreement, in the event Licensee shall (i) be in monetary breach or default for a period of five (5) business days after notice of such default from Owner, (ii) have made a false representation or warranty in this Agreement, (iii) become bankrupt or insolvent, or suffer the appointment of a receiver, or make an assignment for creditors, or (iv) be in non-monetary breach or default or intentionally fail to fully and faithfully act in accordance with this Agreement for a period of thirty (30) days after notice of such default from Owner (or for a period of forty five (45) days after notice of such default from Owner in the event that such breach or default cannot be reasonably cured within such thirty (30) day period), Owner shall have the right to forthwith terminate this Agreement, hold Licensee liable for any damages resulting to Owner and all other available remedies at law and equity. Upon any such termination of this Agreement, Licensee shall comply with any request from Owner to remove of property pursuant to Section 2(d) hereof and shall cooperate in all respects with Owner in removing the Structures from the License Areas and the Facility Premises and returning the License Areas to its condition prior to construction of the Project, or at Owner's election, turning over all operations of the Structures to Owner or a successor Licensee.

(b)    Termination by Licensee. In the event Owner shall (i) have made a materially false representation in this Agreement and fails to cure any such material representation thirty (30) days after notice from Licensee (or for a period of forty five (45) days after notice from Licensee in the event that such material false representation cannot be reasonably cured within such thirty (30) day period), or (ii)

11

be in material breach or default or intentionally fail to fully and faithfully act in accordance with this Agreement for a period of thirty (30) days after notice of such default from Licensee (or for a period of forty five (45) days after notice of such default from Licensee in the event that such material breach or default cannot be reasonably cured within such thirty (30) day period), Licensee shall have the right to forthwith terminate this Agreement, hold Owner liable for any damages resulting to Licensee and all other available remedies at law and equity (provided however, Owner shall not be liable for indirect or consequential damages).

(c)     Survival. All rights, liabilities or claims accrued, or arising out of events occurring, prior to the date of any termination of this Agreement shall survive such termination.

**9.     Representations, Warranties and Covenants.**

(a)     Owner hereby represents, warrants and covenants to Licensee that as of the Effective Date and unless otherwise set forth below, continuing throughout the Term:

(i)     PJG Inc. is a corporation organized and validly existing under the laws of the State of Florida and PJG LLC is a limited liability company organized and validly existing under the laws of the State of Florida. Owner is in good standing and duly qualified to conduct business in the State of Florida. Owner has full power and authority to own and operate the Facility and to carry on its business as contemplated under this Agreement.

(ii)     Owner has full power and authority to enter into this Agreement and to consummate the transactions contemplated herein. This Agreement has been duly executed and delivered by Owner and is a valid and legally binding obligation of Owner, enforceable in accordance with its terms.

(iii)     Owner will at all times cooperate with Licensee's reasonable requests (not in contravention of the terms of the Agreement) in connection with the installation, operation and maintenance of the Adventure Rides and Ziplines and the providing of the Services.

(iv)     Owner shall be responsible for supporting the operations of the Facility and the Facility Premises, including the Licensed Area (except as otherwise provided for in this Agreement), in the normal course of the Owner's business operations.

(v)     Owner shall allocate appropriate resources, within the reasonable budgetary parameters of the Facility, to marketing the Zipline attraction at the Facility to the City of Miami public.

(b)     Licensee hereby represents, warrants and covenants to Owner that as of the Effective Date and unless otherwise set forth below, continuing throughout the Term:

(i)     Licensee is a limited liability company organized and validly existing under the laws of the State of Hawaii. Within sixty (60) days of the Execution Date, and prior to conducting business within the State of Florida, Licensee shall have full power and authority to own its properties and to carry on its business as contemplated under this Agreement, and shall be in good standing and duly qualified to conduct business in the State of Florida.

(ii)     Licensee has full power and authority to enter into this Agreement and to consummate the transactions contemplated herein. This Agreement has been duly executed and delivered by Licensee and is a valid and legally binding obligation of Licensee, enforceable in accordance with its terms.

(iii)    Licensee will at all times cooperate with Owner's reasonable requests (not in contravention of the terms of the Agreement) in connection with the operation of the Facility. Such requests could include but are not limited to appearance of the Licensed Area, and changes resulting from customer feedback. Such requests might also include information requirements and other requests made by external audit firms involved in conducting the annual audit of the Facility and in conducting periodic audits/reviews required by banks, lessors and other like stakeholders of the Facility.

(iv)    The Project and the Adventure Rides and Ziplines will be inspected, on an annual basis, by an ACCT Professional Vendor Member (PVM), or on a more frequent basis if required by then applicable rules, regulation, laws or applicable safety standards for top-rated U.S. adventure ride and zipline attractions.

(v)    Licensee shall (i) post any all new job listings for available positions at the Facility on the job listing bulletin board located at the Facility prior to filling any such new vacancy and provide notice to Owner of any such new job opening, and (ii) provide personnel reports Owner on a quarterly basis (or upon request from Owner at any time) with full personnel background information (including but not limited to name, address and household income) and other personnel data and information as may be necessary for Owner to comply with any municipal job creation programs which it may be a party to.

## 10.    **Restrictive Covenants.**

(a)    Non-Disparagement Agreement. Each party agrees to refrain from any disparagement, defamation, libel, or slander of the other, or tortuous interference with the contracts and relationships of the other, or malicious gossip. By way of example and not of limitation, the parties intend that the foregoing prohibitions include, but are not limited to, taking any action whatsoever designed to harm, or which has the effect of harming, the perception of the other party with regard to any of its products or services, or with respect to any future or potential client, supplier, customer, client, member, or the public generally. The parties agree that a violation of the forgoing covenants would constitute a material breach of this Agreement. The provisions of this paragraph shall continue during the Term, and shall survive for a period of two (2) years after the expiration of this Agreement.

(b)    Confidentiality. The parties understand and agree that each of Licensee and Owner has a unique method of operating its business in which it retains a proprietary interest and reserves a right of confidentiality. Each party covenants and agrees not to use, employ or incorporate any aspect of the business or operation of the other in its own business or in any business which it may hereafter establish, operate or in which it may retain an interest. Each party acknowledges that the Confidential Information remains the sole and exclusive property of the discloser of such Confidential Information. The recipient of any Confidential Information shall use a reasonable degree of care which it uses to protect its highly confidential and proprietary information to protect any Confidential Information and may not disclose any Confidential Information without the prior written consent of the discloser. Upon termination of this Agreement (whether by expiration or by early termination), the recipient of any Confidential Information shall immediately cease use of such Confidential Information and return all such Confidential Information within ten (10) days of termination. As used herein, the term "Confidential Information" includes product information, marketing, sales techniques and information, pricing information and strategies as well as other information disclosed orally, visually or in writing and other business information which is designated as confidential or proprietary, including but not limited to the Confidential Information of third party customers of Licensee and the Confidential Information of third party vendors of Owner. Further, the parties understand that the terms and conditions of this Agreement and the performance thereof, including but not limited to the Term and the amount of compensation to be paid Owner, are confidential and shall not be disclosed by either party to this Agreement to any persons or entities not

parties to this Agreement during the term of this Agreement. The provisions of this paragraph shall continue during the Term, and shall survive after the expiration of this Agreement.

(c)     Enforcement and Savings Clause. The parties stipulate and agree that: (i) adequate consideration exists for the restrictive covenants set forth in paragraphs a and b of this Section 10 above (the "Restrictive Covenants"); (ii) the Restrictive Covenants are necessary to insure the preservation and continuity of the discloser's business and goodwill; (iii) the time period(s) of the respective Restrictive Covenants are reasonable temporal restraints; (iv) the scope of the activities restricted by the Restrictive Covenants is reasonable; and (v) the enforcement of any of the Restrictive Covenants will not interfere with either party's livelihood. The parties hereto intend all provisions of the Restrictive Covenants to be enforced to the fullest extent permitted by law. Accordingly, should a court of competent jurisdiction determine that the scope of any provision of the Restrictive Covenants is too broad to be enforced as written, based on their duration, geographic limitations, scope of activities, or otherwise, the parties intend that the court reform the provision to such narrower scope as it determines to be reasonable and enforceable. The parties agree that each of the agreements set forth in the Restrictive Covenants constitutes a separate agreement independently supported by good and adequate consideration, shall be severable from the other provisions of this Agreement, and (with this paragraph) shall survive the expiration or termination of this Agreement. The parties recognize that the obligations under this Section are special, unique and of extraordinary character and the parties acknowledge the difficulty in forecasting damages arising from the breach of any of the Restrictive Covenants and that the non-breaching may be irreparably harmed thereby. Therefore, the parties agree that the Restrictive Covenants may be enforced by means of injunctive relief or an order of specific performance and that such remedy shall be available in addition to all other remedies available at law or in equity, including the recovery of damages involved in such breach. In such action, the non-breaching shall not be required to plead or prove irreparable harm or lack of an adequate remedy at law or post a bond or any security.

## 11.     Books and Records and Reporting.

(a)     Daily Reporting. Commencing on the date Phase I opens for business to the public, within one (1) business day after the close of each business day, Licensee shall furnish to Owner a statement of Adventure Ride, Zipline and Exclusive Zone tickets redeemed and guests served.

(b)     Monthly Revenue Reporting. Within two (2) business days of each monthly license fee payment, Owner shall provide Licensee a written statement (each, a "Monthly Statement") of monthly revenues during the preceding calendar month based on the point-of-sale system currently utilized by Owner for tracking of Facility revenues. The Monthly Statement shall include monthly Attraction Gross Revenues and Attraction Net Revenues, and line items of the expenses accounting for the difference between monthly Attraction Gross Revenues and Attraction Net Revenues.

(c)     Annual and Periodic Reporting. On or before December 1 of each calendar year during the Term, Licensee shall submit to Owner (i) an annual business plan and forecast for the upcoming calendar year for its operations on the Facility and make to Owner a presentation for the upcoming calendar year outlining its business plan and review of the proposed operating budget for the upcoming year (each, an "Annual Statement"). The Annual Statement shall include a full audit report and financial statements with respect to Licensee and this Agreement issued by a "Big Four" accounting firm or reputable regional accounting firm acceptable to Owner setting forth the income and expense calculations related to Licensee's operations on the Facility.

(d)     Additional Information. Licensee shall deliver to Owner such additional documents, financial statements, tax returns, management reports and other information, with supporting data relating

to the management, maintenance and operation of the Adventure Rides and Ziplines, as Owner may from time to time reasonably request.

(e)     Inspection and Audit.  Upon request, Owner may inspect Licensee's business and financial records relating to the Adventure Rides, Ziplines and the Services. Any such inspection and audit shall be performed during normal business hours, upon reasonable notice to Licensee, at mutually agreed times, and without disruption to Licensee's business.

## 12.     Insurance.

(a)     Insurance Coverages.  At all times during the construction of the Project and during the Term of this Agreement, Licensee shall obtain and maintain the insurance coverage required in this Agreement, including comprehensive liability coverage, workmen's compensation coverage, automobile coverage, employee theft and other coverages, as follows:

(i)     Commercial General Liability. General liability coverage in minimum amounts of at least $3,000,000 in the aggregate and $2,000,000 for bodily injuries to each person, $2,000,000 per occurrence for injuries arising out of each accident, and $1,000,000 for property damage for each accident.  Such coverage shall include XCU coverage for explosion, collapse and damage to property underground, fire, vandalism, malicious mischief and windstorm coverages, products liability coverage, law and ordinance coverage, and completed operations coverage.

(ii)     Worker's Compensation Insurance.  Coverage shall be in accordance with State of Florida law.  Employer's Liability insurance policy shall maintain a limit of $1,000,000 for bodily injury by accident, (each accident), bodily injury by disease, (policy limit) and bodily injury by disease, (each employee).

(iii)     Employee Dishonesty/Crime Coverage Insurance.  Crime coverage with a limit of $1,000,000, covering, without limitation, third party employee dishonesty, money and securities on and off premises, robbery and safe burglary on and off premises, mysterious disappearance, forgery and fraud.

(iv)     Automobile Coverage.  Automobile Liability of at least $1,000,000 for occurrence for, bodily injury and property damage (BI/PD), including uninsured motorist of $1,000,000 coverage for BI/PD, $10,000 broadened PIP coverage, $10,000 medical payments coverage, comprehensive and collision coverage.  Hired and non-owned automobile liability of at least $1,000,000 per occurrence for BI/PD.

(v)     Professional Liability/Advertising Coverage.  Coverage of no less than $2,000,000 for professional liability including false advertising and libel.

(vi)     Environmental Coverage.  Environmental and pollution liability coverage in such amounts as reasonably required by Owner.

(vii)     Umbrella Liability.  Excess coverage over all lines of insurance with a minimum limit of $5,000,000 per occurrence and $10,000,000 in the aggregate.  This policy sits in excess of all other policies referenced in this Section 12.

(b)     Other Insurance Requirements.  Owner shall be named additional insured on the comprehensive general liability and umbrella policies and Licensee will provide Owner with a certificate of insurance evidencing the coverage not less than ten (10) days prior to the anticipated commencement date for construction of the Phase 1 for Owner review and approval in accordance herewith.  Such

certificate of insurance shall provide Owner with thirty (30) days prior written notice of termination, and ten (10) days notice of cancellation for non-payment. All insurance policies required pursuant to this Agreement must be issued by insurance companies licensed in the State of Florida and rated at least A+X by the Best Key Rating & Guide. Licensee shall cooperate with any request for further information from Owner's insurance carriers, including but not limited to, training licensee procedures, safety handbooks or manuals regarding operations and maintenance and work experience of Licensee and any employees, contractors or subcontractors thereof.

(c)    Construction Coverages.    Owner may request, as a condition precedent to the commencement of the construction of the Project, such additional builder's risk, law and ordinance coverages, demolitions coverages  and additional insurances coverages from any and all contractors and subcontractors participating in the construction of the Project, as determined by Owner in its sole discretion.

**13.    Indemnification.**

(a)    Licensee shall hold harmless, defend and indemnify Owner (and all of its members, shareholders, partners, principals, officers, contractors, employees and agents) from any claims, liabilities, expenses (including attorneys' fees, expenses and litigation costs), or judgments arising from the Services, the Adventure Rides and Ziplines or the Structures, including, without limitation, the following: (i) any accident, injury or damages whatsoever caused to any person or to the property of any person and occurring during the Term in or about the Licensed Area and all other portions of the Facility Premises resulting from or in connection with the Adventure Rides and Ziplines, the Structures or the Services, (ii) any accident, injury or damage occurring outside of the Licensed Area or other portions of the Facility Premises used or occupied by Licensee, but anywhere within or about the Facility Premises, where such accident, injury or damage results  or is claimed  to have resulted from  an act, omission or  negligence of Licensee or Licensee's related parties, (iii) any environmental claim relating in any way to Licensee's operation or use of the Licensed Area or any portion of the Facility, (v) any mechanic's or other lien or encumbrance or any action or proceeding brought thereon based upon any alteration or other work or services performed by or for Licensee, (vi) any non-compliance with state, county and federal laws, codes and permits in connection with the Services, the Adventure Rides and Ziplines or the Structures, and (vii) any worker compensation, benefit-related or employment-based claim brought by any Licensee employee or other Licensee related party.  This paragraph shall survive expiration or any termination of this Agreement.

(b)    Owner shall hold harmless, defend and indemnify Licensee (and all of its members, affiliates, directors,  officers, contractors, employees and agents) from any claims, liabilities, expenses (including attorneys' fees, expenses and litigation costs), or judgments arising from: (i) any accident, injury or damages whatsoever caused to any person or to the property of any person and occurring during the Term in or about the Licensed Area and all other portions of the Facility Premises, where such accident, injury or damage results or is claimed to have resulted from an act, omission or negligence of Owner, Owner's related parties or Owner's contractors, employees or agents, (ii) any accident, injury or damage occurring outside of the Licensed Area, but anywhere within or about the Facility Premises, where such accident, injury or damage results or is claimed to have resulted from an act, omission or negligence of Owner, Owner's related parties or Owner's contractors, employees or agents, (iii) any environmental claim relating in any way to Owner's operation or use of the Facility Premises or any portion of the Facility, and (iv) Owner's non-compliance with state, county and federal laws, codes and permits in connection with the Facility Premises.  This paragraph shall survive expiration or any termination of this Agreement.

14.     **Notices.**

All notices, consents, approvals and requests required or permitted under this Agreement shall be given in writing and shall be effective for all purposes if hand delivered or sent by (a) upon delivery, if delivered in person, (b) one (1) business day after having been deposited for overnight delivery with any reputable overnight courier service, or (c) three (3) business days after having been deposited in any post office or mail depository regularly maintained by the U.S. Postal Service and sent by registered or certified mail, postage prepaid, return receipt requested, or (d) email transmission provided that such email notice must also be delivered by one of the means set forth in (a) or (b) above, addressed to the parties as follows:

If to Owner:

Parrot Jungle and Gardens of Watson Island, Inc.
1111 Parrot Jungle Trail
Miami, FL  33132
Attn:  John Dunlap, President
Email: jdunlap@iconicattractions.com

With a required copy to:

Liebler Gonzalez & Portuondo
Courthouse Tower
44 West Flagler Street
25th Floor
Miami, FL 33130
Attn: Christian S. Bruno, Esq.
Email: csb@lgplaw.com

If to Licensee:
Air Play Adventures, LLC
216 Dickenson Street
Lahaina, Hawaii, 96761
Attn: Todd Domeck
Email: todd@gozipus.com

With a required copy to:

Merchant Horovitz LLLC
2145 Wells Street, Suite 303
Wailuku, Hawaii 96793
Attn:  Peter A. Horovitz
Email: pah@mhmaui.com

A party receiving a notice which does not comply with the technical requirements for notice under this Section may elect to waive any deficiencies and treat the notice as having been properly given. A notice shall be deemed to have been given: (a) in the case of hand delivery, at the time of delivery; (b) in the case of registered or certified mail, when delivered or the first attempted delivery on a business day; (c) in the case of expedited prepaid delivery upon delivery; or (d) in the case of email, upon receipt of answerback confirmation, provided that such email notice was also delivered as required in this Section.

17

15.     <u>Subordination</u>. This Agreement and all rights of Licensee shall be subject to and subordinate to the Ground Lease any and all mortgages, security agreements, or like instruments resulting from any financing, refinancing, or collateral financing (including renewals or extensions thereof), and to any and all ground leases, made or arranged by Ground Lessor and/or Owner of its interests in all or any part of the Licensed Area, from time to time in existence, whether now existing or hereafter created. Such subordination shall be self-operative and shall not require any further instrument to evidence such subordination. However, on request, Licensee shall further evidence its agreement to subordinate this Agreement to any and all documents and to all advances made under such documents. Licensee shall be required to provide estoppel certificates upon request by Owner and/or Ground Lessor.

16.     <u>Relationship of the Parties</u>.

        (a)     Licensee's relationship with Owner is that of an independent Licensee, and nothing in this Agreement is intended to, or should be construed to, create a partnership, agency, joint venture or employment relationship. Neither Licensee nor its employees are entitled to any of the benefits that Owner provides for its employees. Any person performing work under this Agreement on behalf of the Licensee shall at all times be under Licensee's exclusive direction and control. Licensee shall pay all wages, salaries and other amounts due such personnel in connection with their performance as an employee of Licensee as required by law. The Licensee shall be responsible for all reports and obligations respecting such persons, including, but not limited to, social security taxes, income tax withholding, unemployment insurance and workers' compensation. The Licensee's performance of services and hours worked shall be entirely within the Licensee's control, and the Owner shall rely upon the Licensee to devote the time reasonably necessary to perform in accordance with this Agreement.

        (b)     Owner shall not be responsible for covering Licensee under any workers' compensation insurance or unemployment compensation insurance plans. Licensee represents and warrants that it is covered by a workers' compensation insurance policy procured and paid for by it. Licensee shall notify Owner immediately if the status of said coverage, notice or sole proprietorship changes.

        (c)     The Licensee and its employees or agents shall have no authority or right to obligate Owner in any way. The Licensee shall identify itself as an independent contractor and shall not hold itself out as an employee or agent of Owner. Owner and its employees or agents shall have no authority or right to obligate Licensee in any way, and Owner shall not hold itself out as an employee or agent of Licensee.

        (d)     Except as otherwise specifically set forth in this Agreement, the parties agree that this is not an exclusive contract and that the parties are free to enter into agreements and contracts for similar or other services with other parties during the Term of this Agreement.

17.     <u>General Provisions</u>.

        (a)     <u>No Assignment</u>. Licensee shall not assign, subcontract or otherwise transfer any interest under this Agreement to any individual or entity, or effectuate a change of majority ownership of or control in Licensee, without the prior written consent of Owner. Any such assignment shall be voidable by Owner and grounds for immediate termination of this Agreement. Owner shall be permitted, without Licensee's prior consent, to assign this Agreement in its entirety if it sells, leases, or otherwise transfers substantially all of its ownership rights in Owner or the Facility Premises.

        (b)     <u>Recording</u>. Neither the Licensee nor anyone claiming under the Licensee shall record this Agreement or any memorandum hereof in any public records without the prior written consent of the Owner and the Ground Lessor.

(c)     Successors and Assigns. This Agreement shall be binding on, and inure to the benefit of, any successor of either party as a result of any change in control of such party, including the sale by such party of all or substantially all of its assets.  Subject to the foregoing, this Agreement will be for the benefit of and be binding upon each party's successors and assigns.

(d)     Time of the Essence.  Time shall be of the essence in the performance of all obligations under this Agreement.

(e)     Governing Law.  This Agreement will be governed in all respects by the laws of the State of Florida (without regard to conflicts of law provisions), as such laws are applied to agreements entered into and to be performed entirely within the State of Florida between Florida residents.

(f)     Attorneys Fees.  In any action, suit, proceeding (including, but not limited to, any arbitration proceeding), claim or counterclaim brought to enforce this Agreement or any of its provisions, the party that substantially prevails in any such action, suit, proceeding, claim or counterclaim (the "Prevailing Party") shall recover its costs, fees and expenses, including, but not limited to, the reasonable costs, fees and expenses of attorneys and outside experts (collectively, "Expenses"), from the other party (the "Non-Prevailing Party"), and the court or arbitration panel shall be so instructed to determine which party is the Prevailing Party, to grant recovery of the Expenses incurred by the Prevailing Party, and to order the Non-Prevailing Party to pay forthwith the Expenses of the Prevailing Party.

(g)     Severability. If any provision of this Agreement is held to be illegal, invalid, or unenforceable under present or future laws, (i) such provision shall be fully severable, (ii) this Agreement shall be construed and enforced as if such illegal, invalid, or unenforceable provision never constituted a part of this Agreement, and (iii) the remaining provisions of this Agreement shall remain in full force and effect and shall not be affected by the illegal, invalid, or unenforceable provision or by its severance from this Agreement. Furthermore, in lieu of such illegal, invalid, or unenforceable provision, there shall be added as part of this Agreement a provision as similar in its terms to such illegal, invalid, or unenforceable provision as may be possible and be legal, valid, and enforceable.

(h)     Waiver.  The waiver by either party of a breach of any provision of this Agreement of the other party will not operate or be construed as a waiver of any other or subsequent breach by such other party.

(i)     Entire Agreement; Modification.   This Agreement constitutes the entire agreement between the parties relating to this subject matter and supersedes all prior or contemporaneous oral or written agreements concerning such subject matter.  This Agreement may only be changed by mutual agreement of the parties in writing.

(j)     Counterparts. This Agreement may be executed in any number of counterparts, each of which will be deemed an original but all of which together will constitute but one and the same instrument. This Agreement may be executed by facsimile, scanned or .pdf signature, which in each case shall constitute an original for all purposes.

(k)     Force Majeure. Any delay in, or failure of performance of, either party to this Agreement shall not constitute a default nor give rise to any claim for damage, if and to the extent such delay or failure is caused by occurrences beyond the control of the party affected, including but not limited to, acts of God or the public enemy, terrorism, vandalism, confiscation of facilities or compliance with any order or request of governmental authority, affecting to a degree not presently existing, the supply, availability, or use of personnel, equipment or materials, acts of war, public disorder, insurrection, rebellion, sabotage, casualties, flood, tornados, hurricanes, superstorms or other natural disasters, riots, strikes, lockouts, or any causes a party is unable, with reasonable diligence, to prevent.  A party who is prevented from

performing for any such reason shall immediately notify the other party in writing of the reason for the non-performance and the anticipated extent of any delay and shall use commercially reasonable efforts under the circumstances to remove such causes and shall proceed to perform with reasonable dispatch whenever such causes are removed or ceased.  During such period, all payments shall be suspended by the parties.

(l)     WAIVER OF TRIAL BY JURY.  TO THE FULLEST EXTENT PERMITTED BY LAW, THE PARTIES HEREBY WAIVE ANY AND ALL RIGHTS THEY OR ANY OF THEM MAY HAVE TO TRIAL BY JURY OF ANY ISSUE ARISING IN CONNECTION WITH ANY ACTION BROUGHT TO ENFORCE THIS AGREEMENT OR OTHERWISE RELATING HERETO.

(m)     Release of GoZip, LLC.  On the date Phase III open for business to the public, GoZip, LLC shall be released as a Licensee party to this Agreement and have no further obligations hereunder.

**[REMAINDER OF PAGE LEFT INTENTIONAL BLANK]**

IN WITNESS WHEREOF, Licensee and Owner have caused this Agreement to be executed by their respective, duly authorized representatives, all as of the Effective Date.

OWNER:

PARROT JUNGLE AND GARDENS OF WATSON ISLAND, INC. (d/b/a Jungle Island), a Florida corporation

By: _____

Name: John Dunlap

Title:  President

and

PJG WATSON, LLC, a Florida limited liability company

By: _____

Name: John Dunlap

Title:  President

LICENSEE:

AIR PLAY ADVENTURES, LLC, a Hawaii limited liability company

By: _____

Name: Peter Winn

Title:  Manager     9/23/15.

and

GOZIP, LLC, a Hawaii limited liability company

By: _____

Name: Todd Domeck

Title:  Manager

21

## SCHEDULE 1

### Definitions

Unless the context otherwise specifies or requires, the following terms shall have the meanings herein specified, such definitions to be applicable equally to the singular and the plural forms of such terms and to all genders:

"Adventure Rides" shall mean any attraction that is aerial in nature including swings, nets, bridges, ziplines, flying foxes, freefall devices, bungee jumps, bungee swings, zipcoasters, water slides over 20' high, ropes courses, challenge courses, adventure parks, zip stops, auto-belays, treehouses, climbing and rock walls, via ferrata type activities, chairlifts, gondolas, aerial trails, aerial bicycles, motorized ziplines, suspension bridges, cable bridges, and drop-type attractions and any other attraction installed or managed by Licensee pursuant to this Agreement.

"Ancillary Park Charge" shall mean charges for general attendance into the Facility Premises that are in addition to the Base Park Charge, which may include, but not limited to: (i) a pledge of Ancillary Park Charge to Owner's mortgages, security agreements, or other like instruments resulting from any financing, refinancing, or collateral finance and  (ii) a charge of Florida Sales and Use Tax to the State of Florida (or any other applicable governmental authority) in accordance with applicable law.

"Approvals" shall mean any permits, licenses and approvals necessary or required from all appropriate governmental authorities for Licensee to construct the Structures, to occupy the License Areas, and to operate the Services therein.

"Attraction Gross Revenue" as used herein, shall mean all income and revenues collected by Licensee related to or in connection with the Adventure Rides, Ziplines and Exclusive Zone or any other activities as may be permitted to be conducted by Licensee under this Agreement.

"Attraction Net Revenue" shall mean all income and revenues collected by Owner from Zipline tickets, related to or in connection with the Services, less the amount of any rebates, refunds or any third party commissions actually incurred by either party, market standard credit card charges, applicable sales and use tax, discounts, gift certificates (until redeemed by use or operation of law), bad debt due payments being accepted and then later declined or reversed.

"Base Park Charge" shall mean the then base price for general attendance into the Facility Premises.  The Base Park Charge at the time of Effective Date is thirty four dollars and ninety five cents ($34.95).

"Breakage Fee" shall mean the (i) amortized Capital Investment amount actually made by Licensee pursuant to Section 3(b) hereof as of the date of termination of this Agreement, plus (ii) One Million and no/100 Dollars ($1,000,000.00).

"Capital Investment" shall mean such capital expenditure amounts actually expended by Licensee towards the Structures and the Project, provided however shall not include operational costs of the Adventure Rides or Ziplines after the respective Approvals for each Phase have been obtained.

"Commencement Date" shall mean the date which Licensee receives its permits for the construction of Phase I.

"Commitment Amount" shall mean the amount of Four Million Dollars ($4,000,000.00).

22

"Construction Documents" shall mean, for each Phase of the Project, the following: (i) budget, (ii) names, contact information and professional background of the general contractor, contractors and subcontractors Licensee desires to retain, and (iii) construction schedule.

"Ground Lease" shall mean that certain Lease and Development Agreement dated September 2, 1997, by and between The City of Miami, Florida, a municipal corporation of the State of Florida (the "Ground Lessor"), as lessor, and PJG Inc., as lessee, as amended (and as may be further amended, restated or otherwise modified from time to time).

"Equipment and Personal Property" shall mean any and all trade fixtures, equipment, and other personal property installed or placed by the Licensee on the Facility Premises.

"Environmental Regulations" shall mean any law, statute, regulation, order or rule now or hereafter promulgated by any governmental authority, whether local, state or federal, relating to air pollution, water pollution, noise control or transporting, storing, handling, discharge, disposal or recovery of on-site or off-site hazardous substances or materials, as same may be amended from time to time, including without limitation, the following: (a) the Clean Air Act (42 U.S.C. § 7401 (et seq.); (b) Marine Protection, Research and Sanctuaries Act (33 U.S.C. § 1401-1445); (c) the Clean Water Act (33 U.S.C. § 1251 et seq.); (d) RCRA, as amended by the Hazardous and Solid Waste Amendments of 1984 (42 U.S.C. § 6901 et seq.); (e) CERCLA, as amended by the Superfund Amendments and Reauthorization Act of 1986 (42 U.S.C. § 9601 et seq.); (f) TSCA; (g) the Federal Insecticide, Fungicide and Rodenticide Act, as amended (7 U.S.C. § 136 et seq.); (h) the Safe Drinking Water Act (42 U.S.C. § 300(f) et seq.); (i) OSHA; (j) the Hazardous Liquid Pipeline Safety Act (42 U.S.C. § 2001 et seq.); (k) the Hazardous Materials Transportation Act (49 U.S.C. § 1801 et seq.); (l) the Noise Control Act of 1972 (42 U.S.C. § 4901 et seq.); (m) EPCRA; and (n) National Environmental Policy Act (42 U.S.C. § 4321-4347); and (o) Medical Waste Tracking Act of 1988 (42 U.S.C. § 6992).

"Hazardous Materials" shall mean (a) any "hazardous waste" as defined by the Resource Conservation and Recovery Act of 1976 (42 U.S.C. § 6901 et seq.) ("RCRA"), as amended from time to time, and regulations promulgated thereunder; (b) any "hazardous substance" being "released" in "reportable quantity," as such terms are defined by the Comprehensive Environmental Response, Compensation and Liability Act of 1980 (42 U.S.C. § 9601 et seq.) ("CERCLA"), as amended from time to time, and regulations promulgated thereunder; (c) asbestos; (d) polychlorinated biphenyls; (e) urea formaldehyde insulation; (f) "hazardous chemicals" or "extremely hazardous substances," in quantities sufficient to require reporting, registration, notification or special treatment or handling under the Emergency Planning and Community Right-to-Know Act of 1986 (42 U.S.C. § 11001, et seq.) ("EPCRA"), as amended from time to time, and regulations promulgated thereunder; (g) any "hazardous chemicals" in levels that would result in exposures greater than those allowed by permissible exposure limits established pursuant to the Occupational Safety and Health Act of 1970 (29 U.S.C. § 651 et seq.) "OSHA"), as amended from time to time, and regulations promulgated thereunder; (h) any substance which requires reporting, registration, notification, removal, abatement or special treatment, storage, handling or disposal under Section 6, 7 or 8 of the Toxic Substances Control Act (15 U.S.C. § 2601 et seq.) ("TSCA"), as amended from time to time, and regulations promulgated thereunder, (i) any toxic or hazardous chemicals described in the Occupational Safety and Health Standards (29 C.F.R. 1910.1000-1047) in levels which would result in exposures greater than those allowed by the permissible exposure limits pursuant to such regulations; (j) the contents of any storage tanks, whether above or below ground; (k) medical wastes; (l) materials related to those described in subparagraphs (a) through (k) hereof; and (m) anything defined as hazardous or toxic under any now existing or hereafter enacted Environmental Regulations.

"License Area" shall mean the area of the Facility described in Exhibit A attached hereto.

"Permit Approval" shall mean approval and issuance by the appropriate governmental authority of the permits for the construction of each Phase of the Project.

"Phase I Rent Commencement Date" shall mean the earlier of (i) the date Phase I of the Project is open for business to the public, and (ii) six (6) months after the date of issuance of the Permit Approval for Phase I.  The estimated Phase I Rent Commencement Date is March 1, 2016.

"Phase I Rent Period" shall mean the period commencing on the Phase I Rent Commencement Date and ending on the day immediately preceding the Phase II Rent Commencement Date.

"Phase II Rent Commencement Date" shall mean the earlier of (i) the date Phase II of the Project is open for business to the public, and (ii) six (6) months after the date of issuance of the Permit Approval for Phase II.  The estimated Phase II Rent Commencement Date is September 1, 2017.

"Phase II Rent Period" shall mean the period commencing on the Phase II Rent Commencement Date and ending on the day immediately preceding the Phase III Rent Commencement Date.

"Phase III Rent Commencement Date" shall mean the earlier of (i) the date Phase III of the Project is open for business to the public, and (ii) six (6) months after the date of issuance of the Permit Approval for Phase III.  The estimated Phase III Rent Commencement Date is February 1, 2018.

"Phase III Rent Period" shall mean the period commencing on the Phase III Rent Commencement Date and ending on the last day of the Term.

"Project" means the construction and installation of the Structures, as depicted at Exhibit A hereto, and all ancillary and related equipment in connection therewith.

"Pricing Guidelines" shall mean the following parameters for which the parties shall mutually agree to the initial and all future charges for which the Attraction Gross Revenues are derived.  Licensee, no later than ninety (90) days prior the expected completion date of each Phase of the Structures, propose to Owner its suggested pricing for up to four (4) pricing tiers from the Base Park Charge for attendees of the Facility Premises to utilize the Adventure Rides, Ziplines and Exclusive Zones ("Zipline Bundles").  Owner shall have the ability to increase the the Base Park Charge up to forty ($40.00) without increase in the Zipline Bundles (the "Permitted Increase").   However any desired increase above the Permitted Increase shall preserve the net dollar differential between the then Base Park Charge and the then applicable Zipline Bundle unless otherwise agreed to by the Parties.

"Services" shall mean (i) the exclusive operation of the Adventure Rides, Ziplines and Exclusive Zone at the Facility, (ii) maintaining all permits, licenses or other approvals required for the operation of the Adventure Rides, Ziplines, and the Exclusive Zone, (iii) conducting, managing and operating the Adventure Rides, Ziplines and Exclusive Zone at the Facility, (iv) paying for all costs, utilities and other expenses required for operation, maintenance, repair and replacement of the Project and the Structures, (v) operating and maintaining the License Areas in an orderly and clean manner and all facilities and equipment therein in a well-maintained state at all times, (vi) obtaining and paying for all utilities necessary to operate the Structures, and (vii) being responsible for the safe operations of the Adventure Rides and Ziplines during the Term and for all safety inspections in accordance with the standards set forth by the ACCT (Association for Challenge Course Technology) and ASTM F-24 Standards for Amusement Devices as the same are amended and replaced from time to time.

"Structures" shall mean the Adventure Rides, Ziplines and Exclusive Zone structures, all supporting equipment, structures and enclosures used solely in connection with the Adventure Rides and

Ziplines and all supporting equipment, structures and exclusive enclosures not currently present or required to be altered in connection with the Exclusive Zone.

"Term" shall mean the period commencing on the Effective Date and ending on the day immediately preceding the tenth (10th) anniversary date of the Phase I Rent Commencement Date.

"Zipline" shall mean an outdoor pulley suspended on a cable to be utilized for the sole purpose of outdoor adventure and personal amusement.

## EXHIBIT A

License Areas

Exhibit A
Jungle Island: AIR+Play Licensed Area



## **EXHIBIT B**

Exclusive Zone

Exhibit B
Cenote Exclusive Zone



**EXHIBIT C**

Licensed Area

Exhibit C
Description and Timeline for Phases 1-3

Phase 1:  Phase 1 will consist of the zipline/canopy tour.  The tour will be comprised of 5-7 ziplines, towers, aerial bridges and decks.  Phase 1 Jungle Island Plan Approval by March 1, 2016.  Plans submitted to City of Miami by April 15, 2016 (note this is dependent upon direction and process as outlined by City of Miami).  Phase 1 opening 3-6 months after plan approval from City of Miami.

Phase 2:  Phase 2 will consist of the swimming Cenote replacing the flamingo pond.  Phase 2 will also include cabanas for rental, water slides, snorkeling lagoon, party and event areas, ziplines and swings.  Phase 2 will be permitted in Summer 2016 and will be open 6-12 months following issuance of permits.

Phase 3*:  Phase 3 will consist of an adventure park with 50-75 "elements" of ropes, nets, bridges, beams and platforms.  Phase 3 will also incorporate additional point of sale and a multi-level "treehouse" deck area.

*Because plans change at Jungle Island, Phase 3 may include other attractions such as aerial balloons, aerial bars, bungee jumps, giant swings, zipcoasters and other adventure activities.  It is AIR+Play's intent to work with Jungle Island on the master plan and incorporate new and exciting adventure elements where they make sense, both in time and location/placement, to Jungle Islands Master Plan.

# EXHIBIT 2

**From:** **Mandy Stewart** mandy@experientialresources.net 
**Subject:** Fwd: Waiver Application Status Change
**Date:** March 1, 2016 at 1:21 PM
**To:** chip.sellers@myfloridalicense.com

Hi Chip,

Thank you for discussing the accessibility waiver application for zip line and aerial adventure parks with me the other day. Chris Gould with Jungle Island has applied for the waiver (as indicated below). With your permission, we will be sending draft drawings over to you in the next 24 hours to accompany this application. Should we email them to you? Should anyone else be included?

Thanks very much,
Mandy

**Mandy Stewart**
Experiential Resources (ERi)
mandy@experientialresources.net



Begin forwarded message:

**From:** Todd Domeck <todd@gozipus.com>
**Subject: Fwd: Waiver Application Status Change**
**Date:** March 1, 2016 at 1:03:18 PM PST
**To:** Mandy Stewart <mandy@experientialresources.net>
**Cc:** Brian Brun <brian@experientialresources.net>

---------- Forwarded message ----------
From: **Christopher Gould** <cgould@jungleisland.com>
Date: Tue, Mar 1, 2016 at 11:02 AM
Subject: Fwd: Waiver Application Status Change
To: Todd Domeck <todd@gozipus.com>, John Dunlap <jdunlap@jungleisland.com>

FYI

**Christopher Gould | Managing Director**
**Jungle Island |** www.JungleIsland.com
1111 Parrot Jungle Trail Miami, FL 33132
O:305-400-7218 | E: cgould@jungleisland.com
Jungleisland

Begin forwarded message:

From: <codes@floridabuilding.org>
Date: March 1, 2016 at 3:58:33 PM EST
To: <cgould@jungleisland.com>
Subject: Waiver Application Status Change
Reply-To: <codes@floridabuilding.org>

The following action has been taken on a Waiver Application You have submitted. The Accessibility Waiver # 145-0 has been marked as Pending Staff Review. If you have any questions or would like additional information, please call the Codes and Standards Section at (850) 487-1824.

Florida Department of Business and Professional Regulations
Building Codes and Standards
http://www.floridabuilding.org

--
Todd Domeck, Owner
Experiential Resources, Inc.
GoZip LLC
Maui Pineapple Tours LLC
Waiver Saver LLC
Sugar Cane Train
and Other Stuff
Office 808 . 441 . 5347
Cell 808 . 214 . 4325
www.ZipCoaster.com
www.PineappleTour.com
www.SugarCaneTrain.com
www.WaiverSaver.com

IMPORTANT:  This email is intended for the use of the individual (s) named above and may contain information that is confidential, privileged or unsuitable for overly sensitive persons with low self-esteem, no sense of humor or irrational religious beliefs.  If you are not the intended recipient, any dissemination, distribution or copying of this email is not authorized (either explicitly or implicitly) and constitutes an irritating social faux pas.  Unless the word absquatulation has been used in its correct context somewhere other than in this warning, it does not have any legal or grammatical use and may be ignored.  No animals were harmed in the transmission of this email, although the chihuahua next door is living on borrowed time, let me tell you!  Those of you with an overwhelming fear of the unknown will be gratified to learn that there is no hidden message revealed by reading this warning backwards, so just ignore that Alert Notice from Microsoft.  However, by pouring a complete circle of salt around yourself and your computer you can ensure that no harm befalls you and your pets.  If you have received this email in error, please add some nutmeg and egg whites and place it in a warm (375 degree) oven for 40 minutes.  Whisk briefly and let it stand for 2 hours before icing.

# EXHIBIT 3

# SUBSURFACE EXPLORATION REPORT
# AND ENGINEERING EVALUATIONS
# PROPOSED ZIPLINES TOWERS
# JUNGLE ISLAND ADVENTURE PARK
# WATSON ISLAND, MIAMI, FL
# MAY 111, 2016
# FILE NO.: 16-2540



Ardaman & Associates, Inc.

## OFFICES

Orlando – 8008 S. Orange Avenue, Orlando Florida 32809 – Phone (407) 855-3860
Alexandria – 3609 Mac Lee Drive, Alexandria, Louisiana 71302 – Phone (318) 443-2888
Bartow – 1525 Centennial Drive, Bartow, Florida 33830 – Phone (863) 533-0858
Baton Rouge – 316 Highlandia Drive, Baton Rouge, Louisiana 70884 – Phone (225) 752-4790
Cocoa – 1300 N. Cocoa Blvd., Cocoa, Florida 32922 – Phone (321) 632-2503
Fort Myers – 9970 Bavaria Road, Fort Myers, Florida 33913 – Phone (239) 768-6600
Miami – 2608 W. 84th Street, Hialeah, Florida 33016 – Phone (305) 825-2683
Monroe – 1122 Hayes Street, West Monroe, Louisiana 71292 – Phone (318) 387-4103
New Orleans – 1305 Distributors Row, Suite I, Jefferson, Louisiana 70123 – Phone (504) 835-2593
Port St. Lucie – 460 Concourse Place NW, Unit 1, Port St. Lucie, Florida 34986 – Phone (772) 878-0072
Sarasota – 78 Sarasota Center Blvd., Sarasota, Florida 34240 – Phone (941) 922-3526
Shreveport – 7222 Greenwood Road, Shreveport, Louisiana 71119 – Phone (318) 636-3673
Tallahassee – 3175 West Tharpe Street, Tallahassee, Florida 32303 – Phone (850) 576-6131
Tampa – 3925 Coconut Palm Drive, Suite 115, Tampa, Florida 33619 – Phone (813) 620-3389
West Palm Beach – 2200 North Florida Mango Road, Suite 101, West Palm Beach, Florida 33409 – Phone (561) 687-8200


Ardaman & Associates, Inc.



**Ardaman & Associates, Inc.**
Geotechnical, Environmental and
Materials Consultants

May 11, 2016
File No.:16-2540

Mr. Todd Domeck
Airplay Adventures, LLC
PO BOX 542
Lahaina, HI 96761

C/o     Mr. Brian J. Brun
        Experiential Resources, Inc

**SUBSURFACE EXPLORATION REPORT**
**PROPOSED ZIPLINE TOWERS**
**JUNGLE ISLAND ADVENTURE PARK**
**WATSON ISLAND, MIAMI, FL**

Ardaman & Associates, Inc. has completed the subsurface exploration and studies of the project site described in our proposal dated March 21, 2016. The work was requested and authorized by Mr. Brian J. Brun from Experiential Resources, Inc. We explored the general subsurface conditions in order to evaluate their suitability for the proposed structures and provide recommendations for foundation design and site preparation. Our work included Standard Penetration Test (SPT) borings and visual engineering classification of the sampled soils. This report describes our explorations and tests, reports their findings, and summarizes our conclusions and recommendations.

Based on our explorations and studies, we conclude that the proposed structures should be founded on a pile-type foundation. We do not recommend supporting the proposed construction on conventional spread foundations, due to the layer of organic soils and silt encountered underlying this site. The following sections of this report describe our explorations and explain our recommendations in greater detail. Our report has been prepared specifically for this project. It is intended for the exclusive use of AirPlay Adventures, LLC. , its representatives and/or assigns. Our work has used methods and procedures consistent with local foundation engineering practices. No other warranty, expressed or implied, is made. We do not guarantee project performance in any respect, only that our work meets normal standards of professional care.

2800 W. 84 Street, Hialeah, Florida 33016   Phone (305) 825-2683   FAX (305) 825-2686
Louisiana: Alexandria, Baton Rouge, Monroe, New Orleans, Shreveport
Florida: Bartow, Cocoa, Fort Myers, Miami, Orlando, Port St. Lucie, Sarasota, Tallahassee, Tampa, W. Palm Beach

May 11, 2016
File No.: 16-2540

-2-

## SITE LOCATION AND DESCRIPTION

The proposed construction is located within the Parrot Jungle Park, on the North side of the McCarthur Causeway, in Watson Island, Miami, Florida. (Section 31, Township 53 S, Range 41 E). A site vicinity map provided by Google Earth Pro 2015 is presented as our Figure 1.

## PROJECT DESCRIPTION

We understand that seven (7) towers will support the proposed ziplines. Towers vary in height and type, from a 10 feet A-frame to a 100 feet Tri-challenge pod.

## FIELD EXPLORATION

To explore subsurface conditions at the site, four (4) - Standard Penetration Test (SPT) borings were performed at the locations shown on the Boring Location Plan (Figure 2). The SPT borings were completed to a depth of 60 feet below grade. The work was performed in accordance with the procedures recommended in ASTM D-1586. A description of our drilling and testing procedures are included in the Appendix. The location of the three of the towers were not accessible for drilling equipment (Towers T1, T3 and T7).

The boring locations were laid out at the approximate location shown in our boring location plan. We estimate that the actual boring locations are within about 10 feet of the location shown. If you need to know the boring locations more accurately, we recommend that you retain a surveyor.

Our drillers examined the soil recovered from the SPT sampler and maintained a log for each boring. The soil samples were taken to our laboratory where they were visually classified by our engineer. The soil classifications and other pertinent data obtained from our explorations are reported on the boring logs in the Appendix.

## SUBSURFACE CONDITIONS

The boring logs in the Appendix present a detailed description of the soils encountered at the locations at the depths explored. The soil stratification shown on the boring logs is based on examination of recovered soil samples and interpretation of the driller's field logs. It indicates only the approximate boundaries between soil types. The actual transitions between adjacent soil strata may be gradual and indistinct.

Ardaman & Associates, Inc.

May 11, 2016
File No.: 16-2540
-3-

The results of our test borings indicate the following general soil profile:

| Depth Below Ground Surface (feet) | Description |
|---|---|
| 0 – 2 | Fill, limerock |
| 2 – 10 | Sand, slightly silty to silty, very fine grained, with some rock fragments and traces of organics |
| 10 – 17 | Silt, soft with organics |
| 17 – 28 | Limestone |
| 28 – 40 | Limestone, poorly cemented |
| 40 – 50 | Limestone |
| 50 – 60 | Varies from poorly cemented to limestone |

The above soil profile is outlined in general terms only.  Please refer to the boring logs for soil profile details.

## GROUNDWATER CONDITIONS

Our drillers observed groundwater in the boreholes at depths between 3.7 and 5.5 feet below the ground surface, as noted on the boring logs.  Fluctuations in the groundwater level on this site should be anticipated throughout the year due to seasonal variations in rainfall, drainage, and other factors. We expect that groundwater conditions are controlled by the tidal fluctuations in the intercoastal.

## DISCUSSIONS AND RECOMMENDATIONS

### GENERAL

Based on the findings of our site exploration, our evaluation of subsurface conditions, and judgment based on our experience with similar projects, we conclude that the soils underlying this site are not satisfactory to support the proposed towers on conventional spread foundations. In our opinion, pile type foundations should be used to support the proposed towers.

The assessment of the allowable capacity for the seven towers was completed using what we considered to be the most representative soil condition through the site. The 14-inch diameter auger cast pile may be the most feasible pile type, considering access

Ardaman & Associates, Inc.

May 11, 2016
File No.: 16-2540

-4-

conditions at some of the tower locations. The 14-inch diameter pile will not require a load test for allowable capacities of 35 tons or less.

## TABLE 1
## CAST-IN-PLACE CONCRETE PILES
### Capacity in tons: Tension (T), Compression (C)

| DEPTH (feet) | PILE DIAMETER (inches) | | |
|:---:|:---:|:---:|:---:|
| | 14 | 16 | 18 |
| 25 | 12 (T) 25 (C) | - | - |
| 28 | 16 (T) 35 (C) | - | - |
| 35 | 34 (T) 70 (C) | 39 (T) 80 (C) | 75 (T) 149 (C) |
| 45 | 54 (T) 112 (C) | 62 (T) 128 (C) | 86 (T) 180 (C) |

For the auger cast piles, the concrete grout used to form the piles should attain a compressive strength in accordance with requirements by the Florida Building Code. The auger may be retrieved slowly to the ground surface as the grout is being pumped. The amount of concrete grout used to form each pile should be larger than 1.2 times the theoretical pile volume (grout factor). At least this calculated volume of pile is to be pumped per foot of pile as the auger is retrieved in one-foot intervals. We expect that the loose sand area may trigger grout factor to values above 1.5. If grout pumping and/or auger retrieval operations are stopped at any time during the formation of a given pile, the borehole is to be re-augered and the pile formed anew. Piles shall not be installed within 6 piles diameters center to center, of a pile constructed within the previous 24 hours. If the concrete level in any completed pile drops, the pile shall be rejected and replaced. If there is difficulty in placing the reinforcement steel in any pile, the pile shall be re-drilled and replaced.

All reinforcement steel should be fitted with a spacer at its lower tip to allow easier installation into the piles and assure its centering. Any modification to these procedures is to be approved by the Geotechnical Engineer based on observations during pile installation. Pile capacities greater than our recommended capacities may be established by performing pile load tests on test piles.

We recommend that Ardaman & Associates, Inc. be retained to observe and monitor the placement of the piles. Each pile should be placed to the depth recommended. Pile installation should be performed in compliance with the Florida Building Code. Care must

May 11, 2016
File No.: 16-2540                                                                              -5-

be exercised during pile placement to assure that existing structures in the proximity of the site are not harmed.

Please note that our recommendations are based on the site being made accessible to the piling equipment.

## Pile Spacing

We recommend a pile of 3 diameters center to center. Closer spacing will require revision of the capacities presented in Table 1.

## Settlements

Calculated settlements under pile foundation resulted in less than one inch. The majority of settlements should occur during construction. Structural analysis of the foundation/structure systems may be performed with a spring constant of 600 k/in for piles in compression and 200 k/in for piles in tension.

## Lateral Load Analysis

We have completed engineering analysis to determine lateral pile capacity for the 14-inch diameter auger cast pile installed to 28 feet below existing grade.

The study was performed using the L-Pile computer program. The input data was developed from the information contained in this report and engineering judgment. Horizontal loads in the range of 3 to 30 kips were applied to a head of the pile at grade beam level. Allowable lateral load was defined as half the load at which a nonlinear behavior in the curve, lateral load versus displacement, was observed. The allowable lateral load for the 14-inch piles to 28 feet is 6 kips.

## Seismic Conditions

Seismic conditions in South Florida are not a practical consideration for structures design. Critical design loads are defined by wind conditions.

## CLOSURE

This report has been prepared in accordance with generally accepted local foundation engineering practice. The recommendations submitted herein are based on the data obtained from the soil borings presented in the Appendix and the assumed loading

 Ardaman & Associates, Inc.

May 11, 2016
File No.: 16-2540                                                                        -6-

conditions previously described. This report may not account for all the possible variations that may exist between conditions observed in the borings and conditions at locations that were not explored. The nature and extent of any such variations may not become evident until construction is underway. If variations are then observed, we recommend that Ardaman & Associates, Inc. be requested to inspect the actual site conditions and, if necessary, re-evaluate the recommendations of this report.

In the event any changes occur in the design, nature or location of any project facilities, Ardaman & Associates, Inc. should be requested to review the conclusions and recommendations in this report. We also recommend that we be requested to review the final foundation drawings and earthwork specifications so that our recommendations may be properly interpreted and implemented in the contract documents.

It has been a pleasure to assist you on this phase of your project. Please contact us whenever we may be of service to you, and please call if you have any questions concerning this report.

**ARDAMAN & ASSOCIATES, INC.**
Certificate of Authorization No. 0005950

Evelio Horta, Ph.D., P.E., G.E.
Senior Geotechnical Engineer
FL Reg. No. 46625

Evelio Horta, Jr., M.S.C.E.
Staff Engineer

Ardaman & Associates, Inc.

# SITE PLAN
## and
# BORING LOGS



SITE VICINITY MAP

Figure No 1.

File No.: 16-2540

Prepared By: EH.Jr

Date: 04/25/16

Ardaman & Associates, Inc.
Geotechnical, Environmental and
Materials Consultants

SUBSURFACE EXPLORATION
PROPOSED ZIPLINE TOWERS
JUNGLE ISLAND, 1111 PARROT PARK, MIAMI
MIAMI DADE COUNTY, FLORIDA



**Ardaman & Associates, Inc.**
Geotechnical, Environmental and
Materials Consultants

SUBSURFACE EXPLORATION
PROPOSED ZIPLINE TOWERS
JUNGLE ISLAND, 1111 PARROT PARK, MIAMI
MIAMI DADE COUNTY, FLORIDA

BORING LOCATION PLAN

Figure No 2.

| File No.: | 16-2540 |
| Prepared By: | EHJr |
| Date: | 04/25/16 |

# APPENDIX

## STANDARD PENETRATION TEST BORING LOGS

Our borings describe subsurface conditions only at the locations drilled and at the time drilled. They provide no information about subsurface conditions below the bottom of the boreholes. At locations not explored, surface conditions that differ from those observed in the borings may exist and should be anticipated.

The information reported on our boring logs is based on our drillers' logs and on visual examination in our laboratory of disturbed soil samples recovered from the borings. The distinction shown on the logs between soil types is approximate only. The actual transition from one soil to another may be gradual and indistinct.

The groundwater depth shown on our boring logs is the water level the driller observed in the borehole when it was drilled. These water levels may have been influenced by the drilling procedures, especially in borings made by rotary drilling with bentonitic drilling mud. An accurate determination of groundwater level required long-term observation of suitable monitoring wells. Fluctuations in groundwater levels throughout the year should be anticipated.

The absence of a groundwater level on certain logs indicates that no groundwater data is available. It does not mean that no groundwater will be encountered at the boring location.

Ardaman & Associates, Inc.

## STANDARD PENETRATION TEST BORINGS

The Standard Penetration Test is a widely accepted method of testing foundation soils in place. The N-Value obtained from the test has been correlated empirically with various soil properties. These empirical correlations allow satisfactory estimates to be made of how the soil is likely to behave when subjected to foundation loads. Tests are usually performed in the boreholes at intervals of five feet. In addition, our Firm performs tests continuously in the interval directly below the expected foundation bearing grade where the soils will be most highly stressed.

Boreholes where Standard Penetration Tests will be performed are drilled with a truck-mounted CME 45A drill rig. The boreholes are advanced by rotary drilling with a winged bit that makes a hole about three inches in diameter. A bentonitic drilling mud is recirculated in order to remove the cuttings and support the walls of the borehole. The drag bit is specially modified to direct the mud upward and reduced disturbance of the soil ahead of the bit.

Occasionally, running or squeezing ground is encountered that cannot be stabilized by the drilling mud alone. In addition, drilling mud may be lost into the soil or rock strata that are unusually pervious. In such cases, flush-coupled steel casing with an outside diameter of about 3.5 inches is driven as a liner for the borehole.

After the borehole has been advanced to the depth where a Standard Penetration Test will be performed, the soil sampler used to run the test is attached to the end of the drill rods and lowered to the bottom of the borehole. The testing procedure used conforms closely to the methods recommended in ASTM D-1586. The sampler used has a split-barrel 24 inches long and an outside diameter of 2.0 inches. It is driven into the ground below the bottom of the borehole using a hammer that weighs 140 pounds and falls 30 inches. The driller records the number of hammer blows need to advance the sampler the second and third six-inch increments constitutes the test result; that is, the N-Value at the depth. The test is completed after the sampler has been driven not more than 24 inches or when refusal is encountered, whichever occurs first. Refusal occurs when 50 hammer blows advance the sampler six inches or less. After the test is completed, the sampler is removed from the borehole and opened.

The driller examined and classified the soil recovered by the sampler. He places representative soil specimens from each test in closed glass jars and takes them to our laboratory. In the laboratory, additional evaluations and tests are performed, if needed. The driller's classifications may be adjusted, if necessary, to conform more closely to the United Soil Classification systems, ASTM D-2487. Jar samples are retained in our laboratory for sixty days, then discarded unless our clients request otherwise.

After completion of a test boring, the water level in the borehole is recorded.

 Ardaman & Associates, Inc.

# STANDARD PENETRATION TEST BORING LOG
## BORING 1

PROJECT: Proposed Zipline Towers
Jungle Island, 1111 Parrot Park, Miami, FL

FILE No.: 16-2540

BORING LOCATION:  SEE PLAN

DRILL CREW:  EG/FCH

WATER OBSERVED AT DEPTH 5.5'

DATE DRILLED:  05/05/16

| DEPTH (FEET) | SYMBOLS FIELD TEST DATA | SOIL DESCRIPTION | SAMPLE No. | N VALUE | N VALUE |
|---|---|---|---|---|---|
| 0 | 9/6 6/6 6/6 | FILL, limerock, sandy | 1 | 12 | |
| | 6/6 5/6 5/6 | | | 10 | |
| 5 | 5/6 4/6 2/6 | FILL, silty sand, with some organics and construction debris (SM) | 2 | 6 | |
| | 5/6 5/6 20/6 | | | 25 | |
| | 5/6 20/6 4/6 | | | 24 | |
| 10 | 5/6 1/6 4/6 | | | 5 | |
| | 1/6 1/6 1/6 | SILT, very soft, grey (ML) | 3 | 2 | |
| 15 | 1/6 1/6 1/6 | | | 2 | |
| | | LIMESTONE, white | 4 | | |
| 20 | 9/6 14/6 7/6 | | | 21 | |
| | 4/6 4/6 5/6 | LIMESTONE, poorly cemented, pale brown | 5 | 9 | |
| 25 | | | | | |
| 30 | 4/6 4/6 2/6 | | | 6 | |
| 35 | 5/6 5/6 5/6 | | | 10 | |

NOTES:

FIELD TEST DATA ARE "BLOWS"/"INCHES DRIVEN"       140-LB HAMMER, 30-INCH FALL.       (ASTM D-1586)

# STANDARD PENETRATION TEST BORING LOG
## BORING 1

PROJECT:  Proposed Zipline Towers
          Jungle Island, 1111 Parrot Park, Miami, FL

FILE No.:  16-2540

BORING LOCATION:  SEE PLAN

DRILL CREW:  EG/FCH

WATER OBSERVED AT DEPTH 5.5'

DATE DRILLED:  05/05/16



| DEPTH (FEET) | SYMBOLS FIELD TEST DATA | SOIL DESCRIPTION | SAMPLE No. | N VALUE |
|---|---|---|---|---|
| 35 | | | | |
| | 0/6 0/6 0/6 | SAND, very loose fine grained, grey (SP) | 6 | 0 |
| 40 | 40/6 27/6 11/6 | LIMESTONE, yellow | 7 | 38 |
| | 17/6 22/6 27/6 | LIMESTONE, white | 8 | 49 |
| 45 | | | | |
| | 5/6 6/6 26/6 | SAND, very loose fine grained, grey | 9 | 32 |
| 50 | | LIMESTONE, white | 10 | |
| | 5/6 4/6 5/6 | LIMESTONE, with coral fragments, pale brown | 11 | 9 |
| 55 | | | | |
| 60 | 5/6 7/6 9/6 | | | 16 |
| 65 | | | | |
| 70 | | | | |

NOTES:

FIELD TEST DATA ARE "BLOWS"/"INCHES DRIVEN", 140-LB HAMMER, 30-INCH FALL.    (ASTM D-1586)

# STANDARD PENETRATION TEST BORING LOG
## BORING 2

PROJECT:  Proposed Zipline Towers
Jungle Island, 1111 Parrot Park, Miami, FL

FILE No.:  16-2540

BORING LOCATION:  SEE PLAN

DRILL CREW:  EG/FCH

WATER OBSERVED AT DEPTH 4.33'

DATE DRILLED:  05/06/16

| DEPTH (FEET) | SYMBOLS FIELD TEST DATA | SOIL DESCRIPTION | SAMPLE No. | N VALUE | N VALUE |
|---|---|---|---|---|---|
| 0 | 25/6 16/6 11/6 | FILL, limerock, sandy (GW) | 1 | 27 | |
| | 5/6 7/6 12/6 | FILL, silty sand, with some organics and rock fragments | | 19 | |
| 5 | 7/6 10/6 10/6 | | | 20 | |
| | 7/6 11/6 11/6 | | | 22 | |
| | 10/6 9/6 6/6 | | | 15 | |
| 10 | 2/6 1/6 1/6 | SAND, fine grained, loose, white (SP) | 3 | 2 | |
| | 1/6 0/6 1/6 | SILT, very soft, grey (ML) | 4 | 1 | |
| 15 | 1/6 1/6 1/6 | | | 2 | |
| | 12/6 10/6 14/6 | LIMESTONE, white | 5 | 24 | |
| 20 | | | | | |
| | 1/6 0/6 1/6 | | | 1 | |
| 25 | 2/6 7/6 7/6 | LIMESTONE, poorly cemented | 6 | 14 | |
| | 11/6 11/6 10/6 | LIMESTONE, pale brown | 7 | 21 | |
| 30 | | | | | |
| 35 | 6/6 5/6 4/6 | SAND, fine grained, loose, pale brown (SP) | 8 | 9 | |

NOTES:

FIELD TEST DATA ARE "BLOWS"/"INCHES DRIVEN"        140-LB HAMMER, 30-INCH FALL.        (ASTM D-1586)

# STANDARD PENETRATION TEST BORING LOG
## BORING 2

PROJECT:  Proposed Zipline Towers
Jungle Island, 1111 Parrot Park, Miami, FL

FILE No.:  16-2540

BORING LOCATION:  SEE PLAN

DRILL CREW:  EG/FCH

WATER OBSERVED AT DEPTH 4.33'

DATE DRILLED:  05/06/16



# STANDARD PENETRATION TEST BORING LOG
## BORING 3

PROJECT:  Proposed Zipline Towers
Jungle Island, 1111 Parrot Park, Miami, FL

FILE No.:  16-2540

BORING LOCATION:  SEE PLAN

DRILL CREW:  EG/FCH

WATER OBSERVED AT DEPTH 5.33'

DATE DRILLED:  05/06/16



| DEPTH (FEET) | SYMBOLS FIELD TEST DATA | SOIL DESCRIPTION | SAMPLE No. | N VALUE | N VALUE |
|---|---|---|---|---|---|
| 0 | 25/6 17/6 11/6 | FILL, limerock (GW) | 1 | 28 | |
| | 4/6 5/6 6/6 | FILL, silty sand, with some organics and rock fragments (SM) | 2 | 11 | |
| 5 | 11/6 9/6 10/6 | | | 19 | |
| | 9/6 9/6 6/6 | | | 15 | |
| | 5/6 2/6 9/6 | | | 11 | |
| 10 | 6/6 5/6 7/6 | SILT, grey, soft | 3 | 12 | |
| | 2/6 1/6 0/6 | | | 1 | |
| 15 | 1/6 1/6 1/6 | | | 2 | |
| | | LIMESTONE, white | 4 | | |
| | 7/6 9/6 15/6 | | | 24 | |
| 20 | | | | | |
| | 2/6 0/6 0/6 | LIMESTONE, poorly cemented, pale brown | 5 | 0 | |
| 25 | 4/6 4/6 4/6 | | | 8 | |
| | | LIMESTONE, pale brown | 6 | | |
| | 29/6 74/3 | HARD DRILLING from 26.5' to 27.5' REFUSAL 3" HARD DRILLING from 28.5' to 32" | | 103 | 103 |
| 30 | | | | | |
| 35 | 1/6 1/6 2/6 | SAND, very loose, green (SP) | 7 | 3 | |

NOTES:

FIELD TEST DATA ARE "BLOWS"/"INCHES DRIVEN"          140-LB HAMMER, 30-INCH FALL.          (ASTM D-1586)

# STANDARD PENETRATION TEST BORING LOG
## BORING 3

PROJECT:  Proposed Zipline Towers
Jungle Island, 1111 Parrot Park, Miami, FL

FILE No.:  16-2540

BORING LOCATION:  SEE PLAN

DRILL CREW:  EG/FCH

WATER OBSERVED AT DEPTH 5.33'

DATE DRILLED:  05/06/16



| DEPTH (FEET) | SYMBOLS FIELD TEST DATA | SOIL DESCRIPTION | SAMPLE No. | N VALUE | N VALUE |
|---|---|---|---|---|---|
| 35 | | LIMESTONE, pale brown | 8 | | |
| | | HARD DRILLING 36.5' to 38' | | | |
| | 30/6 31/6 35/6 | | | 66 | 66 |
| 40 | | HARD DRILLING from 41' to 43' | | | |
| | 81/6 | HARD DRILLING from 43' to 46' | | 81 | 81 |
| 45 | | | | | |
| | 25/6 16/6 7/6 | | | 23 | 23 |
| 50 | | LIMESTONE, pale brown | 9 | | |
| | 5/6 5/6 6/6 | | | 11 | 11 |
| 55 | | | | | |
| | 6/6 4/6 36/6 | | | 40 | 40 |
| 60 | | | | | |
| 65 | | | | | |
| 70 | | | | | |

NOTES:

FIELD TEST DATA ARE "BLOWS"/"INCHES DRIVEN", 140-LB HAMMER, 30-INCH FALL.   (ASTM D-1586)

# STANDARD PENETRATION TEST BORING LOG
## BORING 4

PROJECT:  Proposed Zipline Towers
              Jungle Island, 1111 Parrot Park, Miami, FL

FILE No.:  16-2540

BORING LOCATION:  SEE PLAN

DRILL CREW:  EG/FCH

WATER OBSERVED AT DEPTH 3.67'

DATE DRILLED:  05/05/16

| DEPTH (FEET) | SYMBOLS FIELD TEST DATA | SOIL DESCRIPTION | SAMPLE No. | N VALUE |
|---|---|---|---|---|
| 0 | 5/6 3/6 5/6 | SAND, silty, with some organics and a few rock fragments (SM) | 1 | 10 |
| | 2/6 5/6 9/6 | | | 14 |
| 5 | 16/6 17/6 16/6 | | | 33 |
| | 9/6 11/6 12/6 | | | 23 |
| | 6/6 10/6 12/6 | | | 22 |
| 10 | 6/6 4/6 2/6 | SILT, soft, grey (ML) | 2 | 6 |
| | 4/6 2/6 2/6 | | | 4 |
| 15 | 2/6 0/6 0/6 | | | 0 |
| | 6/6 5/6 17/6 | LIMESTONE, white | 3 | 22 |
| 20 | | | | |
| | 6/6 12/6 11/6 | | | 23 |
| 25 | | | | |
| 30 | 6/6 5/6 4/6 | LIMESTONE, sandy, poorly cemented | 4 | 9 |
| | | LIMESTONE, poorly cemented, brown | 5 | |
| 35 | 4/6 5/6 5/6 | LIMESTONE, very poorly cemented, with voids (Oolite) | 6 | 10 |

NOTES:

FIELD TEST DATA ARE "BLOWS"/"INCHES DRIVEN"    140-LB HAMMER, 30-INCH FALL.    (ASTM D-1586)

# STANDARD PENETRATION TEST BORING LOG
## BORING 4

PROJECT: Proposed Zipline Towers
Jungle Island, 1111 Parrot Park, Miami, FL

FILE No.: 16-2540

BORING LOCATION: SEE PLAN

DRILL CREW: EG/FCH

WATER OBSERVED AT DEPTH 3.67'

DATE DRILLED: 05/05/16



| DEPTH (FEET) | SYMBOLS FIELD TEST DATA | SOIL DESCRIPTION | SAMPLE No. | N VALUE |
|---|---|---|---|---|
| 35 | | | | |
| | 1/6 0/6 0/6 | | | 0 |
| 40 | 1/6 2/6 9/6 | LIMESTONE, white | 7 | 11 |
| | | HARD DRILLING from 41.5'-43' | 8 | |
| | 74/2 | REFUSAL 2" | | 74 |
| 45 | | | | |
| | 27/6 15/6 12/6 | | | 27 |
| 50 | | LIMESTONE, poorly cemented, white | 9 | |
| | 4/6 2/6 4/6 | | | 6 |
| 55 | | LIMESTONE, white | 10 | |
| | 74/3 | HARD DRILLING from 56.5' to 58" REFUSAL 3" | | 74 |
| 60 | | | | |
| 65 | | | | |
| 70 | | | | |

NOTES:

FIELD TEST DATA ARE "BLOWS"/"INCHES DRIVEN", 140-LB HAMMER, 30-INCH FALL.   (ASTM D-1586)

# PILE ALLOWABLE CAPACITY



0
Jungle Island Adventure Park

Engineer:   A&A
File No:     162540

Boring No: B-3
Auger Size     14



PILE CAPACITY

# LATERAL LOAD ANALYSIS

**Jungle Island**

**Lateral Deflection (in)**









Jungle Island

Shear Force (kips)

# EXHIBIT 4



**Experiential Resources, inc.**
PO Box 542
Lahaina, HI 96767

06 June 2016

Trey Davis
Hayward Baker, Inc.
5461 W. Waters Ave. Ste. 900
Tampa, FL 33634

Dear Mr. Davis,

This letter has been prepared by Experiential Resources, inc. (ERi) to announce our intent to utilize the Hayward Baker, Inc. (HBI) team for the design and installation of micropiles for our upcoming zip line tour installation in Miami, FL.

The ERi team will provide the following requested information to HBI:
- Complete/updated plan set for the Jungle Island Zip Tour
- Complete load criteria/load cases

ERi is requesting the following from HBI:
- Development of a contract for design/installation ASAP
- Design completed and submitted to ERi by end of day Friday, 10 June 2016

Please let us know if this is agreeable to HBI, and what additional needs you have to move forward, if any.  Thank you and we look forward to working with HBI on this project.

Best Regards,

Todd Domeck, CEO
Experiential Resources, inc.
todd@experientialresources.net

# EXHIBIT 5



August 5, 2016

Christine Velazquez, Chief
Office of Code Coordination & Public Hearings
701 N.W. 1 Court, Suite #400
Miami, Florida 33136

RE: Letter of Interpretation

Dear Ms. Velazquez:

Jungle Island is requesting a Letter of Interpretation for installation of a zip line tour attraction within the existing property and buildings located at:

Jungle Island
1111 Parrot Jungle Trail
Miami, FL 33132
(305) 400-7000
Folio # 01-3231-000-0014

NOTE: Please see enclosed documents for a current survey, legal description of the property, and the property folio.

Description of Project
The proposed project is a zip line tour located within the existing Jungle Island property. All structures to be installed are freestanding from existing buildings, with the exception of the entrance bridge which will be accessed via an existing outdoor elevated walkway. Guests will be secured into a safety system and will remain off the ground from the entry point until they exit the zip tour.

The zip line tour and its associated structures will consist of:

- A support structure for the bridge entrance from an existing elevated walkway
- Eight (8) overhead suspension bridges
    o Length of bridges ranges from 76' to 123'
- Seven (7) towers of varying dimension with 22 total footings
    o Height of towers ranges from 22' to 133'

- Eight (8) overhead zip lines
  - Length of zip lines ranges from 203' to 1013'
- 39 guy line anchorages to support the tower structures

The entire zip line tour will be enclosed within Jungle Island property, including dual side-by-side zip lines that will travel partially above the waterfront area owned by Jungle Island.



2



3

The footprint of the structures is as follows:

| Course Component | Tower Foundation # | Tower Foundation Type | # Guys | Guy Type |
|---|---|---|---|---|
| Bridge Entry | 2 | 4x8 Footings | | |
| | | | 0 | n/a |
| Tower #1 | 2 | 4x4 Footings | | |
| | 2 | 4x4 Scissor Footings | | |
| | | | 3 | 3.5x3.5 Guy Anchor Footing |
| Tower #2 | 5 | 4x4 Footings | | |
| | | | 1 | 4x8 Raised Ground Anchor |
| Tower #3A | 1 | 8x8 Column Footing | | |
| | | | 1 | 4x8 Raised Ground Anchor |
| | | | 4 | 3.5x3.5 Guy Anchor Footing |
| Tower #3B | 1 | 8x8 Column Footing | | |
| | | | 5 | 3.5x3.5 Guy Anchor Footing |
| Tower #3C | 1 | 8x8 Column Footing | | |
| | | | 1 | 4x8 Raised Ground Anchor |
| | | | 5 | 3.5x3.5 Guy Anchor Footing |
| Tower #4 | 1 | 14x14 Tower Foundation | | |
| | | | 2 | 4x8 Raised Ground Anchor |
| | | | 4 | 3.5x3.5 Guy Anchor Footing |
| Tower #5 | 1 | 14x14 Tower Foundation | | |
| | | | 5 | 3.5x3.5 Guy Anchor Footing |
| Tower #6 | 1 | 14x14 Tower Foundation | | |
| | | | 6 | 4x8 Raised Ground Anchor |
| Tower #7 | 4 | 4x4 Footings | | |
| | 1 | 4x16 Footing | | |
| | | | 2 | 3.5x3.5 Guy Anchor Footing |

| Footings # | Area | Total | Guys # | Area | Total |
|---|---|---|---|---|---|
| 13 | 16 | 208 | 28 | 12.25 | 343 |
| 2 | 32 | 64 | 11 | 32 | 352 |
| 4 | 64 | 256 | 39 | | 695 |
| 3 | 196 | 588 | | | |
| 22 | | 1116 | TOTAL | | 1811 |

Total final footprint of the zip line tour including all tower footings and guy anchors will be 1,811 square feet.

Foundations, footings, and raised ground anchors will be constructed with micropiles and will have additional reinforced concrete construction.

**WETLAND & SHORELINE AREAS**
<u>Known Existing Species of Concern</u>

The following species have been identified as being present at this site:

- Green Buttonwood
- White Mangrove
- Black Mangrove

These are present at the shoreline near Towers #6 & #7 sites, and the dual zip lines running between the two.





Green Buttonwood:
Located near the guy lines for Tower #6. Initial survey indicates that guy lines will fall around the area of the Green Buttonwood. No specific action currently needed.

White Mangrove (~20'):
Located underneath the dual zip lines running beneath planned site of Towers #6 & #7. Currently poses no issue. A permit to maintain the Mangrove at current height may be pursued to ensure no future encroachment into the rider envelope.

White Mangrove & Black Mangrove (~7'):
Located along the shoreline underneath the dual zip lines running between planned site of Towers #6 & #7. Currently poses no issue. We plan to monitor the growth in future years.

NOTE:
*As educational components regarding the ecology of the island are planned to be included in the guest experience, we are invested in maintaining the health and presence of these species at Jungle Island.*

We welcome a vegetation site survey to ensure identification of additional natural resources/species of concern at the site. A construction stakeout survey is being scheduled to identify any conflicts between existing specimen trees and the site plan. We currently do not foresee major conflicts and are happy to work with any authorities having jurisdiction to mitigate the impact of this project on the island's natural resources.

**WATER & SEWER**
There no water or sewer components to be built as part of this project. Jungle Island guests will continue to use existing facilities for restroom and water-related needs. Please note that Jungle Island has the following accounts with the Miami-Dade Water and Sewer Department in the name of PJG WATSON LLC:

8762674256
8584132561
8151348813
7571392048
6209265086
3968831621
3903235164
2253893638
0923262056
1368807414

**CONTACT INFORMATION**
For more information on details of this project, please contact:
Christopher Gould, Managing Director
Jungle Island
(305) 400-7218
cgould@jungleisland.com

AND

Mandy Stewart, Catalyst
Experiential Resources, Inc.
(253) 318-6087
mandy@experientialresources.net

Thank you for your assistance. We look forward to working with you on the project.

Yours Sincerely,

*Christophe Gould*

Christopher Gould
Managing Director

7

# EXHIBIT 6



**Dynamic Designs LLC**

**364 Calle Colina Santa Fe, NM 87501**
**408-768-9669 - License 29335**

## STRUCTURAL PEER REVIEW REPORT
## Jungle Island Zip Course

### INTRODUCTION: PURPOSE OF REPORT

The following report gives the extent of the Peer Review, comments made, the reviewers opinion as to the adequacy of the design detailed by the structural engineer of record in the permit set of structural drawings and calculations and assesses the compliance of the structural drawings and design to the applicable building and design codes applied by the structural engineer of record

The Peer Review was not an exhaustive examination of the complete design. The review was intended to assess the general conformance of the structural design and detailing to the governing codes and widely accepted standards of engineering practice. The report is not intended as a critique of the EOR's work.

### SCOPE OF THE PEER REVIEW

Per the guidelines and criteria provided by the Miami Building Department,

> *"the purpose of the Structural Peer Review is to provide independent verification that the structural design of the Structure is in general conformance with the requirements of the Florida Building Code, and all related structural codes and technical standards.*
>
> *The Structure is defined as follows:*
>
> *\*Structure: the structural frame and the load supporting parts of the floors, roofs, walls, foundations, cladding, cladding framing, stairs, equipment supports, railings, and other secondary items are included in this definition of "Structure"*

Using the guidelines above, the plans and calculations provided to the reviewer by the structural engineer of record were thoroughly and methodically reviewed to ensure that the ride and its structure were designed in accordance with the Florida Building Code and the applicable ASTM-F24 Amusement Ride and Device standards.

Specifically, the peer review included but was not limited to the following tasks

1. Confirm design loads in accordance with applicable building and ride design codes

2. Confirms that all applicable load combinations were applied and used properly

3. Verifies that all structural design criteria and assumptions applied by the structural engineer of record are in accordance with governing building and designs codes, as well as generally accepted engineering practice for safe design

4. Review the geotechnical report to verify the structural design is in accordance with results and recommendations of that report

5. Review of the structure's load path and confirm that it is sound, logical, and abides by all principles of structural engineering design and practice

6. Review of the structural models, including RISA and Solidworks for consistency, accuracy, and conformance with sound engineering practices, as well as building and design code criteria

7. Verify the structural integrity of the design and that it is in accordance with the criteria in the governing building, and design codes relating to such

8. Verify that the "Structure" as defined above, is in conformance with the Florida Building Code

9. Determine that the structural design and drawings meet standards for "general completeness"

10. Preparation of a detailed "Peer Review Report" *(per guidelines set forth by the City of Miami Building Department)*

## QUALIFICATIONS of the PEER REVIEWER

William Kelley became a licensed professional engineer in the state of Florida in 2004. He earned a bachelor's degree in Engineering in 1969 from Case Institute of Technology. He is currently licensed as a professional civil engineer in 16 states. He is also licensed as a mechanical engineer in CA and NV.

Of his 47 years of engineering experience 35 years have been spent primarily in the amusement industry. Design projects range from steel and wood roller coasters to portable kiddie rides. The largest structure designed was a 95-meter-tall steel coaster. He is the Engineer of Record for four zip lines including Slotzilla, which runs over Fremont Street in downtown Las Vegas, the Engineer of Record for five challenge course projects. Work in Florida includes design of the 'Coastersaurus' wood coaster at Legoland in Winter Haven, and repair design for the Dania Beach Hurricane Coaster. His experience design and approval of ride structures gives William the insight and knowledge required to review the design of this project.

## GENERAL PROJECT INFORMATION

**Property Owner**



City of Miami Dept. of Real Estate
444 SW 2nd Avenue, 3rd Fl.
Miami, FL 33130
305-416-1471
mburns@miamigov.com

**Lessee/Project Owner**



Parrot Jungle & Gardens of Watson Island, Inc.
DBA Jungle Island
1111 Parrot Jungle Trail
Miami, FL 33132
305-400-7218
cgould@jungleisland.com

**Designer of Record**



Todd Domeck
Experiential Resources, inc.
P.O. Box 542
Lahaina HI 96767
808-441-5347
todd@experientialresources.net

**Engineer of Record**



Jared Krupa
K2 Engineering and Structural Design
860 Maestro Dr. Suite A,
Reno, Nevada 89511
775-355-0505
jared@k2eng.net

**Project Description**

The proposed project is a zip line course located within the existing Jungle Island property. All structures to be installed are freestanding from existing buildings, with the exception of the entrance bridge which will be accessed via an existing outdoor elevated walkway. Guests will be secured into a safety system and will remain off the ground from the entry point until they exit the zip course.

The zip line course and its associated structures will consist of:
- A support structure for the bridge entrance from an existing elevated walkway
- Eight (8) overhead suspension bridges
  - Length of bridges ranges from 76' to 123'
- Seven (7) towers of varying dimension with 22 total footings
  - Height of towers ranges from 22' to 133'
- Eight (8) overhead zip lines
  - Length of zip lines ranges from 203' to 1013'
- 39 guy line anchorages to support the tower structures


**Structural System**

Structural elements of the course consist of steel and wood towers. All towers are guyed to assist in lateral force resistance. Two (2) towers are constructed of wood poles, one (1) tower consists of guyed steel poles, three (3) towers are steel braced frames and one (1) tower is a wood braced frame.

The foundation system consists of micropiles with reinforced concrete pile caps supporting the tower structures. The Geotechnical Engineer Report, dated May 11, 2016, prepared by Ardaman & Associates was reviewed as part of this report.


**DESIGN CRITERIA**

**Review of Codes**


- Structural notes are shown on Drawings A 000, SD -2 and SD-3

- The 2012 International Building Code (IBC) was the basis for the design

- ASCE-7-10 was used for general Design Loads; ASTM F 2291 was used as the basis for the patron loading of the zip lines

- Latest edition of ACI 318-11 "Building Code Requirements for Structural Concrete" was used for the design of reinforced concrete

- AISC "Specification for Structural Steel Buildings" 14th edition was the basis for the design of structural steel

- AWC NDS-2015 is used to design wood members

**Design Software used by the Structural Engineer of Record**

- RISA 3D: Structural Frame design in 3D & 2D
- RISA Foundation: Mat Foundation, Slab Design & Grade Beam Design
- EnerCalc: Single Member Design, Pad Foundation Design, Concrete member design
- Wood Works: Wood Member only
- Solidworks – curved pod member design
- Office Program: Wind and Seismic force calculation, Lateral design for Light frame structures.

**Material Properties**

- **Cast in Place Concrete**

    o  Concrete strength at 28 days 4000 psi

- **Structural Steel**

    o  Shapes, plates, and bars (except W-Shapes): ASTM A 36 $F_y$ = 36*ksi
    o  W- shapes: ASTM A992, $F_y$ = 50 ksi
    o  Pipe: ASTM A53 or A 501 $F_y$ = 35 ksi min.
    o  Tubes (including HSS): ASTM A 500 Gr B  $F_y$ = 46 ksi min.

- **Bolts**

    o  ASTM A 307 $F_y$ = 36 ksi
    o  ASTM A 325 $F_y$ = 92 ksi
    o  Anchor rods: ASTM A 1554 Grade 36 $F_y$ = 36 ksi

- **Wood**

    o  Sawn lumber:  Spruce-pine-fir (SPF) No. 2 or better Reference Design values $F_b$ = 875 psi $F_t$ = 450 psi $F_v$ = 135 psi $F_c$ = 1150 psi
    o  Timbers:  Spruce-pine-fir No 1 or better Reference Design Values $F_b$ = 850 psi $F_t$ = 550 psi $F_v$ = 125 psi $F_c$ = 700 psi
    o  Poles:  Douglas Fir; Wood fiber strength 8000 psi (per North American Wood Pole Council)

**Structural Loading**

All structural loading in the design models and calculations were found to be consistent with the ASCE 7-10 and ASTM F 2291 codes.

Design loads noted on drawing SD-3 are given below

- **Live Loads**

    - Stairs                    100 psf
    - Landings                50 psf
    - Tower Platforms     50 psf

- **Wind Loads**

    - Basic Wind Speed          180 MPH Exposure D
    - Operational Wind Speed   35 MPH

    The Zip Line Course is a controlled access area. The following load conditions were considered in the design:

    - Maximum weight of rider and equipment   250 lbs
    - Maximum number of people on tower stairs and bridges – 2 per flight
    - Maximum number of people on tower landings – 2 per landing
    - Maximum number of people on tower deck – 6
    - Zip line horizontal load (unfactored) – 5000 lbs
    - Zip Line vertical load – 1000 lbs

## REVIEW OF STRUCTURAL LOAD PATH

A critical task in the Peer Review process is the review of the structural load path, to ensure that it is logical, sound, realistic, and consistent with the design performed by the EOR. For this purpose, the structure's resistance to gravity, live, and wind loading were examined.

**Gravity Load Path**

Careful review of the structural drawings and calculations shows the gravity load path to be acceptable. Decks, landings, and stairs of each tower are adequately supported by vertical elements. Horizontal forces resulting from gravity loading of cable elements (zip lines or bridges) are provided with paths to the foundations through either the tower elements or associated guy lines. The gravity load path is deemed logical and acceptable, based on sound engineering practice and all applicable building and design codes.

**Wind Load Path**

The main wind force resisting system differs depending on the tower. A list of the MWFRS for each tower is given below.

- Tower 1 – N-S Pole X frame; E-W internal guy X bracing
- Bridge Tower – N-S Cantilever poles with tied tops; E-W Braced frame
- Tower 2 – N-S guyed poles; E-W braced frame
- Tower 3 – Guyed steel poles resist forces in all directions
- Towers 4, 5 and 6 – Three dimensional steel braced frame
- Tower 7 – N-S wood poles with steel cross braces; E-W wood trussed frame

The shear load resisting system for each tower was found to provide a load path to the foundations. Foundations are designed to be supported by micropiles. Preliminary micropile design has proceeded using loads from main structural analysis. It is the reviewer's understanding that K2 Engineering and Structural Design will review and approve final micropile design according to identified loads.

The wind load path has been deemed logical and acceptable based on sound engineering practice and all applicable building and design codes.

**Live Load Path**

Live loads on landings and decks are resisted by the same system as the gravity loads. Live loads on zip lines induce lateral load which are resisted by either guy lines attached near the zip line connections or the wind lateral system. The live load path has been deemed logical and acceptable based on sound engineering practice and all applicable building and design codes.

## RISA 3D – Modeling

A major focus of the structural peer review process was an investigation of the RISA models prepared by the engineer of record. These 3-dimensional models were the basis of the design of the structure for all design loads. The RISA models were supplemented by a Solidworks analysis of the "pods". Pods are the bridge landings of tower 3. The pods are constructed with pipes that are bent in 3 dimensions and so are not amenable to analysis with normal structural programs. Figures 1 through 8 show the models used for the tower analyses. Figure 9 shows the pod model.



*Figure 1 – Tower 1 Model*



| Label | Shape |
|-------|-------|
| HR1 | 1/2" Cable |
| HR2 | HSS10x10x4 |
| HR3 | L4x4x4 |
| HR4 | L4x4x4 |

(3) 2 x 8

*Figure 2 – Bridge Tower Support Model*



*Figure 3 – Tower 2 Model*



*Figure 4 – Tower 3 Model*



*Figure 5 – Tower 4 Model*



*Figure 6 – Tower 5 Model*



*Figure 7 – Tower 6 Model*



*Figure 8 – Tower 7 Model*



*Figure 9 – Pod Solidworks Model*

Each tower was modeled as an independent structure. Structural loads included loads from the zip lines and bridges between the towers. Load combinations accounting for various arrangements of these live loads were considered. That is towers were analyzed with all zip lines loaded and with only some of the applicable zip line loads applied.

For the most part, the modeling methods employed by the engineer of record, with respect to using the RISA software, follow industry standards and guidelines. Any exceptions to this statement have been conveyed to the EOR via peer review comments. Full responsibility for the modeling techniques fall within the scope and jurisdiction of the EOR.

To the best of the reviewer's knowledge, construction of the 3-dimensional models and computer analysis appear accurate and consistent with the overall structural design intent.

Beams, columns, and braces were modeled as frame elements with end nodes released as required. Cables were modeled as tension only elements. Decks were modeled as plate elements to enable input of surface loads and provide diaphragm action. Wind, gravity, and dynamic loads were of magnitudes determined by the appropriate building code or industry standard. These loads were applied to the computer models in a manner consistent with standard practice and comply fully with all applicable building and design codes.

Generally, element design was checked by the internal RISA program code checks. For each element of the structure combined loads are checked against provisions of the applicable codes. All elements were found to meet applicable provisions of the relevant code. The program automatically applies codes appropriate to the material of the member. Codes used by the program for member checks are listed earlier in this report. Individual connections were checked manually.

Deflections under the various load conditions were calculated. Serviceability issues with structures of this type are minimal. There are no infill elements that could be damaged by excessive elements. The independent structures are separated by sufficient distance so that interference under maximum deflections is precluded. The structures have controlled access. They are to be unoccupied during storm events.

## ZIP LINE ELEMENTS

Zip lines were designed in accordance with ASTM-F24 standard F2959 "Standard Practice for Special Requirements for Aerial Adventure Courses". Factors of safety required by this standard were achieved. The lines were designed to support forces generated by rescue operations while maintaining the requisite factors of safety. The zip lines were also designed to withstand maximum wind loads specified by ASCE 7-10 for the site location.

An independent check of the EOR's in house program which was used for design of the zip lines was performed. The independent check used the program Robot Structural Analysis. The independent check cable forces agreed with those calculated by the EOR. The report from this check are attached as Annex A.

## FOUNDATION DESIGN

Soil conditions require use of micropiles to support the various footings for the ride. A preliminary design of the footings was included in the reviewed analysis. The design of these elements was found to be in accord with standard engineering practice. Elements designed were of adequate strength to support design loads. Adjustment of the design to accommodate the final micro pile design is under the purview of the EOR.

Calculations conforming to standard industry practice were provided for the anchor rods. Design of the rods was found to be appropriate.

## REVIEW OF STRUCTURAL DRAWINGS

**General Structural**

The General Structural Notes section of any set of structural drawings outlines among other things, specifications for building materials, design criteria, general code requirements, and other requirements set forth by the EOR. The General Structural Notes in the set of structural drawings presented for review do an adequate job at providing the necessary information required to build this structure.

A sheet of general notes outlining requirements specific to the zip lines is included. These notes cover topics such as pre-opening inspections, patron clearance envelope, wire rope terminations and maintenance. Non-structural items such as requirements for patron harnesses and rescue procedures are also covered. The notes included in the drawings adequately provide the information unique to zip lines.

**Zip Line Layout**

Seven sheets of zip line profiles were provided. These sheets adequately present the information such as height of attachment, span, and pre tension required for proper installation of the zip lines.

A sheet is provided that gives sufficient information for installation of the zip line brakes.

**Tower Layouts and Details**

Structural member sizes, connections and relevant details are adequately supplied on the drawings provided.

**Geotechnical Engineer**

All soil testing and reporting was performed by Ardaman & Associates, Inc. Subsurface exploration was carried out on May 11, 2016.

**Soil Borings**

Four Standard penetration test borings were performed to a depth of 60 feet below existing grade. Results from the tests are contained in the Ardaman & Associates report, file 16-2540.

**Soil Profile/ Subsurface Condition**

Results from the test borings indicate the following general soil profile.

| Depth Below Ground Surface (feet) | Description |
|---|---|
| 0 – 2 | Fill, limerock |
| 2 – 10 | Sand, slightly silty to silty, very fine grained, with some rock fragments and traces of organics |
| 10 – 17 | Silt, soft with organics |
| 17 – 28 | Limestone |
| 28 – 40 | Limestone, poorly cemented |
| 40 – 50 | Limestone |
| 50 – 60 | Varies from poorly cemented to limestone |

Ground water was observed in all boreholes at depths between 3.7 and 5.5 feet. Fluctuations in the groundwater level are predicted and probably controlled by tidal fluctuations in the inter-coastal.

The observed soil conditions preclude use of conventional spread footings to support the towers. Micropiles are recommended for the support of the foundation elements. Design of these foundations is ongoing and outside the scope of this report.

The reviewed and approved drawing list is given below,

- A000      Cover Page
- Z101      Zip 1A & 1B Plan/Profile
- Z102      Zip 2 Plan/Profile
- Z103      Zip 3 Plan/Profile
- Z104      Zip 4 Plan/Profile
- Z105      Zip 5 Plan/Profile
- Z106      Zip 6 Plan/Profile
- Z107      Zip 7 Plan/Profile
- S100      Tower 1 Layout – Scissor Tower
- S110      Tower 1 Scissor Tower Footings (PRELIMINARY)
- S115      Bridge and Raised Guy Anchor Details
- S120      Bridge Entry Structure
- S200      Tower 2 Knee Brace Tower
- S210      Tower 2 Knee Brace Stairs
- S220      Tower 2 Knee Brace Tower Footings (PRELIMINARY)
- S300      Tower 3 Tri-pod Challenge Tower
- S301      Tower 3 Tri-pod Challenge Footing Layout
- S302      Tower 3 Tri-pod Challenge Footing and Anchor Detail (PRELIMINARY)
- S310      Tower 3 Tri-pod Challenge Details
- S311      Tower 3 Tri-pod Challenge Pod Stem Orientation
- S312      Tower 3 Tri-pod Challenge Sections
- S313      Tower 3 Tri-pod Challenge Zip Landings
- S330      Tower 3 Tri-pod Challenge Bridges
- S400      Tower 4 Layout
- S401      Tower 4 Details
- S402      Tower 4 Details
- S500      Tower 5 Layout
- S600      Tower 6 Layout
- S601      Tower 6 Details
- S602      Tower 6 Details
- S700      Tower 7 Layout
- S701      Tower 7 Details
- S720      Tower 7 Footings (PRELIMINARY)
- SD-1      Typical Brake Setup
- SD-2      General Notes 1
- SD-3      General Notes 2

## CONCLUSION

The structural design as presented in the submitted calculations and drawings is in general conformance with the requirements of the Florida Building Code and all related structural codes.

# EXHIBIT 7



Experiential Resources, inc.
PO Box 542
Lahaina, HI 96767

14 August 2016

Dan Shehan
Weber Group, Inc.
5233 Progress Way
Sellersburg, IN 47172

Dear Mr. Shehan,

This letter has been prepared by Experiential Resources, inc. (ERi) to announce our intent to utilize the Weber Group, Inc. team for General Contracting services for our upcoming Jungle Island Zip Line Course installation at 1111 Parrot Jungle Trail Miami, FL 33132.

We anticipate the scope of work for this to include:
- Project Budgeting
- Permitting Assistance
- Construction Management
- Subcontractor/Special Inspector Engagements
- Shop Drawings
- Quality Control & Assurance

Please let us know if this is agreeable to Weber Group, Inc., and what additional needs you have to move forward.  Thank you and we look forward to working with you on this project.

Best Regards,

*Todd Domeck*

Todd Domeck, CEO
Experiential Resources, inc.
todd@experientialresources.net

Cc. Ricky Burg

# EXHIBIT 8

City of Miami
Building Department
Permit Application

Plan #: _____
Permit #: _____
Total Due: _____

| Job Location | | Owner Lessee Information | |
|---|---|---|---|
| **Folio Number:** 01-3231-000-0014 | | **Owner:** City of Miami Dept. of Real Estate | |
| **Job Address:** 1111 Parrot Jungle Trail Miami, FL **Zip:** 33132 | | **Owner's Address:** 444 SW 2nd Avenue, 3rd Fl. Miami, FL 33130 | |
| **Legal Address:** 1111 Parrot Jungle Trail Miami, FL 33132 | | **Phone:** 305-416-1471   **E-Mail:** mburke@miamigov.com | |
| **Unit No:** | | **Lessee:** Parrot Jungle & Gardens of Watson Island, Inc. | |
| ☑ Commercial   ☐ Residential   ☐ Dry Run | | **Lessee Address:** 1111 Parrot Jungle Trail Miami, FL 33132 | |
| ☑ Owner ☐ Contractor   ☐ Lessee | | **Phone:** 305-400-7218   **E-Mail:** cgould@jungleisland.com | |
| Contractor Information | | General Information | |
| **Contractor's License/Registration No:** CGC1521666 | | **Proposed Use of Building:** Zip Line Tour | |
| **Contractor's SS# (last 4 digits):** xxx-xx-5768 | | **Current Use:** Q Zoological Park | |
| **Qualifier's Name:** Daniel Ray Shehan | | **Job Description:** 7 Towers, 8 Zip Lines, 8 Suspension Bridges | |
| **Company's Name:** Weber Group, Inc. | | **New Construction Total Cost:** $1,216M | |
| **Address:** 5233 Progress Way | | **New Construction Sq. Ft:** 1181 | |
| **City:** Sellersburg   **State:** IN   **Zip:** 47172 | | **Remodeling Total Cost:** | |
| **Phone:** (812) 246-2100 | | **Remodeling Sq. Ft.:**   **Lineal Ft:** | |
| **E-Mail:** danshehan@webergroupinc.com | | **Units:** N/A   **Floors:**   **Height:** 133'   **Gallons:** N/A | |
| If this is related to another permit, you must provide Master Permit Number: N/A | | | |
| Threshold Inspector | | Bonding Company | |
| **Name:** N/A | | **Name:** N/A | |
| **Address:** N/A | | **Address:** N/A | |
| **Phone:** N/A | | **Phone:** N/A | |
| Permit Type | | Engineer/Architect Information | |
| ☑ Building   ☐ Plumbing | | **Engineer's Name:** Jared Kough, P.E. | |
| ☑ Mechanical/AC   ☐ Plumbing/Gas | | **Address:** 600 Maestro Dr. Reno, NV 89511 | |
| ☐ Electrical   ☐ Roofing | | **Phone:** 775.359.6800 ext. 103 **E-Mail:** jared@zephyr.net | |
| ☐ Landscaping   ☐ Sign | | **Architect's Name:** N/A | |
| ☐ Electrical   ☐ Trees | | **Address:** N/A | |
| ☐ Fire   ☐ Mechanical Elevator | | **Phone:** N/A   **E-Mail:** N/A | |
| Change to Existing Permit | | Building Permit only | |
| ☐ Change of Contractor (CR)   ☐ Change of Qualifier (CQ) | | ☑ New Construction   ☐ Addition | |
| ☐ Re-certification of Plans (RC)   ☐ Plans revision (RV) | | ☐ General Repair/Remodeling   ☐ Misc. Building | |
| ☐ Completion Permit (CP) | | ☐ Change of Occupancy   ☐ Demolition | |
| | | ☐ Change of Use | |

I understand that separate permits must be obtained for other items (i.e. electrical, plumbing, roofing, etc.), unless specifically covered by this permit. In signing this application, I am responsible for the supervision and completion of the construction in accordance with the plans and specifications and for compliance with all federal, state, and county laws applicable.

Owner's Affidavit: I certify that all the foregoing information is correct. Owner Certifies that the aforementioned Contractor has the authorization to perform the work as specified above.

Lessee's Affidavit:  Lessee certifies that he has full consent and authorization from owner of subject property to perform the above-mentioned work and to hire above captioned contractor.

I have read the information contained in this permit and understand that any misrepresentation may constitutes fraud and could void the permit.

*Christopher Gould*
Signature of Owner/Lessee
Christopher Gould
Print Name

*D.R. Shehan*
Signature of Qualifier
Daniel Ray Shehan
Print Name

State of Florida, County of Miami-Dade
Subscribed before me this 16th
Day of _____ 2016
By _____ Fuentes _____
Personally known or Produced Identification
Type of Identification produced Personally Known

NORALY FUENTES
MY COMMISSION #GG031911
EXPIRES February 10, 2020
(407) 398-0153 FloridaNotaryService.com

State of Kentucky, County of Jefferson
Sworn to and subscribed before me this 9th
Day of August 2016
By Patricia S. Szofer
(SEAL)
Personally known or Produced Identification
Type of Identification produced

FOR BUILDING DEPARTMENT USE ONLY

| Revision: No. of Sheets: _____   Tracking required: _____ | |
|---|---|
| Application Received by: _____   Date: _____   Permit Authorized by: _____   Date: _____ | |



Patricia S. Szofer
Notary Public, ID No. 546994
State at Large, Kentucky
My Commission Expires on Feb. 13, 2020

# EXHIBIT 9

9/8/16, 11:49 AM



Department of Finance
Online Payments

Receipt

Your Reference Number:
## 2016252001-83
09/08/2016 11:45:19 AM
Web_user

TRANSACTIONS

**If you have a Customer Number or Invoice**   $3,360.00
**Number please click here**
**2016252001-83-1**
  TRANS ID: 338372
  BUSINESS NAME: CITY OF MIAMI-DEPT OF REAL ESTATE
  *Fee Payment*                                  *$3,360.00*
  FEE NAME: UPFRONT / DRY RUN FEES (BASED ON COST)
  TOTAL AMOUNT:
    **$3,360.00**

PAYMENT

**Visa Credit Sale**                        $3,360.00
  CARD NUMBER: ************8657
  FIRST NAME: Mandy
  LAST NAME: Stewart


CE2016252001-83

# EXHIBIT 10



## City of Miami
### BUILDING DEPARTMENT
## Review/Remarks Comments

Plan Number: BD16-011646-001

Job Address: 1111 PARROT JUNGLE TRL

## Discipline: ASSET MANAGEMENT

| Sheet# | Remark Category | Section Code | Is Complied | Complied By | Complied Date |
|--------|-----------------|--------------|-------------|-------------|---------------|
|        |                 |              |             |             |               |

## Discipline: BUILDING

| Sheet# | Remark Category | Section Code | Is Complied | Complied By | Complied Date |
|--------|-----------------|--------------|-------------|-------------|---------------|
|        |                 |              |             |             |               |

## Discipline: ELECTRICAL

| Sheet# | Remark Category | Section Code | Is Complied | Complied By | Complied Date |
|--------|-----------------|--------------|-------------|-------------|---------------|
|        | NEC MIN STANDARDS |            | X           | RIVERSIDE\racosta | Sep/12/2016 |
|        | **Remark** |  |  | **User Name** | **Last Updated** |
|        | Plans do not show any electrical pages. Could not find any reference to electrical items. | | | RIVERSIDE\racosta | Sep/12/2016 |

## Discipline: ENVIRONMENTAL RESOURCES

| Sheet# | Remark Category | Section Code | Is Complied | Complied By | Complied Date |
|--------|-----------------|--------------|-------------|-------------|---------------|
|        | INITIAL COMPLETENESS |         | X           | RIVERSIDE\qoguntoyinbo | Oct/28/2016 |
|        | **Remark** |  |  | **User Name** | **Last Updated** |
|        | Environmental resources approval is partly based on zoning and public works review, please submit plans and comply comments which may be applicable to or affect disposition. | | | RIVERSIDE\DDeLoach | Sep/19/2016 |
|        | Zoning has approved. | | | RIVERSIDE\qoguntoyinbo | Oct/28/2016 |

| Sheet# | Remark Category | Section Code | Is Complied | Complied By | Complied Date |
|--------|-----------------|--------------|-------------|-------------|---------------|
|        | SURVEY |                      | X           | RIVERSIDE\qoguntoyinbo | Oct/28/2016 |
|        | **Remark** |  |  | **User Name** | **Last Updated** |
|        | provide boundary survey, with all existing trees ,dated less than 12 months. | | | RIVERSIDE\DDeLoach | Sep/19/2016 |
|        | Site visit conducted. No tree assessment required. Installation of Zipline will have insignificant impact to existing trees. | | | RIVERSIDE\qoguntoyinbo | Oct/28/2016 |

| Sheet# | Remark Category | Section Code | Is Complied | Complied By | Complied Date |
|--------|-----------------|--------------|-------------|-------------|---------------|
|        | DISPOSITION PLAN |            | X           | RIVERSIDE\qoguntoyinbo | Oct/28/2016 |
|        | **Remark** |  |  | **User Name** | **Last Updated** |
|        | provide tree disposition plan: includes a legend with all existing tree specifications(overall height,DBH,common name,botanical name, current condition(good,moderate,fair,poor) and indicate remove,remain,relocate. | | | RIVERSIDE\DDeLoach | Sep/19/2016 |
|        | Site visit conducted. No tree assessment required. Installation of Zipline will have insignificant impact to existing trees. | | | RIVERSIDE\qoguntoyinbo | Oct/28/2016 |

| Sheet# | Remark Category | Section Code | Is Complied | Complied By | Complied Date |
|--------|-----------------|--------------|-------------|-------------|---------------|
|        | ADDITIONAL PLANS AND SPECIFICATIONS | | X | RIVERSIDE\qoguntoyinbo | Oct/28/2016 |
|        | **Remark** |  |  | **User Name** | **Last Updated** |
|        | provide a superimposed site plan: plan should clearly depict existing trees and proposed construction simultaneously to display tree/developement conflicts . | | | RIVERSIDE\DDeLoach | Sep/19/2016 |



## City of Miami
### BUILDING DEPARTMENT

## Review/Remarks Comments

Plan Number: BD16-011646-001

Job Address: 1111 PARROT JUNGLE TRL

### Discipline: ENVIRONMENTAL RESOURCES

| Sheet# | Remark Category | Section Code | Is Complied | Complied By | Complied Date |
|---|---|---|---|---|---|
| | ADDITIONAL PLANS AND SPECIFICATIONS | | X | RIVERSIDE\qoguntoyinbo | Oct/28/2016 |
| | **Remark** | | | **User Name** | **Last Updated** |
| | existing tree canopy must be to scale. existing tree protection radius depicted to scale on plan. protection radius to be specified by certified arborist on plans. | | | | |
| | Site visit conducted. No tree assessment required. Installation of Zipline will have insignificant impact to existing trees. | | | RIVERSIDE\qoguntoyinbo | Oct/28/2016 |

| Sheet# | Remark Category | Section Code | Is Complied | Complied By | Complied Date |
|---|---|---|---|---|---|
| | REPLACEMENT PLAN/LANDSCAPE PLAN | | X | RIVERSIDE\qoguntoyinbo | Oct/28/2016 |
| | **Remark** | | | **User Name** | **Last Updated** |
| | provide chapter 17 tree replacement chart for any proposed removals , must provide accurate replacement calculation and trees as per code. | | | RIVERSIDE\DDeLoach | Sep/19/2016 |
| | No tree are being removed as part of the scope of work | | | RIVERSIDE\qoguntoyinbo | Oct/28/2016 |

| Sheet# | Remark Category | Section Code | Is Complied | Complied By | Complied Date |
|---|---|---|---|---|---|
| | MISCELLANEOUS | | X | RIVERSIDE\qoguntoyinbo | Oct/28/2016 |
| | **Remark** | | | **User Name** | **Last Updated** |
| | provide certified arborist report : should be detailed and include pertinent information such as tree species,DBH,height,condition,photographs,recommendations and guidelines for relocations, apprpriate tree protection, TPZ,CRZ,etc. | | | RIVERSIDE\DDeLoach | Sep/19/2016 |
| | Site visit conducted. No tree assessment required. Installation of Zipline will have insignificant impact to existing trees. | | | RIVERSIDE\qoguntoyinbo | Oct/28/2016 |

| Sheet# | Remark Category | Section Code | Is Complied | Complied By | Complied Date |
|---|---|---|---|---|---|
| | MISCELLANEOUS | | X | RIVERSIDE\qoguntoyinbo | Oct/28/2016 |
| | **Remark** | | | **User Name** | **Last Updated** |
| | there may be additional comments upon technical review of resubmitted documents. | | | RIVERSIDE\DDeLoach | Sep/19/2016 |

### Discipline: FINAL QUALITY CHECK

| Sheet# | Remark Category | Section Code | Is Complied | Complied By | Complied Date |
|---|---|---|---|---|---|
| | | | | | |

### Discipline: PLUMBING

| Sheet# | Remark Category | Section Code | Is Complied | Complied By | Complied Date |
|---|---|---|---|---|---|
| 1 | FBCP STANDARDS | | X | RIVERSIDE\EAres-c | Sep/13/2016 |
| | **Remark** | | | **User Name** | **Last Updated** |
| | no plumbing work on plans work scope. | | | RIVERSIDE\EAres-c | Sep/13/2016 |



## City of Miami
### BUILDING DEPARTMENT

## Review/Remarks Comments

Plan Number: BD16-011646-001

Job Address: 1111 PARROT JUNGLE TRL

## Discipline: PUBLIC WORKS

| Sheet# | Remark Category | Section Code | Is Complied | Complied By | Complied Date |
|--------|-----------------|--------------|-------------|-------------|---------------|
|        | PLANS & APPLICATION |          | X | RIVERSIDE\SShmuekler | Sep/26/2016 |
|        | **Remark**      |              |             | **User Name** | **Last Updated** |
|        | PARK IMPROVEMENTS ZOO LINE TOUR,7 TOWERS, 8 ZIP LINES & 8 BRIDGES ALL INSIDE THE PROPERTY. NO SURVEY IS REQD. | | | RIVERSIDE\SShmuekler | Sep/26/2016 |

## Discipline: STRUCTURAL

| Sheet# | Remark Category | Section Code | Is Complied | Complied By | Complied Date |
|--------|-----------------|--------------|-------------|-------------|---------------|
|        | FBC REQUIREMENTS |             |             |             |               |
|        | **Remark**      |              |             | **User Name** | **Last Updated** |
|        | Peer Review addresses the superstructure portion of the project and does not address the foundations. The City of Miami requires that the Peer Review be all encompassing. | | | RIVERSIDE\WHunt | Sep/21/2016 |

| Sheet# | Remark Category | Section Code | Is Complied | Complied By | Complied Date |
|--------|-----------------|--------------|-------------|-------------|---------------|
|        | FBC REQUIREMENTS |             |             |             |               |
|        | **Remark**      |              |             | **User Name** | **Last Updated** |
|        | Foundations depicted throughout the drawings appear to include rock anchor-like elements (micropiles). The Geotechnical Report specifically recommended Auger Piles, which are very common in South Florida. Please revise the drawings and notes throughout to comply with the Geotechnical Report. | | | RIVERSIDE\WHunt | Sep/21/2016 |
|        | Complete foundation design and Peer Review of same required prior to issuance of permit. | | | RIVERSIDE\WHunt | Sep/23/2016 |
|        | Please remove extraneous notes relating to foundation elements other than auger piles. | | | RIVERSIDE\WHunt | Sep/23/2016 |
|        | Especially extraneous notes on drawings SD-2 and SD-3. | | | RIVERSIDE\WHunt | Sep/23/2016 |

| Sheet# | Remark Category | Section Code | Is Complied | Complied By | Complied Date |
|--------|-----------------|--------------|-------------|-------------|---------------|
| SD-3   | FBC REQUIREMENTS |             |             |             |               |
|        | **Remark**      |              |             | **User Name** | **Last Updated** |
|        | Design Criteria note 6 indicates design patron weight plus equipment of 275 pounds. Page 6 of 16 notes 250 pounds. Please resolve the conflict. | | | RIVERSIDE\WHunt | Sep/23/2016 |

| Sheet# | Remark Category | Section Code | Is Complied | Complied By | Complied Date |
|--------|-----------------|--------------|-------------|-------------|---------------|
| S302   | FBC REQUIREMENTS |             |             |             |               |
|        | **Remark**      |              |             | **User Name** | **Last Updated** |
|        | Reference "SECTION VIEW" near bottom left corner of drawing. Please review 6-1/2" embed. With such a deep concrete element, is there a compleeing reason for such little embedment? | | | RIVERSIDE\WHunt | Sep/23/2016 |



### City of Miami
**BUILDING DEPARTMENT**

## Review/Remarks Comments

Plan Number: BD16-011646-001

Job Address: 1111 PARROT JUNGLE TRL

## Discipline: STRUCTURAL

| Sheet# | Remark Category | Section Code | Is Complied | Complied By | Complied Date |
|---|---|---|---|---|---|
| S115 | FBC REQUIREMENTS | 2 | | | |
| | **Remark** | | | **User Name** | **Last Updated** |
| | Please review use of "J" anchor bolts. Other drawing locations show anchor rods with nuts at bottom end (this is preferred anchor rod type). | | | RIVERSIDE\WHunt | Sep/23/2016 |

| Sheet# | Remark Category | Section Code | Is Complied | Complied By | Complied Date |
|---|---|---|---|---|---|
| S220 | FBC REQUIREMENTS | 2 | | | |
| | **Remark** | | | **User Name** | **Last Updated** |
| | Anchor rods are diagrammatically shown as embedded with nuts at termination. This is much preferred by the City as the use of epoxy in hot exposed areas tends to degrade the epoxy's composition and capacity. | | | RIVERSIDE\WHunt | Sep/23/2016 |

| Sheet# | Remark Category | Section Code | Is Complied | Complied By | Complied Date |
|---|---|---|---|---|---|
| | FBC REQUIREMENTS | | | | |
| | **Remark** | | | **User Name** | **Last Updated** |
| | Provide 2 copies of signed and sealed Peer Review, including. Peer Reviews and drawings must be perforated. | | | RIVERSIDE\WHunt | Sep/23/2016 |

| Sheet# | Remark Category | Section Code | Is Complied | Complied By | Complied Date |
|---|---|---|---|---|---|
| | FBC REQUIREMENTS | | | | |
| | **Remark** | | | **User Name** | **Last Updated** |
| | City of Miami requires items submitted to have original ink stamp or embossed seal with original signature and date. Electronic seals are not yet accepted by the City. | | | RIVERSIDE\WHunt | Sep/23/2016 |

## Discipline: ZONING

| Sheet# | Remark Category | Section Code | Is Complied | Complied By | Complied Date |
|---|---|---|---|---|---|
| | PROPOSED USE | | X | RIVERSIDE\CHerrera | Oct/04/2016 |
| | **Remark** | | | **User Name** | **Last Updated** |
| | : PARK IMPROVEMENTS ZOO LINE TOUR ,ZOOLOGICAL PARK,7 TOWERS,8 ZIP LINES & 8 SUSPENSION BRIDGES(inside parrot jungle) | | | RIVERSIDE\CHerrera | Oct/04/2016 |

| Sheet# | Remark Category | Section Code | Is Complied | Complied By | Complied Date |
|---|---|---|---|---|---|
| | REJECTION BY OTHER DISCIPLINE - ZONING | ENVIRONMENTAL RESOURCES | | | |
| | **Remark** | | | **User Name** | **Last Updated** |
| | APPROVAL FROM ENVIRONMENTAL RESOURCES IS REQUIRED. | | | RIVERSIDE\CHerrera | Oct/04/2016 |

# EXHIBIT 11



ADVERTISEMENT

**The Newspaper for the Future of Miami**

# New Jungle Island operator plans broad investments, changes

Written by John Charles Robbins on December 27, 2016



The company set to take over the lease of Jungle Island plans investments and improvements to turn the tropical attraction into a new and improved all-day adventure.

ESJ Capital Partners LLC plans to enhance the facility on Watson Island by adding a zipline, water features and more dining and entertainment options.

"We really want to see how we can improve the experience," Chief Operating Officer Elie Mimoun told Miami Today this week.

"It's going to be a nice experience and we hope the residents appreciate what we're trying to do," he said.

The City of Miami owns the property and leases the 18-acre site.

Formerly known as Parrot Jungle, Jungle Island officially opened its

ADVERTISEMENT



$47 million facility on Watson Island in June 2003. The venue includes tropical gardens, exotic animals, educational exhibits and shows. The park also features the Treetop Ballroom and other meeting facilities that overlook PortMiami.

New Jungle Island operator plans broad investments, changes - Miami Today

The Miami City Commission approved a deal Nov. 17 that terminates a lease and development agreement between the city and Parrot Jungle and Gardens of Watson Island Inc. and PJG Watson Island LLC and transfers the lease to ESJ J.I. Leasehold LLC.

The lease transfer also requires approval by Miami-Dade County and the US Department of Housing and Urban Development.

Attorney Alex Tachmes, representing ESJ, said the matter should come before county commissioners in January. Mr. Mimoun said the company is hoping to have the ground lease in hand by the end of March, after which phase one of the improvement plan can begin.

Mr. Tachmes told city commissioners the Aventura-based company plans a $10 million investment initially. Jungle Island has billed itself as an intimate attraction, enriching the lives of park visitors through immersive experiences centered on adventure, animals, discovery and play.

"We really want to see how we can improve the experience," said Mr. Mimoun.

"First and foremost we're going to improve the appearance of Jungle Island with new signage and a new opening experience," he said. Changes are to include a new traffic pattern and improvements to the parking lot. "It will be a new welcoming experience," he said.

ESJ plans to incorporate some items the previous leaseholder had in the works, including a zipline ride. The application for a building permit for the zipline is under review by city officials.

"Once we get building permit approval we'll break ground first thing out of the gate," Mr. Mimoun said.

For the younger visitors, the company plans to add splash pads for kids and an obstacle course, and revamp the Kids Club.

For adult visitors and teens, ESJ plans to work with Crystal Lagoons to build a large water park or swimming lagoon for water sports and recreational activities, offering beach chairs, umbrellas and private cabanas.

Mr. Mimoun said the company wants to emphasize an environmentally-friendly facility and it will strive for LEED certification.

Improvements are to include water conservation methods and the use of solar power, he said.

He said they plan to reopen the Beach Club and offer morning sporting activities including yoga, exercise, paddleboarding and more.

Food and beverages for the morning crowd are to include healthy drinks.

Phase one is expected to take about 18 to 24 months, he said.

Mr. Tachmes said the improvements are targeted to increase attendance.

"The whole idea is to drive more visitors to the park," he

said. "The other objective it to make it much more interesting than now – a place where you can spend all day rather than just a few hours."

Mr. Mimoun said the plan is to keep most of the animals, offer a better variety of experiences with the animals and make it more of a learning experience and "much more fun."

The company will continue to maintain the banquet facility, meeting and conference rooms, along with improved food and beverage options, said Mr. Tachmes. Phase two is to include construction of a lazy river and a water slide, Mr. Mimoun said.

ESJ also plans to add dockage and offer boat rentals, he said.

The reopened Beach Club will see even more improvements, he said, with the addition of a bar and restaurant with musical entertainment, offering an afternoon and evening beach club experience catering to adults.

Mr. Tachmes said an interesting feature of the Beach Club is that the area has a separate entrance from the general park, which will be more fully developed and made more attractive.

Much of the infrastructure is already in place, he said, it just needs improving.

"The bones are there. It just takes a company like ESJ to invest into it, turn it around and drive the revenue. The location is amazing – it just needs investment to make it peak," Mr. Tachmes said.

"Our vision is to take Jungle Island, which is semi-dormant, and raising it to everyone's appreciation," said Mr. Mimoun.

He said the goal is to make Jungle Island a much desired destination for residents and visitors alike.

Mr. Tachmes said working with the city has been excellent. Commissioner Ken Russell and Mayor Tomás Regalado have been very supportive, he said.

"Absolutely, they've been nothing but helpful and open and supportive," said Mr. Mimoun of city officials.

"We're really optimistic about moving forward," said Mr. Tachmes.

Commissioner Russell, whose district includes the man-made island, told his colleagues in November that he was assured no hotel is currently planned.

Mr. Mimoun confirmed it. He said he told Mr. Russell that to build a hotel today makes no sense. He said his company doesn't want to lose money.

"We'd rather invest in the park, enhancing it and raising it to the level where it should be and making it so the city is proud of it," Mr. Mimoun said, and then perhaps return to city leaders and ask for permission to pursue a hotel. The city attorney's office has said that a proposed hotel would require approval from city voters, along with an OK from city commissioners.

# EXHIBIT 12

From: **Mandy Stewart** mandy@experientialresources.net
Subject: Re: JI // Immediate Team Deadlines [For Review]
Date: January 25, 2017 at 7:15 PM
To: Jon Weislow jweislow@amicon.us
Cc: Dave Rawdon daverawdon@webergroupinc.com, rickyberg@webergroupinc.com, Dan Shehan danshehan@webergroupinc.com,
Todd Domeck todd@experientialresources.net, Brian Brun brian@experientialresources.net, Adam Mopsick amopsick@amicon.us
, John Lawroski JLawroski@amicon.us, Codi Funakoshi codi.funakoshi@amicondevelopment.com



Awesome recap, Jon. Thanks very much!

See my notes in GREEN below.

On the subject of parking that was mentioned during conversation today, currently there is no financial impact to JI if visiting onsite reps get parking validated.  They will notify us if this is due to change during construction.  Also, they're looking into permits/requirements for alternate parking areas adjacent to JI in order to retain main/current parking for guests and JI staff.

Thanks!
Mandy



Mandy Stewart
Catalyst
253.318.6087

On Jan 25, 2017, at 5:43 PM, Jon Weislow <jweislow@amicon.us> wrote:

Team,

Another day of productive meetings. In summary – I wanted to make sure that we all sign off on the below hard deadline dates and plan of action moving forward. Mandy – I put a Friday (01-27-17) deadline for issuance of the preliminary doc you are working on outlining vendor on-ramp requirements. I'm not sure where you are in the process, so let me know if this is overly ambitious. I know you know the target turnaround for this is 'ASAP'.

As we all know, we are slated for a very important coordination meeting on **Tuesday (02-07-17)** with the entire team (including ESJ) to outline scope responsibilities and required site preparation work. As discussed today, the goal is to have corresponding vendors released for site preparation work between Wednesday (02-08-17) and Friday (02-10-17) with site prep work beginning no later than the week of (02-13-17).

Please review the below and let me know your thoughts. Appropriate responses include "perfect", "looks good", "we're on it", and "done."

Talk soon,

Weislow

//

**WEBER**
- Thursday (01-26-17) – *preferably in the morning*

- Issue Amicon estimated limitations of proposed work areas throughout construction that will require the following:
  - Arborist survey
  - Vegetation removal NOTE: I request/recommend progress photos for any future potential reporting requests from City later. Also, notes on any species of concern and large trees impacted.
  - Site fencing and/or decorative screening
  - Post-construction landscaping
- Issue Amicon bullet pointed narrative defining the extent of required structural demolition, hauling, and welding work
- Issue RFP to contractors in attendance during (01-25-17) site walkthrough
- **Wednesday (02-01-17)**
  - Presentation of revised summary budget for full construction scope
  - Presentation of preliminary detailed gantt preconstruction and construction schedule
    - Schedule to include milestone shop drawing submittal and approval dates
  - Presentation of detailed construction phasing plan inclusive of the following:
    - Estimated park shut down dates
    - Areas to be closed off along with anticipated duration of close off
    - Site access pathway
    - Outlined work areas requiring landscaping/screening
    ADD: Specific deadline dates for any known requested animal relocation.
    ADD: Description and dates of any work that will be exceptionally noisy, visible, or in any way exceptionally disruptive, affecting guest experience and/or animal welfare.
  - 
  - 
    - 
- **Friday (02-03-17)**
  - Presentation of revised gantt chart, ready for ESJ review What format is this being presented in?

## ERI/AIRPLAY
- **Thursday (01-26-17)**
  - Provide team with Jungle Island site contact information
  - Provide to Weber loads and calcs for micropile contractors in order for vendors to provide accurate pricing (Weber to provide information direct to subs)
  - Provide **to Weber** updated survey indicating accurate elevations in NGVD (Weber to provide information direct to subs)
- **Friday (01-27-17)**
  - Issuance of preliminary document outlining contractor and subcontractor on-ramp commissioning requirements On it. I've requested verbally and in writing that discussions with JI staff on this be completed by my end of visit this Friday. Report to follow shortly after I have complete info.
- **Tuesday (01-31-17)**
  - Issue final findings of survey & locates to engineering team for revisions

## AMICON
- **Friday (01-27-17)**

- Obtain sample COI from Veronica at Jungle Island outlining mandatory insurance requirements for any vendor scheduled to conduct work at Jungle Island JI doesn't wish to release a full draft sample due to potential for forgery (per Chris). Proposed: these details to be included in the contractor doc described above and provided in an alternate format.
- **Friday (01-27-17)**
  - Confirm permitting requirements for temp water meter and temp power meter (if necessary) NOTE: JI has 5 water meters on site. I suggested to Brian and Weber today that a full list of water requirements (3" for HBI, 4K gal daily minimum, metering, etc.) be compiled in order to have a comprehensive conversation with Mike Indrei (via Chris) about management of water needs.
- **Tuesday (01-31-17)**
  - Walkthroughs are tentatively scheduled with Landscaping and Steel contractors (will require receipt of Weber's site plan markup & steel scope outline)
    - Jungle Island personnel to be in attendance during walkthrough Who is scheduling this with JI, how much notice will JI have/do they request, and what is the check in/out procedure on site? Let's establish a process and chain of communication as a standard practice, please.


Jonathan Weislow

<image003.jpg>

7430 NE 4th Court ǀ Miami, FL 33138
**OFFICE**   305 573 8030
**MOBILE**   571 830 4235
www.smicon.us

# EXHIBIT 13

| 0 | | Jungle Island Accelerated Construction Schedule Rev 2 2.9.17 DR | Jan 15, 2017 | | Jungle |
|---|---|---|---|---|---|
| 2 | | **Design and Permitting** | | | |
| 4 | ⊘ | Review Survey and Utility Locate Results | 8 hours | | 3 |
| 6 | ⊘ | **Engineering Revisions** | **Feb 6, 2017 !** | | |
| 8 | ⊘ | Steel Revisions | Feb 7, 2017 ! | | |
| 10 | | Budget and Schedule Revisions | 8 hours | | 9ES+1 day |
| 12 | ⊘ | **Permit Review Submittal to Final Approval (Overlap)** | **2/20/17 !** | | |
| 14 | ⊘ | Steel Permit Submittal | 2/27/17 ! | | 8ES+1 day |
| 16 | ⊘ | Relocation of Animals at Construction Locations | 2/13/17 ! | | |
| 18 | ⊘ | Re-Stake Micro Piles Due to Utility Locate | Feb 8, 2017 ! | | 5ES+2 days |
| 20 | ⊘ | Remove Vegetation | 2/16/17 ! | | 19 |
| 22 | ⊘ | Install Const. Fence Bus Stop/Vegetation Removal | 2/16/17 ! | | 20SS |
| 24 | ⊘ | Rough Exc/Grade T3, T2, | Mar 6, 2017 ! | | 23 |
| 26 | ⊘ | Shop Drawings | Feb 8, 2017 ! | | 6SS+2 days |
| 28 | ⊘ | Tower Fabrication | 2/13/17 ! | | 6ES-9 days |



# EXHIBIT 14



# Additional Services Work Order

**Project Number:**   **16-412**

**Project:**   **Jungle Island**

**Client Contact:**   **Todd Domeck**
**todd@gozipus.com**
**808-214-4325**

### Scope of Work for Additional Services:

1. Remove Tower 1, Entry & Exit structure for Tower 1, Bridge 1, Zip Line 1A and Zip Line 1B from final approved structural calculation package and structural drawing package
2. Steel fabrication shop drawings for Towers 2 – 7
3. Reinforcement plan for a 3 point pick on all geodesic towers for aerial lift from vertical
4. Reconfigure Triangle Tower 3 foundation to miss Banyan Tree root system (near 3B)
5. Redesign Tower 2 (12' geodesic style)
6. Tower 3 bridge entry with concrete base evaluated with no micro piles
7. Evaluate raising all foundations 1' in depth to prevent need for de-watering
8. Tower 4 & 5 free standing with guy lines but no bridge or zip lines
    a. bridge and zip lines will be added back in future phase
9. Tower 4 guy line relocation due to existing site structure
10. Redesign Tower 6 with quick jump application and spiral stairs relocated

**Budget Amount This Work Order:**        **$34,500** (Not to Exceed)

*This work order serves as an addendum to the original contract. By signing below the Client is acknowledging that all services provided by K2 Engineering and Structural Design to date are complete and satisfactory and that additional services are being requested.*

### Additional Services and Attached Terms and Conditions Approved:

Brian J. Brun
Client Signature                                              K2 Engineering Representative Signature

Date: 2/16/2017                                         Date        2/14/17

*Page 1 of 3*






## *Standard Terms & Conditions*

**Approval Authority**
K2 Engineering and Structural Design (K2) will not be bound by any contract or agreement unless signed by Brandt T. Kennedy, PE or Jared A. Krupa, PE.

**Additional Services:**
The Client understands the full scope of work offered by this Agreement is described in the Basic Services. The following services, including but not limited to, are Additional Services and are not included in the scope of work unless specifically stated otherwise:

1. Work resulting from changes required by the Client, reviewing and/or regulatory agencies/entities or others associated with the project that modify the scope or size of the project as described herein and/or require modification of any completed work.
2. Services made necessary by unforeseen conditions not disclosed to K2 before entering into this Agreement.
3. Reviews of existing development on the site.
4. Work required by special design criteria that exceeds the requirements of local codes and governing agencies.
5. Any construction phase field observation.
6. Legal services such as reports, preparation for testimony, expert testimony, depositions, etc. (min. 4 hours per day or portion thereof)

**Fees for Professional and Additional Services:**
A cancellation fee of 50% will apply to any cancellation where K2 is scheduled out of the office and notice of cancellation is not received within 72 hours of scheduled event (Saturday, Sunday, and Holiday excluded when calculating the 72 hours). Final fees and reimbursable expenses are due after the inspection and prior to release of final stamped documents.

Unless otherwise agreed to, fees for professional and additional services are based on the time charged to the project by K2's professional, technical and administrative personnel. The fees are computed by multiplying the below-listed rates for each hour charged to the project by that individual rounded to the nearest quarter-hour:

| Classification | Hourly Rate |
|---|---|
| Principal | $190 |
| Engineering | $150 |
| Drafting | $100 |
| Administrative | $75 |
| Legal Services | $300 |

**Design without Construction Phase Services**
It is understood and agreed that K2's Basic Services under this Agreement do not include project observation or review of the Contractor's performance or any other construction phase services, and that such services will be provided by the Client. The Client assumes all responsibility for interpretation of the Contract Documents and for construction observation and supervision and waives any claims against K2 that may be in any way connected thereto. If this Project is an addition, alteration, or repair of an existing building or structure or it is the intent by the Client for K2 to implement in their design existing as-built construction, then K2 will base their design for the Project on the best available information at the time their design begins as provided to them by the Client. It is the responsibility of the Client to fund and provide the necessary material testing and inspection services as required by the Construction Documents in order to determine the adequacy of the proposed design. The Client shall anticipate that any modifications to K2's initial design in order to accommodate unforeseen conditions in the field as brought to K2's attention will be billed as Additional Services. All discrepancies between the Construction Documents and the as-built construction discovered in the field shall be brought to the attention of K2 immediately.

**Reimbursable Expenses:**
All expenses incurred will be in addition to the fees listed above. Expenses include air fare (including any cancellation/schedule change charges, baggage fees, etc.), ground transportation or car rental, hotel accommodations, meals, parking, or any special services required to perform requested duties.
Travel expenses and other project related items' direct costs are billed on the basis of K2's direct cost plus 15% to cover associated general and administrative expenses. All printing and reproduction services will be invoiced as follows:

8.5"x11" / 11"x17" / 24"x36" / 30"x42" – $0.12 / $1.00 / $1.75 / $2.25 per page

**Third Party Beneficiaries**
Client and K2 agree that services performed by K2 under this Agreement are solely for the benefit of Client, and are not intended by either Client or K2 to benefit any other person or entity, including but not limited to the project contractor and/or any of its subcontractors. Any such benefit is purely incidental and such other person shall not be deemed a third-party beneficiary of this contract.







**Plans & Specifications**
The plans and specifications prepared under this Agreement are the property of K2. K2 is the author of the documents they prepare and shall retain all common law, statutory and other reserved rights, including copyright. The Client shall be permitted to retain copies, including reproducible copies, of K2's plans and specifications and other documents for information and reference in connection with the Client's use and occupancy of the Project. The Client shall not reuse or make any modifications to the plans and specifications or change the intended use of this project without the prior written authorization of K2.

**Invoices**
Client is required to pay for services in full upon completion of Basic Services. The Client shall notify K2 in writing of any and all objections to an invoice within (10) days of the invoice date. Otherwise, the invoice shall be deemed proper and accepted by the Client. Interest of one and one-half percent (1.5%) per month will be payable on any amounts not paid within 30 days from invoice date. The Client shall pay any and all costs incurred in collecting any delinquent amounts, including attorney's fees. Summary information will be provided on the invoices in accordance with standard billing practices. When non-standard billing is requested by the Client, preparation of such billing shall be considered an Additional Service and billed as such.

**Applicable Law**
In the event of any dispute between the Client and K2 with regard to K2's services, the applicable law shall be that of the State of Nevada. All disputes shall be resolved within the State of Nevada and Washoe County.

**Certificate of Merit**
Client shall make no claim (whether directly or in the form of a third party claim) against K2 unless Client shall have first provided K2 with a written certification executed by an independent Licensed Engineer, specifying each and every act of omission that the certifier contends constitutes a violation of the standard of care expected of an Engineer performing professional services under similar circumstances, in the same locality, and at the same time. Such certificate shall be provided to K2 no less than 30 days prior to their presentation of any such claim.

**Limitation of Liability**
K2's services will be performed in a manner consistent with the standard of care and skill ordinarily exercised by members of the profession currently practicing in the same locality under similar conditions at the time of the services. In recognition of the relative risks and benefits of the project to both the Client and K2, the risks have been allocated such that the Client agrees, to the fullest extent permitted by law, to limit the liability of K2 and its sub consultants to the Client and to all construction contractors and subcontractors on the Project for any and all claims, losses, costs, damages of any nature whatsoever or claims expenses from any cause or causes, so that the total aggregate liability of K2 and its sub consultants to all those named shall not exceed TWO TIMES THE STATED TOTAL FEE FOR SERVICES RENDERED ON THE PROJECT or TWO HUNDRED FIFTY THOUSAND DOLLARS ($250,000), whichever is greater. In no case shall the total aggregate liability of K2 and its sub consultants to all those named exceed the available limits of our insurance coverage. Such claims and causes include, but are not limited to negligence, professional errors or omissions, strict liability, breach of contract or warranty. This is offered in lieu of any warranty, either expressed or implied. K2 shall not be held liable for any damage resulting from "Acts of God" including but not limited to earthquakes, fires, wind storms, floods, tornadoes, hurricanes and the like. K2 shall not be held responsible or liable for claims, which arise, directly or indirectly, in the following circumstances:
1. Data that has been provided to K2 by the Client or Client's agents is inaccurate, false, or materially misleading and K2 has relied on the data as a basis or input to its work.
2. Client, Client's agents, suppliers, contractors, third parties, or servants fail to assure that the construction conforms to design.

**Indemnification**
The Client agrees to indemnify, defend and hold harmless K2, its officers, agents, employees and consultants from and against any and all claims, suits demands, losses and expenses, including reasonable attorneys' fees, by any and all persons, firms, third parties, or any other legal entity on account of any damage to property or persons, including death, arising out of the performance or non-performance of obligations under this Agreement, except where K2 is found to be solely liable for such damages or losses by a court or forum of competent jurisdiction in the state of Nevada.

**Access to Structure**
Client shall make any arrangements so that K2 will have easy access to easily view the structure without the need of special skills or equipment.

**Disputes**
All unresolved claims, disputes and other matters in question between K2 and the Client, arising out of or relating to this Agreement or breach thereof, shall first be subjected to non-binding arbitration for resolution. Dispute causes may include, but are not limited to K2's or the Client's negligence, errors, omissions, strict liability, or breach of contract. All legal actions by either party against the other for breach of this Agreement, or for the failure to perform in accordance with the applicable standard of care, however denominated, that are essentially based upon such breach or failure shall be barred two (2) years from the time the claimant knew or should have known of its claim, but in any event, not later than four (4) years from the substantial completion of our services. In addition, should it be necessary, which we trust it should not, for either party to bring suit to enforce this Agreement, the prevailing party shall be entitled to costs and reasonable attorney's fees incurred in the suit.



# EXHIBIT 15

| ID | | Task Mode | Task Name | Duration | Start | Finish |
|----|---|-----------|-----------|----------|-------|--------|
| 1 | | | **Jungle Island Zip Line Course Accelerated Sch. Del.T 4&5** | **115 days** | **Mon 1/23/17** | **Fri 6/30/17** |
| 2 | | | **Design and Permitting** | **10 days** | **Mon 1/23/17** | **Fri 2/3/17** |
| 3 | | | Utility Locate and Survey | 3 days | Mon 1/23/17 | Wed 1/25/ |
| 4 | | | Review Survey and Utility Locate Results | 5 days | Thu 1/26/17 | Wed 2/1/1 |
| 5 | | | Tower 3 Rotation/Tower 2 Re-design Finalized | 2 days | Thu 2/2/17 | Fri 2/3/17 |
| 6 | | | **Engineering Revisions** | **14 days** | **Mon 2/6/17** | **Thu 2/23/1** |
| 7 | | | Foundation Revisions | 12 days | Mon 2/6/17 | Tue 2/21/1 |
| 8 | | | Steel Revisions | 13 days | Tue 2/7/17 | Thu 2/23/1 |
| 9 | ✓ | | Owner Budget and Schedule Review | 0 days | Tue 2/7/17 | Tue 2/7/17 |
| 10 | | | Budget and Schedule Revisions | 3 days | Wed 2/8/17 | Fri 2/10/17 |
| 11 | | | 3rd Party Re-review | 4 days | Mon 2/6/17 | Thu 2/9/17 |
| 12 | | | **Permit Review Submittal to Final Approval (Overlap)** | **22 days** | **Mon 2/20/17** | **Tue 3/21/17** |
| 13 | | | Foundation Permit Submittal | 6 days | Wed 2/22/17 | Wed 3/1/1 |
| 14 | | | Steel Permit Submittal | 17 days | Mon 2/27/17 | Tue 3/21/1 |
| 15 | | | **Pre-Permit Activities** | **40 days** | **Mon 1/23/17** | **Fri 3/17/17** |
| 16 | | | Relocation of Animals at Construction Locations | 14 days | Mon 2/13/17 | Thu 3/2/1 |
| 17 | ✓ | | Prelim. Stake Micro Piles (Completed) | 2 days | Mon 1/23/17 | Tue 1/24/1 |
| 18 | ✓ | | Re-Stake Micro Piles Due to Utility Locate | 2 days | Wed 2/8/17 | Thu 2/9/17 |
| 19 | | | Identify Vegetation to Remove | 3 days | Fri 2/10/17 | Tue 2/14/1 |
| 20 | | | Remove Vegetation | 15 days | Mon 2/20/17 | Fri 3/10/17 |
| 21 | | | Mobilize GC (Office, Restrooms, etc.) | 3 days | Mon 2/27/17 | Wed 3/1/1 |
| 22 | | | Install Const. Fence Bus Stop/Vegetation Removal | 1 day | Mon 2/20/17 | Mon 2/20/ |
| 23 | | | Install Const. Fence T3,T2 | 2 days | Thu 3/2/17 | Fri 3/3/17 |

| Project: Jungle Island Construct<br>Date: Fri 2/17/17 | Task | | Inactive Summary | | External Tasks |
|---|---|---|---|---|---|
| | Split | | Manual Task | | External Milestone |
| | Milestone | ◇ | Duration-only | | Deadline |
| | Summary | | Manual Summary Rollup | | Progress |
| | Project Summary | | Manual Summary | | Manual Progress |
| | Inactive Task | | Start-only | ⸤ | |
| | Inactive Milestone | ○ | Finish-only | ⸣ | |

Page 1

| ID | | Task Mode | Task Name | Duration | Start | Finish |
|---|---|---|---|---|---|---|
| 24 | | | Rough Exc/Grade T3, T2, | 10 days | Mon 3/6/17 | Fri 3/17/17 |
| 25 | | | **Towers** | **45 days** | **Wed 2/8/17** | **Tue 4/11/1** |
| 26 | | | Shop Drawings | 15 days | Wed 2/8/17 | Tue 2/28/17 |
| 27 | | | Fabricate FDN Steel (Bolts, Base Plates, etc.) | 15 days | Fri 2/17/17 | Thu 3/9/17 |
| 28 | | | Tower Fabrication | 42 days | Mon 2/13/17 | Tue 4/11/1 |
| 29 | | | **Foundation Permit Procurement** | **1 day** | **Tue 2/28/17** | **Tue 2/28/1** |
| 30 | | | **FULL Permit Procurement** | **1 day** | **Wed 3/22/17** | **Wed 3/22/1** |
| 31 | | | **Construction Activities** | **96 days** | **Thu 2/16/17** | **Fri 6/30/17** |
| 32 | | | Deliver FDN Steel (Bolts, Base Plates, etc.) | 3 days | Mon 3/13/17 | Wed 3/15/17 |
| 33 | | | Contact/Schedule Micro Pile Sub | 0 days | Thu 2/16/17 | Thu 2/16/17 |
| 34 | | | Construction Stake | 2 days | Fri 3/24/17 | Mon 3/27/17 |
| 35 | | | **Micro Piles/Exacvate T6,T7,T4,T5** | **25 days** | **Mon 3/27/17** | **Fri 4/28/17** |
| 36 | | | **Concrete Foundations** | **23 days** | **Mon 4/3/17** | **Wed 5/3/17** |
| 37 | | | T3 | 20 days | Mon 4/3/17 | Fri 4/28/17 |
| 38 | | | T2 | 6 days | Fri 4/21/17 | Fri 4/28/17 |
| 39 | | | T6 | 6 days | Wed 4/26/17 | Wed 5/3/17 |
| 40 | | | T7 | 6 days | Wed 4/26/17 | Wed 5/3/17 |
| 41 | | | Tower Shipping/Mobilize Erection Crews | 8 days | Wed 4/12/17 | Fri 4/21/17 |
| 42 | | | Pre-Assembly/Erection/(3 days)Inspections | 13 days | Mon 4/24/17 | Wed 5/10/1 |
| 43 | | | **HELO - Install Towers (After 7 day Cylinder Breaks)** | **4 days** | **Thu 5/11/17** | **Tue 5/16/1** |
| 44 | | | **Detail Towers** | **17 days** | **Wed 5/17/17** | **Thu 6/8/17** |
| 45 | | | Cable Install | 10 days | Wed 5/17/17 | Tue 5/30/1 |
| 46 | | | Brake System Install | 4 days | Fri 5/26/17 | Wed 5/31/1 |

Project: Jungle Island Construct
Date: Fri 2/17/17

| | | | | | |
|---|---|---|---|---|---|
| Task | | Inactive Summary | | External Tasks | |
| Split | | Manual Task | | External Milestone | |
| Milestone | ◇ | Duration-only | | Deadline | |
| Summary | | Manual Summary Rollup | | Progress | |
| Project Summary | | Manual Summary | | Manual Progress | |
| Inactive Task | | Start-only | | | |
| Inactive Milestone | | Finish-only | | | |

| ID | | Task Mode | Task Name | Duration | Start | Finish |
|----|---|-----------|-----------|----------|-------|--------|
| 47 | | | Testing/Adjustments | 3 days | Mon 5/29/17 | Wed 5/31/1 |
| 48 | | | Inspections/Compliance | 3 days | Tue 5/30/17 | Thu 6/1/17 |
| 49 | | | Training | 7 days | Wed 5/31/17 | Thu 6/8/17 |
| 50 | | | Landscape Reclamation | 10 days | Wed 5/31/17 | Tue 6/13/1 |
| 51 | | | **Soft Opening** | 16 days | Fri 6/9/17 | Fri 6/30/17 |
| 52 | | | **Grand Opening** | 0 days | Fri 6/30/17 | Fri 6/30/17 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Project: Jungle Island Construct**<br>**Date: Fri 2/17/17** | Task | | Inactive Summary | | External Tasks | |
| | Split | | Manual Task | | External Milestone | |
| | Milestone | ◇ | Duration-only | | Deadline | |
| | Summary | | Manual Summary Rollup | | Progress | |
| | Project Summary | | Manual Summary | | Manual Progress | |
| | Inactive Task | | Start-only | | | |
| | Inactive Milestone | | Finish-only | | | |



Project: Jungle Island Construct
Date: Fri 2/17/17

| | | | | | | |
|---|---|---|---|---|---|---|
| Task | | Inactive Summary | | External Tasks | | |
| Split | | Manual Task | | External Milestone | | |
| Milestone | ◇ | Duration-only | | Deadline | | |
| Summary | | Manual Summary Rollup | | Progress | | |
| Project Summary | | Manual Summary | | Manual Progress | | |
| Inactive Task | | Start-only | | | | |
| Inactive Milestone | | Finish-only | | | | |

Page 4



| | | | | | |
|---|---|---|---|---|---|
| Task | | Inactive Summary | | External Tasks | |
| Split | | Manual Task | | External Milestone | |
| Milestone | ◇ | Duration-only | | Deadline | |
| Summary | | Manual Summary Rollup | | Progress | |
| Project Summary | | Manual Summary | | Manual Progress | |
| Inactive Task | | Start-only | | | |
| Inactive Milestone | | Finish-only | | | |

Project: Jungle Island Construct
Date: Fri 2/17/17

| Jan 15, '17 | | | | | | | Jan 22, '17 | | | | | | | Jan 29, '17 | | | | | | | Feb 5, '17 | | | | | | | Feb 12, '17 | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| S | M | T | W | T | F | S | S | M | T | W | T | F | S | S | M | T | W | T | F | S | S | M | T | W | T | F | S | S | M | T | W | T | F | S |

Project: Jungle Island Construct
Date: Fri 2/17/17

| | | | |
|---|---|---|---|
| Task | | Inactive Summary | External Tasks |
| Split | | Manual Task | External Milestone |
| Milestone | ◇ | Duration-only | Deadline |
| Summary | | Manual Summary Rollup | Progress |
| Project Summary | | Manual Summary | Manual Progress |
| Inactive Task | | Start-only | |
| Inactive Milestone | | Finish-only | |

Page 6

| | | | | | | |
|---|---|---|---|---|---|---|
| 26, '17 | Mar 5, '17 | Mar 12, '17 | Mar 19, '17 | Mar 26, '17 | Ap |

**Project: Jungle Island Construct**
**Date: Fri 2/17/17**

| | | | |
|---|---|---|---|
| Task | Inactive Summary | External Tasks |
| Split | Manual Task | External Milestone |
| Milestone ◇ | Duration-only | Deadline |
| Summary | Manual Summary Rollup | Progress |
| Project Summary | Manual Summary | Manual Progress |
| Inactive Task | Start-only | |
| Inactive Milestone | Finish-only | |



| | |
|---|---|
| Project: Jungle Island Construct | |
| Date: Fri 2/17/17 | |

| | | | | | |
|---|---|---|---|---|---|
| Task | | Inactive Summary | | External Tasks | |
| Split | | Manual Task | | External Milestone | |
| Milestone | ◇ | Duration-only | | Deadline | |
| Summary | | Manual Summary Rollup | | Progress | |
| Project Summary | | Manual Summary | | Manual Progress | |
| Inactive Task | | Start-only | | | |
| Inactive Milestone | | Finish-only | | | |

| | 26, '17 | | | | | | Mar 5, '17 | | | | | | Mar 12, '17 | | | | | | Mar 19, '17 | | | | | | Mar 26, '17 | | | | | | Ap |
| | M | T | W | T | F | S | S | M | T | W | T | F | S | S | M | T | W | T | F | S | S | M | T | W | T | F | S | S | M | T | W | T | F | S | S |

| | | | | | |
|---|---|---|---|---|---|
| | Task | ▨▨▨▨▨ | Inactive Summary | ▯ ▭ ▯ | External Tasks |
| | Split | | Manual Task | ▨▨▨▨ | External Milestone |
| Project: Jungle Island Construct | Milestone | ◇ | Duration-only | ▨▨▨▨▨ | Deadline |
| Date: Fri 2/17/17 | Summary | ▮▬▬▮ | Manual Summary Rollup | ▬▬▬▬ | Progress |
| | Project Summary | ▮▬▬▮ | Manual Summary | ▮▬▬▬▮ | Manual Progress |
| | Inactive Task | | Start-only | ⊏ | |
| | Inactive Milestone | | Finish-only | ⊐ | |

| | Apr 16, '17 | Apr 23, '17 | Apr 30, '17 | May 7, '17 | May 14 |
|---|---|---|---|---|---|
| T W T F S | S M T W T F S | S M T W T F S | S M T W T F S | S M T W T F S | S M |

| | | | | |
|---|---|---|---|---|
| **Project: Jungle Island Construct** | Task | | Inactive Summary | External Tasks |
| **Date: Fri 2/17/17** | Split | | Manual Task | External Milestone |
| | Milestone | ◇ | Duration-only | Deadline |
| | Summary | | Manual Summary Rollup | Progress |
| | Project Summary | | Manual Summary | Manual Progress |
| | Inactive Task | | Start-only | |
| | Inactive Milestone | | Finish-only | |



Project: Jungle Island Construct
Date: Fri 2/17/17

| | |
|---|---|
| Task | Inactive Summary |
| Split | Manual Task |
| Milestone | Duration-only |
| Summary | Manual Summary Rollup |
| Project Summary | Manual Summary |
| Inactive Task | Start-only |
| Inactive Milestone | Finish-only |

External Tasks
External Milestone
Deadline
Progress
Manual Progress

| | Apr 16, '17 | | | | | | Apr 23, '17 | | | | | | Apr 30, '17 | | | | | | May 7, '17 | | | | | | May 14 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| T | W | T | F | S | S | M | T | W | T | F | S | S | M | T | W | T | F | S | S | M | T | W | T | F | S | S | M |

| Project: Jungle Island Construct | Task | | Inactive Summary | | External Tasks |
|---|---|---|---|---|---|
| Date: Fri 2/17/17 | Split | | Manual Task | | External Milestone |
| | Milestone | ◇ | Duration-only | | Deadline |
| | Summary | | Manual Summary Rollup | | Progress |
| | Project Summary | | Manual Summary | | Manual Progress |
| | Inactive Task | | Start-only | [ | |
| | Inactive Milestone | | Finish-only | ] | |

| | W | T | F | S | May 28, '17 S | M | T | W | T | F | S | Jun 4, '17 S | M | T | W | T | F | S | Jun 11, '17 S | M | T | W | T | F | S | Jun 18, '17 S | M | T | W | T | F | S | Jun 25, '17 S | M | T |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

| | | | |
|---|---|---|---|
| **Project: Jungle Island Construct** **Date: Fri 2/17/17** | Task | | Inactive Summary | | External Tasks |
| | Split | | Manual Task | | External Milestone |
| | Milestone | ◇ | Duration-only | | Deadline |
| | Summary | | Manual Summary Rollup | | Progress |
| | Project Summary | | Manual Summary | | Manual Progress |
| | Inactive Task | | Start-only | ⊏ | |
| | Inactive Milestone | | Finish-only | ⊐ | |

Page 13

| | May 28, '17 | | Jun 4, '17 | | Jun 11, '17 | | Jun 18, '17 | | Jun 25, '17 |
|---|---|---|---|---|---|---|---|---|---|
| W T F S | S M T W T F S | S M T W T F S | S M T W T F S | S M T W T F S | S M T |



**Project: Jungle Island Construct**
**Date: Fri 2/17/17**

| | | | |
|---|---|---|---|
| Task | | Inactive Summary | External Tasks |
| Split | | Manual Task | External Milestone |
| Milestone | ◇ | Duration-only | Deadline |
| Summary | | Manual Summary Rollup | Progress |
| Project Summary | | Manual Summary | Manual Progress |
| Inactive Task | | Start-only | |
| Inactive Milestone | | Finish-only | |

Page 14

| | | |
|---|---|---|
| Task | Inactive Summary | External Tasks |
| Split | Manual Task | External Milestone |
| Milestone ◇ | Duration-only | Deadline |
| Summary | Manual Summary Rollup | Progress |
| Project Summary | Manual Summary | Manual Progress |
| Inactive Task | Start-only | |
| Inactive Milestone | Finish-only | |

Project: Jungle Island Construct
Date: Fri 2/17/17

Page 15

# EXHIBIT 16

## CHARACTER & BRAND IMAGES

**Time & Place:**
1942-ish, Panama.

**Character Snapshot:**
ISABELLE V. DYE
b. September 6, 1912 - Chicago, IL, USA

American biologist and anthropologist.  Second oldest of five children of Raymond (US Naval officer) and Catherine (homemaker).  Raised in an upper middle class home. Considered "bright", left private school at 11 years old to be instructed full time by tutors.  Family moved from the US to Fort Kobbe/Howard Air Force Base in Panama when she was 18 years old (1930). She completed her formal education and began scientific field work with renowned mentors at 20.  Started exploring/researching solo on select trips at 23 years old.

She pushed to be included in the biological research team at the Barro Colorado Field Station in central Panama but, along with other female researchers, was excluded from many of the activities and denied housing due to gender.  Had friends within the Latin American scientific community who encouraged her research and (through the support of her father) she began work elsewhere in the country, where she lived in the field and began encountering more indigenous populations.

An aircraft enthusiast and amateur pilot, she remained in Panama through WWII, interested in and connected to Pacific theatre military operations via her father, but not directly involved herself.

Her work identifying medically and culturally significant plants of the region, as well as writings of the Kuna and Embera people would eventually place her amongst the top scientists of Central America.  Ultimately, she would spend over a decade of uninterrupted living amongst the Kuna, Embera, as well as from her main jungle base camp and her coastal outpost camp before moving on to her next adventure (leaving her camps intact for other researchers).

Fearless.  Challenging.  Smart.  Animal lover.  Known for accurate and beautiful sketches of her subjects (plants, animals, and people).  Spoke English, Spanish, and the Chibchan and Choco dialects. Capable adventurer.  Food lover.  Well-liked by most.  Local legend and friend of the people.

**Brand Images – Camp (Structure EXTERIORS & Lighting):**

- raised platform on piers
- rough pole tent supports
- rectangular main body with potential A-frame elements
- multiple fabric layers on top
- open air front and back
- overhead center lantern lighting
- additional lighting on porch and walkway areas.











**Brand Images – Camps (INTERIORS):**

- Wood deck floor
- Canvas walls on sides
- Cool, authentic, indigenous stuff hanging from support posts
- Rustic and base camp-like, but with amenities and comfort items (brought from home & collected from indigenous people)
- Wood, leather, canvas, glass, metal, brass – durable, quality
- Backpacks and gear, plus art, and scholarly function
- Furniture made from items brought from home, and scavenged and and locally acquired items
- No bed – local striped textile hammocks, mosquito netting
- Lightning jars with dried botanicals labeled in Latin

**"AROUND THE HOUSE"**

 

 



(framed Winslow Homer painting to hang in tent)













## INDIGENOUS PEOPLE – KUNA

















INDIGENOUS PEOPLE – EMBERA














**Functional Needs – (BASE CAMP & OUTPOST):**

BASE CAMP (at main entrance):

**Tent #1 (Welcome, Registration, Guest Orientation)**

Note: Technology will be present. We want to limit how much is seen from the main Jungle Island entrance. Ideas on how to disguise it are welcome!

- Welcome & Registration Desk (w/seating for staff)
- Places for basics
  - Office supplies (paper, pens, clipboards)
  - Bins w/fanny packs for guests to bring along
  - Radio station w/chargers
  - Staff personal gear storage (could be as basic as a trunk)
- Registration computer (desktop or large tablet)
- Station for handheld tablets for registration (5)
- Informational Signage (per ASTM)
- Seating for one guest group (up to 12)
- Screen/speakers for watching intro/safety video (we want to make a retro safety video, and ideally it would be projected onto a surface rather than having a TV present, unless the TV could be well incorporated.)

**Tent #2 (Meet Guides & Gear Up)**
- Places to hang Guest gear (enough for two groups)
  - 30 full body harnesses w/lanyards (up to 5 lbs each)
  - 30 helmets
  - 24 trolleys, carabiners, & lanyards (up to 4 lbs each set)
- Seating for one guest group (up to 12)

OUTPOST CAMP (directly adjacent to Tower #7):

**Outpost Tent (Gear Down & Debrief)**

Note: While Base Camp is very "deep jungle", we want the Outpost Camp to feel more "coastal jungle".

- Space for taking off gear
- Creative bin for helmets (a hanging canoe or hammock?)
- Bench style seating for one guest group plus guides (up to 15 people)

**Fire pit outside of Base Camp Tent #1**

- Area to be used to "hold" guests who arrive prior to their group being allowed into the welcome/registration tent
- Should be a functional fire pit for night time use (possibly gas with aromatic woods)
- Should have seating for 16 people
- Ideally will be incorporated into the "peninsula" that the Base Camp Tents are on (remove concrete between pit and peninsula to expose earth, add landscaping)
- Will need to have a fence enclosing it to prevent entry of non-zip line guests (see picture with bench seating with back that can function as a fence)
- May be themed as cooking/gathering area for the Base Camp, have musical instruments present, etc.







SECURITY & EMERGENCY RELOCATION NEEDS:

- Tents will need to be fully enclosed/secured for night time
- As many objects as possible will need to be secured to prevent theft/damage
- Computers/Tablets should be removable/lockable
- Tent coverings will need to be taken completely down in the event of shutdown for tropical storms/hurricanes
- Interior furniture and decorative items need to be able to be relocated in the event of shutdown for tropical storms/hurricanes
  - Furniture that stores items to allow for easy relocation and storage would be helpful
  - Not hanging items directly on the structure

RANDOM PLANES THAT OUR CHARACTER LIKES:

Beechcraft Staggerwing



Ford Tri Motor

P51 Mustang



DC 3



# EXHIBIT 17

GoZipUS Mail - Update on Schedule and Activities                                    10/31/17, 10:19 PM



Todd Domeck <todd@gozipus.com>

## Update on Schedule and Activities
5 messages

**Todd Domeck** <todd@gozipus.com>                          Fri, Apr 7, 2017 at 12:30 PM
To: John Dunlap <Jdunlap@jungleisland.com>
Cc: Elie Mimoun <em@esj.us>, Matthew Fuller <mf@esj.us>, Mandy Stewart <mandy@experientialresources.net>, Brian Brun <brian@experientialresources.net>, Christopher Gould <cgould@jungleisland.com>, "mauicraig@gmail.com" <mauicraig@gmail.com>, Adam Mopsick <amopsick@amicon.us>, Jon Weislow <jweislow@amicon.us>

Ladies and Gentlemen
I believe Mark Twain is frequently misquoted for writing "I'm sorry for the long letter, but I didn't have time to write a short one." Well, I apologize but have a lot of information I want to get out all at once.

Attached is an updated schedule that has been compiled by Weber with AirPlay/ERi input. Its not ideal but it clearly tells you where we are. I've also attached the final plan set and a document illustrating the temporary operations areas.

While the documents for the permit are all on their way to Miami, I made the decision to hold off the expeditor till Monday for a bunch of reasons. Knowing no progress was going to be made at the city over the weekend, we decided to wait till one of our folks (Mandy) was there on Monday morning to go through the plan sets, additional pages, changes and various letters from Engineers to make sure we are 100% when these updated documents get to the city. Mandy and the permit expeditor will ensure these documents are at the city on Monday.

Much of the future will be dependent on how long the documents are at the permit office. As previously discussed, we are going to break ground prior to execution of the full permit.

Back to the schedule. We are working on several strategies to speed up the process.

**Micro Piles:**

- Two separate machines and crews drilling
- Extend hours of work from 10 hours to 12 hours, 6 nights per week
- Ability to leave grout hoses in the park (off of the walk paths and disguised to some extent) from one shift top the next
- Ability to leave drill machines (size is similar to a skid loader) at the last drill location from one shift to the next in lieu of removing the machine(s) from the park to staging, and then drive the back in (at a snail's pace
- Well-marked JI utilities, and/or the ability to have a JI grounds worker stay alongside the driller to identify any unmarked utilities, or repair the damage if impacted

**Concrete Foundations and Pile Caps:**

- Forms and reinforcement to be pre-fabricated prior to bring to the site in order to set in place, anchor, and be ready to pour sooner
- Ability to pour concrete during the day, or up until noon-ish, <u>but ideally</u>, a large volume of work would be set up during a series of daylight work hours and a pour would be scheduled with the hope for the ability to pour all of what is set up by closing down portions of the park for a short time until pouring is completed
- A mix design has been produced by the ready mix supplier to facilitate an earlier break of 75% of intended PSI strength in 7 days- which would theoretically allow towers to be set on new concrete sooner than anticipated
- Completion is anticipated for the end of May- (and leading to...>)

**Helicopter Fly Date:**

- To be able to move the Helo date up one month (or to the first two weeks of June), steel would need to have been fabricated and ready for erection on the pads by the first week of June.

- This action alone raises to absolute possibility of achieving an opening date at the beginning of July- given the durations of cabling and fine tuning the zip course before use by guests

**Jungle Island Participation:  Here's what we need from y'all!**

- ALL animals will be moved prior to any work being executed.
- ALL fencing- with exception to the Liger cage- will be relocated/reconfigured temporarily prior to work being executed. Liger fencing will be relocated just in time for drilling and coordinated between Weber and JI staff
- ALL appurtenances will have been addressed/moved prior to work on site commencing
- Ability to pour concrete during park operating hours by closing sections of the park temporarily
- Ability to close the park for what could possibly be one- two days per week- for two to three weeks- contingent upon what concrete could get poured with minimal impact to the park guests by way of Concrete bullet point 2.
- Potential Utility Impacts-The availability and/or use of a very knowledgeable park employee to work with the driller and excavator when drilling/digging foundations
- Ability to have JI Park open at noon on concrete pour dates
- Ability to utilize park staff on occasion to help construction to maintain temp fencing and screening
- Ability to have additional lay down areas for Tower assembly, i.e.; Beach, grassy area adjacent to picnic areas, alongside parking garage- especially if there will be multiple connecting crews and towers will be shipped individually, and as completed.

I hope that some, or most of these strategies and activities can be implemented as we progress into construction.  We believe that they could only help recover lost days in the pre-construction phase of the project.  Please also bear in mind that we are drilling in an area where there may be pockets of porous limestone or obstructions that could result in additional drilling and result in a time impact, weather impacts or weather make up days have not been factored into any part of this equation, and the current iteration of a realistic, and already accelerated construction schedule does not include any of these potentially accelerating strategies into any durations or finish dates.  However, we are committed to performing to the best and to the limits of our abilities to make this project a success for the whole team.

From here on out we will update ESJ/JI with a schedule on Fridays.  We will do intermediate updates if opening date changes +/- 5 days one way or the other.  Let us know what strategies Jungle Island is willing to deploy to help us get the opening where we want it to be.

Finally, we will be starting installation of the Temporary Operations Areas in the next few weeks.  These are being installed above grade and without a permit.  We will work with Weber in the future to design the permanent Ops areas in conjunction with our Phase 2 and the Crystal Lagoon, etc.

Congrats on closing your transaction.  We look forward to making a giant impact on the Jungle Island Brand.

Todd and AirPlay Team


--
Todd Domeck, Owner
Experiential Resources, Inc.
GoZip LLC
Maui Pineapple Tours LLC
Waiver Saver LLC
Sugar Cane Train
and Other Stuff
Office 808 . 441 . 5347
Cell 808 . 214 . 4325
www.ZipCoaster.com
www.PineappleTour.com
www.SugarCaneTrain.com
www.WaiverSaver.com

IMPORTANT: This email is intended for the use of the individual (s) named above and may contain information that is

confidential, privileged or unsuitable for overly sensitive persons with low self-esteem, no sense of humor or irrational religious beliefs. If you are not the intended recipient, any dissemination, distribution or copying of this email is not authorized (either explicitly or implicitly) and constitutes an irritating social faux pas. Unless the word absquatulation has been used in its correct context somewhere other than in this warning, it does not have any legal or grammatical use and may be ignored. No animals were harmed in the transmission of this email, although the chihuahua next door is living on borrowed time, let me tell you! Those of you with an overwhelming fear of the unknown will be gratified to learn that there is no hidden message revealed by reading this warning backwards, so just ignore that Alert Notice from Microsoft. However, by pouring a complete circle of salt around yourself and your computer you can ensure that no harm befalls you and your pets. If you have received this email in error, please add some nutmeg and egg whites and place it in a warm (375 degree) oven for 40 minutes. Whisk briefly and let it stand for 2 hours before icing.

**3 attachments**

Updated Jungle Island Accelerated Schedule Rev 8.pdf
208K

170330 AirPlay Ops Areas - for JI approval.pdf
1218K

Jungle Island Full Set (REV1 Stamped 3-31-17) CERTIFIED.pdf
12467K

---

**Adam Mopsick <amopsick@amicon.us>**                                    Fri, Apr 7, 2017 at 1:56 PM
To: Todd Domeck <todd@gozipus.com>

Thanks Todd.  I'd like to set up a time to talk about what we can additionally do locally to help you implement the below to ensure we achieve our goals.    Are you free next week?


**ADAM MOPSICK**




7430 NE 4ᵗʰ Court l Miami, FL 33138

**OFFICE**   305 573 8030 x122

**MOBILE**  305 216 4319

**DIRECT**   786 345 2451

www.amicon.us


**From:** Todd Domeck [mailto:todd@gozipus.com]
**Sent:** Friday, April 7, 2017 3:31 PM
**To:** John Dunlap <Jdunlap@jungleisland.com>
**Cc:** Elie Mimoun <em@esj.us>; Matthew Fuller <mf@esj.us>; Mandy Stewart

<mandy@experientialresources.net>; Brian Brun <brian@experientialresources.net>; Christopher
Gould <cgould@jungleisland.com>; mauicraig@gmail.com; Adam Mopsick <amopsick@amicon.us>;
Jon Weislow <jweislow@amicon.us>
**Subject:** Update on Schedule and Activities

[Quoted text hidden]

---

**GoZip US** <todd@gozipus.com>                                                Fri, Apr 7, 2017 at 1:59 PM
To: Adam Mopsick <amopsick@amicon.us>

I'm in Miami next Friday. Let's meet up then.

Todd Domeck, Owner
808 . 214 . 4325

> On Apr 7, 2017, at 10:56 AM, Adam Mopsick <amopsick@amicon.us> wrote:
>
> Thanks Todd.  I'd like to set up a time to talk about what we can additionally do locally to
> help you implement the below to ensure we achieve our goals.     Are you free next week?
>
>
> **ADAM MOPSICK**
>
>
> <image003.jpg>
>
> [Quoted text hidden]

---

**Adam Mopsick** <amopsick@amicon.us>                                          Fri, Apr 7, 2017 at 2:06 PM
To: GoZip US <todd@gozipus.com>

Perfect.  lunch?


**ADAM MOPSICK**





7430 NE 4th Court I Miami, FL 33138

**OFFICE**   305 573 8030 x122

**MOBILE**   305 216 4319

GoZipUS Mail - Update on Schedule and Activities                                                                10/31/17, 10:19 PM

DIRECT   786 345 2451

www.amicon.us

---

**From:** GoZip US [mailto:todd@gozipus.com]
**Sent:** Friday, April 7, 2017 4:59 PM
**To:** Adam Mopsick <amopsick@amicon.us>
**Subject:** Re: Update on Schedule and Activities

[Quoted text hidden]

---

Elie Mimoun <em@esj.us>                                                           Sun, Apr 9, 2017 at 1:45 AM
To: Todd Domeck <todd@gozipus.com>, Mandy Stewart <mandy@experientialresources.net>
Cc: John Dunlap <Jdunlap@jungleisland.com>, Matt Fuller <mf@esj.us>, Brian Brun <brian@experientialresources.net>,
Christopher Gould <cgould@jungleisland.com>, "mauicraig@gmail.com" <mauicraig@gmail.com>, Adam Mopsick
<amopsick@amicon.us>, Jon Weislow <jweislow@amicon.us>

Todd,

Thank you for this latest update. Based on your new time line the opening is now scheduled for 8/7/2017 which is over
1 month delay.

The first question is - Are the strategies you mentioned below, if implemented, able to move our opening date back to
July 4 weekend?

Secondly, can you please prepare a schedule detailing exactly what you need from Jungle Island and WHEN you
need it so we can get working on these items hopefully achieving them before your requested date.
With regard to these items - JOHN DUNLAP - can you please confirm that it is possible and that these items will not
effect ( or minimally effect) the park operations and guest experience?

Thank you,


Elie Mimoun I Chief Operating Officer I ESJ Capital Partners, LLC
19950 W. Country Club Drive I Suite 800 I Aventura, Florida 33180
Main Line: 305-600-5001 IFax: 305-402-8069 I Cell: 786-210-2104
em@esj.us I www.esj.us

The information contained in this electronic message is privileged and confidential and is intended only for the use of the individual named above and others who have been specifically
authorized to receive such. If the recipient is not the intended recipient, you are hereby notified that any dissemination, distribution or duplication of the communication is strictly
prohibited. If you have received this communication in error, or if any problems occur with transmission, please immediately notify us by telephone (305) 600-5001.
Please consider the environment before printing this email.


[Quoted text hidden]
[Quoted text hidden]
<Updated Jungle Island Accelerated Schedule Rev 8.pdf><170330 AirPlay Ops Areas - for JI
approval.pdf><Jungle Island Full Set (REV1 Stamped 3-31-17) CERTIFIED.pdf>

---

# EXHIBIT 18

From: **Todd Gmail** todddomeck@gmail.com
Subject: Zipline Project Update April 14, 2017
Date: April 15, 2017 at 8:51 AM
To: Elie Mimoun em@esj.us
Cc: Matthew Fuller mf@esj.us, Craig Hill craig@hawaiirros.com, John Dunlap jdunlap@jungleisland.com, Mandy Stewart mandy@experientialresources.net, Brian Brun brian@experientialresources.net, Adam Mc Intyre adammcintyre@webergroupinc.com, Dave Rawdon daverawdon@webergroupinc.com, Dan Shehan danshehan@webergroupinc.com, Christopher Gould cgould@jungleisland.com, Adam Mopsick amopsick@amicon.us, Jon Weislow jweislow@amicon.us

Aloha

Late in the day on Friday, ESJ folks asked that we "take a pause" on starting to drill micropiles for Tower 6 (Beach Tower) that was scheduled to occur next week. Matt has asked that we look into all the options that we can to address concerns from the Beach Club Operator.

With that in mind, I will be meeting with Adam McIntyre next Wednesday to brainstorm options to accommodate restaurant/kitchen in the base of Tower 6. We expect to have some visuals produced by the end of the week for discussion purposes.

What's this do to the schedule? July 4 is now officially out. This redesign will take 2 weeks at minimum, plus additional weeks of engineering, plus new pricing, plus procurement, plus permitting, etc. we'll have a better handle on the impacts (time/money) once we have a design to move forward with that has been approved by ESJ.

If we want to really nail this, Adam and I will need actual autocad files from Beach Club people. Also, brand images of what they have in mind would be helpful. This would include structures, textures, surfaces, lighting, etc. I would expect this to be a simple request given all the effort that we all are putting in to accommodating them.

Finally, it would be helpful to get everyone (ESJ, Jungle, Weber, Airplay) on the same page. Please facilitate a meeting as soon as y'all can. Tuesday afternoon would work best for me.

Because I know this question will come up, I'll address it now. "Why can't you start on all the other foundations except Tower 6?" Any modifications (height, angle, size, etc) of any of the towers (remember they are all connected and function as a system) will have an effect on another tower or foundation. While we don't expect at this stage for there to be severe impacts on the other structures, we must re-look at everything as a whole. And that's what we are going to do.

Some of you might be wondering "Hey Todd, are you happy about this?" Uhhh. Nope. I'm not. It blows our summer opening and is going to have a short term financial impact. However, looking ahead 3+ years from now, I can see the value in taking a minute to get this right structurally, being a good neighbor to our co-tenant, and re-looking at this tower to determine if we can make it cooler/better/more creative/more functional.

We look forward to resolving this as soon as possible.

Todd Domeck, Owner
808 . 214 . 4325

# EXHIBIT 19

GoZipUS Mail - Friday Update                                                                    10/31/17, 10:26 PM



Todd Domeck <todd@gozipus.com>

---

## Friday Update
8 messages

---

**Todd Domeck** <todd@gozipus.com>                              Mon, Apr 24, 2017 at 2:12 PM
To: Matthew Fuller <mf@esj.us>
Cc: Elie Mimoun <em@esj.us>, John Dunlap <Jdunlap@jungleisland.com>, Mandy Stewart
<mandy@experientialresources.net>, Brian Brun <brian@experientialresources.net>, "mauicraig@gmail.com"
<mauicraig@gmail.com>

Aloha guys
I ended up traveling a lot longer than expected last Friday. I wasn't able to get the info I needed for the update but
should have it shortly. Will send update today.
Mahalo
Todd

--

Todd Domeck, Owner
Experiential Resources, Inc.
GoZip LLC
Maui Pineapple Tours LLC
Waiver Saver LLC
Sugar Cane Train
and Other Stuff
Office 808 . 441 . 5347
Cell 808 . 214 . 4325
www.ZipCoaster.com
www.PineappleTour.com
www.SugarCaneTrain.com
www.WaiverSaver.com

IMPORTANT: This email is intended for the use of the individual (s) named above and may contain information that is
confidential, privileged or unsuitable for overly sensitive persons with low self-esteem, no sense of humor or irrational
religious beliefs. If you are not the intended recipient, any dissemination, distribution or copying of this email is not
authorized (either explicitly or implicitly) and constitutes an irritating social faux pas. Unless the word
absquatulation has been used in its correct context somewhere other than in this warning, it does not have any legal
or grammatical use and may be ignored. No animals were harmed in the transmission of this email, although the
chihuahua next door is living on borrowed time, let me tell you! Those of you with an overwhelming fear of
the unknown will be gratified to learn that there is no hidden message revealed by reading this warning backwards, so
just ignore that Alert Notice from Microsoft. However, by pouring a complete circle of salt around yourself and your
computer you can ensure that no harm befalls you and your pets. If you have received this email in error, please add
some nutmeg and egg whites and place it in a warm (375 degree) oven for 40 minutes. Whisk briefly and let it stand
for 2 hours before icing.

---

**Elie Mimoun** <em@esj.us>                                     Thu, Apr 27, 2017 at 2:04 PM
To: Todd Domeck <todd@gozipus.com>
Cc: Matt Fuller <mf@esj.us>, John Dunlap <Jdunlap@jungleisland.com>, Mandy Stewart
<mandy@experientialresources.net>, Brian Brun <brian@experientialresources.net>, "mauicraig@gmail.com"
<mauicraig@gmail.com>

Mahalo,

GoZipUS Mail - Friday Update                                                                    10/31/17, 10:26 PM

please advise what is your favorite option of the 4 for tower 6 - Beach club

Elie Mimoun I Chief Operating Officer I ESJ Capital Partners, LLC
19950 W. Country Club Drive I Suite 800 I Aventura, Florida 33180
Main Line: 305-600-5001 IFax: 305-402-8069 I Cell: 786-210-2104
em@esj.us I www.esj.us

The information contained in this electronic message is privileged and confidential and is intended only for the use of the individual named above and others who have been specifically
authorized to receive such. If the recipient is not the intended recipient, you are hereby notified that any dissemination, distribution or duplication of the communication is strictly
prohibited. If you have received this communication in error, or if any problems occur with transmission, please immediately notify us by telephone (305) 600-5001.
Please consider the environment before printing this email.

[Quoted text hidden]

**Mandy Stewart** <mandy@experientialresources.net>                                 Thu, Apr 27, 2017 at 2:12 PM
To: Todd Domeck <todd@experientialresources.net>, Brian Brun <brian@experientialresources.net>

What do we think, guys?  We should also send a brief "why".



Mandy Stewart
Catalyst
253.318.6087

Begin forwarded message:

**From:** Elie Mimoun <em@esj.us>
**Subject: Re: Friday Update**
**Date:** April 27, 2017 at 2:04:39 PM PDT
**To:** Todd Domeck <todd@gozipus.com>
**Cc:** Matt Fuller <mf@esj.us>, John Dunlap <Jdunlap@jungleisland.com>, Mandy Stewart
<mandy@experientialresources.net>, Brian Brun <brian@experientialresources.net>,
"mauicraig@gmail.com" <mauicraig@gmail.com>
[Quoted text hidden]

**Brian Brun** <brian@experientialresources.net>                                       Thu, Apr 27, 2017 at 2:23 PM
To: Mandy Stewart <mandy@experientialresources.net>
Cc: Todd Domeck <todd@experientialresources.net>

I'm really leaning towards option 1 with a content of option 2.
We should also put a note that the timelines proposed in this option set was based on the revised scope eliminating
the bridge and zips to towers 4 & 5 add another week to the schedule to accommodate full scope completion.



Brian J. Brun •  Project Manager/Partner
Experiential Resources, Inc. •  We make the cool stuff
m. 502-718-6010 | t. 808-441-5347
f. 502-324-7141 | e. brian@experientialresources.net
w. http://www.zipcoaster.com

GoZipUS Mail - Friday Update

10/31/17, 10:26 PM



CONFIDENTIALITY NOTICE: This e-mail message, including any attachments, is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original.

🖨 Please consider the environment before printing this email.

[Quoted text hidden]

---

**Mandy Stewart** <mandy@experientialresources.net>
To: Brian Brun <brian@experientialresources.net>
Cc: Todd Domeck <todd@experientialresources.net>

Thu, Apr 27, 2017 at 3:37 PM

Let's get on a call ASAP and sort this out, please.



Mandy Stewart
Catalyst
253.318.6087

[Quoted text hidden]

---

**Mandy Stewart** <mandy@experientialresources.net>
To: Elie Mimoun <em@esj.us>
Cc: Todd Domeck <todd@gozipus.com>, Matt Fuller <mf@esj.us>, John Dunlap <Jdunlap@jungleisland.com>, Brian Brun <brian@experientialresources.net>, Craig Hill <mauicraig@gmail.com>

Thu, Apr 27, 2017 at 8:22 PM

Hey Elie,

Sorry for the delayed response. We approached the redesign with collaboration in mind, not our own preferences, so it was a process to get through everyone's thoughts. Where we landed...

We LOVE the Iconic Tower in Option 4. It's beautiful, will change the skyline, and would be a valuable asset from many standpoints, including adding to the aesthetic of the beach club. If we have the financial backing and timeline support to do that option, it's a clear winner. It also includes a lot of unknowns that are out of our direct control (engineering, permitting, etc.) that have the potential to impact the estimated opening date. So, unless time and money are not primary factors, we need to be practical.

When prioritizing overall costs, margins of compromise, opening dates, etc., our clear choice is Option 1. The beach club will need to redesign the Sunset View space with every option, so that may be considered a neutral point. We believe that while shifting the other beach club structures to allow for the 18' needed will be moderately inconvenient, it doesn't equate to the money and time involved with a redesign, engineering, and associated costs associated with moving or redesigning Tower 6, especially considering that we are almost through permitting, and to the best of our knowledge the beach club hasn't begun that process.

So after a lot of words, our preference is Option 1. Thanks for asking.

Mandy and the AirPlay Team



Mandy Stewart
Catalyst
253.318.6087

[Quoted text hidden]

# EXHIBIT 20

GoZipUS Mail - T6 - Beach Club                                                                                10/31/17, 10:33 PM



Todd Domeck <todd@gozipus.com>

---

## T6 - Beach Club
8 messages

---

**Todd Domeck** <todd@gozipus.com>                                       Tue, May 9, 2017 at 11:50 AM
To: Cleo Vo Dai <cleovo@me.com>, Matthew Fuller <mf@esj.us>, Elie Mimoun <em@esj.us>, John Dunlap
<Jdunlap@jungleisland.com>, Mandy Stewart <mandy@experientialresources.net>, f@ffdmiami.com
Cc: Brian Brun <brian@experientialresources.net>, Adam McIntyre <adammcintyre@webergroupinc.com>, Dan Shehan
<DanShehan@webergroupinc.com>

First, we appreciate everyone taking the time yesterday to work on the joint use of space on the beach.  We're glad
that we've found a solution that works for us all.

Attached are the files that illustrate the new Tower 6 location, as identified during our meeting.  Both the beach club
and zip line team agreed on this location yesterday, however that we're requesting that everyone please provide a
final confirmation on this tower location via this email.

Elie and Matt:  following everyone's final confirmation, in order to remobilize the project AirPlay will need a written
Notice To Proceed that cites the new tower location and instructs us to recommence all necessary work on the zip line
tour project.

Finally, following confirmation of the tower location by all parties, we look forward to scheduling meeting to talk through
the operations needs of both projects.  Until then we would appreciate prompt communication from everyone on this
so we can get everything to our engineers as soon as possible.


Todd Domeck, Owner
Experiential Resources, Inc.
GoZip LLC
Maui Pineapple Tours LLC
Waiver Saver LLC
Sugar Cane Train
and Other Stuff
Office 808 . 441 . 5347
Cell 808 . 214 . 4325
www.ZipCoaster.com
www.PineappleTour.com
www.SugarCaneTrain.com
www.WaiverSaver.com

IMPORTANT:  This email is intended for the use of the individual (s) named above and may contain information that is
confidential, privileged or unsuitable for overly sensitive persons with low self-esteem, no sense of humor or irrational
religious beliefs.  If you are not the intended recipient, any dissemination, distribution or copying of this email is not
authorized (either explicitly or implicitly) and constitutes an irritating social faux pas.  Unless the word
absquatulation has been used in its correct context somewhere other than in this warning, it does not have any legal
or grammatical use and may be ignored.  No animals were harmed in the transmission of this email, although the
chihuahua next door is living on borrowed time, let me tell you!  Those of you with an overwhelming fear of
the unknown will be gratified to learn that there is no hidden message revealed by reading this warning backwards, so
just ignore that Alert Notice from Microsoft.  However, by pouring a complete circle of salt around yourself and your
computer you can ensure that no harm befalls you and your pets.  If you have received this email in error, please add
some nutmeg and egg whites and place it in a warm (375 degree) oven for 40 minutes.  Whisk briefly and let it stand

for 2 hours before icing.

**2 attachments**

🖼 **proposed site plan Updated May 9, 2017 d.pdf**
1012K

📄 **proposed site plan Updated May 9, 2017.dwg**
1016K

---

**Matthew Fuller <mf@esj.us>**                          Tue, May 9, 2017 at 12:11 PM
To: Todd Domeck <todd@gozipus.com>, Cleo Vo Dai <cleovo@me.com>, Elie Mimoun <em@esj.us>, John Dunlap
<Jdunlap@jungleisland.com>, Mandy Stewart <mandy@experientialresources.net>, f@ffdmiami.com
Cc: Brian Brun <brian@experientialresources.net>, Adam McIntyre <adammcintyre@webergroupinc.com>, Dan Shehan
<DanShehan@webergroupinc.com>

Sounds encouraging.  We will provide a Notice to Proceed

Sincerely,

Matt

Matthew Fuller I Chief Investment Officer

ESJ Capital Partners, LLC

19950 W. Country Club Drive I Suite 800 I Aventura, Florida 33180

Direct: 305-363-6838 IFax: 305-402-8069

Cell: 305-877-2203

mf@esj.us I www.esj.us

The information contained in this electronic message is privileged and confidential and is intended only for the use of the individual named above and others who have been specifically authorized to receive such. If the recipient is not the intended recipient, you are hereby notified that any dissemination, distribution or duplication of the communication is strictly prohibited. If you have received this communication in error, or if any problems occur with transmission, please immediately notify us by telephone (305) 600-5001.

Please consider the environment before printing this email.

---

**From:** Todd Domeck <todd@gozipus.com>
**Date:** Tuesday, May 9, 2017 at 2:50 PM
**To:** Cleo Vo Dai <cleovo@me.com>, Matthew Fuller <mf@esj.us>, Elie Mimoun <em@esj.us>,
John Dunlap <Jdunlap@jungleisland.com>, Mandy Stewart <mandy@experientialresources.net>,
<f@ffdmiami.com>

Cc: Brian Brun <brian@experientialresources.net>, Adam McIntyre
<adammcintyre@webergroupinc.com>, Dan Shehan <DanShehan@webergroupinc.com>
Subject: T6 - Beach Club
[Quoted text hidden]

---

**Elie Mimoun** <em@esj.us>                                     Tue, May 9, 2017 at 12:23 PM
To: Todd Domeck <todd@gozipus.com>
Cc: Cleo Vo Dai <cleovo@me.com>, Matthew Fuller <mf@esj.us>, John Dunlap <Jdunlap@jungleisland.com>, Mandy
Stewart <mandy@experientialresources.net>, f@ffdmiami.com, Brian Brun <brian@experientialresources.net>, Adam
McIntyre <adammcintyre@webergroupinc.com>, Dan Shehan <DanShehan@webergroupinc.com>

In continuation to Todd's email below, I would like that Cleo or anyone on Villa Azure side confirm in writing by printing
the attached site plan and initialing and sending back to all.
I would ask that Air play and Jungle Island do the same.

Elie Mimoun, COO
ESJ Capital Partners
305-600-5001
[Quoted text hidden]

> <proposed site plan Updated May 9, 2017 d.pdf>

> <proposed site plan Updated May 9, 2017.dwg>

---

**Mandy Stewart** <mandy@experientialresources.net>             Tue, May 9, 2017 at 12:37 PM
To: Elie Mimoun <em@esj.us>
Cc: Todd Domeck <todd@gozipus.com>, Cleo Vo Dai <cleovo@me.com>, Matt Fuller <mf@esj.us>, John Dunlap
<Jdunlap@jungleisland.com>, f@ffdmiami.com, Brian Brun <brian@experientialresources.net>, Adam McIntyre
<adammcintyre@webergroupinc.com>, Dan Shehan <DanShehan@webergroupinc.com>

Thanks, Elie.

Please see attached for AirPlay's copy.


Mandy Stewart
Catalyst
253.318.6087

On May 9, 2017, at 3:23 PM, Elie Mimoun <em@esj.us> wrote:

In continuation to Todd's email below, I would like that Cleo or anyone on Villa Azure side confirm in
writing by printing the attached site plan and initialing and sending back to all.
I would ask that Air play and Jungle Island do the same.

Elie Mimoun, COO
ESJ Capital Partners
305-600-5001

On May 9, 2017, at 2:50 PM, Todd Domeck <todd@gozipus.com> wrote:

---

First, we appreciate everyone taking the time yesterday to work on the joint use of space on the beach. We're glad that we've found a solution that works for us all.

Attached are the files that illustrate the new Tower 6 location, as identified during our meeting. Both the beach club and zip line team agreed on this location yesterday, however that we're requesting that everyone please provide a final confirmation on this tower location via this email.

Elie and Matt: following everyone's final confirmation, in order to remobilize the project AirPlay will need a written Notice To Proceed that cites the new tower location and instructs us to recommence all necessary work on the zip line tour project.

Finally, following confirmation of the tower location by all parties, we look forward to scheduling meeting to talk through the operations needs of both projects. Until then we would appreciate prompt communication from everyone on this so we can get everything to our engineers as soon as possible.

Todd Domeck, Owner
Experiential Resources, Inc.
GoZip LLC
Maui Pineapple Tours LLC
Waiver Saver LLC
Sugar Cane Train
and Other Stuff
Office 808 . 441 . 5347
Cell 808 . 214 . 4325
www.ZipCoaster.com
www.PineappleTour.com
www.SugarCaneTrain.com
www.WaiverSaver.com

IMPORTANT: This email is intended for the use of the individual (s) named above and may contain information that is confidential, privileged or unsuitable for overly sensitive persons with low self-esteem, no sense of humor or irrational religious beliefs. If you are not the intended recipient, any dissemination, distribution or copying of this email is not authorized (either explicitly or implicitly) and constitutes an irritating social faux pas. Unless the word absquatulation has been used in its correct context somewhere other than in this warning, it does not have any legal or grammatical use and may be ignored. No animals were harmed in the transmission of this email, although the chihuahua next door is living on borrowed time, let me tell you! Those of you with an overwhelming fear of the unknown will be gratified to learn that there is no hidden message revealed by reading this warning backwards, so just ignore that Alert Notice from Microsoft. However, by pouring a complete circle of salt around yourself and your computer you can ensure that no harm befalls you and your pets. If you have received this email in error, please add some nutmeg and egg whites and place it in a warm (375 degree) oven for 40 minutes. Whisk briefly and let it stand for 2 hours before icing.

<proposed site plan Updated May 9, 2017 d.pdf>

<proposed site plan Updated May 9, 2017.dwg>

**170509 T6 Location Approval - AirPlay.pdf**

GoZipUS Mail - T6 - Beach Club                                                                    10/31/17, 10:33 PM

🖼 472K

---

**Elie Mimoun** <em@esj.us>                                              Tue, May 9, 2017 at 1:50 PM
To: Mandy Stewart <mandy@experientialresources.net>
Cc: Todd Domeck <todd@gozipus.com>, Cleo Vo Dai <cleovo@me.com>, Matt Fuller <mf@esj.us>, John Dunlap
<Jdunlap@jungleisland.com>, f@ffdmiami.com, Brian Brun <brian@experientialresources.net>, Adam McIntyre
<adammcintyre@webergroupinc.com>, Dan Shehan <DanShehan@webergroupinc.com>

Thank you Air play.

Once we get execution from Vila Azure we will be able to proceed.
Time is of the essence so please review and execute asap

Elie Mimoun, COO
ESJ Capital Partners
305-600-5001
[Quoted text hidden]

       <170509 T6 Location Approval - AirPlay.pdf>

[Quoted text hidden]

---

**Cleo Vo Dai** <cleovo@me.com>                                         Tue, May 9, 2017 at 2:52 PM
To: Elie Mimoun <em@esj.us>
Cc: Mandy Stewart <mandy@experientialresources.net>, Todd Domeck <todd@gozipus.com>, Matt Fuller <mf@esj.us>,
John Dunlap <Jdunlap@jungleisland.com>, f@ffdmiami.com, Brian Brun <brian@experientialresources.net>, Adam
McIntyre <adammcintyre@webergroupinc.com>, Dan Shehan <DanShehan@webergroupinc.com>

Thank you Todd for sending and thank you Elie. We will send the signature in the AM.

Just to clarify, our identity for this project is Riviera management not Villa Azure.
[Quoted text hidden]

# EXHIBIT 21



Todd Domeck <todd@gozipus.com>

## approval tower 6

2 messages

**Cleo Vo Dai** <cleovo@me.com>                                          Wed, May 10, 2017 at 7:44 AM
To: Todd Domeck <todd@gozipus.com>, Elie Mimoun <em@esj.us>, John Dunlap <jdunlap@jungleisland.com>, Mandy Stewart <mandy@experientialresources.net>, Matt Fuller <mf@esj.us>
Cc: Marco Benatar <elitemtl@gmail.com>, Paul Breuza <paulbreuza@me.com>, Francois Frossard <f@ffdmiami.com>, Brian Brun <brian@experientialresources.net>, Adam McIntyre <adammcintyre@webergroupinc.com>, Dan Shehan <DanShehan@webergroupinc.com>

Hello everyone,

Thank you for all gathering to find a solution.

Please see signature approval of tower 6 location. Please note that this is pending tower design, budget and additional expense approval of course.

Kind regards

. Cleo Vo-Dai

---

 **170509 T6 Location Approval - AirPlay.pdf**
496K

---

**Mandy Stewart** <mandy@experientialresources.net>                     Wed, May 10, 2017 at 10:48 AM
To: Cleo Vo Dai <cleovo@me.com>
Cc: Todd Domeck <todd@gozipus.com>, Elie Mimoun <em@esj.us>, John Dunlap <jdunlap@jungleisland.com>, Matt Fuller <mf@esj.us>, Marco Benatar <elitemtl@gmail.com>, Paul Breuza <paulbreuza@me.com>, Francois Frossard <f@ffdmiami.com>, Brian Brun <brian@experientialresources.net>, Adam McIntyre <adammcintyre@webergroupinc.com>, Dan Shehan <DanShehan@webergroupinc.com>

Awesome - thanks, Cleo!

Moving forward, we had previously provided estimated costs associated with this option as follows:

- Costs associated with stoppage of work and remobilization - final number TBD based on length of stoppage

- Cost for redesign/reengineering/review of Tower 6 and Tower 3 column, associated guy cables and foundations: $50,000

- Cost for increasing Tower 6 steel member sizes, Tower 3 column materials, and capacity of all

associated guy cables and foundations: $300,000-$350,000

Note that the original estimated cost didn't include materials changes that we have since discussed that will help the tower match with the beach club aesthetic. We do think, however, that with a little creativity we can make these additions work within or close to these numbers.

Can everyone please confirm whether this is an acceptable maximum target budget? We will, of course, aim to keep costs as low as possible. We will provide a complete budget of the redesigned tower, footings, guy lines, surfaces, etc. after redesign and engineering, and prior to starting fabrication and construction.

Thanks much,
Mandy



Mandy Stewart
Catalyst
253.318.6087

[Quoted text hidden]
[Quoted text hidden]
<170509 T6 Location Approval - AirPlay.pdf>

# EXHIBIT 22

# Formal Notice to Proceed

**ESJ JI Leasehold LLC**
**1111 Parrot Jungle Trail**
**Miami, FL 33132**

06 June 2017

**To:  Mr. Todd Domeck – AirPlay Adventures LLC of Lahaina, HI, and Affiliates**

**RE: AirPlay Adventures Zip Tour at Jungle Island - Stop Work Order/Notice to Proceed**

Mr. Domeck,

This letter shall serve as formal written notice of the removal of the "Stop Work Order" as levied on April 14, 2017 to Todd Domeck of AirPlay Adventures LLC, by Matt Fuller of ESJ Capital Partners.  This notice does hereby release AirPlay Adventures LLC ("AirPlay") and all its construction crews and affiliates to proceed and continue with the construction and installation of the AirPlay Adventures Zip Tour at Jungle Island in Miami, Florida, effective immediately.

ESJ JI Leasehold, LLC ("ESJ") also acknowledges that both past and current communication and evidence relative to all AirPlay Adventures Zip Tour project delay costs incurred since the "Stop Work Order" was imposed on April 14, 2017, as provided to ESJ by AirPlay, whether directly or indirectly, spoken, written, or otherwise noted, shall be resolved under a separate agreement, and prior to completion of the AirPlay Adventures Zip Tour project.

ESJ JI Leasehold, LLC acknowledges that the additional costs associated with the modifications to the project scope under this Notice to Proceed are estimated to be approximately $500,000.00, inclusive of, but not limited to:

   a)  any associated hard and soft costs associated with 'Option #2' as per the 'Zip Tour/Beach Club Joint Space Use Options Proposal' dated (04-27-17), as well as
   b)  schedule delay and remobilization costs due to the Stop Work Order issued to Airplay on (04-14-17).

Upon confirmation of the final scope of work and receipt of associated pricing for both hard and soft costs, Airplay and ESJ will resolve under a separate agreement as noted in paragraph 2 above.  As these costs are now being incurred solely at the request of ESJ, outside of the original License Agreement dated 21 September 2015, it is agreed upon that Airplay will not be held liable for these costs and that the source of funding of this additional work will be resolved solely by ESJ JI Leasehold, LLC.

# Formal Notice to Proceed

**ESJ JI Leasehold LLC**
**1111 Parrot Jungle Trail**
**Miami, FL 33132**

ESJ JI Leasehold, LLC also acknowledges that as of the date of execution of this Notice to Proceed, the expected soft opening of the zip course is December 01, 2017 and a Grand Opening is December 08, 2017.

Should the final scope of work deviate from Airplay's current understanding of the Tower 6 logistic modifications noted in 'Option #02' as per the 'Zip Tour/Beach Club Joint Space Use Options Proposal' dated (04-27-17); the costs and schedule implications noted above will be subject to change.

X _____

Signature of ESJ JI Leasehold, LLC Agent

STATE OF _____:

COUNTY OF _____:

The foregoing instrument was acknowledged before me this _____ day of _____, 2017, by _____ for ESJ JI Leasehold LLC.

     (name)                     (title)

(SEAL)

_____
Notary Public,
State of _____
(Signature of Notary Public)

_____
(Print, Type, or Stamp Commissioned Name of Notary Public)

☐ Personally Known OR ☐ Produced Identification

Type of Identification Produced _____

2 of 2

# EXHIBIT 23

From:       ESJ JI Operations, LLC
To:         AirPlay Adventures LLC of Lahaina, HI
Today:      June 9, 2017
Re:         Notice to Proceed (Ref: Stop Work Order of April 14, 2017)

---

You are hereby given notice to proceed with the AirPlay Adventures Zip Tour at Jungle Island in Miami, Florida. Please proceed with the construction and installation, effective immediately.

ESJ JI Operations, LLC
A Florida limited liability company

By:     ESJ Capital Partners, LLC
        A Florida limited liability company,
        Its Manager

        By: _____
            Gabriel Amiel, Manager

        By: _____
            Arnaud Sitbon, Manager

# EXHIBIT 24

GoZipUS Mail – Zip lines insurance for constructions                                                                    10/31/17, 10:45 PM



Todd Domeck <todd@gozipus.com>

## Zip lines insurance for constructions
8 messages

---

**Elie Mimoun** <em@esj.us>                                                                 Tue, Jun 13, 2017 at 8:48 AM
To: todd@experientialresources.net, Mandy Stewart <mandy@airplayadventures.com>, Adam McIntyre
<adammcintyre@webergroupinc.com>, Brian Adams <Brian.Adams@usi.com>

All,

We now have the building permit and should be breaking ground this Friday - we will not accept a delay in ground
breaking because the insurance issues are not resolved.

Please advise asap.

Thank you

Elie Mimoun, COO
ESJ Capital Partners
305-600-5001

---

**Mandy Stewart** <mandy@airplayadventures.com>                                           Tue, Jun 13, 2017 at 9:02 AM
To: Todd Domeck <todd@experientialresources.net>

And exactly where did "breaking ground this Friday" come from? It's going to be weeks.

Sent from my iPhone

Begin forwarded message:

> **From:** Elie Mimoun <em@esj.us>
> **Date:** June 13, 2017 at 8:48:23 AM PDT
> **To:** todd@experientialresources.net, Mandy Stewart <mandy@airplayadventures.com>, Adam McIntyre
> <adammcintyre@webergroupinc.com>, Brian Adams <Brian.Adams@usi.com>
> **Subject: Zip lines insurance for constructions**

[Quoted text hidden]

---

**Brian Adams** <Brian.Adams@usi.com>                                                     Tue, Jun 13, 2017 at 9:54 AM
To: Elie Mimoun <em@esj.us>
Cc: "todd@experientialresources.net" <todd@experientialresources.net>, Mandy Stewart
<mandy@airplayadventures.com>, Adam McIntyre <adammcintyre@webergroupinc.com>

Elie, To the best of my knowledge the insurance requirements are not in place. And this is a big problem for everyone
including the City of Miami. Am traveling all day today, and will back in the office tomorrow by 10:30, or 11:00 am.
Have a good one! All the best, Brian

Sent from my iPhone
[Quoted text hidden]

---

GoZipUS Mail – Zip lines insurance for constructions                                                10/31/17, 10:45 PM

**Elie Mimoun <em@esj.us>**                                                   Wed, Jun 14, 2017 at 9:06 AM
To: Brian Adams <Brian.Adams@usi.com>, John Dunlap <jdunlap@jungleisland.com>, Christopher Gould
<cgould@jungleisland.com>
Cc: "todd@experientialresources.net" <todd@experientialresources.net>, Mandy Stewart
<mandy@airplayadventures.com>, Adam McIntyre <adammcintyre@webergroupinc.com>

Brian,

Can I please have an exact list of the Insurance and coverage requirements we need for the construction phase of the
zip lines.

Can you also advise which parts offer existing liability insurance would act as additional coverage as well.

Adam or Todd - please send us the certificates of your insurances which cover this construction phase of the Zips.

Thank you

Elie Mimoun I Chief Operating Officer I ESJ Capital Partners, LLC
19950 W. Country Club Drive I Suite 800 I Aventura, Florida 33180
Main Line: 305-600-5001 IFax: 305-402-8069 I Cell: 786-210-2104
em@esj.us I www.esj.us

The information contained in this electronic message is privileged and confidential and is intended only for the use of the individual named above and others who have been specifically
authorized to receive such. If the recipient is not the intended recipient, you are hereby notified that any dissemination, distribution or duplication of the communication is strictly
prohibited. If you have received this communication in error, or if any problems occur with transmission, please immediately notify us by telephone (305) 600-5001.
Please consider the environment before printing this email.

[Quoted text hidden]

**Mandy Stewart <mandy@airplayadventures.com>**                               Wed, Jun 14, 2017 at 9:29 AM
To: Elie Mimoun <em@esj.us>
Cc: Brian Adams <Brian.Adams@usi.com>, John Dunlap <jdunlap@jungleisland.com>, Christopher Gould
<cgould@jungleisland.com>, Todd Domeck <todd@experientialresources.net>, Adam McIntyre
<adammcintyre@webergroupinc.com>

Elie,

Attached are the COIs for the AirPlay Builder's Risk policy.  Given the delay, we will now need to extend the policy
past its current termination but our broker is aware.  Once we confirm coverage needs, we'll update and extend as
needed, and have new COIs issued.

Let us know if anyone has any questions or wants to view the actual policy.

Thanks!



Mandy Stewart
AirPlay Adventures, COO
m.253.318.6087 • mandy@
airplayadventures.com

On Jun 14, 2017, at 9:06 AM, Elie Mimoun <em@esj.us> wrote:

Brian,

Can I please have an exact list of the Insurance and coverage requirements we need for the construction phase of the zip lines.

Can you also advise which parts offer existing liability insurance would act as additional coverage as well.

Adam or Todd - please send us the certificates of your insurances which cover this construction phase of the Zips.

Thank you

Elie Mimoun I Chief Operating Officer I ESJ Capital Partners, LLC
19950 W. Country Club Drive I Suite 800 I Aventura, Florida 33180
Main Line: 305-600-5001 IFax: 305-402-8069 I Cell: 786-210-2104
em@esj.us I www.esj.us

The information contained in this electronic message is privileged and confidential and is intended only for the use of the individual named above and others who have been specifically authorized to receive such. If the recipient is not the intended recipient, you are hereby notified that any dissemination, distribution or duplication of the communication is strictly prohibited. If you have received this communication in error, or if any problems occur with transmission, please immediately notify us by telephone (305) 600-5001.
Please consider the environment before printing this email.

On Jun 13, 2017, at 12:54 PM, Brian Adams <Brian.Adams@usi.com> wrote:

Elie, To the best of my knowledge the insurance requirements are not in place. And this is a big problem for everyone including the City of Miami. Am traveling all day today, and will back in the office tomorrow by 10:30, or 11:00 am. Have a good one! All the best, Brian

Sent from my iPhone

On Jun 13, 2017, at 8:48 AM, Elie Mimoun <em@esj.us> wrote:

All,

We now have the building permit and should be breaking ground this Friday - we will not accept a delay in ground breaking because the insurance issues are not resolved.

Please advise asap.

Thank you

Elie Mimoun, COO
ESJ Capital Partners
305-600-5001

AirPlay COIs - Builder's Risk.pdf

GoZipUS Mail - Zip lines insurance for constructions                                                     10/31/17, 10:45 PM

399K

**Brian Adams** <Brian.Adams@usi.com>                                                     Wed, Jun 14, 2017 at 12:36 PM
To: Elie Mimoun <em@esj.us>, John Dunlap <jdunlap@jungleisland.com>, Christopher Gould
<cgould@jungleisland.com>
Cc: "todd@experientialresources.net" <todd@experientialresources.net>, Mandy Stewart
<mandy@airplayadventures.com>, Adam McIntyre <adammcintyre@webergroupinc.com>

Elie, John, and Chris,


Good afternoon! Just returned from California, and have about a 1,000 emails to digest. And it will
take me about a day to get to this homework assignment.  Further, it is fair to say I have been thru this
drill with Todd, and Mandy for many months, and "they have not moved the needle", no disrespect.
They are lovely people, but have not "delivered the promise".  Maybe it is a question of "capacity", or
insurance history that is a factor… I really don't know what their issue is. At this point, I suggest Todd,
and Mandy present their COI / EOI to Frank Fernandez at the City of Miami for approval.


And may I suggest to you that the three of us have a cordial and private conversation at a date, and
time that works best for you. Please advise at your earliest. Much appreciated. In fact, I will make a
point of going to Jungle Island to make it easy for the team.


All the best,



*Brian*


**Brian Adams**

**Senior Vice President**

*USI Insurance Services*

*2400 E. Commercial Blvd. Ste. 600, Ft. Lauderdale, FL 33328*

**(305) 528-1202 Cell; (954) 607-4022 Direct;**

**(800) 474-4199 Toll Free; (610) 537-9589 Direct Fax**

**Email: brian.adams@usi.com:** www.usi.com

GoZipUS Mail - Zip lines insurance for constructions                                    10/31/17, 10:45 PM



THE USI ONE ADVANTAGE®

Our Approach to Delivering Client Solutions learn more ►

*[faded illegible text]*

*[faded illegible text]*

**From:** Elie Mimoun [mailto:em@esj.us]
**Sent:** Wednesday, June 14, 2017 12:07 PM
**To:** Brian Adams <Brian.Adams@usi.com>; John Dunlap <jdunlap@jungleisland.com>; Christopher Gould <cgould@jungleisland.com>
**Cc:** todd@experientialresources.net; Mandy Stewart <mandy@airplayadventures.com>; Adam McIntyre <adammcintyre@webergroupinc.com>
**Subject:** Re: Zip lines insurance for constructions

[Quoted text hidden]

Todd Domeck <todd@gozipus.com>                                     Wed, Jun 14, 2017 at 3:18 PM
To: Brian Adams <Brian.Adams@usi.com>
Cc: Elie Mimoun <em@esj.us>, John Dunlap <jdunlap@jungleisland.com>, Christopher Gould <cgould@jungleisland.com>, Mandy Stewart <mandy@airplayadventures.com>, Adam McIntyre <adammcintyre@webergroupinc.com>

Hello All,

With all due respect, I have to disagree with what Brian has expressed in his email.  We have been requesting an updated and consolidated list of insurance requirements at minimum since Mandy and I met with Elie in February. Elie took extensive notes regarding insurance and contractual details, and was going to review and get back to us. Although that conversation was delayed by the closing and other events, we are scheduled to resolve these details next week.

In the interim, we have been completely transparent about where this process is at, have maintained an open dialogue with Brian and all other parties regarding requirements, and have acquired policies accordingly.

This is evidenced the COIs sent earlier. This policy was based on a list received directly from Brian via email on March 20th. This list was handed directly to out broker who was instructed to make everything Brian put down for the Builder's Risk policy happen. Which we did, until the list changed with the email sent out by Veronica on May 26th. This email called out additional coverages that hadn't been included in the conversation until that point.

We are completely on board to provide coverage that sufficiently manages everyone's risk. Three key points we would like to make are:

1)  We have expressed and gotten agreement from ownership that these coverages will be in place before there is risk to manage, but not unnecessarily early. Otherwise we're just wasting money. As evidenced by our current policy, when we anticipated the risk of active construction the policy was in place, and with all the Builder's Risk coverages requested by Brian at that date.

2)  We have yet to receive a comprehensive and consolidated list from ownership and/or their representative that reflects an agreement of ownership's insurance team, AirPlay's insurance team, and takes into consideration what we should be contractually bound to do moving forward. This is not because of our lack of action or request or willingness, we simple haven't received a clear, unified message in writing from all parties representing Jungle Island.

3)  Once we receive a comprehensive and "Final" list of all coverages that are now required (and not clearly addressed in our current contract), we will work with Jungle Island/ESJ to determine the actual risk and expenses associated with the additional coverage and then further determine who should be responsible for the additional cost.

We would like nothing better than to gain clarity on this.    And we also ask that lack of clear direction not be interpreted as lack of cooperation or intent.

Please, let's finally get a list so we can put this subject to rest.

Thanks

Todd

[Quoted text hidden]
--
Todd Domeck, Owner
Experiential Resources, Inc.
GoZip LLC
Maui Pineapple Tours LLC
Waiver Saver LLC
Sugar Cane Train
and Other Stuff
Office 808 . 441 . 5347
Cell 808 . 214 . 4325
www.ZipCoaster.com
www.PineappleTour.com
www.SugarCaneTrain.com
www.WaiverSaver.com

IMPORTANT: This email is intended for the use of the individual (s) named above and may contain information that is confidential, privileged or unsuitable for overly sensitive persons with low self-esteem, no sense of humor or irrational religious beliefs. If you are not the intended recipient, any dissemination, distribution or copying of this email is not authorized (either explicitly or implicitly) and constitutes an irritating social faux pas. Unless the word absquatulation has been used in its correct context somewhere other than in this warning, it does not have any legal or grammatical use and may be ignored. No animals were harmed in the transmission of this email, although the chihuahua next door is living on borrowed time, let me tell you! Those of you with an overwhelming fear of the unknown will be gratified to learn that there is no hidden message revealed by reading this warning backwards, so just ignore that Alert Notice from Microsoft. However, by pouring a complete circle of salt around yourself and your computer you can ensure that no harm befalls you and your pets. If you have received this email in error, please add some nutmeg and egg whites and place it in a warm (375 degree) oven for 40 minutes. Whisk briefly and let it stand for 2 hours before icing.

---

**Brian Adams** <Brian.Adams@usi.com>                                    Thu, Jun 15, 2017 at 11:32 AM
To: Elie Mimoun <em@esj.us>, John Dunlap <jdunlap@jungleisland.com>, Christopher Gould <cgould@jungleisland.com>
Cc: "todd@experientialresources.net" <todd@experientialresources.net>, Mandy Stewart <mandy@airplayadventures.com>, Adam McIntyre <adammcintyre@webergroupinc.com>

To All,

To start the insurance requirements for the construction of the Zip Line should include, but not be limited to the following:

- The named insureds by endorsement shall include ESJ J.I. Leasehold, LLC, ESJ J.I. Operations, LLC, DBA Jungle Island, and Iconic Attractions Group, LLC., but for workers compensation.

- The policies should have a 60 cancellation clause, but 10 day cancellation notice for non-payment of premium.

- The policies should have a waiver of subrogation by endorsement in favor of the named insureds referenced above.

- Commercial general liability including XCU, contract liability, products and completed operations liability, fire damage legal liability with increase limits, advertising offense, and more...

- The workers compensation requires an all states endorsement to include the state of Florida, or a policy issued in the state of Florida with increased limits.

- Environmental Liability / Pollution Liability.

- Professional Liability

- Automobile liability, and hired and non-owned automobile liability

- Umbrella liability, following form, and following cover

- Crime

- Builders risk including soft costs, business interruption, and theft on the premise and in transit

- Bid bond

- Performance Bond

- Directors and Officers Liability

- Employment Practices Liability

- Cyber Liability

- All sub-contractors, engineers, architects, manufacturers / products, and vendors are required to meet ESJ's insurance requirements with an indemnification, and hold harmless agreement favoring ESJ…

As I recall Todd is scheduled to be at Jungle Island on 6-22-17, and I am happy to meet him to review all insurance requirements, and to explain in detail the risks, exposures, and hazards; and to show my file dating back to July 2015, if necessary.

In the meantime, please call, or email me with any question, or inquiry. Much appreciated.

GoZipUS Mail - Zip lines insurance for constructions

10/31/17, 10:45 PM

Look forward to working with you on this great adventure!

Have a good one!

All the best,

*Brian*

**Brian Adams**

**Senior Vice President**

*USI Insurance Services*

*2400 E. Commercial Blvd. Ste. 600, Ft. Lauderdale, FL 33328*

**(305) 528-1202 Cell; (954) 607-4022 Direct;**

**(800) 474-4199 Toll Free; (610) 537-9589 Direct Fax**

**Email:  brian.adams@usi.com; www.usi.com**



THE USI ONE ADVANTAGE®

Our Approach to Delivering Client Solutions learn more ►

**From:** Elie Mimoun [mailto:em@esj.us]
**Sent:** Wednesday, June 14, 2017 12:07 PM
**To:** Brian Adams <Brian.Adams@usi.com>; John Dunlap <jdunlap@jungleisland.com>; Christopher Gould <cgould@jungleisland.com>
**Cc:** todd@experientialresources.net; Mandy Stewart <mandy@airplayadventures.com>; Adam McIntyre <adammcintyre@webergroupinc.com>
**Subject:** Re: Zip lines insurance for constructions


Brian,

[Quoted text hidden]

# EXHIBIT 25



**From:** **Brian Adams** Brian.Adams@usi.com
**Subject:** RE: Zip lines insurance for constructions
**Date:** June 15, 2017 at 11:32 AM
**To:** Elie Mimoun em@esj.us, John Dunlap jdunlap@jungleisland.com, Christopher Gould cgould@jungleisland.com
**Cc:** lodd@experientialresources.net, Mandy Stewart mandy@airplayadventures.com, Adam McIntyre
adammcintyre@webergroupinc.com



To All,

To start the insurance requirements for the construction of the Zip Line should include, but not be limited to the following:

-   The named insureds by endorsement shall include ESJ J.I. Leasehold, LLC, ESJ J.I. Operations, LLC, DBA Jungle Island, and Iconic Attractions Group, LLC., but for workers compensation.

-   The policies should have a 60 cancellation clause, but 10 day cancellation notice for non-payment of premium.

-   The policies should have a waiver of subrogation by endorsement in favor of the named insureds referenced above.

-   Commercial general liability including XCU, contract liability, products and completed operations liability, fire damage legal liability with increase limits, advertising offense, and more...

-   The workers compensation requires an all states endorsement to include the state of Florida, or a policy issued in the state of Florida with increased limits.

-   Environmental Liability / Pollution Liability.

-   Professional Liability

-   Automobile liability, and hired and non-owned automobile liability

-   Umbrella liability, following form, and following cover

-   Crime

-   Builders risk including soft costs, business interruption, and theft on the premise and in transit

-   Bid bond

-   Performance Bond

-   Directors and Officers Liability

-   Employment Practices Liability

-   Cyber Liability

- All sub-contractors, engineers, architects, manufacturers / products, and vendors are required to meet ESJ's insurance requirements with an indemnification, and hold harmless agreement favoring ESJ...

As I recall Todd is scheduled to be at Jungle Island on 6-22-17, and I am happy to meet him to review all insurance requirements, and to explain in detail the risks, exposures, and hazards; and to show my file dating back to July 2015, if necessary.

In the meantime, please call, or email me with any question, or inquiry. Much appreciated.

Look forward to working with you on this great adventure!

Have a good one!

All the best,


*Brian*

**Brian Adams**
**Senior Vice President**
*USI Insurance Services*
*2400 E. Commercial Blvd. Ste. 600, Ft. Lauderdale, FL 33328*
**(305) 528-1202 Cell; (954) 607-4022 Direct;**
**(800) 474-4199 Toll Free; (610) 537-9589 Direct Fax**
**Email: brian.adams@usi.com; www.usi.com**




THE USI ONE ADVANTAGE®
Our Approach to Delivering Client Solutions learn more ►

Please note that you may not rely on email communication to us to report a claim or to give us instructions to place, bind, change or terminate coverage unless we have subsequently confirmed to you in writing that we have received your message and will be taking the action you have requested.

Confidentiality Notice: The information contained in this email message including any attachments is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient and have received this communication in error, please contact the sender by reply email and destroy all copies of the original message. Thank You.

**From:** Elie Mimoun [mailto:em@esj.us]
**Sent:** Wednesday, June 14, 2017 12:07 PM
**To:** Brian Adams <Brian.Adams@usi.com>; John Dunlap <jdunlap@jungleisland.com>; Christopher Gould <cgould@jungleisland.com>
**Cc:** todd@experientialresources.net; Mandy Stewart <mandy@airplayadventures.com>; Adam McIntyre <adammcintyre@webergroupinc.com>
**Subject:** Re: Zip lines insurance for constructions

Brian,

Can I please have an exact list of the Insurance and coverage requirements we need for the construction phase of the zip lines.

Can you also advise which parts offer existing liability insurance would act as additional coverage as well.

Adam or Todd - please send us the certificates of your insurances which cover this construction phase of the Zips.

Thank you

Elie Mimoun I Chief Operating Officer I ESJ Capital Partners, LLC
19950 W. Country Club Drive I Suite 800 I Aventura, Florida 33180
Main Line: 305-600-5001 IFax: 305-402-8069 I Cell: 786-210-2104
em@esj.us I www.esj.us

The information contained in this electronic message is privileged and confidential and is intended only for the use of the individual named above and others who have been specifically authorized to receive such. If the recipient is not the intended recipient, you are hereby notified that any dissemination, distribution or duplication of the communication is strictly prohibited. If you have received this communication in error, or if any problems occur with transmission, please immediately notify us by telephone (305) 600-5001.
Please consider the environment before printing this email.

On Jun 13, 2017, at 12:54 PM, Brian Adams <Brian.Adams@usi.com> wrote:

Elie, To the best of my knowledge the insurance requirements are not in place. And this is a big problem for everyone including the City of Miami. Am traveling all day today, and will back in the office tomorrow by 10:30, or 11:00 am. Have a good one! All the best, Brian

Sent from my iPhone

On Jun 13, 2017, at 8:48 AM, Elie Mimoun <em@esj.us> wrote:

All,

We now have the building permit and should be breaking ground this Friday - we will not accept a delay in ground breaking because the insurance issues are not resolved.

Please advise asap.

Thank you

Elie Mimoun, COO
ESJ Capital Partners
305-600-5001

# EXHIBIT 26

GoZipUS Mail - Air Play breach of lease                                                11/27/17, 2:04 PM



Todd Domeck <todd@gozipus.com>

## Air Play breach of lease

**Dave Rawdon** <daverawdon@webergroupinc.com>                        Mon, Jul 17, 2017 at 7:48 AM
To: Elie Mimoun <em@esj.us>
Cc: John Dunlap <jdunlap@jungleisland.com>, Todd Domeck <todd@experientialresources.net>, Dan Shehan
<DanShehan@webergroupinc.com>, Paul Ohlin <paulohlin@webergroupinc.com>, Adam McIntyre
<adammcintyre@webergroupinc.com>, Mandy Stewart <mandy@experientialresources.net>, "Mauicraig@gmail.com"
<Mauicraig@gmail.com>, Brian Brun <brian@experientialresources.net>, Dave Rawdon
<daverawdon@webergroupinc.com>

Good morning Elie,

I was provided with the email string below and will now provide you with Weber's formal response to your questions:

1. Weber will produce an updated schedule within the next 24 hours that will be based upon the proposed current payment due being made to Weber on Friday July 21, 2017 followed by subcontractor mobilization periods, fabrication of the steel towers, and a full execution of the work.  When that schedule has been completed, it will be published to all the addressees on this email string.
2. Weber has not received a formal, written "Stop Work Order" from AirPlay however, we do confirm that a request has been provided to Weber by AirPlay with the direction to not proceed any further until all Zip Course structural issues have been resolved and subsequent release is then provided by AirPlay to Weber to proceed to full capacity on the Zip Course project.

End of response.

Respectfully,

Dave

**Dave Rawdon**

Sr. Project Manager

Weber Group, Inc.

512.781.2188

**From:** Elie Mimoun <em@esj.us>
**Date:** July 17, 2017 at 3:58:28 AM PDT
**To:** Todd Domeck <todd@gozipus.com>
**Cc:** John Dunlap <Jdunlap@jungleisland.com>, Mandy Stewart <mandy@experientialresources.net>, Brian Brun <brian@experientialresources.net>, "mauicraig@gmail.com" <mauicraig@gmail.com>, Dan Shehan <DanShehan@webergroupinc.com>, "Adam McIntyre" <adammcintyre@webergroupinc.com>
**Subject: Re: Air Play breach of lease**

Todd,

This clarification is much appreciated.

Thank you.


Team Weber,

Unless we hear back from you , we will assume that you agree with all of Todd's statements and we can move forward with our plans.


Respectfully,



Sent by Elie



On Jul 17, 2017, at 4:21 AM, Todd Domeck <todd@gozipus.com> wrote:

> Elie
>
> Thanks for your direct communication on this.
>
> Regarding the confusing messages:
>
> 1: I spoke with you and John about this. The Engineer submitted "Shop Drawings" after the plans were finalized that significantly changed several structural components of the project without explanation. I am working with him on a daily basis to resolve this issue as well as resolve all issues related to the Tower 6 move. Expect to have everything resolved by this Friday.
>
> 2: Weber will be paid by this Friday.
>
> 3: You and I discussed this as well. We have not given any official "Stop" but have been very clear with you guys and Weber about the importance of proceeding only after we have the Engineering issues resolved, mostly regarding the implications of the Tower 6 move.

To confirm

1). We will still have towers up in September and people riding Ziplines in October.

2). AirPlay has not issued any stop work order and the Notice to proceed is still in effect. However, we are not going to proceed until we resolve the issues related to the Tower 6 move.  Again, expect to have it resolved by Friday.


We will work more closely with Weber to clear up any miscommunications in the future and if you ever have questions or concerns, please contact me personally.


Thanks


On Fri, Jul 14, 2017 at 10:30 AM, Elie Mimoun <em@esj.us> wrote:

Teams Weber and Airplay,


In the past few days we have received conflicting information from you both with regard to the timing of ground breaking and completion of the Zip lines. These include the following messages:

1) Engineers are did not complete and submit finals to be used for construction.

2) Airplay owes us over $200,000 and we can't continue to work without getting paid.

3) Airplay has given us a "STOP" order cancelling the "Notice to Proceed" because ESJ did not finalize a lease amendment requested.


We have been working diligently with our marketer, IT and City officials in approving many other developments for the park and relied on your "official" version to us that Ground breaking will be August 1 and that towers will go up in Sept. and  people will ride zip lines in October.


I request that Both Weber and Airplay confirm in writing by replying to my email that:

1)The above time line is Still Accurate.

2) There is no "Stop" order and that the Notice to Proceed is still in effect.


If we don't receive written confirmation by Monday 9am we will be exploring lease cancellation options with our legal department. We have all worked very hard to get this project off the ground and it will be ashamed to see it fall through.

Respectfully,

Elie Mimoun I Chief Operating Officer I ESJ Capital Partners, LLC

19950 W. Country Club Drive I Suite 800 I Aventura, Florida 33180

Main Line: 305-600-5001 IFax: 305-402-8069 I Cell: 786-210-2104

em@esj.us I www.esj.us

The information contained in this electronic message is privileged and confidential and is intended only for the use of the individual named above and others who have been specifically authorized to receive such. If the recipient is not the intended recipient, you are hereby notified that any dissemination, distribution or duplication of the communication is strictly prohibited. If you have received this communication in error, or if any problems occur with transmission, please immediately notify us by telephone (305) 600-5001.

Please consider the environment before printing this email.

--

Todd Domeck, Owner

Experiential Resources, Inc.

GoZip LLC

Maui Pineapple Tours LLC

Waiver Saver LLC

Sugar Cane Train

and Other Stuff

Office 808 . 441 . 5347

Cell 808 . 214 . 4325

www.ZipCoaster.com

www.PineappleTour.com

www.SugarCaneTrain.com

www.WaiverSaver.com

IMPORTANT:  This email is intended for the use of the individual (s) named above
and may contain information that is confidential, privileged or unsuitable for overly
sensitive persons with low self-esteem, no sense of humor or irrational religious beliefs.  If
you are not the intended recipient, any dissemination, distribution or copying of this email
is not authorized (either explicitly or implicitly) and constitutes an irritating social faux pas.
Unless the word absquatulation has been used in its correct context somewhere other
than in this warning, it does not have any legal or grammatical use and may be ignored.
No animals were harmed in the transmission of this email, although the chihuahua next
door is living on borrowed time, let me tell you!  Those of you with an overwhelming fear of
the unknown will be gratified to learn that there is no hidden message revealed by
reading this warning backwards, so just ignore that Alert Notice from Microsoft.  However,
by pouring a complete circle of salt around yourself and your computer you can
ensure that no harm befalls you and your pets.  If you have received this email in error,
please add some nutmeg and egg whites and place it in a warm (375 degree) oven for
40 minutes.  Whisk briefly and let it stand for 2 hours before icing.

# EXHIBIT 27

10/31/17, 10:57 PM



Todd Domeck <todd@gozipus.com>

# Ziplines Project Schedule
2 messages

**Todd Domeck** <todd@gozipus.com>                                     Wed, Aug 2, 2017 at 2:21 AM
To: Elie Mimoun <em@esj.us>
Cc: John Dunlap <Jdunlap@jungleisland.com>, Brian Brun <brian@experientialresources.net>, Mandy Stewart
<mandy@airplayadventures.com>

Elie
I haven't run this through Weber yet but will this week.  I'll also send over a prettier version that you can put on the
fridge.

Tower 6 Engineering revisions complete by August 18
Fabricate Geodesic Towers Started August 1 and complete by September 8
Excavation and clearing for micropile install August 14-26
Micropile Install August 28-September 30
Concrete Installation September 11-October 13
Fabricate Tower 3 Complex September 1-October 14
Basecamp, Outpost and Equipment Storage areas September 11-October 9
Geodesic Tower Installation October 2-31
Install Tower 3 Complex October 16-31
Suspension Bridge Installation October 16-November 10
Ziplines Installation October 30-November 15
Tower 6 Installation November 6-21
Commissioning and Inspections November 20-27
Soft Opening November 24-December 4


--
Todd Domeck, Owner
Experiential Resources, Inc.
GoZip LLC
Maui Pineapple Tours LLC
Waiver Saver LLC
Sugar Cane Train
and Other Stuff
Office 808 . 441 . 5347
Cell 808 . 214 . 4325
www.ZipCoaster.com
www.PineappleTour.com
www.SugarCaneTrain.com
www.WaiverSaver.com

IMPORTANT:  This email is intended for the use of the individual (s) named above and may contain information that is
confidential, privileged or unsuitable for overly sensitive persons with low self-esteem, no sense of humor or irrational
religious beliefs.  If you are not the intended recipient, any dissemination, distribution or copying of this email is not
authorized (either explicitly or implicitly) and constitutes an irritating social faux pas.  Unless the word
absquatulation has been used in its correct context somewhere other than in this warning, it does not have any legal
or grammatical use and may be ignored.  No animals were harmed in the transmission of this email, although the
chihuahua next door is living on borrowed time, let me tell you!  Those of you with an overwhelming fear of
the unknown will be gratified to learn that there is no hidden message revealed by reading this warning backwards, so

just ignore that Alert Notice from Microsoft.  However, by pouring a complete circle of salt around yourself and your computer you can ensure that no harm befalls you and your pets.  If you have received this email in error, please add some nutmeg and egg whites and place it in a warm (375 degree) oven for 40 minutes.  Whisk briefly and let it stand for 2 hours before icing.

**Elie Mimoun <em@esj.us>**                                               Wed, Aug 2, 2017 at 4:18 AM
To: Todd Domeck <todd@gozipus.com>
Cc: Mandy Stewart <mandy@airplayadventures.com>

Thank you for finally sending something however it is much more than 3 weeks delay.

Secondly, you were supposed to send me many other items including an official Notice To Proceed for Weber.

Todd, my board and frankly myself are beginning to lose faith.

Sent by Elie

[Quoted text hidden]

# EXHIBIT 28



Todd Domeck <todd@gozipus.com>

---

## Tower 6 move
1 message

---

**GoZip US** <todd@gozipus.com>                                    Sun, Aug 6, 2017 at 12:51 PM
To: Matthew Fuller <mf@esj.us>
Cc: Mandy Stewart <mandy@airplayadventures.com>, Elie Mimoun <em@esj.us>, John Dunlap
<jdunlap@jungleisland.com>

Matt
Thanks for he various discussions over the weekend. As discussed. We need to make a final decision on tower 6
move. I believe that we can get to a Thanksgiving opening if we leave everything as is. Please confirm by end of day
Monday that we do not have to move Tower 6 and can proceed with current  Permitted plans.
Mahalo

Todd Domeck, Owner
808 . 214 . 4325

---

# EXHIBIT 29



**From:** **Mandy Stewart** mandy@airplayadventures.com
**Subject:** Re: Existing License Areas
**Date:** August 9, 2017 at 10:18 AM
**To:** Adam McIntyre adammcintyre@webergroupinc.com
**Cc:** Todd Domeck todd@experientialresources.net, Dan Shehan danshehan@webergroupinc.com

Hey Adam!

I'm checking in to see how it's looking for the re-drawn license areas. We need to get the addendum to ESJ ASAP, and we're happy to draw them ourselves if we have the latest site plan from you. Just need to make sure that we're on the same page as far as the areas.

Thanks much for your help,
Mandy

 **Mandy Stewart**
COO, AirPlay Adventures
m.253.318.6087 • mandy@airplayadventures.com

On Aug 1, 2017, at 11:21 AM, Mandy Stewart <mandy@airplayadventures.com> wrote:

<Screen Shot 2017-08-01 at 11.18.42 AM.png><Screen Shot 2017-08-01 at 11.18.28 AM.png>

**Mandy Stewart**
COO, AirPlay Adventures
m.253.318.6087 • mandy@airplayadventures.com

# EXHIBIT 30



From: **Mandy Stewart** mandy@airplayadventures.com
Subject: Re: Existing License Areas
Date: August 9, 2017 at 10:18 AM
To: Adam McIntyre adammcintyre@webergroupinc.com
Cc: Todd Domeck todd@experientialresources.net, Dan Shehan danshehan@webergroupinc.com

Hey Adam!

I'm checking in to see how it's looking for the re-drawn license areas.  We need to get the addendum to ESJ ASAP, and we're happy to draw them ourselves if we have the latest site plan from you.  Just need to make sure that we're on the same page as far as the areas.

Thanks much for your help,
Mandy

  **Mandy Stewart**
**COO, AirPlay Adventures**
m.253.318.6087 • mandy@airplayadventures.com

On Aug 1, 2017, at 11:21 AM, Mandy Stewart <mandy@airplayadventures.com> wrote:

<Screen Shot 2017-08-01 at 11.18.42 AM.png><Screen Shot 2017-08-01 at 11.18.28 AM.png>

**Mandy Stewart**
**COO, AirPlay Adventures**
m.253.318.6087 • mandy@airplayadventures.com

# EXHIBIT 31



Todd Domeck <todd@gozipus.com>

## AirPlay Zip Tour Remobilization
17 messages

**Mandy Stewart** <mandy@airplayadventures.com>                    Wed, Aug 9, 2017 at 5:40 PM
To: Adam Mopsick <amopsick@amicon.us>
Cc: Todd Domeck <todd@experientialresources.net>, Dan Shehan <danshehan@webergroupinc.com>, Brian Brun
<brian@experientialresources.net>

Adam et al,

The intent of this email is to set forth the current parameters and expectations of the zip tour project, as agreed upon by AirPlay, ERi, and Weber.  Please note the following:

·    Per the conversation yesterday, AirPlay is authorized to proceed and is prepared to move the project forward with Weber immediately.

·    The Tower 6 location will be at the agreed upon revised location, 31.5' toward the end of the beach.

·    We have confirmed dates with our subcontractors, and the soonest date for on site remobilization of construction is <u>Tuesday, 05 September 2017</u>.

·    Assuming this commencement date, we are currently showing a completion date of <u>05 February 2017</u>.


Please confirm the above with ESJ so that we can begin immediately.

Thanks very much,

Mandy

AirPLAY          **Mandy Stewart**
ADVENTURES       COO, AirPlay Adventures
                 m.253.318.6087 • mandy@airplayadventures.com


**Adam Mopsick** <amopsick@amicon.us>                              Wed, Aug 9, 2017 at 6:45 PM
To: Elie Mimoun <em@esj.us>, John Dunlap <jdunlap@jungleisland.com>
Cc: Todd Domeck <todd@experientialresources.net>, Dan Shehan <danshehan@webergroupinc.com>, Brian Brun
<brian@experientialresources.net>, Mandy Stewart <mandy@airplayadventures.com>, Jon Weislow <jweislow@amicon.us>

Thank you for the email Mandy.   Elie / John - please review the below and confirm acceptance or provide comments and feedback.  Obviously no one is happy with the estimated completion date and we will all do our best to find opportunities to improve on this.   Please advise if you would like to get on a call to discuss.

Mandy, at your convenience, please provide a detailed breakdown of the 5 month schedule.  Also - what do you need from ESJ / JI to

put this in motion immediately?

Adam Mopsick
www.amicon.us
305-216-4319

Sent from my iPhone

On Aug 9, 2017, at 8:40 PM, Mandy Stewart <mandy@airplayadventures.com> wrote:

> Adam et al,
>
> The intent of this email is to set forth the current parameters and expectations of the zip tour project, as agreed upon by AirPlay, ERi, and Weber.  Please note the following:
>
> · Per the conversation yesterday, AirPlay is authorized to proceed and is prepared to move the project forward with Weber immediately.
>
> · The Tower 6 location will be at the agreed upon revised location, 31.5' toward the end of the beach.
>
> · We have confirmed dates with our subcontractors, and the soonest date for on site remobilization of construction is <u>Tuesday, 05 September 2017</u>.
>
> · Assuming this commencement date, we are currently showing a completion date of <u>05 February 2017</u>.
>
>
> Please confirm the above with ESJ so that we can begin immediately.
>
> Thanks very much,
>
> Mandy
>
> AirPLAY | **Mandy Stewart**
> | COO, AirPlay Adventures
> | m.253.318.6087 • mandy@airplayadventures.com

---

**Mandy Stewart** <mandy@airplayadventures.com>                                            Thu, Aug 10, 2017 at 12:25 AM
To: Brian Brun <brian@experientialresources.net>, Dan Shehan <danshehan@webergroupinc.com>
Cc: Todd Domeck <todd@experientialresources.net>

Hey Brian & Dan,

Do we have a copy of the schedule that we feel comfortable distributing?

I'll talk to Todd in the AM about what I think we need from ESJ, but I'd like to hear your thoughts on that, too, if you guys feel like chiming

in.

Dan, I'm going to push for forward progress on our contract amendment.  I haven't heard anything back from Adam, and per ESJ we need him to sign off on the revised license areas. Any assist will be appreciated!

Thanks all,
Mandy

AirPLAY    |  Mandy Stewart
              |  COO, AirPlay Adventures
              |  m. +1.253.318.6087

Sent from my iPhone during a knife fight in a crashing helicopter over the Panamanian jungle. Please excuse typos and errors.

Begin forwarded message:

> **From:** Adam Mopsick <amopsick@amicon.us>
> **Date:** August 9, 2017 at 6:45:32 PM PDT
> **To:** Elie Mimoun <em@esj.us>, John Dunlap <jdunlap@jungleisland.com>
> **Cc:** Todd Domeck <todd@experientialresources.net>, Dan Shehan <danshehan@webergroupinc.com>, Brian Brun <brian@experientialresources.net>, Mandy Stewart <mandy@airplayadventures.com>, Jon Weislow <jweislow@amicon.us>
> **Subject: Re: AirPlay Zip Tour Remobilization**
>
> Thank you for the email Mandy.   Elie / John - please review the below and confirm acceptance or provide comments and feedback.   Obviously no one is happy with the estimated completion date and we will all do our best to find opportunities to improve on this.  Please advise if you would like to get on a call to discuss.
>
> Mandy, at your convenience, please provide a detailed breakdown of the 5 month schedule.   Also - what do you need from ESJ / JI to put this in motion immediately?
>
>
> Adam Mopsick
> **www.amicon.us**
> **305-216-4319**
>
>
> Sent from my iPhone
>
>
> On Aug 9, 2017, at 8:40 PM, Mandy Stewart <mandy@airplayadventures.com> wrote:
>
>> Adam et al,
>>
>> The intent of this email is to set forth the current parameters and expectations of the zip tour project, as agreed upon by AirPlay, ERi, and Weber.  Please note the following:
>>
>>> ·    Per the conversation yesterday, AirPlay is authorized to proceed and is prepared to move the project forward with Weber immediately.
>>>
>>> ·    The Tower 6 location will be at the agreed upon revised location, 31.5' toward the end of the beach.
>>>
>>> ·    We have confirmed dates with our subcontractors, and the soonest date for on site remobilization of construction is **Tuesday, 05 September 2017**.
>>>
>>> ·    Assuming this commencement date, we are currently showing a completion date of **05 February 2017**.
>>
>> Please confirm the above with ESJ so that we can begin immediately.

GoZipUS Mail - AirPlay Zip Tour Remobilization                                    10/31/17, 11:02 PM

Thanks very much,

Mandy

AirPLAY    **Mandy Stewart**
           COO, AirPlay Adventures
           m.253.318.6087 • mandy@airplayadventures.com

---

**Jon Weislow** <jweislow@amicon.us>                              Thu, Aug 10, 2017 at 2:27 PM
To: Adam Mopsick <amopsick@amicon.us>, Elle Mimoun <em@esj.us>, John Dunlap <jdunlap@jungleisland.com>
Cc: Todd Domeck <todd@experientialresources.net>, Dan Shehan <danshehan@webergroupinc.com>, Brian Brun
<brian@experientialresources.net>, Mandy Stewart <mandy@airplayadventures.com>

Good afternoon Elle,

Have you had a chance to review the below? I believe the Airplay team is waiting on ESJ to say 'go' to put the wheels in motion and
mobilize the Weber team.

Note that we are all operating with the understanding that every effort will be made by the team to expedite the schedule. Further
exploration of project phasing and acceleration will run concurrent to project mobilization.

JONATHAN WEISLOW



7430 NE 4th Court I Miami, FL 33138

**OFFICE**   305 573 8030

**DIRECT**   786 641 6351

**MOBILE**   571 830 4235

**www.amicon.us**

---

GoZipUS Mail - AirPlay Zip Tour Remobilization                                                    10/31/17, 11:02 PM

**From:** Adam Mopsick
**Sent:** Wednesday, August 9, 2017 9:46 PM
**To:** Elie Mimoun <em@esj.us>; John Dunlap <jdunlap@jungleisland.com>
**Cc:** Todd Domeck <todd@experientialresources.net>; Dan Shehan <danshehan@webergroupinc.com>; Brian Brun
<brian@experientialresources.net>; Mandy Stewart <mandy@airplayadventures.com>; Jon Weislow <jweislow@amicon.us>
**Subject:** Re: AirPlay Zip Tour Remobilization


Thank you for the email Mandy.    Elie / John - please review the below and confirm acceptance or provide comments and feedback.
Obviously no one is happy with the estimated completion date and we will all do our best to find opportunities to improve on this.
Please advise if you would like to get on a call to discuss.


Mandy, at your convenience, please provide a detailed breakdown of the 5 month schedule.   Also - what do you need from ESJ / JI to
put this in motion immediately?




Adam Mopsick

www.amicon.us

305-216-4319



Sent from my iPhone



On Aug 9, 2017, at 8:40 PM, Mandy Stewart <mandy@airplayadventures.com> wrote:

Adam et al,

The intent of this email is to set forth the current parameters and expectations of the zip tour project, as agreed upon by
AirPlay, ERi, and Weber.  Please note the following:

   · Per the conversation yesterday, AirPlay is authorized to proceed and is prepared to move the
   project forward with Weber immediately.

   · The Tower 6 location will be at the agreed upon revised location, 31.5' toward the end of the beach.

   · We have confirmed dates with our subcontractors, and the soonest date for on site remobilization of
   construction is <u>Tuesday, 05 September 2017</u>.

   · Assuming this commencement date, we are currently showing a completion date of <u>05 February
   2017</u>.


Please confirm the above with ESJ so that we can begin immediately.

Thanks very much,

Mandy


**Mandy Stewart**
COO, AirPlay Adventures
m.253.318.6087 • mandy@airplayadventures.com

GoZipUS Mail – AirPlay Zip Tour Remobilization                                      10/31/17, 11:02 PM

AirPLAY

---

**Elie Mimoun** <em@esj.us>                                          Sun, Aug 13, 2017 at 12:35 PM
To: Adam Mopsick <amopsick@amicon.us>, Todd Domeck <todd@experientialresources.net>, Mandy Stewart
<mandy@airplayadventures.com>
Cc: John Dunlap <jdunlap@jungleisland.com>, Dan Shehan <danshehan@webergroupinc.com>, Brian Brun
<brian@experientialresources.net>, Jon Weislow <jweislow@amicon.us>

Team Airplay,

Although it is very hard to digest this huge loss of time, we hereby give you an official notice to proceed.
We request weekly updates in writing from Weber and Amicom your Owner Rep. They can be via email with copies to John Dunlap and
myself.

Lastly, I am still waiting on the few missing items you need to submit to me so that we can finalize the Amendment to our agreement.

We are working on setting times to meet you next week or the following along with meeting Weber Reps as well.

If there are any changes positive OR negative we request that you inform us immediately.

Now lets go build some ZIPs.

Elie Mimoun | Chief Operating Officer | ESJ Capital Partners, LLC
19950 W. Country Club Drive | Suite 800 | Aventura, Florida 33180
Main Line: 305-600-5001 |Fax: 305-402-8069 | Cell: 786-210-2104
em@esj.us | www.esj.us

The information contained in this electronic message is privileged and confidential and is intended only for the use of the individual named above and others who have been specifically authorized to receive such. If
the recipient is not the intended recipient, you are hereby notified that any dissemination, distribution or duplication of the communication is strictly prohibited. If you have received this communication in error, or if
any problems occur with transmission, please immediately notify us by telephone (305) 600-5001.
Please consider the environment before printing this email

On Aug 9, 2017, at 9:45 PM, Adam Mopsick <amopsick@amicon.us> wrote:

Thank you for the email Mandy.   Elie / John - please review the below and confirm acceptance or provide comments and
feedback.   Obviously no one is happy with the estimated completion date and we will all do our best to find opportunities

GoZipUS Mail – AirPlay Zip Tour Remobilization                                          10/31/17, 11:02 PM

to improve on this.  Please advise if you would like to get on a call to discuss.

Mandy, at your convenience, please provide a detailed breakdown of the 5 month schedule.   Also - what do you need from ESJ / JI to put this in motion immediately?

Adam Mopsick
www.amicon.us
305-216-4319

Sent from my iPhone

On Aug 9, 2017, at 8:40 PM, Mandy Stewart <mandy@airplayadventures.com> wrote:

> Adam et al,
>
> The intent of this email is to set forth the current parameters and expectations of the zip tour project, as agreed upon by AirPlay, ERi, and Weber.  Please note the following:
>
>         · Per the conversation yesterday, AirPlay is authorized to proceed and is prepared to move the project forward with Weber immediately.
>
>         · The Tower 6 location will be at the agreed upon revised location, 31.5' toward the end of the beach.
>
>         · We have confirmed dates with our subcontractors, and the soonest date for on site remobilization of construction is **Tuesday, 05 September 2017**.
>
>         · Assuming this commencement date, we are currently showing a completion date of **05 February 2017**.
>
>
> Please confirm the above with ESJ so that we can begin immediately.
>
> Thanks very much,
>
> Mandy
>
> AirPLAY     **Mandy Stewart**
>              COO, AirPlay Adventures
>              m.253.318.6087 • mandy@airplayadventures.com

---

**GoZip US** <todd@gozipus.com>                                  Sun, Aug 13, 2017 at 1:41 PM
To: Craig Hill <mauicraig@gmail.com>

Todd Domeck, Owner
808 . 214 . 4325

Begin forwarded message:

**From:** Elie Mimoun <em@esj.us>
**Date:** August 13, 2017 at 11:35:27 AM AKDT
**To:** Adam Mopsick <amopsick@amicon.us>, Todd Domeck <todd@experientialresources.net>, Mandy Stewart <mandy@airplayadventures.com>
**Cc:** John Dunlap <jdunlap@jungleisland.com>, Dan Shehan <danshehan@webergroupinc.com>, Brian Brun <brian@experientialresources.net>, Jon Weislow <jweislow@amicon.us>
**Subject: Re: AirPlay Zip Tour Remobilization**

Team Airplay,

Although it is very hard to digest this huge loss of time, we hereby give you an official notice to proceed.
We request weekly updates in writing from Weber and Amicom your Owner Rep. They can be via email with copies to John Dunlap and myself.

Lastly, I am still waiting on the few missing items you need to submit to me so that we can finalize the Amendment to our agreement.

We are working on setting times to meet you next week or the following along with meeting Weber Reps as well.

If there are any changes positive OR negative we request that you inform us immediately.

Now lets go build some ZIPs.

Elie Mimoun l Chief Operating Officer l ESJ Capital Partners, LLC
19950 W. Country Club Drive l Suite 800 l Aventura, Florida 33180
Main Line: 305-600-5001 lFax: 305-402-8069 l Cell: 786-210-2104
em@esj.us l www.esj.us

The information contained in this electronic message is privileged and confidential and is intended only for the use of the individual named above and others who have been specifically authorized to receive such. If the recipient is not the intended recipient, you are hereby notified that any dissemination, distribution or duplication of the communication is strictly prohibited. If you have received this communication in error, or if any problems occur with transmission, please immediately notify us by telephone (305) 600-5001.
Please consider the environment before printing this email.

On Aug 9, 2017, at 9:45 PM, Adam Mopsick <amopsick@amicon.us> wrote:

Thank you for the email Mandy.   Elie / John - please review the below and confirm acceptance or provide comments and feedback.   Obviously no one is happy with the estimated completion date and we will all do our best to find opportunities to improve on this.   Please advise if you would like to get on a call to discuss.

Mandy, at your convenience, please provide a detailed breakdown of the 5 month schedule.   Also - what do you need from ESJ / JI to put this in motion immediately?

Adam Mopsick
www.amicon.us
305-216-4319

Sent from my iPhone

On Aug 9, 2017, at 8:40 PM, Mandy Stewart <mandy@airplayadventures.com> wrote:

Adam et al,

The intent of this email is to set forth the current parameters and expectations of the zip tour project, as agreed upon by AirPlay, ERI, and Weber.  Please note the following:

·    Per the conversation yesterday, AirPlay is authorized to proceed and is prepared to move the project forward with Weber immediately.

·    The Tower 6 location will be at the agreed upon revised location, 31.5' toward the end of the beach.

·    We have confirmed dates with our subcontractors, and the soonest date for on site remobilization of construction is **Tuesday, 05 September 2017**.

·    Assuming this commencement date, we are currently showing a completion date of **05 February 2017**.

Please confirm the above with ESJ so that we can begin immediately.

Thanks very much,

Mandy

AirPLAY
ADVENTURES
**Mandy Stewart**
COO, AirPlay Adventures
m.253.318.6087 • mandy@airplayadventures.com

---

**Adam Mopsick** <amopsick@amicon.us>                                    Sun, Aug 13, 2017 at 5:49 PM
To: Todd Domeck <todd@experientialresources.net>

Good?

Adam Mopsick

Amicon Construction Services
Amicon Management
**www.amicon.us**

Sent from my iPhone

Begin forwarded message:

    **From:** Elie Mimoun <em@esj.us>

**Date:** August 13, 2017 at 3:35:27 PM EDT
**To:** Adam Mopsick <amopsick@amicon.us>, Todd Domeck <todd@experientialresources.net>, Mandy Stewart <mandy@airplayadventures.com>
**Cc:** John Dunlap <jdunlap@jungleisland.com>, Dan Shehan <danshehan@webergroupinc.com>, Brian Brun <brian@experientialresources.net>, Jon Weislow <jweislow@amicon.us>
**Subject: Re: AirPlay Zip Tour Remobilization**

Team Airplay,

Although it is very hard to digest this huge loss of time, we hereby give you an official notice to proceed.
We request weekly updates in writing from Weber and Amicom your Owner Rep. They can be via email with copies to John Dunlap and myself.

Lastly, I am still waiting on the few missing items you need to submit to me so that we can finalize the Amendment to our agreement.

We are working on setting times to meet you next week or the following along with meeting Weber Reps as well.

If there are any changes positive OR negative we request that you inform us immediately.

Now lets go build some ZIPs.

Elie Mimoun I Chief Operating Officer I ESJ Capital Partners, LLC
19950 W. Country Club Drive I Suite 800 I Aventura, Florida 33180
Main Line: 305-600-5001 IFax: 305-402-8069 I Cell: 786-210-2104
em@esj.us I www.esj.us

The information contained in this electronic message is privileged and confidential and is intended only for the use of the individual named above and others who have been specifically authorized to receive such. If the recipient is not the intended recipient, you are hereby notified that any dissemination, distribution or duplication of the communication is strictly prohibited. If you have received this communication in error, or if any problems occur with transmission, please immediately notify us by telephone (305) 600-5001.
Please consider the environment before printing this email.

On Aug 9, 2017, at 9:45 PM, Adam Mopsick <amopsick@amicon.us> wrote:

Thank you for the email Mandy.   Elie / John - please review the below and confirm acceptance or provide comments and feedback.   Obviously no one is happy with the estimated completion date and we will all do our best to find opportunities to improve on this.   Please advise if you would like to get on a call to discuss.

Mandy, at your convenience, please provide a detailed breakdown of the 5 month schedule.   Also - what do you need from ESJ / JI to put this in motion immediately?

Adam Mopsick
www.amicon.us
305-216-4319

Sent from my iPhone

On Aug 9, 2017, at 8:40 PM, Mandy Stewart <mandy@airplayadventures.com> wrote:

Adam et al,

The intent of this email is to set forth the current parameters and expectations of the zip tour project, as agreed upon by AirPlay, ERi, and Weber.  Please note the following:

·    Per the conversation yesterday, AirPlay is authorized to proceed and is prepared to move the project forward with Weber immediately.

·    The Tower 6 location will be at the agreed upon revised location, 31.5' toward the end of the beach.

·    We have confirmed dates with our subcontractors, and the soonest date for on site remobilization of construction is <u>Tuesday, 05 September 2017</u>.

·    Assuming this commencement date, we are currently showing a completion date of <u>05 February 2017</u>.

Please confirm the above with ESJ so that we can begin immediately.

Thanks very much,

Mandy

AirPLAY

**Mandy Stewart**
COO, AirPlay Adventures
m.253.318.6087 • mandy@airplayadventures.com

---

**GoZip US** <todd@gozipus.com>
To: Adam Mopsick <amopsick@amicon.us>

Sun, Aug 13, 2017 at 7:53 PM

Mostly. Are we moving the tower?

Todd Domeck, Owner
808 . 214 . 4325

On Aug 13, 2017, at 4:49 PM, Adam Mopsick <amopsick@amicon.us> wrote:

Good?

Adam Mopsick

Amicon Construction Services
Amicon Management
**www.amicon.us**

Sent from my iPhone

Begin forwarded message:

**From:** Elie Mimoun <em@esj.us>

**Date:** August 13, 2017 at 3:35:27 PM EDT
**To:** Adam Mopsick <amopsick@amicon.us>, Todd Domeck <todd@experientialresources.net>, Mandy Stewart <mandy@airplayadventures.com>
**Cc:** John Dunlap <jdunlap@jungleisland.com>, Dan Shehan <danshehan@webergroupinc.com>, Brian Brun <brian@experientialresources.net>, Jon Weislow <jweislow@amicon.us>
**Subject:** Re: AirPlay Zip Tour Remobilization

Team Airplay,

Although it is very hard to digest this huge loss of time, we hereby give you an official notice to proceed. We request weekly updates in writing from Weber and Amicom your Owner Rep. They can be via email with copies to John Dunlap and myself.

Lastly, I am still waiting on the few missing items you need to submit to me so that we can finalize the Amendment to our agreement.

We are working on setting times to meet you next week or the following along with meeting Weber Reps as well.

If there are any changes positive OR negative we request that you inform us immediately.

Now lets go build some ZIPs.

Elie Mimoun l Chief Operating Officer l ESJ Capital Partners, LLC
19950 W. Country Club Drive l Suite 800 l Aventura, Florida 33180
Main Line: 305-600-5001 lFax: 305-402-8069 l Cell: 786-210-2104
em@esj.us l www.esj.us

The information contained in this electronic message is privileged and confidential and is intended only for the use of the individual named above and others who have been specifically authorized to receive such. If the recipient is not the intended recipient, you are hereby notified that any dissemination, distribution or duplication of the communication is strictly prohibited. If you have received this communication in error, or if any problems occur with transmission, please immediately notify us by telephone (305) 600-5001.
Please consider the environment before printing this email.

On Aug 9, 2017, at 9:45 PM, Adam Mopsick <amopsick@amicon.us> wrote:

Thank you for the email Mandy.    Elie / John - please review the below and confirm acceptance or provide comments and feedback.   Obviously no one is happy with the estimated completion date and we will all do our best to find opportunities to improve on this.  Please advise if you would like to get on a call to discuss.

Mandy, at your convenience, please provide a detailed breakdown of the 5 month schedule. Also - what do you need from ESJ / JI to put this in motion immediately?

Adam Mopsick
www.amicon.us
305-216-4319

Sent from my iPhone

On Aug 9, 2017, at 8:40 PM, Mandy Stewart <mandy@airplayadventures.com> wrote:

Adam et al,

The intent of this email is to set forth the current parameters and expectations of the zip tour project, as agreed upon by AirPlay, ERI, and Weber.  Please note the following:

·     Per the conversation yesterday, AirPlay is authorized to

proceed and is prepared to move the project forward with Weber immediately.

·    The Tower 6 location will be at the agreed upon revised location, 31.5' toward the end of the beach.

·    We have confirmed dates with our subcontractors, and the soonest date for on site remobilization of construction is <u>Tuesday, 05 September 2017</u>.

·    Assuming this commencement date, we are currently showing a completion date of <u>05 February 2017</u>.

Please confirm the above with ESJ so that we can begin immediately.

Thanks very much,

Mandy

**AirPLAY**      **Mandy Stewart**
         COO, AirPlay Adventures
         m.253.318.6087 • mandy@airplayadventures.com

---

**Mandy Stewart** <mandy@airplayadventures.com>                                          Sun, Aug 13, 2017 at 8:02 PM
To: Todd Domeck <todd@experientialresources.net>, Brian Brun <brian@experientialresources.net>

See attached. Revisions? Demands? Emojis?

**AirPLAY**      **Mandy Stewart**
         COO, AirPlay Adventures
         m.253.318.6087 • mandy@airplayadventures.com

Begin forwarded message:

**From:** Elie Mimoun <em@esj.us>
**Subject: Re: AirPlay Zip Tour Remobilization**
**Date:** August 13, 2017 at 12:35:27 PM PDT
**To:** Adam Mopsick <amopsick@amicon.us>, Todd Domeck <todd@experientialresources.net>, Mandy Stewart <mandy@airplayadventures.com>
**Cc:** John Dunlap <jdunlap@jungleisland.com>, Dan Shehan <danshehan@webergroupinc.com>, Brian Brun <brian@experientialresources.net>, Jon Weislow <jweislow@amicon.us>

Team Airplay,

Although it is very hard to digest this huge loss of time, we hereby give you an official notice to proceed.
We request weekly updates in writing from Weber and Amicom your Owner Rep. They can be via email with copies to
John Dunlap and myself.

Lastly, I am still waiting on the few missing items you need to submit to me so that we can finalize the Amendment to our
agreement.

We are working on setting times to meet you next week or the following along with meeting Weber Reps as well.

If there are any changes positive OR negative we request that you inform us immediately.

Now lets go build some ZIPs.

Elie Mimoun l Chief Operating Officer l ESJ Capital Partners, LLC
19950 W. Country Club Drive l Suite 800 l Aventura, Florida 33180
Main Line: 305-600-5001 lFax: 305-402-8069 l Cell: 786-210-2104
em@esj.us l www.esj.us

The information contained in this electronic message is privileged and confidential and is intended only for the use of the individual named above and others who have been specifically
authorized to receive such. If the recipient is not the intended recipient, you are hereby notified that any dissemination, distribution or duplication of the communication is strictly prohibited. If
you have received this communication in error, or if any problems occur with transmission, please immediately notify us by telephone (305) 600-5001.
Please consider the environment before printing this email.

On Aug 9, 2017, at 9:45 PM, Adam Mopsick <amopsick@amicon.us> wrote:

Thank you for the email Mandy.   Elie / John - please review the below and confirm acceptance or provide
comments and feedback.   Obviously no one is happy with the estimated completion date and we will all do
our best to find opportunities to improve on this.  Please advise if you would like to get on a call to discuss.

Mandy, at your convenience, please provide a detailed breakdown of the 5 month schedule.  Also - what do
you need from ESJ / JI to put this in motion immediately?

Adam Mopsick
www.amicon.us
305-216-4319

Sent from my iPhone

On Aug 9, 2017, at 8:40 PM, Mandy Stewart <mandy@airplayadventures.com> wrote:

Adam et al,

The intent of this email is to set forth the current parameters and expectations of the zip tour
project, as agreed upon by AirPlay, ERI, and Weber.  Please note the following:

· Per the conversation yesterday, AirPlay is authorized to proceed and is
prepared to move the project forward with Weber immediately.

· The Tower 6 location will be at the agreed upon revised location, 31.5'
toward the end of the beach.

· We have confirmed dates with our subcontractors, and the soonest date
for on site remobilization of construction is **Tuesday, 05 September 2017**.

· Assuming this commencement date, we are currently showing a
completion date of **05 February 2017**.

GoZipUS Mail – AirPlay Zip Tour Remobilization                                    10/31/17, 11:02 PM

Please confirm the above with ESJ so that we can begin immediately.

Thanks very much,

Mandy

AirPLAY

Mandy Stewart
COO, AirPlay Adventures
m.253.318.6087 • mandy@airplayadventures.com

---

📄 **170813 Elie Draft Email.docx**
80K

---

**Matthew Fuller <mf@esj.us>**                                    Mon, Aug 14, 2017 at 8:29 AM
To: Elie Mimoun <em@esj.us>, Adam Mopsick <amopsick@amicon.us>, Todd Domeck <todd@experientialresources.net>, Mandy Stewart <mandy@airplayadventures.com>
Cc: John Dunlap <jdunlap@jungleisland.com>

All,
We look forward to the zip line construction proceeding asap AND moving tower 6 (which should save us future cost since it will be located in a more preferred beach spot).

Sincerely,

Matt

Matthew Fuller I Chief Investment Officer

ESJ Capital Partners, LLC

19950 W. Country Club Drive I Suite 800 I Aventura, Florida 33180

Direct: 305-363-6838 IFax: 305-402-8069

Cell: 305-877-2203

mf@esj.us I www.esj.us

The information contained in this electronic message is privileged and confidential and is intended only for the use of the individual named above and others who have been specifically authorized to receive such. If the recipient is not the intended recipient, you are hereby notified that any dissemination, distribution or duplication of the communication is strictly prohibited. If you have received this communication in error, or if any problems occur with transmission, please immediately notify us by telephone (305) 600-5001.

Please consider the environment before printing this email.

**From:** Elie Mimoun <em@esj.us>
**Date:** Sunday, August 13, 2017 at 3:35 PM
**To:** Adam Mopsick <amopsick@amicon.us>, Todd Domeck <todd@experientialresources.net>, Mandy Stewart <mandy@airplayadventures.com>
**Cc:** John Dunlap <jdunlap@jungleisland.com>, Dan Shehan <danshehan@webergroupinc.com>, Brian Brun <brian@experientialresources.net>, Jon Weislow <jweislow@amicon.us>
**Subject:** Re: AirPlay Zip Tour Remobilization

Team Airplay,

Although it is very hard to digest this huge loss of time, we hereby give you an official notice to proceed.
We request weekly updates in writing from Weber and Amicom your Owner Rep. They can be via email with copies to John Dunlap and myself.

Lastly, I am still waiting on the few missing items you need to submit to me so that we can finalize the Amendment to our agreement.

We are working on setting times to meet you next week or the following along with meeting Weber Reps as well.

If there are any changes positive OR negative we request that you inform us immediately.

Now lets go build some ZIPs.

Elie Mimoun I Chief Operating Officer I ESJ Capital Partners, LLC
19950 W. Country Club Drive I Suite 800 I Aventura, Florida 33180
Main Line: 305-600-5001 IFax: 305-402-8069 I Cell: 786-210-2104
em@esj.us I www.esj.us

The information contained in this electronic message is privileged and confidential and is intended only for the use of the individual named above and others who have been specifically authorized to receive such. If the recipient is not the intended recipient, you are hereby notified that any dissemination, distribution or duplication of the communication is strictly prohibited. If you have received this communication in error, or if any problems occur with transmission, please immediately notify us by telephone (305) 600-5001.
Please consider the environment before printing this email.

On Aug 9, 2017, at 9:45 PM, Adam Mopsick <amopsick@amicon.us> wrote:

Thank you for the email Mandy.   Elie / John - please review the below and confirm acceptance or provide comments and feedback.   Obviously no one is happy with the estimated completion date and we will all do our best to find opportunities to improve on this.   Please advise if you would like to get on a call to discuss.

Mandy, at your convenience, please provide a detailed breakdown of the 5 month schedule.   Also - what do you need from ESJ / JI to put this in motion immediately?

Adam Mopsick
www.amicon.us
305-216-4319

Sent from my iPhone

GoZipUS Mail - AirPlay Zip Tour Remobilization                                           10/31/17, 11:02 PM

On Aug 9, 2017, at 8:40 PM, Mandy Stewart <mandy@airplayadventures.com> wrote:

Adam et al,

The intent of this email is to set forth the current parameters and expectations of the zip tour project, as agreed upon by AirPlay, ERi, and Weber.  Please note the following:

· Per the conversation yesterday, AirPlay is authorized to proceed and is prepared to move the project forward with Weber immediately.

· The Tower 6 location will be at the agreed upon revised location, 31.5' toward the end of the beach.

· We have confirmed dates with our subcontractors, and the soonest date for on site remobilization of construction is Tuesday, 05 September 2017.

· Assuming this commencement date, we are currently showing a completion date of 05 February 2017.

Please confirm the above with ESJ so that we can begin immediately.

Thanks very much,

Mandy

AirPLAY      **Mandy Stewart**
ADVENTURES   COO, AirPlay Adventures
             m.253.318.6087 • mandy@airplayadventures.com

---

**Todd Domeck** <todd@gozipus.com>                                   Mon, Aug 14, 2017 at 3:41 PM
To: Elie Mimoun <em@esj.us>
Cc: Adam Mopsick <amopsick@amicon.us>, Todd Domeck <todd@experientialresources.net>, Mandy Stewart <mandy@airplayadventures.com>, John Dunlap <jdunlap@jungleisland.com>, Dan Shehan <danshehan@webergroupinc.com>, Brian Brun <brian@experientialresources.net>, Jon Weislow <jweislow@amicon.us>

Thanks Elie
We are moving forward.  I will be in Miami next Tuesday and Wednesday.  Look forward to catching up and moving things towards the finish line.
Todd

On Sun, Aug 13, 2017 at 11:35 AM, Elie Mimoun <em@esj.us> wrote:
Team Airplay,

Although it is very hard to digest this huge loss of time, we hereby give you an official notice to proceed.

We request weekly updates in writing from Weber and Amicom your Owner Rep. They can be via email with copies to John Dunlap and myself.

Lastly, I am still waiting on the few missing items you need to submit to me so that we can finalize the Amendment to our agreement.

We are working on setting times to meet you next week or the following along with meeting Weber Reps as well.

If there are any changes positive OR negative we request that you inform us immediately.

Now lets go build some ZIPs.

Elie Mimoun I Chief Operating Officer I ESJ Capital Partners, LLC
19950 W. Country Club Drive I Suite 800 I Aventura, Florida 33180
Main Line: 305-600-5001 IFax: 305-402-8069 I Cell: 786-210-2104
em@esj.us I www.esj.us

The information contained in this electronic message is privileged and confidential and is intended only for the use of the individual named above and others who have been specifically authorized to receive such. If the recipient is not the intended recipient, you are hereby notified that any dissemination, distribution or duplication of the communication is strictly prohibited. If you have received this communication in error, or if any problems occur with transmission, please immediately notify us by telephone (305) 600-5001.
Please consider the environment before printing this email.

On Aug 9, 2017, at 9:45 PM, Adam Mopsick <amopsick@amicon.us> wrote:

Thank you for the email Mandy.   Elie / John - please review the below and confirm acceptance or provide comments and feedback.   Obviously no one is happy with the estimated completion date and we will all do our best to find opportunities to improve on this.   Please advise if you would like to get on a call to discuss.

Mandy, at your convenience, please provide a detailed breakdown of the 5 month schedule.   Also - what do you need from ESJ / JI to put this in motion immediately?

Adam Mopsick
www.amicon.us
305-216-4319

Sent from my iPhone

On Aug 9, 2017, at 8:40 PM, Mandy Stewart <mandy@airplayadventures.com> wrote:

Adam et al,

The intent of this email is to set forth the current parameters and expectations of the zip tour project, as agreed upon by AirPlay, ERi, and Weber.  Please note the following:

·    Per the conversation yesterday, AirPlay is authorized to proceed and is prepared to move the project forward with Weber immediately.

·    The Tower 6 location will be at the agreed upon revised location, 31.5' toward the end of the beach.

·    We have confirmed dates with our subcontractors, and the soonest date for on site remobilization of construction is **Tuesday, 05 September 2017**.

·    Assuming this commencement date, we are currently showing a completion date of **05 February 2017**.

Please confirm the above with ESJ so that we can begin immediately.

Thanks very much,

GoZipUS Mail - AirPlay Zip Tour Remobilization                                                          10/31/17, 11:02 PM

Mandy

**Mandy Stewart**
AirPLAY   COO, AirPlay Adventures
ADVENTURES   m.253.318.6087 • mandy@airplayadventures.com

--
Todd Domeck, Owner
Experiential Resources, Inc.
GoZip LLC
Maui Pineapple Tours LLC
Waiver Saver LLC
Sugar Cane Train
and Other Stuff
Office 808 . 441 . 5347
Cell 808 . 214 . 4325
www.ZipCoaster.com
www.PineappleTour.com
www.SugarCaneTrain.com
www.WaiverSaver.com

IMPORTANT:  This email is intended for the use of the individual (s) named above and may contain information that is
confidential, privileged or unsuitable for overly sensitive persons with low self-esteem, no sense of humor or irrational religious beliefs.
If you are not the intended recipient, any dissemination, distribution or copying of this email is not authorized (either explicitly
or implicitly) and constitutes an irritating social faux pas.  Unless the word absquatulation has been used in its correct
context somewhere other than in this warning, it does not have any legal or grammatical use and may be ignored.  No animals
were harmed in the transmission of this email, although the chihuahua next door is living on borrowed time, let me tell you!  Those
of you with an overwhelming fear of the unknown will be gratified to learn that there is no hidden message revealed by reading this
warning backwards, so just ignore that Alert Notice from Microsoft.  However, by pouring a complete circle of salt around yourself and
your computer you can ensure that no harm befalls you and your pets.  If you have received this email in error, please add some
nutmeg and egg whites and place it in a warm (375 degree) oven for 40 minutes.  Whisk briefly and let it stand for 2 hours before icing.

Mandy Stewart <mandy@airplayadventures.com>                                    Fri, Sep 1, 2017 at 8:55 AM
To: Todd Domeck <todd@experientialresources.net>

August 13th - see below.

**Mandy Stewart**
AirPLAY   COO, AirPlay Adventures
ADVENTURES   m.253.318.6087 • mandy@airplayadventures.com

Begin forwarded message:

**From:** Elie Mimoun <em@esj.us>

**Subject: Re: AirPlay Zip Tour Remobilization**
**Date:** August 13, 2017 at 3:35:27 PM EDT
**To:** Adam Mopsick <amopsick@amicon.us>, Todd Domeck <todd@experientialresources.net>, Mandy Stewart <mandy@airplayadventures.com>
**Cc:** John Dunlap <jdunlap@jungleisland.com>, Dan Shehan <danshehan@webergroupinc.com>, Brian Brun <brian@experientialresources.net>, Jon Weislow <jweislow@amicon.us>

Team Airplay,

Although it is very hard to digest this huge loss of time, we hereby give you an official notice to proceed.
We request weekly updates in writing from Weber and Amicom your Owner Rep. They can be via email with copies to John Dunlap and myself.

Lastly, I am still waiting on the few missing items you need to submit to me so that we can finalize the Amendment to our agreement.

We are working on setting times to meet you next week or the following along with meeting Weber Reps as well.

If there are any changes positive OR negative we request that you inform us immediately.

Now lets go build some ZIPs.

Elie Mimoun I Chief Operating Officer I ESJ Capital Partners, LLC
19950 W. Country Club Drive | Suite 800 | Aventura, Florida 33180
Main Line: 305-600-5001 IFax: 305-402-8069 I Cell: 786-210-2104
em@esj.us I www.esj.us

The information contained in this electronic message is privileged and confidential and is intended only for the use of the individual named above and others who have been specifically authorized to receive such. If the recipient is not the intended recipient, you are hereby notified that any dissemination, distribution or duplication of the communication is strictly prohibited. If you have received this communication in error, or if any problems occur with transmission, please immediately notify us by telephone (305) 600-5001.
Please consider the environment before printing this email.

> On Aug 9, 2017, at 9:45 PM, Adam Mopsick <amopsick@amicon.us> wrote:
>
> Thank you for the email Mandy.    Elie / John - please review the below and confirm acceptance or provide comments and feedback.   Obviously no one is happy with the estimated completion date and we will all do our best to find opportunities to improve on this.  Please advise if you would like to get on a call to discuss.
>
> Mandy, at your convenience, please provide a detailed breakdown of the 5 month schedule.  Also - what do you need from ESJ / JI to put this in motion immediately?
>
>
> Adam Mopsick
> **www.amicon.us**
> **305-216-4319**
>
> Sent from my iPhone
>
>
> On Aug 9, 2017, at 8:40 PM, Mandy Stewart <mandy@airplayadventures.com> wrote:
>
> > Adam et al,
> >
> > The intent of this email is to set forth the current parameters and expectations of the zip tour project, as agreed upon by AirPlay, ERi, and Weber.  Please note the following:
> >
> > · Per the conversation yesterday, AirPlay is authorized to proceed and is prepared to move the project forward with Weber immediately.
> >
> > · The Tower 6 location will be at the agreed upon revised location, 31.5' toward the end of the beach.

·   We have confirmed dates with our subcontractors, and the soonest date for on site remobilization of construction is <u>Tuesday, 05 September 2017</u>.

·   Assuming this commencement date, we are currently showing a completion date of <u>05 February 2017</u>.

Please confirm the above with ESJ so that we can begin immediately.

Thanks very much,

Mandy

**Mandy Stewart**
COO, AirPlay Adventures
m.253.318.6087 • mandy@airplayadventures.com

# EXHIBIT 32



**From:** **Mandy Stewart** mandy@airplayadventures.com
**Subject:** Re: PJ licensed areas
**Date:** August 15, 2017 at 1:11 PM
**To:** Adam McIntyre adammcintyre@webergroupinc.com
**Cc:** Todd Domeck todd@gozipus.com

Hey Adam,

See attached for a PDF. The red shaded area aligns more with Todd's original outline that we sent over. We're looking to head toward the original Tower 1 area, rather than Tower 2. Bear in mind that our aerial fun in this area won't have great effect what's happening on the ground underneath. Let me know your thoughts.

Other notes, do you want to highlight the original T1 and associated lines/bridge as the optional Phase 3? Trying to get this to align with the table I sent along a couple weeks ago.

Thanks much!
:-)
Mandy

**Mandy Stewart**
COO, AirPlay Adventures
m.253.318.6087 • mandy@airplayadventures.com

AirPLAY ADVENTURES



On Aug 15, 2017, at 10:17 AM, Adam McIntyre <adammcintyre@webergroupinc.com> wrote:

M, take a look at the attached plan. I tried to capture the licensed area we discussed in relation to the current master planning.

How does this look to you? Do I need to increase it in some areas?

Adam McIntyre

architect + creative director
www.webergroupinc.com
o 812.246.2100 x116
c 502.216.1872

<PJI WGI Master Plan 081517 airplay areas.pdf>

**From:** Mandy Stewart mandy@airplayadventures.com
**Subject:** Re: PJ licensed areas
**Date:** August 16, 2017 at 7:48 AM
**To:** Adam McIntyre adammcintyre@webergroupinc.com
**Cc:** Todd Domeck todd@gozipus.com



Awesome, possum! I'll take care of the rest and send the final to you for reference.

Thanks much,
Mandy



Mandy Stewart
COO, AirPlay Adventures
m. +1.253.318.6087

Sent from my iPhone during a knife fight in a crashing helicopter over the Panamanian jungle. Please excuse typos and errors.

On Aug 16, 2017, at 6:51 AM, Adam McIntyre <adammcintyre@webergroupinc.com> wrote:

> Morning,
> I updated the boundary.  See attached.
>
> As for the phase III stuff, let me know or feel free to highlight as a secondary color.
>
> Adam McIntyre
> architect + creative director
> www.webergroupinc.com
> o 812.246.2100 x116
> c 502.216.1872
>
> **From:** Mandy Stewart [mailto:mandy@airplayadventures.com]
> **Sent:** Tuesday, August 15, 2017 4:12 PM
> **To:** Adam McIntyre <adammcintyre@webergroupinc.com>
> **Cc:** Todd Domeck <todd@gozipus.com>
> **Subject:** Re: PJ licensed areas
>
> Hey Adam,
>
> See attached for a PDF.  The red shaded area aligns more with Todd's original outline that we sent over.  We're looking to head toward the original Tower 1 area, rather than Tower 2. Bear in mind that our aerial fun in this area won't have great effect what's happening on the ground underneath.  Let me know your thoughts.
>
> Other notes, do you want to highlight the original T1 and associated lines/bridge as the optional Phase 3?  Trying to get this to align with the table I sent along a couple weeks ago.
>
> Thanks much!
> :-)
> Mandy
>
> <image001.jpg> | Mandy Stewart

COO, AirPlay Adventures
m.253.318.6087 • mandy@airplayadventures.com

On Aug 15, 2017, at 10:17 AM, Adam McIntyre
<adammcintyre@webergroupinc.com> wrote:

M, take a look at the attached plan.  I tried to capture the licensed area we
discussed in relation to the current master planning.

How does this look to you?  Do I need to increase it in some areas?


Adam McIntyre
architect + creative director
www.webergroupinc.com
o 812.246.2100 x116
c 502.216.1872


<PJI WGI Master Plan 081517 airplay areas.pdf>

<PJI WGI Master Plan 081617 airplay areas.pdf>



Todd Domeck <todd@gozipus.com>

---

## PJ licensed areas

**Adam McIntyre** <adammcintyre@webergroupinc.com>
To: Mandy Stewart <mandy@airplayadventures.com>
Cc: Todd Domeck <todd@gozipus.com>

Wed, Aug 16, 2017 at 6:51 AM

Morning,

I updated the boundary.  See attached.


As for the phase III stuff, let me know or feel free to highlight as a secondary color.


Adam McIntyre

architect + creative director

www.webergroupinc.com

o 812.246.2100 x116

c 502.216.1872

---

**From:** Mandy Stewart [mailto:mandy@airplayadventures.com]
**Sent:** Tuesday, August 15, 2017 4:12 PM
**To:** Adam McIntyre <adammcintyre@webergroupinc.com>
**Cc:** Todd Domeck <todd@gozipus.com>
**Subject:** Re: PJ licensed areas


Hey Adam,


See attached for a PDF.  The red shaded area aligns more with Todd's original outline that we sent over.  We're looking to head toward the original Tower 1 area, rather than Tower 2. Bear in mind that our aerial fun in this area won't have great effect what's happening on the ground undermeath.  Let me know your thoughts.


Other notes, do you want to highlight the original T1 and associated lines/bridge as the optional Phase 3?  Trying to get this to align with the table I sent along a couple weeks ago.

Thanks much!

:-)

Mandy


Mandy Stewart
COO, AirPlay Adventures
m.253.318.6087 • mandy@airplayadventures.com

[Quoted text hidden]
[Quoted text hidden]

<PJI WGI Master Plan 081517 airplay areas.pdf>

**PJI WGI Master Plan 081617 airplay areas.pdf**
309K

# EXHIBIT 33



Todd Domeck <todd@gozipus.com>

## AirPlay Phasing Docs

1 message

**Mandy Stewart** <mandy@airplayadventures.com>                    Fri, Aug 18, 2017 at 2:57 AM
To: Elie Mimoun <em@esj.us>
Cc: Todd Domeck <todd@experientialresources.net>, John Dunlap <jdunlap@jungleisland.com>, Dan Shehan
<danshehan@webergroupinc.com>, Brian Brun <brian@experientialresources.net>, Adam McIntyre
<adammcintyre@webergroupinc.com>

Elie,

Attached please find the requested documents for the AirPlay phases.  Please take a look and let us know if you have
any questions.  Per your request, the license areas have been run by Adam and we're good to go.

Thanks much,
Mandy

‘AirPLAY        **Mandy Stewart**
 ADVENTURES     COO, AirPlay Adventures
                m.253.318.6087 • mandy@airplayadventures.com



**2 attachments**

**170817 JI Master Plan w AirPlay License Areas.pdf**
900K

**170818 JI Phases - AirPlay.pdf**
135K

# AirPlay Adventures Jungl
# Licensed Areas

| Phase | Anticipated Dates: | Description |
|---|---|---|
| I | Commencement: September 2017<br><br>First Operations: February 15, 2018 | Design, installation, & operation of:<br>• Six (6) line, six (6) tower zip line tour<br>• Final zip lines are dual, superman-style (to be operated and ticketed independently of the full zip tour)<br>• Freefall event |
| II | Commencement: September 2018<br><br>First Operations: February 15, 2019 | Design, installation, & operation of:<br>• Aerial adventure course & Banyan treehouse<br>Continued operation of:<br>• Zip line tour<br>• Superman zip lines<br>• Freefall event |
| III (optional; exact details TBD by additional written agreement) | Commencement: TBD<br><br>First Operations: TBD | Anticipated design, installation, & operation of:<br>• Additional tower at beginning of zip line tour (Tower 1) including additional zip line(s)<br>• Addition of a zip line through an existing waterfall; responsibility for waterfall design and any site modification TBD<br>• Other aerial adventure attractions TBD<br>Continued operation of:<br>• Aerial adventure course & Banyan treehouse<br>• Zip line tour<br>• Superman zip lines<br>• Freefall event |

Definitions of Dates

Commencement Date:
The date that Licensee obtains all approvals required by the Owner and the Authority Having Jurisdiction to proceed with the installation (construction) of an individual attraction

Date of First Operations:
The date immediately following the date of receipt the Acceptance Inspection Report (provided by a third-party ACCT PVM) and any licenses or certificates required by the Owner and the Authority Having Jurisdiction; when Licensee may allow non-personnel to participate in or on activities involving the attractions/structures

# EXHIBIT 34



Todd Domeck <todd@gozipus.com>

---

## AirPlay Amendment

**Elie Mimoun** <em@esj.us>                                        Wed, Aug 23, 2017 at 2:38 PM
To: Mandy Stewart <mandy@airplayadventures.com>, Todd Domeck <todd@experientialresources.net>
Cc: John Dunlap <jdunlap@jungleisland.com>

Attached is the draft Amendment per our discussions.

Please review and advise,

Elie Mimoun | Chief Operating Officer | ESJ Capital Partners, LLC
19950 W. Country Club Drive | Suite 800 | Aventura, Florida 33180
Main Line: 305-600-5001 |Fax: 305-402-8069 | Cell: 786-210-2104
em@esj.us | www.esj.us

The information contained in this electronic message is privileged and confidential and is intended only for the use of the individual named above and others who have been specifically authorized to receive such. If the recipient is not the intended recipient, you are hereby notified that any dissemination, distribution or duplication of the communication is strictly prohibited. If you have received this communication in error, or if any problems occur with transmission, please immediately notify us by telephone (305) 600-5001. Please consider the environment before printing this email.

> On Aug 22, 2017, at 5:03 PM, Elie Mimoun <em@esj.us> wrote:
>
> thanks for the Mazal Tov.
>
> I will have it for you tomorrow.
>
> Elie Mimoun | Chief Operating Officer | ESJ Capital Partners, LLC
> 19950 W. Country Club Drive | Suite 800 | Aventura, Florida 33180
> Main Line: 305-600-5001 |Fax: 305-402-8069 | Cell: 786-210-2104
> em@esj.us | www.esj.us
>
> The information contained in this electronic message is privileged and confidential and is intended only for the use of the individual named above and others who have been specifically authorized to receive such. If the recipient is not the intended recipient, you are hereby notified that any dissemination, distribution or duplication of the communication is strictly prohibited. If you have received this communication in error, or if any problems occur with transmission, please immediately notify us by telephone (305) 600-5001. Please consider the environment before printing this email.

>> On Aug 22, 2017, at 5:02 PM, Mandy Stewart <mandy@airplayadventures.com> wrote:
>>
>> Hey Elie,
>>
>> We're checking to see if we can please get the language for the contract amendment for
>> our review.  We'd like to have time to go over it before we are out at ESJ on Thursday.

Thanks much and mazel tov on the daughter heading off to college!
:-)
Mandy



**Mandy Stewart**
COO, AirPlay Adventures
m.253.318.6087 • mandy@airplayadventures.com

📎 **air play license first amendment draft 082117 530pm.docx**
309K

## FIRST AMENDMENT TO LICENSE AGREEMENT

**THIS FIRST AMENDMENT TO LICENSE AGREEMENT** (this "<u>Amendment</u>") is entered into and effective as of <u>August 21, 2017</u> by and between **AIR PLAY ADVENTURES, LLC**, a Hawaii limited liability company, and **GOZIP, LLC**, a Hawaii limited liability company (collectively, "<u>Licensee</u>"), whose address is _____, and **ESJ JI OPERATIONS, LLC**, a Florida limited liability company ("<u>Licensee</u>"), whose address is c/o ESJ Capital Partners, LLC, 19950 W. Country Club Drive, Suite 800, Aventura, FL 33180. Licensor and Licensee are the "Parties".

### RECITALS:

**A.**     Licensor and Licensee entered into that certain License Agreement dated September 21, 2015 (the "<u>License</u>") concerning the Premises at approximately 1111 Parrot Jungle Trail, Miami, Florida 33132, as more particularly defined in the License.

**B.**     The scope of the License in terms of what Licensee's rights are is being narrowed to only the construction and operation of zip line tour and free fall event.

**C.**     Licensor and Licensee desire to amend the License as set forth herein.

**NOW, THEREFORE,** in consideration of Ten Dollars ($10.00) and other good and valuable consideration as described herein, the receipt and sufficiency of which are hereby acknowledged and confessed, the Parties hereby agree as follows:

1.     <u>Recitals; Defined Terms</u>. The foregoing recitals are true and correct and are incorporated herein by reference. All capitalized terms used herein and not expressly defined herein shall have the meaning given in the License.

2.     <u>Updated Exhibit "A" and Exhibit "C"</u>. Exhibit "A" and Exhibit "C" are hereby deleted in their entirety and replaced with Exhibit "A" and Exhibit "C" attached hereto and incorporated herein by reference, which among other things, moves the ziplines and adventure park, includes base camp and gear storage at the base of the Serpentarium (this does not include the other base camp at the entrance to the park) and relocates Tower 6, and provides for effective dates. All relocation and theming costs are at Licensee's sole cost and expense, and if Licensor is able to collect any contributing funds from the beach club operator toward Tower 6 relocation then Licensor shall credit those contributing funds against Article 5 license fees coming due under this instant License Agreement (provided, however, that Licensor's sole obligation to seek or collect the contributing funds shall not exceed making an informal request to the beach club operator and Licensee shall have no claims or causes of action against Licensor relating to insufficient efforts to obtain the contributing funds). To the extent of any express conflict between the dates, amounts, time frames and other terms and provisions expressly set forth in the Exhibits and those in the body of the License Agreement, the dates, amounts, time frames and other terms and provisions in the Exhibits shall control.

3. <u>**License Fee Commencement Date**</u>. Article 5 is amended as follows: The Licensee shall commence payment of licensee fees in Article 5(a)(i) with the first payment due and payable on July 1, 2017.

- During the Phase I Rent Period described in Article 5(a)(i), the license fee is amended to be the greater of 27% of Attraction Net Revenue and $25,000 monthly;

- during the Phase II Rent Period describe in Article 5(a)(ii), the license fee is amended to be the greater of 27% (this percentage shall increase to 30% commencing on the 13th payment of the Phase II Rent Period) of Attraction Net Revenue and $33,334 monthly; and

- during the Phase III Rent Period describe in Article 5(a)(iii), the license fee is amended to be the greater of 30% (this percentage shall increase to 33.5% commencing on the 13th payment of the Phase III Rent Period) of Attraction Net Revenue and $41,667 monthly.

4. <u>**Removal of Cenote**</u>. The Cenote (and all other activities, adventures, and operations beyond the zip line tour and free fall event), and all references to it, are hereby deleted from the License. Exhibit "B" is hereby deleted.

5. <u>**License Term**</u>. Article 2 of the License entitled "Term" is amended to provide that the License Period shall expire ten (10) years after the Effective Date, and further that there shall be two, five-year renewal options instead of one five-year renewal option.

6. <u>**Exclusivity Canceled**</u>. License Article 1(c)(i), which gives Licensee the exclusive right to operate Adventure Rides and Ziplines on the Facility Premises, is hereby deleted, and it is confirmed that Licensee shall have no exclusivity rights under the License.

7. <u>**Construction of the Structures**</u>. The Parties agree that License Article 3(a)(ii) shall not apply to engineering plans.

8. <u>**Marketing Materials**</u>. Any marketing materials must be approved by both Parties.

9. <u>**Pricing Guidelines**</u>. The Pricing Guidelines, as defined in Schedule 1 under Definitions, is hereby amended to provide as follows: failures or delays in agreeing on the Pricing Guidelines shall not give rise to any claims or causes of action by Licensee against Licensor, and if any failure or delay in agreeing continues for more than ten days the parties, upon request of either party, agree to mutually appoint a third person to make the decision which decision shall not be outside the Pricing Guideline spectrum range of the parties' Pricing Guideline dispute.

10. <u>**Estoppel**</u>. Licensee certifies to Licensor as follows: (1) the License is in full force and effect; (2) except as set forth in this Amendment, the License has not been modified or amended and constitutes the entire and the only agreement between the Licensor and Licensee for the Premises; (3) there are no existing defaults on the part of the Licensee or the Licensor under the License and no events which with the passage or lapse of time would constitute such a

default, and all conditions of the License to be performed by Licensor and necessary to the enforceability of the License have been satisfied to the extent such conditions could be satisfied on or before the date hereof; (4) Licensee does not currently have or hold any claims or demands against the Licensor.

11.  **Matters of Title**.  Licensee understands, acknowledges and agrees that the License, as amended hereby, is subject to all title matters of record, all survey matters, and all governmental matters, including without limitation those exceptions and exclusions from coverage reflected by or disclosed in the Owner's Policy of Title Insurance issued by North American Title Insurance Company bearing Policy Number: FL564-17-00032-1, Date of Policy: April 6, 2017 at 3:29pm, and Agent File Reference RLG 15-044.

12.  **Controlling Agreement; Counterparts, Facsimiles**.  The License, as amended by this Amendment, constitutes the entire agreement between the Parties pertaining to the License, and supersedes all prior agreements and communications, whether oral or written, between the Parties pertaining to the License. To the extent any provisions contained herein conflict with the License, the provisions contained herein shall supersede such conflicting provisions contained in the License, and the License, except as modified hereby, remains unchanged and ratified. This Amendment may be executed in counterparts. Each executed counterpart of this Amendment will constitute an original document, and all executed counterparts, together, will constitute the same agreement. This Amendment may be signed and delivered by facsimile or .pdf format by e-mail or other legible e-mail scan and copies are acceptable as originals for all purposes.

*{signatures on following pages}*

**IN WITNESS WHEREOF,** the Licensor has executed and delivered this First Amendment to License Agreement effective as of the day and year first above written.

Witnesses as to Licensor:                **LICENSOR:**

                                          **ESJ JI OPERATIONS, LLC,**
                                          A Florida limited liability company
                                          By ESJ Capital Partners, LLC, its Manager

_____

Print Name: _____

                                          By: _____ (SEAL)
_____                        Gabriel Amiel, Manager

Print Name: _____


STATE OF FLORIDA                }
COUNTY OF MIAMI-DADE            } SS:

The foregoing was acknowledged before me on August __, 2017, by Gabriel Amiel, as Manager of ESJ CAPITAL PARTNERS, LLC, a Florida limited liability company, the Manager of ESJ JI OPERATIONS, LLC, a Florida limited liability company, on behalf of the companies, and they are personally known to me.


                    _____
                    Notary Public, State of Florida

**IN WITNESS WHEREOF**, the Licensee has executed and delivered this First Amendment to License Agreement effective as of the day and year first above written.

Witnesses as to Licensee:       **LICENSEE:**

                               **AIR PLAY ADVENTURES, LLC,**
                               a Hawaii limited liability company

_____

Print Name: _____

_____       By: _____
Print Name: _____     Print Name: _____
                               Title: Manager

STATE OF HAWAII              }
COUNTY OF _____ } SS:

The foregoing was acknowledged before me on August 1, 2017 by _____, Manager of Air Play Adventures, LLC, a Hawaii limited liability company, on behalf of the company, and said person is personally known to me or produced a _____ as identification.

_____
Notary Public, State of Hawaii at Large

**IN WITNESS WHEREOF**, the Licensee has executed and delivered this First Amendment to License Agreement effective as of the day and year first above written.

Witnesses as to Licensee:          **LICENSEE**:

                                    **GOZIP, LLC,**
                                    a Hawaii limited liability company

_____

Print Name: _____

_____        By: _____

Print Name: _____    Print Name: _____
                               Title: Manager

STATE OF HAWAII          }
COUNTY OF _____ } SS:

The foregoing was acknowledged before me on August 1, 2017 by _____, Manager of GoZip, LLC, a Hawaii limited liability company, on behalf of the company, and said person is personally known to me or produced a _____ as identification.

_____
Notary Public, State of Hawaii at Large

Page 6 of 8

EXHIBIT "A"

AirPlay Adventures Jungle Island
Licensed Areas



Phase 1: Zip Line Tour & Freefall Event
Phase 2: Aerial Adventure Course & Banyan Treehouse
Optional Phase 3: Additional Tower, Bridge, &
Zip Lines (TBD by additional agreement)

NOTE: Additional areas for guy lines associated with installations are unhighlighted, but are
reflected in the site plan.

Page 7 of 8

EXHIBIT "C"

| Phase | Anticipated Dates: | Description |
|---|---|---|
| I | Commencement: September 2017<br><br>First Operations: February 15, 2018 | Design, installation, & operation of:<br>• Six (6) line, six (6) tower zip line tour<br>• Final zip lines are dual, superman-style (to be operated and ticketed independently of the full zip tour)<br>• Freefall event |
| II | Commencement: September 2018<br><br>First Operations: February 15, 2019 | Design, installation, & operation of:<br>• Aerial adventure course & Banyan treehouse<br>Continued operation of:<br>• Zip line tour<br>• Superman zip lines<br>• Freefall event |
| III (optional; exact details TBD by additional written agreement) | Commencement: TBD<br><br>First Operations: TBD | Anticipated design, installation, & operation of:<br>• Additional tower at beginning of zip line tour (Tower 1) including additional zip line(s)<br>• Addition of a zip line through an existing waterfall; responsibility for waterfall design and any site modification TBD<br>• Other aerial adventure attractions TBD<br>Continued operation of:<br>• Aerial adventure course & Banyan treehouse<br>• Zip line tour<br>• Superman zip lines<br>• Freefall event |

Definitions of Dates

Commencement Date:
The date that Licensee obtains all approvals required by the Owner and the Authority Having Jurisdiction to proceed with the installation (construction) of an individual attraction

Date of First Operations:
The date immediately following the date of receipt the Acceptance Inspection Report (provided by a third-party ACCT PVM) and any licenses or certificates required by the Owner and the Authority Having Jurisdiction; when Licensee may allow non-personnel to participate in or on activities involving the attractions/structures

# EXHIBIT 35



Todd Domeck <todd@gozipus.com>

## Lemons into lemonade

2 messages

---

**Elie Mimoun** <em@esj.us>                                    Wed, Sep 6, 2017 at 8:43 AM
To: Jon Weislow <jweislow@amicon.us>, Adam Mopsick <amopsick@amicon.us>, John Dunlap
<jdunlap@jungleisland.com>, Todd Domeck <todd@experientialresources.net>, Adam McIntyre
<adammcintyre@webergroupinc.com>, Mandy Stewart <mandy@airplayadventures.com>

Guys,

I spoke with Dunlap earlier about this idea.

Since park needs to be closed for the storm, and since we might get damage which would make it impossible for the
park to reopen for a few weeks - we would like to mobilize as many teams as possible to do all the site prep,
demolition digging etc throughout phase 1 for Zips, crystal, etc.

I am copying both weber and Airplay to see how fast they can mobilize.

Please advise your thoughts on this matter

Elie Mimoun I Chief Operating Officer I ESJ Capital Partners, LLC
19950 W. Country Club Drive | Suite 800 | Aventura, Florida 33180
Main Line: 305-600-5001 IFax: 305-402-8069 | Cell: 786-210-2104
em@esj.us I www.esj.us

The information contained in this electronic message is privileged and confidential and is intended only for the use of the individual named above and others who have been specifically
authorized to receive such. If the recipient is not the intended recipient, you are hereby notified that any dissemination, distribution or duplication of the communication is strictly
prohibited. If you have received this communication in error, or if any problems occur with transmission, please immediately notify us by telephone (305) 600-5001.
Please consider the environment before printing this email.

---

**Adam Mopsick** <amopsick@amicon.us>                          Thu, Sep 7, 2017 at 2:33 PM
To: Elie Mimoun <em@esj.us>, Jon Weislow <jweislow@amicon.us>, John Dunlap <jdunlap@jungleisland.com>, Adam
McIntyre <adammcintyre@webergroupinc.com>, Todd Domeck <todd@gozipus.com>, Mandy Stewart
<mandy@experientialresources.net>

Elie,

I think we will need to evaluate conditions after the storm.  If it misses us, we can dive back in
immediately and re-evaluate the schedule based on a few days lost.  If we get a direct hit (along with
the rest of the city) with extensive long term power outages and widespread damage and flooding
across Miami Beach and downtown, we are going to have to dial in to the local subcontractor base
and identify what is feasible.  The biggest problem we are all going to face in the industry is a massive
labor shortage.  I am optimistic we are spared and are dealing with the former.

Either way, we need to connect immediately after the storm for a group damage assessment and immediate next steps.  I am in Orlando (after a 9 hour drive) but am available to talk tomorrow if you wish.

**ADAM MOPSICK**

 AMICON

7430 NE 4th Court I Miami, FL 33138

**OFFICE**   305 573 8030 x122

**MOBILE**  305 216 4319

**DIRECT**   786 345 2451

**www.amicon.us**

**From:** Elie Mimoun [mailto:em@esj.us]
**Sent:** Wednesday, September 6, 2017 11:44 AM
**To:** Jon Weislow <jweislow@amicon.us>; Adam Mopsick <amopsick@amicon.us>; John Dunlap <jdunlap@jungleisland.com>; Todd Domeck <todd@experientialresources.net>; Adam McIntyre <adammcintyre@webergroupinc.com>; Mandy Stewart <mandy@airplayadventures.com>
**Subject:** Lemons into lemonade

[Quoted text hidden]

# EXHIBIT 36

GoZipUS Mail - Zip Tour Update

10/31/17, 11:09 PM



Todd Domeck <todd@gozipus.com>

## Zip Tour Update

3 messages

**Mandy Stewart** <mandy@airplayadventures.com>                Sun, Sep 24, 2017 at 9:18 AM
To: Elie Mimoun <em@esj.us>
Cc: Todd Domeck <todd@experientialresources.net>, Craig Hill <mauicraig@gmail.com>

L'Shanah Tovah!

I hope that you and your family had a great holiday, and a wonderful year ahead.  Here's your briefing on what's up with the zip tour. We're still working with Weber and Hayward Baker to get Hayward Baker back on track and get a date locked in.  They need the time to review scope changes with the tower move, assess materials and work, and then fit us into their workload.  This is in progress and we are pushing all parties to get this done quickly.

I spoke with Mike Indrei at the end of last week about the feasibility of having the surveyor out to do the first of the construction stakeouts beginning this Friday September 29 as previously discussed and currently booked.  Due to the current state of the park, he expressed some significant reservations about the ability of the survey team to navigate through the park and work within the areas they need.  Obviously with surveying it's not just about the immediate area, there are also line of sight needs.  I had a conversation with Mike about how we need to make this happen ASAP, which of course he understands.  We began having conversations last week with ERi, and ERi with Weber to manage that situation the best we can.

The last thing we all want is for the surveyor to show up and then leave because the work areas within the park are inaccessible.  I haven't received notice of when Dave is going to be on the ground, but at the latest Todd and I will be there first thing Wednesday.  I think the first thing that needs to happen is for whomever is on the ground first to do a walk through and assessment.  And I think that if there are any immediate access issues that we need to have a Jungle Island team ready to start clearing.  We will have at minimum a good chunk of Wednesday, plus Thursday to make enough progress to get ahead of the survey team and then keep clearing and stay ahead if needed.  Note that they may also need to respond to immediate needs of the surveyors while they're onsite.

What we need from Jungle Island is the team dedicated to clearing so we can keep the surveyors moving.  Is that something you guys can do on your end?  If so, should we (and/or Weber) work with Mike directly on that?

Thanks much,
Mandy

AirPLAY
ADVENTURES

**Mandy Stewart**
COO, AirPlay Adventures
m.253.318.6087 • mandy@airplayadventures.com

**Elie Mimoun** <em@esj.us>                                          Sun, Sep 24, 2017 at 10:58 AM
To: Mandy Stewart <mandy@airplayadventures.com>
Cc: Todd Domeck <todd@experientialresources.net>, Craig Hill <mauicraig@gmail.com>

Thank you for the update.

We agree with the assessment below and will do all we can to assist.

Can I forward this email to John Dunlap and Adam from Amicom to coordinate.

Sent by Elie

[Quoted text hidden]

---

**Mandy Stewart** <mandy@airplayadventures.com>                    Sun, Sep 24, 2017 at 11:29 AM
To: Elie Mimoun <em@esj.us>
Cc: Todd Domeck <todd@experientialresources.net>, Craig Hill <mauicraig@gmail.com>

Absolutely, let's make a plan!

Thanks,
Mandy

**AirPLAY**
ADVENTURES

**Mandy Stewart**
COO, AirPlay Adventures
m.253.318.6087 • mandy@airplayadventures.com

[Quoted text hidden]

# EXHIBIT 37

GoZipUS Mail - Ninja Lounge Install/ Kids play area                                                  10/31/17, 11:14 PM



Todd Domeck <todd@gozipus.com>

---

## Ninja Lounge Install/ Kids play area

2 messages

---

**Todd Domeck** <todd@gozipus.com>                                  Wed, Oct 4, 2017 at 9:59 AM
To: Adam McIntyre <adammcintyre@webergroupinc.com>
Cc: Elie Mimoun <em@esj.us>, Mandy Stewart <mandy@airplayadventures.com>

Aloha Adam
I spoke with Elie yesterday and he said that you were the gatekeeper of all estimates and projects in the park. Elie
has asked us to provide installation cost for the Ninja Lounge and associated exterior ropes course stuff. He asked
me to contact you to get a scope of work so we can price out that project as well as the kids play area.
Let me know if any of this exist yet or if y'all need assistance in putting it together so we can determine the best path
forward.
Mahalo
Todd

--
Todd Domeck, Owner
Experiential Resources, Inc.
GoZip LLC
Maui Pineapple Tours LLC
Waiver Saver LLC
Sugar Cane Train
and Other Stuff
Office 808 . 441 . 5347
Cell 808 . 214 . 4325
www.ZipCoaster.com
www.PineappleTour.com
www.SugarCaneTrain.com
www.WaiverSaver.com

IMPORTANT: This email is intended for the use of the individual (s) named above and may contain information that is
confidential, privileged or unsuitable for overly sensitive persons with low self-esteem, no sense of humor or irrational
religious beliefs. If you are not the intended recipient, any dissemination, distribution or copying of this email is not
authorized (either explicitly or implicitly) and constitutes an irritating social faux pas. Unless the word
absquatulation has been used in its correct context somewhere other than in this warning, it does not have any legal
or grammatical use and may be ignored. No animals were harmed in the transmission of this email, although the
chihuahua next door is living on borrowed time, let me tell you! Those of you with an overwhelming fear of
the unknown will be gratified to learn that there is no hidden message revealed by reading this warning backwards, so
just ignore that Alert Notice from Microsoft. However, by pouring a complete circle of salt around yourself and your
computer you can ensure that no harm befalls you and your pets. If you have received this email in error, please add
some nutmeg and egg whites and place it in a warm (375 degree) oven for 40 minutes. Whisk briefly and let it stand
for 2 hours before icing.

---

**Adam McIntyre** <adammcintyre@webergroupinc.com>                  Wed, Oct 4, 2017 at 10:39 AM
To: Todd Domeck <todd@gozipus.com>
Cc: Elie Mimoun <em@esj.us>, Mandy Stewart <mandy@airplayadventures.com>, Nick Holmes
<nickholmes@webergroupinc.com>

Can do.

We should set up a call to go through what we understand the Ninja Lounge to consist of.  At this point it's not terribly specific (since they don't currently have an outdoor component), but we know what the interior layout can hold.

We also have some plans for the Kids Play area, but it's recently changed a bit in configuration.  I'll send you the plans.

Adam McIntyre

architect + creative director

www.webergroupinc.com

o 812.246.2100 x116

c 502.216.1872

**From:** Todd Domeck [mailto:todd@gozipus.com]
**Sent:** Wednesday, October 04, 2017 1:00 PM
**To:** Adam McIntyre <adammcintyre@webergroupinc.com>
**Cc:** Elie Mimoun <em@esj.us>; Mandy Stewart <mandy@airplayadventures.com>
**Subject:** Ninja Lounge Install/ Kids play area

[Quoted text hidden]

From: **Adam McIntyre** adammcintyre@webergroupinc.com 
Subject: some JI files
Date: October 4, 2017 at 1:58 PM
To: Todd Domeck todd@gozipus.com, Mandy Stewart mandy@airplayadventures.com
Cc: Nick Holmes nickholmes@webergroupinc.com



**Kids play area-**
We did a plan recently of that area and then had to modify it since they added a Flowrider back
in that area. The ideas represented are solid enough though. The main structure is simple in plan
but has a net climb over the entire middle (see reference photos). Each tower would be different,
but all in a jungle theme. I attached some imagery I like. Nathaniel's group wrote some
backstories which we might play off of once we get more granular on this.
I did like the idea of tying back to the animal barn and activating the upper level of that with
more Ninja lounge stuff for the rainy or super hot days. They bring local programming to the
table and we need to leverage that.

In the latest plan the discovery play stream is off to the side. We just did one of those in AZ.
Good European components. Not cheap.

I think this should be part of regular admission price so I'm not sure how you monetize it...but
that's for you to figure out if you decide to take this on.

**Ninja Lounge-**
See the scratch plan I sent to Ninja folks...Their course would go inside and has an area for their
silks class and parkour. There is also the opportunity to activate the roof of that building too.
They suggested a massive trampoline.
As you can see there is an outdoor component as well that takes advantage of the pond. We can't
have people in the pond yet, but we can have them cross it.
You can also see the idea of the large net suspended in the courtyard...and we also talked with
retail about poking into their double height space to bring folks in there as well.

Since the ninja folks don't do outdoor I can see a simple partnership (and rev share) with them.
Seems straightforward enough.







Plenty to discuss, let me know when.

Adam McIntyre
architect + creative director
www.webergroupinc.com
o 812.246.2100 x116
c 502.216.1872

BERMED EARTH ← EXISTING R.R.







# EXHIBIT 38

GoZipUS Mail – Response to your recent emails                                    11/27/17, 1:51 PM



Todd Domeck <todd@gozipus.com>

## Response to your recent emails

**Elie Mimoun <em@esj.us>**                                    Fri, Oct 13, 2017 at 9:35 AM
To: GoZip US <todd@gozipus.com>, "Bruno, Christian S." <cbruno@cozen.com>

i just got it and read it.

Very sorry you took this path. I saw you already CC you attorney so i have no choice but do the same.

I was very clear with you that the time lines are critical.

This is a jewish holiday and i will not take any steps until Monday, should give you time to think if you really want to go down this road. I would love nothing more than to work with you but not this way.

Elie Mimoun I Chief Operating Officer I ESJ Capital Partners, LLC
19950 W. Country Club Drive | Suite 800 | Aventura, Florida 33180
Main Line: 305-600-5001 IFax: 305-402-8069 I Cell: 786-210-2104
em@esj.us I www.esj.us

The information contained in this electronic message is privileged and confidential and is intended only for the use of the individual named above and others who have been specifically authorized to receive such. If the recipient is not the intended recipient, you are hereby notified that any dissemination, distribution or duplication of the communication is strictly prohibited. If you have received this communication in error, or if any problems occur with transmission, please immediately notify us by telephone (305) 600-5001.
Please consider the environment before printing this email.

On Oct 13, 2017, at 9:25 AM, GoZip US <todd@gozipus.com> wrote:

Sent this last night. Sounds like you didn't receive it.  Let me know when you want to talk.  I know it's a holiday for you. I'm flexible.

Todd Domeck, Owner
808 . 214 . 4325

Begin forwarded message:

> **From:** GoZip US <todd@gozipus.com>
> **Date:** October 12, 2017 at 8:55:18 PM MST
> **To:** em@esj.us
> **Cc:** jarraslia@gjb-law.com
> **Subject: Response to your recent emails**

Aloha Elie,

As you know, in January 2017 AirPlay requested a meeting to discuss an Amendment to our License Agreement. During that period, we believed that ESJ's plans would be mutually beneficial to AirPlay's projects as well as to ESJ's and AirPlay's common goals for Jungle Island.  During that time, we were agreeable to giving up our exclusive rights to

-- and only to -- the cenote area and water slides.  We were willing to extend this offer both as a good faith gesture, as well as to benefit our business relationship and the overall project.

We appreciate your time during the most recent in-person meetings to discuss an Amendment to the License Agreement.  It is apparent to us that ESJ wants to modify the contractual arrangement by removing some of the agreements that make the License Agreement valuable to Airplay. Reiterating our September 28, 2017 conversation at the ESJ offices, Airplay is unwilling to waive its exclusivity regarding Adventure Rides. You and John Dunlap have stated to us, "We aren't going to let you [AirPlay Adventures] tell us what we can and cannot do inside our park."  While we can respect that sentiment generally, ESJ stepped into the shoes of PJG and the License Agreement, so ESJ is contractually obligated to provide us exclusivity.

Similarly, in the course of discussing your proposed Amendment, ESJ has also sought to accelerate the dates for rent, require that design and construction funds be escrowed, and otherwise taken positions that make a reasonable amendment impossible.  Based on ESJ's insistence on these provisions, we have reached a point where further negotiations will not likely produce any amendment that is acceptable to AirPlay.

Based on these unacceptable proposals, at this time Airplay Adventures will proceed with the project under the terms of the only contract, the September 2015 License Agreement. We will comply with the provisions in the Agreement and will expect you to fulfill your obligations under that agreement.

We note that ESJ, John Dunlap, Weber Group, and Amicon have all openly discussed with us that ESJ has been actively negotiating with operators regarding the installation of attractions that will directly compete with our products within the park.  At the same time, the contract that is currently in force, provides for Airplay's exclusivity, contains a broad non-disparagement provision, and provides for confidentiality.  Obviously, Airplay will demand strict adherence to those provisions.

It appears to us (AirPlay) that ESJ's actions demonstrate a desire to undermine the current contract, so that ESJ can partner with other companies to design, construct, and/or operate Adventure Rides. This would be in direct competition with AirPlay's attractions and violate our agreed upon exclusivity.  If that is the case, AirPlay is willing to entertain a legitimate and reasonable offer from you to change our existing business relationship.

In response to the list of items that you currently are requesting from AirPlay, absent a substantial and mutually amenable change in the business relationship, we will continue to move forward to fulfill our obligations under the existing License Agreement, while making a good faith effort to partner with others who are also involved in the larger Jungle Island Master Plan.  I would further insist that any deadlines set should be mutually agreed upon in order to set everyone up for success and move forward in our partnership.

We continue to be available to discuss business resolutions to these issues, including the performance of the existing License Agreement.  We will be in Miami next week to make progress on the Base Camp site, as previously promised and happy to discuss options face-to-face.

Mahalo


Todd Domeck, Owner
808 . 214 . 4325

# EXHIBIT 39



COZEN
O'CONNOR

October 17, 2017

Christian S. Bruno
Direct Phone   305-677-0202
Direct Fax      305-720-2172
cbruno@cozen.com

**VIA E-MAIL AND FEDEX OVERNIGHT**

Air Play Adventures, LLC
216 Dickenson Street
Lahaina, Hawaii, 96761
Attn: Todd Domeck
Email: todd@gozips.com

Re:    License Agreement by and among Air Play Adventures, LLC ("**Air Play**") and
       GoZip, LLC ("**GoZip**" and together with Air Play, the "**Licensee**") and ESJ JI
       Leasehold, LLC, a Florida limited liability company (as assignee to Parrot
       Jungle and Gardens of Watson Island, Inc. and PJG Watson, LLC) ("**Owner**")
       dated September 21, 2015 (the "**License Agreement**").

Dear Mr. Domeck:

        This firm represents the Owner in connection with the above-referenced License
Agreement. This correspondence constitutes written notice of breach from Owner to Licensee
pursuant to the above-referenced License Agreement. Licensee has repeatedly and continuously
failed to timely perform its construction obligations pursuant to the License Agreement. As
provided in the License Agreement, time was of the essence with respect to each of these
obligations. Unfortunately, even after Licensee's recent promises to commence construction and
complete the Project in an expeditious manner – which promises do not relieve Licensee of its
existing defaults – Licensee has still taken no material or affirmative action to mobilize contractor
personnel, has failed to make payments or required deposits to the general contractor, Weber
Group, as necessary to commence construction, and has failed to act with any sense of urgency to
proceed with the Project. This is despite the fact that the Park has been closed to the public and
fully accessible to Licensee to perform construction of the Ziplines without public safety
interference or considerations. Furthermore, AirPlay agreed that the Project would be modified to
relocate Tower 6 and that the Project would recommence and be completed as expeditiously as
possible as memorialized in the August 9, 2017 email from Mandy Stewart that the Project would
commence no later than September 5, 2017 and be completed no later than February 5, 2018.

        In addition to Licensee's general failure to meet any deadlines, we note the following non-
exhaustive list of additional breaches and violations under the License Agreement:

        -       Failure to provide certificates of insurance for the following insurance
                coverages required pursuant to Section 12 of the License Agreement
                repeatedly requested on behalf of Owner:
        -       valid workers compensation policy in the State of Florida;

Air Play Adventures, LLC
Page 2
October 17, 2017

- umbrella liability coverage;
- appropriate coverages for design engineer;
- appropriate coverages for crane operator;
- payment and performance bond for the construction of the Zipline in an amount satisfactory to Owner pursuant to Section 12(c), or alternatively, escrow sufficient monies to cover all contractor orders placed;
- Failure to timely pay subcontractors pursuant to pursuant to Section 3(a)(ix) of the License Agreement, including, but not limited to, Hayward Baker, Amicon;
- Failure to provide monthly financial summaries of all Capital Investment and Commitments Amounts expended in connection with the Project, pursuant to Section 3(b) of the License Agreement;
- Failure to provide requested construction schedules;
- Failure to provide requested payment schedules;
- Failure to produce proof of funds.

Licensee's consistent delays and false promises have created significant doubt that Licensee is capable to complete its financial and other obligations under the License Agreement. Due to the foregoing, Owner hereby requests adequate assurances in the form of production from Licensee of the following data, documents and information within five (5) days from the date hereof:

1. 2016 and year-to-date financial statements and tax returns for each of Air Play and GoZip certified by a nationally-recognized accounting firm;
2. Proof of funds from Air Play and GoZip to cover projected Project costs in full;
3. Copies of all contracts for work with contractors and subcontractors engaged thus far;
4. Copies of all contractors and subcontractors invoices and proof of payment thereof.

Lastly, we point your attention to the estoppel certificate Licensee delivered to Owner as part of its purchase of the Park, attached hereto as Exhibit A, which states at paragraph 4 that monthly rent in the amount of $16,666.67 had commenced and had been paid through July 1, 2017. Owner relied upon this estoppel certified by each Licensee and hereby demands payment of all such amounts retroactive to August 1, 2017.  Additionally, we request evidence of your authorization to execute the estoppel on behalf of Air Play which was managed by Peter Winn as of September 23, 2015, the date of the original License Agreement.

Failure to meet any of the requests set forth herein may result in termination of the License Agreement pursuant to Section 8.

As you know, Owner has been negotiating with Licensee in good faith to amend the License Agreement despite the foregoing breaches.  Owner is willing to continue to do so, but does not waive its right to immediately enforce any and all of its rights and remedies under the License

Air Play Adventures, LLC
Page 3
October 17, 2017


Agreement or as available at law or equity (including its right to recover attorneys' fees), and all such rights are hereby reserved.

Regards,

COZEN O'CONNOR

Christian S. Bruno


cc:   Elie Mimoun (*via email*)
      Jason Domark, Esq. (*via email*)

      Merchant Horovitz LLLC (*via email and FedEx Overnight*)
      2145 Wells Street, Suite 303
      Wailuku, Hawaii 96793
      Attn: Peter A. Horovitz
      Email: rah@mhmaui.com

      John Arrastia, Esq. (*via email*)
      Email: jarrastia@gjb-law.com

<u>Exhibit A</u>

<u>Zipline Estoppel</u>

[Attached]

## Licensee Estoppel Certificate

This Licensee Estoppel Certificate (this "Certificate"), dated as of March 24, 2017, is entered into by AIR PLAY ADVENTURES, LLC, a Hawaii limited liability company and GOZIP, LLC, a Hawaii limited liability company (jointly and severally, "Licensee"), the licensee under the License Agreement (as hereinafter defined), with PARROT JUNGLE AND GARDENS OF WATSON ISLAND, INC., a Florida corporation and PJG WATSON, LLC, a Florida limited liability company (collectively, "Licensor"), for the right to purchase, install, operate and maintain outdoor ziplines and adventure park obstacle course and related equipment (the "Services") in the designated areas described on Exhibit A hereto (the "Lease Areas"), which Lease Areas are a part of Licensor's leasehold estate located at 1111 Parrot Jungle Trail, Miami, Florida 33132, commonly known as Jungle Island (the "Property").

Licensee, for good and valuable consideration, and intending to be legally bound, hereby certifies to ESJ JI LEASEHOLD, LLC, a Florida limited liability company and its successors and assigns ("Buyer"), and any lender providing mortgage, mezzanine or other financing (collectively, "Lender") to Buyer or its affiliates, and their respective successors and assigns, as follows:

1.    Licensee currently provides the Services and occupies the Lease Areas pursuant to a License Agreement between Licensor and Licensee dated September 21, 2015 (the "License Agreement"), a copy of which is attached hereto as Exhibit B and made a part hereof. The License Agreement attached as Exhibit B is a true, complete and correct copy of the License Agreement. The License Agreement is valid, binding and in full force and effect, and there has been no other amendment, modification, or supplement of any kind or nature varying the stated terms and conditions of the License Agreement.

2.    Licensee has accepted possession of and occupies the entire Leased Areas under the License Agreement during the dates and times specified therein. The term of the License Agreement commenced on July 1, 2017, which is the Phase I Rent Commencement Date (as defined in the License Agreement).

3.    The initial term of the License Agreement expires on June 30 2027 Licensee has a one (1) time right to renew the License Agreement for an additional five (5) years as provided for in the License Agreement, and no further extension rights.

4.    The License Agreement currently requires payment of a monthly rent of *the greater of* $16,666.67 *or* thirty percent (30%) of Attraction Net Revenue (as defined in the License), which has been paid through the month of July 1, 2017. All such rent has been paid through July 1, 2017 and there are no pending reconciliations of rent for 2016 or prior years No rents, additional rents, percentage rents or other sums or charges have been paid for more than one (1) month in advance of the due date thereof.

5.    Through the date of this Certificate, Licensee has paid a total of $ 1,200,000 in capital toward the Commitment Amount (as defined in the License Agreement), as well as a Licensee Cenote Investment in the amount of $ 0 Zero .

TCD

6.      There is no security deposit.

7.      To the best of Licensee's knowledge, Licensor and Licensee have performed all of their obligations under the License Agreement, and Licensee has no knowledge of any event which with the giving of notice, the passage of time or both would constitute a default by either Licensee or Licensor under the License Agreement.

8.      Licensee has no claim against Licensor and no offset or defense to enforcement of any of the terms of the License Agreement.

9.      Licensee has not assigned the License Agreement and has not sublicensed the Lease Areas or any part thereof or interest therein.

10.     Licensee has no right or option pursuant to the License Agreement or otherwise to purchase all or any part of the Lease Areas.  Licensee does not have any right or option for additional space on the Property.

11.     No voluntary actions or, to Licensee's best knowledge, involuntary actions are pending against Licensee under the bankruptcy laws of the United States or any state thereof.

12.     Reference is made to that certain Master Sublease entered into by and between Parrot Jungle and Gardens of Watson Island, Inc., a Florida corporation and PJG Watson, LLC, a Florida limited liability company dated October 1, 2000, a memorandum of which is recorded in Official Records Book 19446, Page 8 of the Public Records of Miami-Dade County, Florida (the "Public Records"), as amended by that certain First Modification of Sublease dated August 13, 2002 and recorded in Book 20602, Page 3495 of the Public Records (the "Master Sublease"). Licensee acknowledges and agrees that a termination of the Master Sublease shall not terminate or otherwise affect the validity or enforceability of the License Agreement or the any of the provisions thereof.

13.     The undersigned individual hereby certifies that he or she is duly authorized to sign, acknowledge and deliver this letter on behalf of Licensee.

*[Remainder of page intentionally blank.*
*Signature page to follow.]*

Licensee acknowledges that Buyer will rely on this Certificate in purchasing the Property from Licensor, and Lender will rely on this Certificate in making a loan or otherwise extending credit to Buyer or its affiliates.  The information contained in this Certificate shall be for the benefit of Buyer and Lender, and their respective successors and assigns.

**AIR PLAY ADVENTURES, LLC**

By: _Todd Domeck_
Name: _Todd Domeck_
Title: _Member_

**GOZIP, LLC**

By: _Todd Domeck_
Name: _Todd Domeck_
Title: _Member_

**EXHIBIT A**

Exhibit A
Jungle Island: AIR+Play Licensed Area



## EXHIBIT B

EXECUTION COPY

## LICENSE AGREEMENT

      THIS LICENSE AGREEMENT (this "Agreement") is made as of September 21, 2015 (the "Effective Date"), by and among AIR PLAY ADVENTURES, LLC, a Hawaii limited liability company, GOZIP, LLC, a Hawaii limited liability company (joint and severally, the "Licensee") each with a business address of 216 Dickenson Street, Lahaina, Hawaii, 96761, PARROT JUNGLE AND GARDENS OF WATSON ISLAND, INC., a Florida corporation ("PJG Inc."), and PJG WATSON, LLC, a Florida limited liability company ("PJG LLC", and collectively with PJG Inc., the "Owner"), each with a business address of 1111 Parrot Jungle Trail, Miami, Florida 33132.

### RECITALS

A.  PJG, Inc., is the leasehold land owner of certain real property commonly known as the "Jungle Island" (hereinafter the "Facility" or "Facility Premises"), located at 1111 Parrot Jungle Trail, Miami, Florida 33132, by virtue of its interest as the current tenant under that certain Lease and Development Agreement dated September 2, 1997, by and between the City of Miami, Florida, a municipal corporation of the State of Florida (the "City"), as landlord, PJG Inc., as tenant, as amended by (i) that certain Modification to Lease and Development Agreement dated April 14, 2000; (ii) that certain Modification to Lease and Development Agreement dated August 13, 2002; (iii) that certain Third Modification to Lease and Development Agreement dated October 29, 2008 (the "Third Modification to Master Lease") and (iv) that certain Fourth Modification to Lease and Development Agreement dated June 24, 2009 (collectively, the "Master Lease").

B.  Licensee is an affiliate of GoZip, LLC, a Hawaii limited liability company, which is an established third party provider of zip line tours throughout the United States.

C.  Owner and Licensee desire for Licensee to purchase, install, operate and maintain outdoor ziplines and adventure park obstacle courses and related equipment in the above ground designated areas of the Facility Premises as described in Exhibit A attached hereto (the "License Areas") and to construct certain related structure improvements within the License Areas.

D.  Owner is willing to grant to Licensee a license to use the License Areas (as such term may be amended from time to time pursuant to this Agreement) for the purpose stated herein, subject to the terms and requirements of this Agreement.

E.  Capitalized terms in this Agreement shall have the meanings ascribed to such terms in these Recitals and in Schedule 1 hereto.

      NOW THEREFORE, based upon the foregoing recitals, the mutual promises made herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, the parties hereto agree as follows:

1.    **License.** Owner hereby grants to Licensee the right to operate within the License Areas only for the use stated herein and subject to the provisions and conditions of this Agreement, including the following:

      (a)    Zipline and Adventure Structures. During the Term of this Agreement, Licensee will have access to the License Areas and may install the Structures within the License Areas (as such term may be

amended from time to time), all in accordance with the procedures set forth in this Agreement and the zoning laws, rules and regulations applicable to the Facility Premises.

(b)    Design Concept and Owner Approval.    The design and number of Zipline, Adventure Rides and their Structures for each Phase shall be mutually agreed upon by the parties and approved by Owner in accordance with Section 3(a) herein.

(c)    Rights, Use Requirements and Restrictions.

(i)    Licensee shall have the exclusive right to operate Adventure Rides and Ziplines on the Facility Premises.

(ii)    Licensee's rights under this Agreement are subject to all covenants, restrictions, easements, agreements, reservations and encumbrances upon, and all other conditions of title to the License Areas. Licensee shall also have the exclusive right to install and operate, including operating for revenue, water slides, cabanas and other water attractions at the swimming Cenote depicted and denoted on the attached Exhibit "B" as the "Exclusive Zone".

(iii)    Licensee's rights under this Agreement are subject to all present and future building restrictions, regulations, zoning laws, ordinances, resolutions and orders of any local, state or federal agency, now or hereafter having jurisdiction over the License Areas or the Licensee's use of the License Areas.

(iv)    Licensee may use the License Areas only for constructing, installing, operating, maintaining, and repairing the Adventure Rides and Ziplines and Structures and the Exclusive Zone and no other use.

(v)    Except for the Structures, Licensee must not install any signs in the License Areas other than required safety warning signs or any other signs as are requested or approved by Owner, and Licensee bears all costs pertaining to the erection, installation, maintenance, and removal of all signs. Owner shall not unreasonably withhold or delay approval of any signage within the License Areas provided that any such requested signage is consistent with the signage and general advertising aesthetics of the Facility as determined by Owner.

(vi)    Licensee must at all times use its commercially reasonable best efforts to minimize any impact that its use of the License Areas will have on other uses of the Facility Premises.

(vii)    Licensee may not remove, damage, or alter in any way any improvements or property of Owner upon the License Areas, whether currently existing or installed in the future, without Owner's prior written approval.

(viii)    Licensee must repair any damage or alteration to the License Areas to the same condition that existed before the damage or alteration, which approval shall not be unreasonably withheld, conditioned or delayed.

(ix)    Licensee has non-exclusive right for ingress and egress, seven days a week, 24 hours a day, for the construction, installation and maintenance of the Structures, which right will be so as to not unreasonably interfere with Owner operations.  In the event that construction of the Structures require interference of the regular business operations of Owner or any of its third party vendors or contactors located on the Facility Premises, Owner shall make commercially reasonable efforts to provide for a construction schedule agreeable to all interested parties to permit such construction.

(d)   Limitation on Grant. This Agreement grants to Licensee a license to use the License Areas as provided herein.  The parties do not by this instrument intend to create a lease, easement, or other real property interest or vest with Licensee any real property interest in the License Areas and nothing express or implied in this Agreement grants Licensee any right or authority to enter, occupy, or use any property that is not solely owned by Owner and fully described herein.

(e)   Rights Reserved.

(i)   Licensee acknowledges that its use of the License Areas is subject and subordinate to Owner's use of the License Areas. Licensee agrees that Owner's use of License Areas, including for any event held at the Facility, shall have precedence over any construction, installation and maintenance activities by Licensee.  However, notwithstanding the foregoing, Owner shall use commercially reasonably efforts to provide thirty (30) days advance written notice of any such Owner's use to the extent feasible and will in all instances provide Licensee with no less than two (2) business days' advance written notice of any such Owner's use, Owner's use will not otherwise interfere with the operation, of the Adventure Rides and Ziplines, and Owner will protect and preserve Licensee's equipment and materials during such use.  Owner shall be liable for any damages incurred by Licensee due to Owner's use of the License Areas not caused by Licensee or any of its employees or agents.

(ii)   If License Areas are installed with or shall be installed with any fire, emergency or communication equipment in or near the License Areas, the Licensee will take reasonable measures to avoid interference problems between the Structures and Owner's equipment.  Licensee will not install, operate or allow its agents, employees, or contractors to use any equipment, methodology or technology that may interfere with the optimum effective use or operation of Owner's fire, emergency or other communication equipment, methodology or technology (i.e., voice or other data receiving and/or transmitting equipment) that is presently in use or may be in use in the future.  If such interference does occur, the Licensee must immediately discontinue using the equipment, methodology or technology that causes the interference until corrective measures are taken which must be made at no cost to Owner. Owner and the Licensee will use their best reasonable efforts to resolve immediately any interference problems, but if an interference problem is unavoidable, Owner's right to use Owner's own equipment remains paramount to any use of the License Areas by the Licensee and Licensee has the right to terminate this Agreement without penalty. In the event that such interference does occur and the Licensee installed equipment is related to the legitimate safety need or best safety-practices of Licensee, then Owner shall make commercially reasonable for a period of 30 days efforts to provide for a resolution mutually agreeable Owner, Licensee and any other interested parties to allow such equipment to remain.

(iii)   Owner may, at all times, enter upon the License Areas for any lawful purpose, provided the action does not unreasonably interfere with the Licensee's use or occupancy of the License Areas.  Without limiting the generality of the foregoing, Owner and any furnisher of utilities and other services may, at their own cost, (A) enter upon the License Areas at any time to make repairs, replacements or alterations that, in the opinion of Owner or the furnisher of utilities and other services, may be necessary or advisable and from time to time to construct or install over, in, or under the License Areas systems or parts, and (B) in connection with any maintenance, use the License Areas for access to other parts in and around the License Areas; provided that in the exercise of these rights of access, repairs, alterations or new construction, Owner does not unreasonably interfere with the use and occupancy of the License Areas by the Licensee, including any obstruction of or other interference or functionality of the Adventure Rides and Ziplines.  The exercise of any of the foregoing rights by Owner or others does not constitute an eviction of the Licensee, nor be made the grounds for any abatement of license fees, or any claim for damages.  Notwithstanding the foregoing, Owner shall at all times comply with Licensee's instructions, rules and regulations relating to safety or security in, on or around any Zipline Structure of which Owner shall have been provided notice of from Licensee.

3

(iv)     In the event of a major renovation or improvement of the Facility which requires temporary or permanent removal of certain Structures, or any Adventure Ride or Zipline shall be incompatible with the major renovation or improvement of the Facility, Owner shall have the right to (A) terminate this Agreement upon at least one hundred eighty (180) days' prior written notice of termination, or (B) temporarily suspend the license granted pursuant to this Agreement until the completion of such renovation, upon at least one hundred twenty (120) days' prior written notice of suspension, so as to allow the re-installation of the Structures in the Licensed Area or some other mutually agreeable location on the Facility Premises upon renovation completion, at Owners sole cost.   In the event of either of the foregoing, Licensee shall remove said Structures in accordance with Section 2(d) hereof.   In the event of a removal or suspension of the license granted hereunder with respect to all or a portion of the Adventure Rides or Ziplines, Owner shall reimburse Licensee, within thirty (30) days of Licensee's surrender of the Facility in accordance with the terms of this Agreement, any non-reimbursable license, permit and other fees paid to the City of Miami or other governmental agency in connection with the removed Adventure Rides and/or Ziplines on a pro-rated basis for the period of suspension (for the Adventure Rides and/or Ziplines which have been removed or temporarily suspended).  In the event of a termination of the license granted hereunder pursuant to subparagraph (A) of this Section 1(iv), Owner shall reimburse Licensee, within thirty (30) days of Licensee's surrender of the Facility in accordance with the terms of this Agreement, any non-reimbursable license, permit and other fees paid to the City of Miami or other governmental agency on a pro-rated basis for the period after the date of termination plus, provided Licensee is not in material default of this Agreement (beyond any applicable notice and cure period), the Breakage Fee.

2.     Term.

(a)     License Period.  This Agreement shall be effective as of the Effective Date and shall continue until the end of the Term.

(b)     Approvals.  Licensee must obtain all Approvals necessary for the installation and use of the Project in accordance with the specification set forth herein.  In the event the City of Miami (or other appropriate governmental authority) denies the permitting application for the first Phase (as defined below) of the Project, and such decision in non-appealable or is not appealed within thirty (30) days of notification to Licensee or Owner of such denial, then this Agreement will automatically terminate and the parties shall have no further liability to each other, except such obligations that may expressly survive termination of this Agreement.  In the event that the Approvals for any subsequent Phase is denied, and such decision in non-appealable or is not appealed within thirty (30) days of notification to Licensee or Owner of such denial, then the Commitment Amount and the license fees pursuant to Section 5 hereof shall be adjusted accordingly, as reasonably determined by Owner and approved by Licensee, Each party agrees to immediately deliver copies of any notices or correspondence from event the City of Miami (or other appropriate governmental authority) related hereto to the other party.

(c)     Renewal Option.  Provided that (i) Licensee is not in default or breach of this Agreement at such time, and (ii) the original Structures has/have been replaced, repaired or updated in accordance with Section 3(d) of this Agreement before the ninetieth (90th) calendar day preceding the end of the Term (the "Renewal Deadline"), Licensee shall have a one (1) time right to renew and extend this Agreement for a period of five (5) years by providing written notice to Owner of such election to renew no less than ninety (90) days prior to the end of the Term.  In such event, the Term shall extend for a period of five (5) years from the end of the date on which the Term would have ended and all other terms and conditions of the Agreement shall remain unchanged.

(d)     Surrender of Possession.  Upon the expiration or termination of this Agreement (exclusive of any temporary suspension of this Agreement by Owner pursuant to Section 1(e)(iii) above), the

4

Licensee's right to occupy the License Areas and to exercise the privileges and rights granted by this Agreement automatically cease, and it must surrender and leave the License Areas in good condition, normal wear and tear excepted. Except as otherwise provided herein, all Equipment and Personal Property remains the property of Licensee, and the Licensee may, at any time during the thirty (30) day period after the expiration or termination of this Agreement, remove same from the License Areas so long as Licensee is not in default of any of its obligations under this Agreement. Licensee must repair, at its sole cost, any damage caused by the removal of the Structures. Notwithstanding anything to the contrary in this Agreement, if this Agreement is terminated due to a Licensee default or in the event any Equipment and Personal Property not removed by the Licensee within the thirty (30) day period set forth in this paragraph, then either, at Owner's election, (i) the Structures and/or all Equipment and Personal Property shall become a part of the License Areas and ownership and title of all such Equipment and Personal Property shall automatically vest in Owner, or (ii) Owner shall remove and dispose of such property and Licensee shall reimburse Owner for all cost and expense incurred in connection with such removal and disposal. Licensee shall acquire and be the lawful owner of all Equipment and Personal Property and shall not be permitted to pledge, encumber, transfer, assign or otherwise hypothecate the Equipment and Personal Property, or any portion thereof, without the prior written consent of Owner. Any such encumbrance or hypothecation shall be deemed void ab initio. This paragraph shall survive the expiration or earlier termination of this Agreement.

(e)     Hold-over.  In the event Licensee continues to occupy the License Areas after the expiration or termination of this Agreement, such hold-over does not constitute a renewal or extension of this Agreement, and the Licensee must pay Owner twice the minimum amount of revenue share payments due to Owner in the last month of the Agreement pursuant to Section 5 hereof, with each month fully accruing after the first day of the month regardless of the actual number of days Licensee holds over during the month, plus any payment obligation, accrued during the hold-over.

3.     Construction of the Structures.

(a)     Construction Conditions.  Licensee shall be solely responsible for the payment of all necessary capital, labor, materials, equipment, start-up requirements and other expenses (including, but not limited to, initial design, Adventure Ride and Zipline acquisition, installation costs, government and permit fees) for the Project on the Facility Premises, in accordance with the following terms and conditions:

(i)     It is anticipated that the Project shall be built in three phases (Phase I, II and III) as further described in Exhibit C attached hereto (each a "Phase" and collectively, the "Phases").

(ii)     Professionally prepared plans and drawings for the each Phase shall be prepared by Weber Group Inc. and presented to Owner for written approval prior to the application of any required permits or approvals or prior to the commencement of construction of each Phase of the Project. Such plans and drawings will be designed so as to present uniformity of design, function, appearance and quality throughout and consistent with other improvements located in or near the License Areas. Such plans for Phase 1 shall be submitted to Owner by Licensee within thirty (30) days after the Effective Date.

(iii)     Licensee shall submit the proposed Construction Documents to Owner (each a "Plan Submission") beginning with thirty (30) days after the Effective Date for Phase 1, and within ninety (90) days from the Commencement Date for Phase II and within two hundred and seventy (270) days from the Commencement Date for Phase III. Owner shall, in its sole but reasonable discretion, approve or disapprove of each Plan Submission within ten (10) days after Owner's receipt of any such Plan Submission. If Owner disapproves all or any part of a Plan Submission, Owner shall notify Licensee setting forth in reasonable detail the reasons for such disapproval, and Licensee shall submit new or

corrected plans for Owner's approval within twenty (20) days following receipt of Owner's disapproval notice. In the event Owner does not respond within such ten (10) day period, such Plan Submission shall be deemed approved. The foregoing provisions relating to the approval or disapproval and submission of corrected plans shall continue to apply until any such plans have been approved by Owner. Owner's review of any Plan Submission or the granting of any consent or approval thereof shall not constitute a release from any obligation that Licensee has under this Agreement.

        (iv)    Licensee shall submit (or cause its general contractor to submit) its application for construction permits to the appropriate governmental authority within thirty (30) days after the Owner's approval (or deemed approval), pursuant to the preceding subparagraph (iii) above, of the Plan Submission for each Phase of the Project. Licensee shall promptly provide Owner with copies of any Permit Approval received by Licensee.

        (v)    Licensee and any chosen general contractor, contractors and subcontractors shall possess all qualifications, all licenses required under all applicable laws and commercially sufficient expertise required for the performance of the Project (or any Phase). The Project will be performed in a professional and workman-like manner and shall comply and observe all applicable laws, codes, rules and regulations applicable to the Project (or any Phase).

        (vi)    The Licensee shall be responsible for obtaining all necessary Approvals and shall be responsible for the costs and expense thereof. Owner agrees to provide in a timely manner all reasonable information and permissions requested by Licensee and cooperate with all reasonable requirements to obtain any necessary Approvals. The Licensee shall provide the Owner with copies of all such permits and Approvals. No construction activities related to Project may commence before all required Permit Approvals have been obtained and the completion of all requirements of such permits.

        (vii)    While performing any demolition, removal or construction work in connection with the Project, the Licensee shall not engage in any action (A) that constitutes a violation of any applicable law, order, ordinance, rule, regulation or code of any government authority, (B) that may cause injury to persons unless applicable safety regulations and standards are observed, (C) that may deface or injure property located on the Facility that is not subject to the Project, (D) that permits an unreasonably objectionable noise or odor to be emitted or permit anything to be done on property where the Facility is located tending to create a health, environmental or safety hazard or nuisance or cause any penalty to the Owner. The Licensee shall erect and maintain all reasonable or necessary safeguards for protection of persons and property, including safety barriers to and warnings of dangers and hazards, which safeguards and notices shall remain in place until completion of the work in accordance with this Agreement.

        (viii)    Prior to commencement of construction and at all times during the duration of the Project, Licensee, at its sole expense, shall obtain and carry during all Builders Risk coverage construction activities in an amount to be determined by Owner. Owner shall be named additional insured on policy and Licensee will provide Owner with a certificate of insurance evidencing the coverage no less than two (2) days prior to the commencement of each Phase of the Project for Owner review and approval. Such certificate of insurance shall provide Owner with thirty (30) days prior written notice of termination, and ten (10) days' notice of cancellation for non-payment.

        (ix)    Licensee must timely pay for all labor, materials and work, and all professional and other services related to the Project. Licensee shall hold harmless, defend and indemnify Owner (and all of its members, shareholders, partners, principals, officers, employees and agents) from any claims, liabilities, expenses (including attorneys' fees, expenses and litigation costs), or judgments arising from Licensee's work of the Project or any other improvements or construction, including, without limitation, materials used or stored for said improvements, or the material, equipment, operations/activities of

6

Licensee's contractors and subcontractors.  Licensee shall also hold harmless, defend and indemnify Owner (and all of its members, shareholders, partners, principals, officers, employees and agents) against any and all claims, liabilities, expenses (including attorneys' fees, expenses and litigation costs) and financial losses arising from any non-compliance with state, county and federal laws, codes and permits in connection with the Project and Licensee's work.  This paragraph shall survive expiration or any termination of this Agreement.

        (x)     No Hazardous Materials shall be handled upon, about, above or beneath any portion of the Facility Premises or the property on which the Licensed Area is located by or on behalf of the Licensee without the prior written consent of the Owner. Notwithstanding the obligation of the Licensee to indemnify the Owner pursuant to this Agreement, the Licensee shall, at its sole cost and expense, promptly take all actions required by any federal, state or local governmental agency or political subdivision, or necessary for the Owner to make full use of any portion of the property, which requirements or necessity arise from the handling of Hazardous Materials by the Licensee, or another on its behalf, upon, about, above or beneath any portion of the Licensed Area or the property on which the Licensed Area is located.

        (xi)    Licensee will not do or be empowered to do any act which encumbers or may encumber Owner's title or which subjects the Facility (or any part thereof) or the land upon which the Facility is located (the "Land") to any lien arising from the Project or this Agreement.  Licensee must immediately remove and cause to be fully released any and all liens or encumbrances which are filed against the Facility Premises as a result of any act or omission of Licensee or Licensee's agents, contractors or subcontractors. If Licensee fails to remove and cause to be fully released any such lien within thirty (30) days following Licensee's receipt of notice thereof, then Owner may, but is not obligated to, remove such lien, and Licensee shall pay all costs of removal or bonding the lien to Owner upon demand. Licensee shall never, under any circumstances, have the power to subject the interest of Owner in the Facility or the Land to any mechanic's, materialmen's, or construction liens of any kind. In order to comply with the provisions of Chapter 713.10, Florida Statutes, it is specifically provided that neither Licensee nor anyone claiming by, through or under Licensee, including, but not limited to, contractors, subcontractors, materialmen, mechanics and/or laborers, shall have any right to file or place any mechanics', materialmen's or construction liens of any kind whatsoever upon the Facility Premises, the Land, or improvements thereon, and any such liens are hereby specifically prohibited. All parties with whom Licensee may deal are put on notice that Licensee has no power to subject Owner's interest to any mechanics', materialmen's or construction lien of any kind or character, and all such persons so dealing with Licensee must look solely to the credit of Licensee, and not to Owner's interest or assets. IN ADDITION, THE INTEREST OF OWNER OR THE GROUND LESSOR OF THE LAND IN THE FACILITY PREMISES AND THE LAND SHALL NOT BE SUBJECT TO LIENS FOR IMPROVEMENTS TO THE FACILITY PREMISES AND/OR THE LAND MADE BY LICENSEE, NOTWITHSTANDING ANY APPROVAL BY OWNER OF ANY CONTRACT(S) WITH ANY CONTRACTOR(S) OR SUBCONTRACTOR(S), AND/OR OWNER'S APPROVAL OF ANY SUCH IMPROVEMENT(S) AND/OR PLANS. PRIOR TO ENTERING INTO ANY CONTRACT FOR THE CONSTRUCTION OF ANY ALTERATION OR IMPROVEMENT, LICENSEE SHALL NOTIFY THE CONTRACTOR(S) AND/OR SUBCONTRACTOR(S) MAKING IMPROVEMENTS TO THE FACILITY PREMISES AND/OR THE LAND OF THE FOREGOING PROVISION, AND LICENSEE'S KNOWING OR WILLFUL FAILURE TO PROVIDE SUCH NOTICE TO THE CONTRACTOR(S) AND/OR SUBCONTRACTOR(S) SHALL RENDER THE CONTRACT BETWEEN OWNER AND  CONTRACTOR(S) AND/OR SUBCONTRACTOR(S) OR ANY CONTRACT BETWEEN CONTRACTOR AND ANY SUBCONTRACTOR VOIDABLE AT THE OPTION OF OWNER. Licensee agrees that in no event shall a notice of commencement be recorded in the public records of Miami-Dade County, Florida against the Facility in connection with the construction of the Project or any work performed or related to this Agreement.

7

(xii)   The Licensee shall protect and preserve existing utilities on and serving the Facility and shall provide for disconnects of same as necessary.  The Licensee shall preserve all Facility utilities, water distribution systems and wastewater collection systems at their respective service connections.

(xiii)   The Licensee shall remove all waste materials, rubbish and equipment upon completion of the Project, and shall leave the Project site in a generally orderly condition.  Licensee must keep as-built records of the Licensee's Improvements and furnish copies of records to Owner, at no cost to Owner, upon completion of the improvements and any changes to the same.

(b)   Adventure Rides and Ziplines Capital Investment Requirement.  Licensee represents and covenants that it shall expend capital of not less than the Commitment Amount towards the design and construction costs of the Project including all permits and governmental approval fees, engineering and design fees, construction labor costs, Adventure Ride and Zipline equipment and, and/or all other direct construction and start-up costs and expenses for the Adventure Rides and Ziplines (exclusive of operational costs after the respective Approvals for each Phase have been obtained).  The Commitment Amount is a minimum capital commitment by the Licensee in the completion of the Structures, and Licensee shall bear any and all costs in excess of the Commitment Amount.  Licensee shall provide Owner with financial summaries and evidence of the Capital Investment spent in connection with the Project on a periodic monthly basis during the construction period of each Phase for Owner's review and approval.  Licensee shall comply with any and all requests from Owner regarding evidence of the Capital Investment expenditures within ten (10) day of Licensee's receipt of such notice.  In the event of Licensee's failure to meet the Commitment Amount or failure to comply with the information and documentation requests hereto, then the license fees pursuant to Section 5 hereof shall be adjusted accordingly, as reasonably determined by Owner and approved by Licensee.  In the event Licensee fails to provide such approval, Owner shall have the option to immediately terminate this Agreement upon notice of default to Licensee with no amounts (for reimbursement or otherwise) due and owing to Licensee (irrespective of anything to the contrary anywhere else in this Agreement) in connection with such termination. The Capital Investment shall commence to amortize, on a straight-line 365-day basis for the period of time remaining in the Term, on the earlier of June 1, 2017 or the date all required Approvals for the open of business of Phase 3 have been issued by the appropriate governmental authorities. (By way of example, assuming the Term commences on June 1, 2016 and Capital Investment amortization commences on June 1, 2017, the amortization of the Capital Investment for the 9 year period remaining on the Term shall be $37,037.04 per month or $1,217.66 per day.)

(c)   Cenote Pool at Flamingo Way Capital Investment Requirement.  As part of Phase III of the Project, the flamingo pool currently located on the Facility Premises shall be converted into a cenote swimming pool and incorporated as part of the adventure attraction (the "Cenote Pool Conversion").  In addition to the Commitment Amount, Licensee shall be responsible for payment the first $250,000.00 of all costs and expenses incurred in connection with the Cenote Pool Conversion, as well as one-half of all amounts in excess of $500,000.00 but less than $1,000,000.00 (collectively, the "Licensee Cenote Investment") such that Licensee's aggregate contribution amount towards the Cenote Pool Conversion shall not exceed $500,000.00.  Owner shall be responsible for payment the second $250,000.00 of all costs and expenses incurred in connection with the Cenote Pool Conversion, one-half of all amounts in excess of $500,000.00 but less than $1,000,000.00 and for all other required costs and expenses incurred in connection with the Cenote Pool Conversion.  Licensee shall recapture the Licensee Cenote Investment pursuant to Section 5(b) hereof.

(d)   Refresh/Replacement of Structures.  At the commencement of the eight (8th) year of the Term, the parties shall mutually and reasonably evaluate the state and condition of the Structures and the competitive need for required repair, replacement or updating of the Structures based on (i) the condition

8

of the Structures, and (ii) advances in the Zipline marketplace within the United States. In the event Owner determines, in its sole discretion, that it is necessary for the Structures or Adventure Rides and Ziplines to be repaired, replaced, or updated to a certain standard or specification as the parties may mutually agree, then Licensee shall have the option, in order to maintain its renewal option pursuant to Section 2(c) of this Agreement, to implement such new or updated Structures prior to the Renewal Deadline, at its sole cost and expense, in accordance with such agreed upon standards and specification and otherwise in accordance with the terms and conditions of this Agreement. In the event no mutually agreed upon replacement or update of the Structures is completed by the Renewal Deadline, then this Agreement shall expire by its terms at the expiration of the Term, unless otherwise renewed by the parties in writing.

4.   **Licensee's Operations.**

(a)   Scope of Services. Licensee agrees, and Owner consents, to provide the Services on the Facility during the Term hereof. Use of the Licensed Area shall be limited to such uses expressly provided for in this Agreement.

(b)   Personnel. At all times during the Term hereof, Licensee must at all times have on-call and at Owner's access an active, qualified, and experienced representative to supervise the Structures, and who is authorized to act for the Licensee in matters pertaining to all emergencies and the day-to-day operation of the Adventure Rides and Ziplines and Structures. Licensee will provide the Owner with the names, addresses, and 24-hour telephone numbers of all such persons in writing. Licensee may elect to arrange with Owner for the use of Owner's personnel, at Owner's discretion.

(c)   Utilities and Other Expenses. Licensee shall be responsible for and shall pay to Owner: (i) all charges imposed upon Owner for any increased operating expenses specifically related to the Adventure Rides and Ziplines or the Structures or for services requested or used by Licensee (for example, increased electrical charges in the event separate metering for the Structures is unavailable), (ii) any amounts due imposed upon Owner as a direct result of Licensee's acts or omissions or specifically and solely charged as a result of the Structures or the operations thereof, (iii) any increase in the cost for Owner's insurance premiums in the event such increase is due to this Agreement and the operations hereunder, and (iv) the direct costs associated with Owner's coordination (including cost of labor, general contracts, etc.) in the construction of the Project. All such amounts shall be paid by Licensee to Owner on the first (1th) day of each month during the Term for the immediately succeeding month if such charges are recurring charges of identical amount (or within fifteen (15) days after Owner renders a bill therefore to Licensee if such charges are one-time non-recurring charges or non-identical in amount). Notwithstanding anything to the contrary herein, if available, Licensee shall implement, at its own cost and expense, separate electrical metering for the Project and the Structures in its own name, and pay all amounts billed in connection with such utilities in a timely manner and not permit any such billed amounts to become delinquent.

(d)   Attraction Pricing. The parties shall mutually determine the pricing for the Adventure Rides and Zipline, Cenote and Exclusive Zone attractions pursuant to the Pricing Guidelines set forth, and each party may request discounts to select groups and free rides, as applicable and as mutually agreed upon by the parties.

(e)   Hours of Operation. Licensee shall provide the Services and be open to the public at the Facility Premises during the normal operating days and hours of the Facility, unless agreed to otherwise between the parties.

(f)    Collection of Revenue.   Owner shall exclusively handle collection of all Attraction Gross Revenue (as defined below) from third party customers.

5.    License Fees and Other Payments.

(a)    Monthly License Fee Payments.   On the fifth (5th) of each month during the Term commencing in the month immediately succeeding the month in which Phase I Rent Commencement Date occurs, Owner shall withhold from its collection of Attraction Gross Revenue (or Licensee shall pay to Owner in the event of no or insufficient revenues from the attractions) the following license fees:

(i)    During the Phase I Rent Period, the greater of (A) thirty percent (30.0%) of Attraction Net Revenue from the immediately preceding calendar month, or (B) $16,666.67.

(ii)    During the Phase II Rent Period, the greater of (A) thirty percent (30.0%) of Attraction Net Revenue from the immediately preceding calendar month, or (B) $33,333.33.

(iii)    During the first eighteen (18) months of the Phase III Rent Period, the greater of (A) thirty-three and one-half percent (33.5%) of Attraction Net Revenue from the immediately preceding calendar month, or (B) $50,000.00.

(iv)    After the first eighteen (18) months of the Phase III Rent Period, (A) if the Attraction Gross Revenue is less than $4,500,000.00 for the immediately preceding 12-month period, the greater of (x) twenty-eight percent (28%) of Attraction Net Revenue from the immediately preceding calendar month, or (y) $50,000.00, or (B) if the Attraction Gross Revenue is at least $4,500,000.00 00 for the immediately preceding 12-month period, three and one-half percent (33.5%) of Attraction Net Revenue from the immediately preceding calendar month.

Commencing after Phase I Rent Period, the balance of Attraction Net Revenues for the immediately preceding month (if any) shall be distributed from Owner to Licensee on the fifth (5th) day of each month during the Term.  Owner shall make commercially reasonable best efforts to make such distributions to Licensee on a bi-monthly basis, provided that such periodic distributions are operationally feasible without increased cost or expense to Owner or the operations of the Facility.

(b)    Recapture of Licensee Cenote Investment.   Notwithstanding the foregoing Section 5(a) above, during any period of time during the Term for which a license fee payment of thirty-three and one-half percent (33.5%) of Attraction Net Revenues is owed to Owner, provided that Licensee is not in monetary default under this Agreement, Licensee shall be credited three and one-half percent (3.5%) of such fees per month until such time as the Licensee Cenote Investment has been recaptured in full by Licensee.

(c)    City Rent and Revenue Adjustments.   Owner shall be responsible for the collection and payment of any rent or subrent due in connection with this Agreement to Ground Lessor pursuant to the Ground Lease (the "City Rent").  Notwithstanding the foregoing or anything to the contrary in this Agreement, in the event that City Rent increases from its current rate of 5.00% of all Attraction Gross Revenues, then the revenue share license fee payable to Owner pursuant to Section 5(a) above shall be incrementally increased to cover such additional City Rent; provided however that the City Rent shall not increase above six percent (6%) of all Attraction Gross Revenues.

(d)    Manner of Payment.   Except the extent the payments set forth in Section 5(a) may be deducted from Owner's collection of Attraction Gross Revenue, any and all other payments due hereunder shall be paid to Owner upon demand and without deduction or set-off, in lawful money of the

10

United States of America via check at Owner's address, or to such other address as Owner may from time to time designate in writing, or via wire transfer to such bank account as Owner may from time to time designate in writing. All licensee fees and other payment obligations due under this Agreement such shall survive expiration or termination of this Agreement.

6.    <u>Florida Sales and Use Tax.</u>

     (a)    Licensee shall be responsible for computing any applicable State of Florida sales and use tax, and any local option surtax which may be levied or due in connection with this Agreement or any sales to third parties in connection herewith (the "<u>Florida Sales and Use Tax</u>"), and for separately making any and all applicable payments of Florida Sales and Use Tax to the State of Florida (or any other applicable governmental authority) in accordance with applicable law.

     (b)    Licensee shall indemnify and hold Owner harmless from any and all liability or obligation related to the Florida Sales and Use Tax and shall not permit any obligation related thereto to become a lien on the Facility Premises (or any portion thereof).

7.    <u>Environmental Matters.</u>   Licensee will not use or permit in the Facility any flammable or explosive material, toxic substances, environmentally Hazardous Materials or other items hazardous to persons or property. Licensee will not use the Facility in any manner that (a) invalidates or is in conflict with any fire, insurance, life, safety or other codes or policies covering the Land or the Facility, or (b) increases the rate of any fire or other insurance being maintained with respect to the Land or the Facility. If any insurance premium is higher than it otherwise would be due to Licensee's failure to comply with the provisions of this paragraph, Licensee shall reimburse Owner immediately on demand the amount constituting that part of Owner's insurance premiums that are charged because of Licensee's said failure. Licensee will not use the Facility nor permit the Facility to be used in violation of any Environmental Regulations (as defined below). Licensee assumes sole and full responsibility for, and will remedy at Licensee's sole cost, any and all such violations caused by Licensee.

8.    <u>Termination.</u>

     (a)    <u>Termination by Owner.</u>   In addition to any other grounds for termination set forth in this Agreement, in the event Licensee shall (i) be in monetary breach or default for a period of five (5) business days after notice of such default from Owner, (ii) have made a false representation or warranty in this Agreement, (iii) become bankrupt or insolvent, or suffer the appointment of a receiver, or make an assignment for creditors, or (iv) be in non-monetary breach or default or intentionally fail to fully and faithfully act in accordance with this Agreement for a period of thirty (30) days after notice of such default from Owner (or for a period of forty five (45) days after notice of such default from Owner in the event that such breach or default cannot be reasonably cured within such thirty (30) day period), Owner shall have the right to forthwith terminate this Agreement, hold Licensee liable for any damages resulting to Owner and all other available remedies at law and equity. Upon any such termination of this Agreement, Licensee shall comply with any request from Owner to remove of property pursuant to Section 2(d) hereof and shall cooperate in all respects with Owner in removing the Structures from the License Areas and the Facility Premises and returning the License Areas to its condition prior to construction of the Project, or at Owner's election, turning over all operations of the Structures to Owner or a successor Licensee.

     (b)    <u>Termination by Licensee.</u>   In the event Owner shall (i) have made a materially false representation in this Agreement and fails to cure any such material representation thirty (30) days after notice from Licensee (or for a period of forty five (45) days after notice from Licensee in the event that such material false representation cannot be reasonably cured within such thirty (30) day period), or (ii)

11

be in material breach or default or intentionally fail to fully and faithfully act in accordance with this Agreement for a period of thirty (30) days after notice of such default from Licensee (or for a period of forty five (45) days after notice of such default from Licensee in the event that such material breach or default cannot be reasonably cured within such thirty (30) day period), Licensee shall have the right to forthwith terminate this Agreement, hold Owner liable for any damages resulting to Licensee and all other available remedies at law and equity (provided however, Owner shall not be liable for indirect or consequential damages).

(c)     Survival.  All rights, liabilities or claims accrued, or arising out of events occurring, prior to the date of any termination of this Agreement shall survive such termination.

9.     **Representations, Warranties and Covenants.**

(a)     Owner hereby represents, warrants and covenants to Licensee that as of the Effective Date and unless otherwise set forth below, continuing throughout the Term:

(i)     PJG Inc. is a corporation organized and validly existing under the laws of the State of Florida and PJG LLC is a limited liability company organized and validly existing under the laws of the State of Florida.  Owner is in good standing and duly qualified to conduct business in the State of Florida.  Owner has full power and authority to own and operate the Facility and to carry on its business as contemplated under this Agreement.

(ii)     Owner has full power and authority to enter into this Agreement and to consummate the transactions contemplated herein.  This Agreement has been duly executed and delivered by Owner and is a valid and legally binding obligation of Owner, enforceable in accordance with its terms.

(iii)     Owner will at all times cooperate with Licensee's reasonable requests (not in contravention of the terms of the Agreement) in connection with the installation, operation and maintenance of the Adventure Rides and Ziplines and the providing of the Services.

(iv)     Owner shall be responsible for supporting the operations of the Facility and the Facility Premises, including the Licensed Area (except as otherwise provided for in this Agreement), in the normal course of the Owner's business operations.

(v)     Owner shall allocate appropriate resources, within the reasonable budgetary parameters of the Facility, to marketing the Zipline attraction at the Facility to the City of Miami public.

(b)     Licensee hereby represents, warrants and covenants to Owner that as of the Effective Date and unless otherwise set forth below, continuing throughout the Term:

(i)     Licensee is a limited liability company organized and validly existing under the laws of the State of Hawaii.  Within sixty (60) days of the Execution Date, and prior to conducting business within the State of Florida, Licensee shall have full power and authority to own its properties and to carry on its business as contemplated under this Agreement, and shall be in good standing and duly qualified to conduct business in the State of Florida.

(ii)     Licensee has full power and authority to enter into this Agreement and to consummate the transactions contemplated herein.  This Agreement has been duly executed and delivered by Licensee and is a valid and legally binding obligation of Licensee, enforceable in accordance with its terms.

12

        (iii)    Licensee will at all times cooperate with Owner's reasonable requests (not in contravention of the terms of the Agreement) in connection with the operation of the Facility. Such requests could include but are not limited to appearance of the Licensed Area, and changes resulting from customer feedback. Such requests might also include information requirements and other requests made by external audit firms involved in conducting the annual audit of the Facility and in conducting periodic audits/reviews required by banks, lessors and other like stakeholders of the Facility.

        (iv)    The Project and the Adventure Rides and Ziplines will be inspected, on an annual basis, by an ACCT Professional Vendor Member (PVM), or on a more frequent basis if required by then applicable rules, regulation, laws or applicable safety standards for top-rated U.S. adventure ride and zipline attractions.

        (v)    Licensee shall (i) post any all new job listings for available positions at the Facility on the job listing bulletin board located at the Facility prior to filling any such new vacancy and provide notice to Owner of any such new job opening, and (ii) provide personnel reports Owner on a quarterly basis (or upon request from Owner at any time) with full personnel background information (including but not limited to name, address and household income) and other personnel data and information as may be necessary for Owner to comply with any municipal job creation programs which it may be a party to.

## 10.    Restrictive Covenants.

        (a)    Non-Disparagement Agreement. Each party agrees to refrain from any disparagement, defamation, libel, or slander of the other, or tortuous interference with the contracts and relationships of the other, or malicious gossip. By way of example and not of limitation, the parties intend that the foregoing prohibitions include, but are not limited to, taking any action whatsoever designed to harm, or which has the effect of harming, the perception of the other party with regard to any of its products or services, or with respect to any future or potential client, supplier, customer, client, member, or the public generally. The parties agree that a violation of the forgoing covenants would constitute a material breach of this Agreement. The provisions of this paragraph shall continue during the Term, and shall survive for a period of two (2) years after the expiration of this Agreement.

        (b)    Confidentiality. The parties understand and agree that each of Licensee and Owner has a unique method of operating its business in which it retains a proprietary interest and reserves a right of confidentiality. Each party covenants and agrees not to use, employ or incorporate any aspect of the business or operation of the other in its own business or in any business which it may hereafter establish, operate or in which it may retain an interest. Each party acknowledges that the Confidential Information remains the sole and exclusive property of the discloser of such Confidential Information. The recipient of any Confidential Information shall use a reasonable degree of care which it uses to protect its highly confidential and proprietary information to protect any Confidential Information and may not disclose any Confidential Information without the prior written consent of the discloser. Upon termination of this Agreement (whether by expiration or by early termination), the recipient of any Confidential Information shall immediately cease use of such Confidential Information and return all such Confidential Information within ten (10) days of termination. As used herein, the term "Confidential Information" includes product information, marketing, sales techniques and information, pricing information and strategies as well as other information disclosed orally, visually or in writing and other business information which is designated as confidential or proprietary, including but not limited to the Confidential Information of third party customers of Licensee and the Confidential Information of third party vendors of Owner. Further, the parties understand that the terms and conditions of this Agreement and the performance thereof, including but not limited to the Term and the amount of compensation to be paid Owner, are confidential and shall not be disclosed by either party to this Agreement to any persons or entities not

parties to this Agreement during the term of this Agreement. The provisions of this paragraph shall continue during the Term, and shall survive after the expiration of this Agreement.

(c)    Enforcement and Savings Clause. The parties stipulate and agree that: (i) adequate consideration exists for the restrictive covenants set forth in paragraphs a and b of this Section 10 above (the "Restrictive Covenants"); (ii) the Restrictive Covenants are necessary to insure the preservation and continuity of the discloser's business and goodwill; (iii) the time period(s) of the respective Restrictive Covenants are reasonable temporal restraints; (iv) the scope of the activities restricted by the Restrictive Covenants is reasonable; and (v) the enforcement of any of the Restrictive Covenants will not interfere with either party's livelihood. The parties hereto intend all provisions of the Restrictive Covenants to be enforced to the fullest extent permitted by law. Accordingly, should a court of competent jurisdiction determine that the scope of any provision of the Restrictive Covenants is too broad to be enforced as written, based on their duration, geographic limitations, scope of activities, or otherwise, the parties intend that the court reform the provision to such narrower scope as it determines to be reasonable and enforceable. The parties agree that each of the agreements set forth in the Restrictive Covenants constitutes a separate agreement independently supported by good and adequate consideration, shall be severable from the other provisions of this Agreement, and (with this paragraph) shall survive the expiration or termination of this Agreement. The parties recognize that the obligations under this Section are special, unique and of extraordinary character and the parties acknowledge the difficulty in forecasting damages arising from the breach of any of the Restrictive Covenants and that the non-breaching may be irreparably harmed thereby. Therefore, the parties agree that the Restrictive Covenants may be enforced by means of injunctive relief or an order of specific performance and that such remedy shall be available in addition to all other remedies available at law or in equity, including the recovery of damages involved in such breach. In such action, the non-breaching shall not be required to plead or prove irreparable harm or lack of an adequate remedy at law or post a bond or any security.

11.    Books and Records and Reporting.

(a)    Daily Reporting. Commencing on the date Phase I opens for business to the public, within one (1) business day after the close of each business day, Licensee shall furnish to Owner a statement of Adventure Ride, Zipline and Exclusive Zone tickets redeemed and guests served.

(b)    Monthly Revenue Reporting. Within two (2) business days of each monthly license fee payment, Owner shall provide Licensee a written statement (each, a "Monthly Statement") of monthly revenues during the preceding calendar month based on the point-of-sale system currently utilized by Owner for tracking of Facility revenues. The Monthly Statement shall include monthly Attraction Gross Revenues and Attraction Net Revenues, and line items of the expenses accounting for the difference between monthly Attraction Gross Revenues and Attraction Net Revenues.

(c)    Annual and Periodic Reporting. On or before December 1 of each calendar year during the Term, Licensee shall submit to Owner (i) an annual business plan and forecast for the upcoming calendar year for its operations on the Facility and make to Owner a presentation for the upcoming calendar year outlining its business plan and review of the proposed operating budget for the upcoming year (each, an "Annual Statement"). The Annual Statement shall include a full audit report and financial statements with respect to Licensee and this Agreement issued by a "Big Four" accounting firm or reputable regional accounting firm acceptable to Owner setting forth the income and expense calculations related to Licensee's operations on the Facility.

(d)    Additional Information. Licensee shall deliver to Owner such additional documents, financial statements, tax returns, management reports and other information, with supporting data relating

14

to the management, maintenance and operation of the Adventure Rides and Ziplines, as Owner may from time to time reasonably request.

(e)   Inspection and Audit.  Upon request, Owner may inspect Licensee's business and financial records relating to the Adventure Rides, Ziplines and the Services. Any such inspection and audit shall be performed during normal business hours, upon reasonable notice to Licensee, at mutually agreed times, and without disruption to Licensee's business.

12.   Insurance.

(a)   Insurance Coverages.  At all times during the construction of the Project and during the Term of this Agreement, Licensee shall obtain and maintain the insurance coverage required in this Agreement, including comprehensive liability coverage, workmen's compensation coverage, automobile coverage, employee theft and other coverages, as follows:

(i)   Commercial General Liability.  General liability coverage in minimum amounts of at least $3,000,000 in the aggregate and $2,000,000 for bodily injuries to each person, $2,000,000 per occurrence for injuries arising out of each accident, and $1,000,000 for property damage for each accident.  Such coverage shall include XCU coverage for explosion, collapse and damage to property underground, fire, vandalism, malicious mischief and windstorm coverages, products liability coverage, law and ordinance coverage, and completed operations coverage.

(ii)   Worker's Compensation Insurance.  Coverage shall be in accordance with State of Florida law.  Employer's Liability insurance policy shall maintain a limit of $1,000,000 for bodily injury by accident, (each accident), bodily injury by disease, (policy limit) and bodily injury by disease, (each employee).

(iii)   Employee Dishonesty/Crime Coverage Insurance.  Crime coverage with a limit of $1,000,000, covering, without limitation, third party employee dishonesty, money and securities on and off premises, robbery and safe burglary on and off premises, mysterious disappearance, forgery and fraud.

(iv)   Automobile Coverage.  Automobile Liability of at least $1,000,000 for occurrence for, bodily injury and property damage (BI/PD), including uninsured motorist of $1,000,000 coverage for BI/PD, $10,000 broadened PIP coverage, $10,000 medical payments coverage, comprehensive and collision coverage.  Hired and non-owned automobile liability of at least $1,000,000 per occurrence for BI/PD.

(v)   Professional Liability/Advertising Coverage.  Coverage of no less than $2,000,000 for professional liability including false advertising and libel.

(vi)   Environmental Coverage.  Environmental and pollution liability coverage in such amounts as reasonably required by Owner.

(vii)   Umbrella Liability.  Excess coverage over all lines of insurance with a minimum limit of $5,000,000 per occurrence and $10,000,000 in the aggregate.  This policy sits in excess of all other policies referenced in this Section 12.

(b)   Other Insurance Requirements.  Owner shall be named additional insured on the comprehensive general liability and umbrella policies and Licensee will provide Owner with a certificate of insurance evidencing the coverage not less than ten (10) days prior to the anticipated commencement date for construction of the Phase 1 for Owner review and approval in accordance herewith.  Such

certificate of insurance shall provide Owner with thirty (30) days prior written notice of termination, and ten (10) days notice of cancellation for non-payment. All insurance policies required pursuant to this Agreement must be issued by insurance companies licensed in the State of Florida and rated at least A+X by the Best Key Rating & Guide. Licensee shall cooperate with any request for further information from Owner's insurance carriers, including but not limited to, training licensee procedures, safety handbooks or manuals regarding operations and maintenance and work experience of Licensee and any employees, contractors or subcontractors thereof.

    (c)    <u>Construction Coverages</u>.    Owner may request, as a condition precedent to the commencement of the construction of the Project, such additional builder's risk, law and ordinance coverages, demolitions coverages and additional insurances coverages from any and all contractors and subcontractors participating in the construction of the Project, as determined by Owner in its sole discretion.

    13.    <u>Indemnification</u>.

    (a)    Licensee shall hold harmless, defend and indemnify Owner (and all of its members, shareholders, partners, principals, officers, contractors, employees and agents) from any claims, liabilities, expenses (including attorneys' fees, expenses and litigation costs), or judgments arising from the Services, the Adventure Rides and Ziplines or the Structures, including, without limitation, the following: (i) any accident, injury or damages whatsoever caused to any person or to the property of any person and occurring during the Term in or about the Licensed Area and all other portions of the Facility Premises resulting from or in connection with the Adventure Rides and Ziplines, the Structures or the Services, (ii) any accident, injury or damage occurring outside of the Licensed Area or other portions of the Facility Premises used or occupied by Licensee, but anywhere within or about the Facility Premises, where such accident, injury or damage results or is claimed to have resulted from an act, omission or negligence of Licensee or Licensee's related parties, (iii) any environmental claim relating in any way to Licensee's operation or use of the Licensed Area or any portion of the Facility, (v) any mechanic's or other lien or encumbrance or any action or proceeding brought thereon based upon any alteration or other work or services performed by or for Licensee, (vi) any non-compliance with state, county and federal laws, codes and permits in connection with the Services, the Adventure Rides and Ziplines or the Structures, and (vii) any worker compensation, benefit-related or employment-based claim brought by any Licensee employee or other Licensee related party. This paragraph shall survive expiration or any termination of this Agreement.

    (b)    Owner shall hold harmless, defend and indemnify Licensee (and all of its members, affiliates, directors, officers, contractors, employees and agents) from any claims, liabilities, expenses (including attorneys' fees, expenses and litigation costs), or judgments arising from: (i) any accident, injury or damages whatsoever caused to any person or to the property of any person and occurring during the Term in or about the Licensed Area and all other portions of the Facility Premises, where such accident, injury or damage results or is claimed to have resulted from an act, omission or negligence of Owner, Owner's related parties or Owner's contractors, employees or agents, (ii) any accident, injury or damage occurring outside of the Licensed Area, but anywhere within or about the Facility Premises, where such accident, injury or damage results or is claimed to have resulted from an act, omission or negligence of Owner, Owner's related parties or Owner's contractors, employees or agents, (iii) any environmental claim relating in any way to Owner's operation or use of the Facility Premises or any portion of the Facility, and (iv) Owner's non-compliance with state, county and federal laws, codes and permits in connection with the Facility Premises. This paragraph shall survive expiration or any termination of this Agreement.

14. <u>Notices.</u>

All notices, consents, approvals and requests required or permitted under this Agreement shall be given in writing and shall be effective for all purposes if hand delivered or sent by (a) upon delivery, if delivered in person, (b) one (1) business day after having been deposited for overnight delivery with any reputable overnight courier service, or (c) three (3) business days after having been deposited in any post office or mail depository regularly maintained by the U.S. Postal Service and sent by registered or certified mail, postage prepaid, return receipt requested, or (d) email transmission provided that such email notice must also be delivered by one of the means set forth in (a) or (b) above, addressed to the parties as follows:

<u>If to Owner:</u>

Parrot Jungle and Gardens of Watson Island, Inc.
1111 Parrot Jungle Trail
Miami, FL  33132
Attn: John Dunlap, President
Email: jdunlap@jungleadventures.com

<u>With a required copy to:</u>

Liebler Gonzalez & Portuondo
Courthouse Tower
44 West Flagler Street
25th Floor
Miami, FL 33130
Attn: Christian S. Bruno, Esq.
Email: csb@lgplaw.com

<u>If to Licensee:</u>
Air Play Adventures, LLC
216 Dickenson Street
Lahaina, Hawaii, 96761
Attn: Todd Domeck
Email: todd@navylane.com

<u>With a required copy to:</u>

Merchant Horovitz LLLC
2145 Wells Street, Suite 303
Wailuku, Hawaii 96793
Attn:  Peter A. Horovitz
Email: prh@gahmaui.com

A party receiving a notice which does not comply with the technical requirements for notice under this Section may elect to waive any deficiencies and treat the notice as having been properly given. A notice shall be deemed to have been given: (a) in the case of hand delivery, at the time of delivery; (b) in the case of registered or certified mail, when delivered or the first attempted delivery on a business day; (c) in the case of expedited prepaid delivery upon delivery; or (d) in the case of email, upon receipt of answerback confirmation, provided that such email notice was also delivered as required in this Section.

17

15.    <u>Subordination</u>. This Agreement and all rights of Licensee shall be subject to and subordinate to the Ground Lease any and all mortgages, security agreements, or like instruments resulting from any financing, refinancing, or collateral financing (including renewals or extensions thereof), and to any and all ground leases, made or arranged by Ground Lessor and/or Owner of its interests in all or any part of the Licensed Area, from time to time in existence, whether now existing or hereafter created. Such subordination shall be self-operative and shall not require any further instrument to evidence such subordination. However, on request, Licensee shall further evidence its agreement to subordinate this Agreement to any and all documents and to all advances made under such documents. Licensee shall be required to provide estoppel certificates upon request by Owner and/or Ground Lessor.

16.    <u>Relationship of the Parties</u>.

(a)    Licensee's relationship with Owner is that of an independent Licensee, and nothing in this Agreement is intended to, or should be construed to, create a partnership, agency, joint venture or employment relationship. Neither Licensee nor its employees are entitled to any of the benefits that Owner provides for its employees. Any person performing work under this Agreement on behalf of the Licensee shall at all times be under Licensee's exclusive direction and control. Licensee shall pay all wages, salaries and other amounts due such personnel in connection with their performance as an employee of Licensee as required by law. The Licensee shall be responsible for all reports and obligations respecting such persons, including, but not limited to, social security taxes, income tax withholding, unemployment insurance and workers' compensation. The Licensee's performance of services and hours worked shall be entirely within the Licensee's control, and the Owner shall rely upon the Licensee to devote the time reasonably necessary to perform in accordance with this Agreement.

(b)    Owner shall not be responsible for covering Licensee under any workers' compensation insurance or unemployment compensation insurance plans. Licensee represents and warrants that it is covered by a workers' compensation insurance policy procured and paid for by it. Licensee shall notify Owner immediately if the status of said coverage, notice or sole proprietorship changes.

(c)    The Licensee and its employees or agents shall have no authority or right to obligate Owner in any way. The Licensee shall identify itself as an independent contractor and shall not hold itself out as an employee or agent of Owner. Owner and its employees or agents shall have no authority or right to obligate Licensee in any way, and Owner shall not hold itself out as an employee or agent of Licensee.

(d)    Except as otherwise specifically set forth in this Agreement, the parties agree that this is not an exclusive contract and that the parties are free to enter into agreements and contracts for similar or other services with other parties during the Term of this Agreement.

17.    <u>General Provisions</u>.

(a)    <u>No Assignment</u>. Licensee shall not assign, subcontract or otherwise transfer any interest under this Agreement to any individual or entity, or effectuate a change of majority ownership of or control in Licensee, without the prior written consent of Owner. Any such assignment shall be voidable by Owner and grounds for immediate termination of this Agreement. Owner shall be permitted, without Licensee's prior consent, to assign this Agreement in its entirety if it sells, leases, or otherwise transfers substantially all of its ownership rights in Owner or the Facility Premises.

(b)    <u>Recording</u>. Neither the Licensee nor anyone claiming under the Licensee shall record this Agreement or any memorandum hereof in any public records without the prior written consent of the Owner and the Ground Lessor.

18

(c)     Successors and Assigns. This Agreement shall be binding on, and inure to the benefit of, any successor of either party as a result of any change in control of such party, including the sale by such party of all or substantially all of its assets.  Subject to the foregoing, this Agreement will be for the benefit of and be binding upon each party's successors and assigns.

(d)     Time of the Essence.  Time shall be of the essence in the performance of all obligations under this Agreement.

(e)     Governing Law.  This Agreement will be governed in all respects by the laws of the State of Florida (without regard to conflicts of law provisions), as such laws are applied to agreements entered into and to be performed entirely within the State of Florida between Florida residents.

(f)     Attorneys Fees.  In any action, suit, proceeding (including, but not limited to, any arbitration proceeding), claim or counterclaim brought to enforce this Agreement or any of its provisions, the party that substantially prevails in any such action, suit, proceeding, claim or counterclaim (the "Prevailing Party") shall recover its costs, fees and expenses, including, but not limited to, the reasonable costs, fees and expenses of attorneys and outside experts (collectively, "Expenses"), from the other party (the "Non-Prevailing Party"), and the court or arbitration panel shall be so instructed to determine which party is the Prevailing Party, to grant recovery of the Expenses incurred by the Prevailing Party, and to order the Non-Prevailing Party to pay forthwith the Expenses of the Prevailing Party.

(g)     Severability. If any provision of this Agreement is held to be illegal, invalid, or unenforceable under present or future laws, (i) such provision shall be fully severable, (ii) this Agreement shall be construed and enforced as if such illegal, invalid, or unenforceable provision never constituted a part of this Agreement, and (iii) the remaining provisions of this Agreement shall remain in full force and effect and shall not be affected by the illegal, invalid, or unenforceable provision or by its severance from this Agreement. Furthermore, in lieu of such illegal, invalid, or unenforceable provision, there shall be added as part of this Agreement a provision as similar in its terms to such illegal, invalid, or unenforceable provision as may be possible and be legal, valid, and enforceable.

(h)     Waiver.  The waiver by either party of a breach of any provision of this Agreement of the other party will not operate or be construed as a waiver of any other or subsequent breach by such other party.

(i)     Entire Agreement; Modification.  This Agreement constitutes the entire agreement between the parties relating to this subject matter and supersedes all prior or contemporaneous oral or written agreements concerning such subject matter.  This Agreement may only be changed by mutual agreement of the parties in writing.

(j)     Counterparts.  This Agreement may be executed in any number of counterparts, each of which will be deemed an original but all of which together will constitute but one and the same instrument.  This Agreement may be executed by facsimile, scanned or .pdf signature, which in each case shall constitute an original for all purposes.

(k)     Force Majeure.  Any delay in, or failure of performance of, either party to this Agreement shall not constitute a default nor give rise to any claim for damage, if and to the extent such delay or failure is caused by occurrences beyond the control of the party affected, including but not limited to, acts of God or the public enemy, terrorism, vandalism, confiscation of facilities or compliance with any order or request of governmental authority, affecting to a degree not presently existing, the supply, availability, or use of personnel, equipment or materials, acts of war, public disorder, insurrection, rebellion, sabotage, casualties, flood, tornados, hurricanes, superstorms or other natural disasters, riots, strikes, lockouts, or any causes a party is unable, with reasonable diligence, to prevent.  A party who is prevented from

19

performing for any such reason shall immediately notify the other party in writing of the reason for the non-performance and the anticipated extent of any delay and shall use commercially reasonable efforts under the circumstances to remove such causes and shall proceed to perform with reasonable dispatch whenever such causes are removed or ceased.  During such period, all payments shall be suspended by the parties.

(l)     WAIVER OF TRIAL BY JURY.  TO THE FULLEST EXTENT PERMITTED BY LAW, THE PARTIES HEREBY WAIVE ANY AND ALL RIGHTS THEY OR ANY OF THEM MAY HAVE TO TRIAL BY JURY OF ANY ISSUE ARISING IN CONNECTION WITH ANY ACTION BROUGHT TO ENFORCE THIS AGREEMENT OR OTHERWISE RELATING HERETO.

(m)     Release of GoZip, LLC.  On the date Phase III open for business to the public, GoZip, LLC shall be released as a Licensee party to this Agreement and have no further obligations hereunder.

[REMAINDER OF PAGE LEFT INTENTIONAL BLANK]

IN WITNESS WHEREOF, Licensee and Owner have caused this Agreement to be executed by their respective, duly authorized representatives, all as of the Effective Date.

OWNER:

PARROT JUNGLE AND GARDENS OF WATSON ISLAND, INC. (d/b/a Jungle Island), a Florida corporation

By: _____
Name: John Dunlap
Title: President

and

PJG WATSON, LLC, a Florida limited liability company

By: _____
Name: John Dunlap
Title: President


LICENSEE:

AIR PLAY ADVENTURES, LLC, a Hawaii limited liability company:

By: _____
Name: Peter Winn
Title: Manager

and

GOZIP, LLC, a Hawaii limited liability company

By: _____
Name: Todd Domeck
Title: Manager

21

## SCHEDULE 1

### Definitions

Unless the context otherwise specifies or requires, the following terms shall have the meanings herein specified, such definitions to be applicable equally to the singular and the plural forms of such terms and to all genders:

"Adventure Rides" shall mean any attraction that is aerial in nature including swings, nets, bridges, ziplines, flying foxes, freefall devices, bungee jumps, bungee swings, zipcoasters, water slides over 20' high, ropes courses, challenge courses, adventure parks, zip stops, auto-belays, treehouses, climbing and rock walls, via ferrata type activities, chairlifts, gondolas, aerial trails, aerial bicycles, motorized ziplines, suspension bridges, cable bridges, and drop-type attractions and any other attraction installed or managed by Licensee pursuant to this Agreement.

"Ancillary Park Charge" shall mean charges for general attendance into the Facility Premises that are in addition to the Base Park Charge, which may include, but not limited to: (i) a pledge of Ancillary Park Charge to Owner's mortgages, security agreements, or other like instruments resulting from any financing, refinancing, or collateral finance and  (ii) a charge of Florida Sales and Use Tax to the State of Florida (or any other applicable governmental authority) in accordance with applicable law.

"Approvals" shall mean any permits, licenses and approvals necessary or required from all appropriate governmental authorities for Licensee to construct the Structures, to occupy the License Areas, and to operate the Services therein.

"Attraction Gross Revenue" as used herein, shall mean all income and revenues collected by Licensee related to or in connection with the Adventure Rides, Ziplines and Exclusive Zone or any other activities as may be permitted to be conducted by Licensee under this Agreement.

"Attraction Net Revenue" shall mean all income and revenues collected by Owner from Zipline tickets, related to or in connection with the Services, less the amount of any rebates, refunds or any third party commissions actually incurred by either party, market standard credit card charges, applicable sales and use tax, discounts, gift certificates (until redeemed by use or operation of law), bad debt due payments being accepted and then later declined or reversed.

"Base Park Charge" shall mean the then base price for general attendance into the Facility Premises.  The Base Park Charge at the time of Effective Date is thirty four dollars and ninety five cents ($34.95).

"Breakage Fee" shall mean the (i) amortized Capital Investment amount actually made by Licensee pursuant to Section 3(b) hereof as of the date of termination of this Agreement, plus (ii) One Million and no/100 Dollars ($1,000,000.00).

"Capital Investment" shall mean such capital expenditure amounts actually expended by Licensee towards the Structures and the Project, provided however shall not include operational costs of the Adventure Rides or Ziplines after the respective Approvals for each Phase have been obtained.

"Commencement Date" shall mean the date which Licensee receives its permits for the construction of Phase I.

"Commitment Amount" shall mean the amount of Four Million Dollars ($4,000,000.00).

22

"Construction Documents" shall mean, for each Phase of the Project, the following: (i) budget, (ii) names, contact information and professional background of the general contractor, contractors and subcontractors Licensee desires to retain, and (iii) construction schedule.

"Ground Lease" shall mean that certain Lease and Development Agreement dated September 2, 1997, by and between The City of Miami, Florida, a municipal corporation of the State of Florida (the "Ground Lessor"), as lessor, and PJG Inc., as lessee, as amended (and as may be further amended, restated or otherwise modified from time to time).

"Equipment and Personal Property" shall mean any and all trade fixtures, equipment, and other personal property installed or placed by the Licensee on the Facility Premises.

"Environmental Regulations" shall mean any law, statute, regulation, order or rule now or hereafter promulgated by any governmental authority, whether local, state or federal, relating to air pollution, water pollution, noise control or transporting, storing, handling, discharge, disposal or recovery of on-site or off-site hazardous substances or materials, as same may be amended from time to time, including without limitation, the following:  (a) the Clean Air Act (42 U.S.C. § 7401 (et seq.); (b) Marine Protection, Research and Sanctuaries Act (33 U.S.C. § 1401-1445); (c) the Clean Water Act (33 U.S.C. § 1251 et seq.); (d) RCRA, as amended by the Hazardous and Solid Waste Amendments of 1984 (42 U.S.C. § 6901 et seq.); (e) CERCLA, as amended by the Superfund Amendments and Reauthorization Act of 1986 (42 U.S.C. § 9601 et seq.); (f) TSCA; (g) the Federal Insecticide, Fungicide and Rodenticide Act, as amended (7 U.S.C. § 136 et seq.); (h) the Safe Drinking Water Act (42 U.S.C. § 300(f) et seq.); (i) OSHA; (j) the Hazardous Liquid Pipeline Safety Act (42 U.S.C. § 2001 et seq.); (k) the Hazardous Materials Transportation Act (49 U.S.C. § 1801 et seq.); (l) the Noise Control Act of 1972 (42 U.S.C. § 4901 et seq.); (m) EPCRA; and (n) National Environmental Policy Act (42 U.S.C. § 4321-4347); and (o) Medical Waste Tracking Act of 1988 (42 U.S.C. § 6992).

"Hazardous Materials" shall mean (a) any "hazardous waste" as defined by the Resource Conservation and Recovery Act of 1976 (42 U.S.C. § 6901 et seq.) ("RCRA"), as amended from time to time, and regulations promulgated thereunder; (b) any "hazardous substance" being "released" in "reportable quantity," as such terms are defined by the Comprehensive Environmental Response, Compensation and Liability Act of 1980 (42 U.S.C. § 9601 et seq.) ("CERCLA"), as amended from time to time, and regulations promulgated thereunder; (c) asbestos; (d) polychlorinated biphenyls; (e) urea formaldehyde insulation; (f) "hazardous chemicals" or "extremely hazardous substances," in quantities sufficient to require reporting, registration, notification or special treatment or handling under the Emergency Planning and Community Right-to-Know Act of 1986 (42 U.S.C. § 11001, et seq.) ("EPCRA"), as amended from time to time, and regulations promulgated thereunder; (g) any "hazardous chemicals" in levels that would result in exposures greater than those allowed by permissible exposure limits established pursuant to the Occupational Safety and Health Act of 1970 (29 U.S.C. § 651 et seq.) "OSHA"), as amended from time to time, and regulations promulgated thereunder; (h) any substance which requires reporting, registration, notification, removal, abatement or special treatment, storage, handling or disposal under Section 6, 7 or 8 of the Toxic Substances Control Act (15 U.S.C. § 2601 et seq.) ("TSCA"), as amended from time to time, and regulations promulgated thereunder; (i) any toxic or hazardous chemicals described in the Occupational Safety and Health Standards (29 C.F.R. 1910.1000-1047) in levels which would result in exposures greater than those allowed by the permissible exposure limits pursuant to such regulations; (j) the contents of any storage tanks, whether above or below ground; (k) medical wastes; (l) materials related to those described in subparagraphs (a) through (k) hereof; and (m) anything defined as hazardous or toxic under any now existing or hereafter enacted Environmental Regulations.

"License Area" shall mean the area of the Facility described in Exhibit A attached hereto.

"Permit Approval" shall mean approval and issuance by the appropriate governmental authority of the permits for the construction of each Phase of the Project.

"Phase I Rent Commencement Date" shall mean the earlier of (i) the date Phase I of the Project is open for business to the public, and (ii) six (6) months after the date of issuance of the Permit Approval for Phase I. The estimated Phase I Rent Commencement Date is March 1, 2016.

"Phase I Rent Period" shall mean the period commencing on the Phase I Rent Commencement Date and ending on the day immediately preceding the Phase II Rent Commencement Date.

"Phase II Rent Commencement Date" shall mean the earlier of (i) the date Phase II of the Project is open for business to the public, and (ii) six (6) months after the date of issuance of the Permit Approval for Phase II. The estimated Phase II Rent Commencement Date is September 1, 2017.

"Phase II Rent Period" shall mean the period commencing on the Phase II Rent Commencement Date and ending on the day immediately preceding the Phase III Rent Commencement Date.

"Phase III Rent Commencement Date" shall mean the earlier of (i) the date Phase III of the Project is open for business to the public, and (ii) six (6) months after the date of issuance of the Permit Approval for Phase III. The estimated Phase III Rent Commencement Date is February 1, 2018.

"Phase III Rent Period" shall mean the period commencing on the Phase III Rent Commencement Date and ending on the last day of the Term.

"Project" means the construction and installation of the Structures, as depicted at Exhibit A hereto, and all ancillary and related equipment in connection therewith.

"Pricing Guidelines" shall mean the following parameters for which the parties shall mutually agree to the initial and all future charges for which the Attraction Gross Revenues are derived. Licensee, no later than ninety (90) days prior the expected completion date of each Phase of the Structures, propose to Owner its suggested pricing for up to four (4) pricing tiers from the Base Park Charge for attendees of the Facility Premises to utilize the Adventure Rides, Ziplines and Exclusive Zones ("Zipline Bundles"). Owner shall have the ability to increase the the Base Park Charge up to forty ($40.00) without increase in the Zipline Bundles (the "Permitted Increase"). However any desired increase above the Permitted Increase shall preserve the net dollar differential between the then Base Park Charge and the then applicable Zipline Bundle unless otherwise agreed to by the Parties.

"Services" shall mean (i) the exclusive operation of the Adventure Rides, Ziplines and Exclusive Zone at the Facility, (ii) maintaining all permits, licenses or other approvals required for the operation of the Adventure Rides, Ziplines, and the Exclusive Zone, (iii) conducting, managing and operating the Adventure Rides, Ziplines and Exclusive Zone at the Facility, (iv) paying for all costs, utilities and other expenses required for operation, maintenance, repair and replacement of the Project and the Structures, (v) operating and maintaining the License Areas in an orderly and clean manner and all facilities and equipment therein in a well-maintained state at all times, (vi) obtaining and paying for all utilities necessary to operate the Structures, and (vii) being responsible for the safe operations of the Adventure Rides and Ziplines during the Term and for all safety inspections in accordance with the standards set forth by the ACCT (Association for Challenge Course Technology) and ASTM F-24 Standards for Amusement Devices as the same are amended and replaced from time to time.

"Structures" shall mean the Adventure Rides, Ziplines and Exclusive Zone structures, all supporting equipment, structures and enclosures used solely in connection with the Adventure Rides and

Ziplines and all supporting equipment, structures and exclusive enclosures not currently present or required to be altered in connection with the Exclusive Zone.

"Term" shall mean the period commencing on the Effective Date and ending on the day immediately preceding the tenth (10th) anniversary date of the Phase I Rent Commencement Date.

"Zipline" shall mean an outdoor pulley suspended on a cable to be utilized for the sole purpose of outdoor adventure and personal amusement.

**EXHIBIT A**

Licensed Areas

Exhibit A
Jungle Island: AIR+Play Licensed Area



## EXHIBIT B

Exclusive Zone

Exhibit B
Cenote Exclusive Zone



## EXHIBIT C

### Licensed Area

Exhibit C
Description and Timeline for Phases 1-3

Phase 1:  Phase 1 will consist of the zipline/canopy tour.  The tour will be comprised of 5-7 ziplines, towers, aerial bridges and decks.  Phase 1 Jungle Island Plan Approval by March 1, 2016.  Plans submitted to City of Miami by April 15, 2016 (note this is dependent upon direction and process as outlined by City of Miami).  Phase 1 opening 3-6 months after plan approval from City of Miami.

Phase 2:  Phase 2 will consist of the swimming Cenote replacing the flamingo pond. Phase 2 will also include cabanas for rental, water slides, snorkeling lagoon, party and event areas, ziplines and swings.  Phase 2 will be permitted in Summer 2016 and will be open 6-12 months following issuance of permits.

Phase 3*:  Phase 3 will consist of an adventure park with 50-75 "elements" of ropes, nets, bridges, beams and platforms.  Phase 3 will also incorporate additional point of sale and a multi-level "treehouse" deck area.

*Because plans change at Jungle Island, Phase 3 may include other attractions such as aerial balloons, aerial bars, bungee jumps, giant swings, zipcoasters and other adventure activities.  It is AIR+Play's intent to work with Jungle Island on the master plan and incorporate new and exciting adventure elements where they make sense, both in time and location/placement, to Jungle Islands Master Plan.

# EXHIBIT 40



From: **GoZip US** todd@gozipus.com
Subject: Fwd: Jungle Island - Notice from Owner to Air Play Adventures, LLC
Date: October 18, 2017 at 7:42 PM
To: mandy@experientialresources.net, mauicraig@gmail.com, brian@experientialresources.net
Cc: Alfredo Gonzalez agonzalez@gjb-law.com, jarrastia@gjb-law.com

Todd Domeck, Owner
808 . 214 . 4325

Begin forwarded message:

From: "Bruno, Christian S." <CBruno@cozen.com>
Date: October 18, 2017 at 9:58:07 PM EDT
To: "Todd Domeck - Zip Line. (todd@gozipus.com)" <todd@gozipus.com>
Cc: Elie Mimoun <em@esj.us>, "pah@mhmaui.com" <pah@mhmaui.com>, "jarrastia@gjb-law.com" <jarrastia@gjb-law.com>, "Domark, Jason" <JDomark@cozen.com>
Subject: Re: Jungle Island - Notice from Owner to Air Play Adventures, LLC

Todd,

As follow-up to Owner's correspondence delivered in email below, Licensee is hereby demanded to immediately cease and desist from all further construction on Jungle Island premises until such time as all required and requested insurance coverages (including, but not limited to, FL workers comp) have been delivered and approved by Owner's insurance consultant. It is my understanding those have not been provided as required per Section 12(c). Please provide COIs to me and I will pass along or provide to Brian Adams and copy me. Owner shall hold Licensee liable for any and all direct or indirect damages and losses in connection with any coverage deficiency or other violation of the License Agreement. Thank you for you anticipated cooperation.

Christian S. Bruno
Member, Cozen O'Connor
cbruno@cozen.com

-------- Original message --------
From: "Bruno, Christian S." <CBruno@cozen.com>
Date: 10/17/17 6:11 PM (GMT-05:00)
To: "Todd Domeck - Zip Line. (todd@gozipus.com)" <todd@gozipus.com>
Cc: Elie Mimoun <em@esj.us>, pah@mhmaui.com, jarrastia@gjb-law.com, "Domark, Jason" <JDomark@cozen.com>
Subject: Jungle Island - Notice from Owner to Air Play Adventures, LLC

## Please see attached correspondence.



**Christian S. Bruno**
**Member | Cozen O'Connor**
Southeast Financial Center, 200 S. Biscayne Blvd, 30th Floor | Miami, FL 33131
P: (305) 677-0202 F: (305) 720-2172 E: cbruno@cozen.com
Email | Bio | Map | cozen.com

*Notice: This communication, including attachments, may contain information that is confidential and protected by the attorney/client or other privileges. It constitutes non-public information intended to be conveyed only to the designated recipient(s). If the reader or recipient of this communication is not the intended recipient, an employee or agent of the intended recipient who is responsible for delivering it to the intended recipient, or you believe that you have received this communication in error, please notify the sender immediately by return e-mail and promptly delete this e-mail, including attachments without reading or saving them in any manner. The unauthorized use, dissemination, distribution, or reproduction of this e-mail, including attachments, is prohibited and may be unlawful. Receipt by anyone other than the intended recipient(s) is not a waiver of any attorney/client or other privilege.*

# EXHIBIT 41



AIRPADV-01                    BALBERTI

# CERTIFICATE OF LIABILITY INSURANCE

DATE (MM/DD/YYYY)
**10/23/2017**

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must have ADDITIONAL INSURED provisions or be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER | CONTACT NAME: Beccah Alberti | | |
|---|---|---|---|
| Hibbs - Hallmark & Co<br>PO Box 8357<br>Tyler, TX 75711 | PHONE (A/C, No, Ext): (903) 561-8484 5651 | | FAX (A/C, No): (903) 561-8341 |
| | E-MAIL ADDRESS: beccah.alberti@hibbshallmark.com | | |
| | INSURER(S) AFFORDING COVERAGE | | NAIC # |
| | INSURER A : Hiscox Insurance Company Inc. | | |
| INSURED | INSURER B : Kinsale Ins. Co. | | 38920 |
| AirPlay Adventures LLC<br>P O BOX 542<br>Lahaina, HI 96767 | INSURER C : Colony Ins Co | | 39993 |
| | INSURER D : | | |
| | INSURER E : | | |
| | INSURER F : | | |

| COVERAGES | CERTIFICATE NUMBER: | REVISION NUMBER: |
|---|---|---|

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | | ADDL INSD | SUBR WVD | TYPE OF INSURANCE | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|---|
| A | X | | | COMMERCIAL GENERAL LIABILITY | ANE201122517 | 07/06/2017 | 07/06/2018 | EACH OCCURRENCE | $ 1,000,000 |
| | | | | CLAIMS-MADE ☐ X OCCUR | X | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ 100,000 |
| | | | | | | | | MED EXP (Any one person) | $ |
| | | | | | | | | PERSONAL & ADV INJURY | $ 1,000,000 |
| | | | | GEN'L AGGREGATE LIMIT APPLIES PER: | | | | GENERAL AGGREGATE | $ 2,000,000 |
| | X | POLICY ☐ PRO-JECT ☐ LOC | | | | | | PRODUCTS - COMP/OP AGG | $ 1,000,000 |
| | | OTHER: | | | | | | HIRED NONOWNED | $ 1,000,000 |
| | | | | AUTOMOBILE LIABILITY | | | | COMBINED SINGLE LIMIT (Ea accident) | $ |
| | | | | ANY AUTO | | | | BODILY INJURY (Per person) | $ |
| | | | | OWNED AUTOS ONLY / SCHEDULED AUTOS | | | | BODILY INJURY (Per accident) | $ |
| | | | | HIRED AUTOS ONLY / NON-OWNED AUTOS ONLY | | | | PROPERTY DAMAGE (Per accident) | $ |
| B | X | | | UMBRELLA LIAB ☐ X OCCUR | 01000576720 | 10/19/2017 | 10/19/2018 | EACH OCCURRENCE | $ 5,000,000 |
| | X | | | EXCESS LIAB ☐ CLAIMS-MADE X | | | | AGGREGATE | $ 5,000,000 |
| | | DED ☐ RETENTION $ | | | | | | | $ |
| | | | | WORKERS COMPENSATION AND EMPLOYERS' LIABILITY | | | | PER STATUTE OTHER | |
| | | | | ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? (Mandatory in NH) | N/A | | | E.L. EACH ACCIDENT | $ |
| | | | | | | | | E.L. DISEASE - EA EMPLOYEE | $ |
| | | | | If yes, describe under DESCRIPTION OF OPERATIONS below | | | | E.L. DISEASE - POLICY LIMIT | $ |
| A | | | | Professional. Liabili. | ANE201122517 | 07/06/2017 | 07/06/2018 | | 2,000,000 |
| C | | | | Pollution | CSP307247 | 07/07/2017 | 07/07/2018 | | 1,000,000 |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)
Additional insured status applies per the attached form.

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| City of Miami<br>Miami City Hall<br>3500 Pan America Drive<br>Miami, FL 33133 | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS.<br><br>AUTHORIZED REPRESENTATIVE |

ACORD 25 (2016/03)                    © 1988-2015 ACORD CORPORATION. All rights reserved.

The ACORD name and logo are registered marks of ACORD

AGENCY CUSTOMER ID: AIRPADV-01                                           BALBERTI

LOC #: 1

# ACORD®

## ADDITIONAL REMARKS SCHEDULE                          Page   1   of   1

| AGENCY | NAMED INSURED |
|---|---|
| Hibbs - Hallmark & Co | AirPlay Adventures LLC.<br>P O BOX 542<br>Lahaina, HI 96767 |

| POLICY NUMBER | | |
|---|---|---|
| SEE PAGE 1 | | |
| CARRIER | NAIC CODE | EFFECTIVE DATE: SEE PAGE 1 |
| SEE PAGE 1 | SEE P 1 | |

**ADDITIONAL REMARKS**

THIS ADDITIONAL REMARKS FORM IS A SCHEDULE TO ACORD FORM,

FORM NUMBER:   ACORD 25   FORM TITLE:   Certificate of Liability Insurance

$6,000,000 Excess Policy
Endurance American Specialty Insurance Company eff. 10/19/17 to 10/19/18
Policy #: ELD30000483800
Limits: $6,000,000 Occurrence/Aggregate

ACORD 101 (2008/01)                                            © 2008 ACORD CORPORATION.  All rights reserved.

The ACORD name and logo are registered marks of ACORD



HISCOX PRO™

Administered by Hiscox Inc.
520 Madison Avenue 32nd Floor, New York, NY 10022
(646) 452-2353

---

### Endorsement 7

NAMED INSURED: Airplay Adventures, LLC

**E6149.4 Additional Insured Endorsement**
In consideration of the premium charged, and on the understanding this endorsement leaves all other terms, conditions, and exclusions unchanged, it is agreed the General Liability Occurence Coverage Part is/are amended as follows:

I.   The following definition is added to the end of Section III. Who is an insured:

   **Additional insured**       means the person or organization listed below:

   ESJ JI Operations, LLC- 1111 Parrot Jungle Trail Miami, FL 33132
   ESJ JI Leasehold, LLC- 1111 Parrot Jungle Trail Miami, FL 33132
   Iconic Attractions Group, LLC - 1111 Parrot Jungle Trail Miami, FL 33132
   Weber Group, Inc.- 5233 Progress Way Sellersburg, IN 47172
   City of Miami, Miami City Hall, 3500 Pan American Drive Miami, FL 33133

   Coverage is available for additional insureds solely for their liability arising out of the named insured's negligence or of those acting on the named insured's behalf and not for any liability arising out of the sole negligence of the additional insured.

II.   In the preamble of Section III. Who is an insured, the words "additional insured," are added after "named insured,".

III.   In Section VII. Definitions, the definition of "You, your, or insured" is amended to add the words "additional insured," after "named insured,".

| | | | |
|---|---|---|---|
| Endorsement effective: | 07/06/2017 | Certificate No.: | ANE2011225.17 |
| Endorsement No: | 7 | Processed Date: | 07/12/2017 |
| Hiscox Inc. | | | |

Authorized Representative
Carl Bach

**ACORD**

AIRPADV-01    BALBERTI

# CERTIFICATE OF LIABILITY INSURANCE

DATE (MM/DD/YYYY)
10/23/2017

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW.  THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT:  If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must have ADDITIONAL INSURED provisions or be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement.  A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER | | CONTACT NAME: | Beccah Alberti | |
|---|---|---|---|---|
| Hibbs - Hallmark & Co<br>PO Box 8357<br>Tyler, TX 75711 | | PHONE (A/C, No, Ext): (903) 561-8484 5651 | | FAX (A/C, No): (903) 561-8341 |
| | | E-MAIL ADDRESS: beccah.alberti@hibbshallmark.com | | |
| | | INSURER(S) AFFORDING COVERAGE | | NAIC # |
| | | INSURER A : Hiscox Insurance Company Inc. | | |
| INSURED | | INSURER B : Kinsale Ins. Co. | | 38920 |
| AirPlay Adventures LLC<br>P O BOX 542<br>Lahaina, HI 96767 | | INSURER C : Colony Ins Co | | 39993 |
| | | INSURER D : | | |
| | | INSURER E : | | |
| | | INSURER F : | | |

## COVERAGES       CERTIFICATE NUMBER:          REVISION NUMBER:

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED.  NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSD | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|
| A | X COMMERCIAL GENERAL LIABILITY | | X | ANE201122517 | 07/06/2017 | 07/06/2018 | EACH OCCURRENCE | $ 1,000,000 |
| | ☐ CLAIMS-MADE  X OCCUR | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ 100,000 |
| | | | | | | | MED EXP (Any one person) | $ |
| | | | | | | | PERSONAL & ADV INJURY | $ 1,000,000 |
| | GEN'L AGGREGATE LIMIT APPLIES PER: | | | | | | GENERAL AGGREGATE | $ 2,000,000 |
| | X POLICY ☐ PRO-JECT ☐ LOC | | | | | | PRODUCTS - COMP/OP AGG | $ 1,000,000 |
| | OTHER: | | | | | | HIRED NONOWNED | $ 1,000,000 |
| | AUTOMOBILE LIABILITY | | | | | | COMBINED SINGLE LIMIT (Ea accident) | $ |
| | ☐ ANY AUTO | | | | | | BODILY INJURY (Per person) | $ |
| | ☐ OWNED AUTOS ONLY  ☐ SCHEDULED AUTOS | | | | | | BODILY INJURY (Per accident) | $ |
| | ☐ HIRED AUTOS ONLY  ☐ NON-OWNED AUTOS ONLY | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | | | | | | | $ |
| B | X UMBRELLA LIAB  X OCCUR | | | 01000576720 | 10/19/2017 | 10/19/2018 | EACH OCCURRENCE | $ 5,000,000 |
| | X EXCESS LIAB  ☐ CLAIMS-MADE | X | | | | | AGGREGATE | $ 5,000,000 |
| | ☐ DED ☐ RETENTION $ | | | | | | | $ |
| | WORKERS COMPENSATION AND EMPLOYERS' LIABILITY      Y / N | | | | | | PER STATUTE  ☐ OTHER | |
| | ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? (Mandatory in NH) | | N/A | | | | E.L. EACH ACCIDENT | $ |
| | If yes, describe under DESCRIPTION OF OPERATIONS below | | | | | | E.L. DISEASE - EA EMPLOYEE | $ |
| | | | | | | | E.L. DISEASE - POLICY LIMIT | $ |
| A | Professional Liabili | | | ANE201122517 | 07/06/2017 | 07/06/2018 | | 2,000,000 |
| C | Pollution | | | CSP307247 | 07/07/2017 | 07/07/2018 | | 1,000,000 |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)
Additional Insured status applies per the attached form.

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| ESJ JI Leasehold, LLC<br>1111 Parrot Jungle Trail<br>Miami, FL 33132 | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS.<br><br>AUTHORIZED REPRESENTATIVE<br>_signature_ |

ACORD 25 (2016/03)        © 1988-2015 ACORD CORPORATION.  All rights reserved.

The ACORD name and logo are registered marks of ACORD

AGENCY CUSTOMER ID: AIRPADV-01                                    BALBERTI

LOC #: 1

# ACORD®

## ADDITIONAL REMARKS SCHEDULE

Page 1 of 1

| AGENCY | NAMED INSURED |
|---|---|
| Hibbs - Hallmark & Co | AirPlay Adventures LLC.<br>P.O BOX 542<br>Lahaina, HI 96767 |

| POLICY NUMBER | | |
|---|---|---|
| SEE PAGE 1 | | |

| CARRIER | NAIC CODE | EFFECTIVE DATE: SEE PAGE 1 |
|---|---|---|
| SEE PAGE 1 | SEE P 1 | |

**ADDITIONAL REMARKS**

THIS ADDITIONAL REMARKS FORM IS A SCHEDULE TO ACORD FORM,

FORM NUMBER:   ACORD 25   FORM TITLE: Certificate of Liability Insurance

$6,000,000 Excess Policy
Endurance American Specialty Insurance Company eff. 10/19/17 to 10/19/18
Policy #: ELD30000483800
Limits: $6,000,000 Occurrence/Aggregate

ACORD 101 (2008/01)

© 2008 ACORD CORPORATION. All rights reserved.

The ACORD name and logo are registered marks of ACORD



**HISCOX PRO**™   Administered by Hiscox Inc.
520 Madison Avenue 32nd Floor, New York, NY 10022
(646) 452-2353

<u>Endorsement 7</u>

NAMED INSURED: Airplay Adventures, LLC

**E6149.4 Additional Insured Endorsement**
In consideration of the premium charged, and on the understanding this endorsement leaves all other terms, conditions, and exclusions unchanged, it is agreed the General Liability Occurence Coverage Part is/are amended as follows:

i.     The following definition is added to the end of Section III. Who is an insured:

      **Additional Insured**    means the person or organization listed below:

                ESJ JI Operations, LLC- 1111 Parrot Jungle Trail Miami, FL 33132
                ESJ JI Leasehold, LLC- 1111 Parrot Jungle Trail Miami, FL 33132
                Iconic Attractions Group, LLC - 1111 Parrot Jungle Trail Miami, FL 33132
                Weber Group, Inc.- 5233 Progress Way Sellersburg, IN 47172

                Coverage is available for additional insureds solely for their liability arising out of the named insured's negligence or of those acting on the named insured's behalf and not for any liability arising out of the sole negligence of the additional insured.

II.    In the preamble of Section III. Who is an insured, the words **"additional insured,"** are added after **"named insured,"**.

III.   In Section VII. Definitions, the definition of **"You, your, or insured"** is amended to add the words **"additional insured,"** after **"named insured,"**.

| | | | |
|---|---|---|---|
| Endorsement effective: | 07/06/2017 | Certificate No.: | ANE2011225.17 |
| Endorsement No: | 7 | Processed Date: | 07/10/2017 |

Hiscox Inc.

Authorized Representative
Carl Bach



AIRPADV-01  BALBERTI

# CERTIFICATE OF LIABILITY INSURANCE

DATE (MM/DD/YYYY)
10/23/2017

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must have ADDITIONAL INSURED provisions or be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER | CONTACT NAME: Beccah Alberti | | |
|---|---|---|---|
| Hibbs - Hallmark & Co PO Box 8357 Tyler, TX 75711 | PHONE (A/C, No, Ext): (903) 561-8484 5651 | | FAX (A/C, No): (903) 561-8341 |
| | E-MAIL ADDRESS: beccah.alberti@hibbshallmark.com | | |
| | INSURER(S) AFFORDING COVERAGE | | NAIC # |
| | INSURER A : Hiscox Insurance Company Inc. | | |
| INSURED | INSURER B : Kinsale Ins. Co. | | 38920 |
| AirPlay Adventures LLC P O BOX 542 Lahaina, HI 96767 | INSURER C : Colony Ins Co | | 39993 |
| | INSURER D : | | |
| | INSURER E : | | |
| | INSURER F : | | |

COVERAGES  CERTIFICATE NUMBER:  REVISION NUMBER:

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSD | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|
| A | X COMMERCIAL GENERAL LIABILITY | X | | ANE201122517 | 07/06/2017 | 07/06/2018 | EACH OCCURRENCE | $ 1,000,000 |
| | CLAIMS-MADE X OCCUR | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ 100,000 |
| | | | | | | | MED EXP (Any one person) | $ |
| | | | | | | | PERSONAL & ADV INJURY | $ 1,000,000 |
| | GEN'L AGGREGATE LIMIT APPLIES PER: | | | | | | GENERAL AGGREGATE | $ 2,000,000 |
| | X POLICY PRO-JECT LOC | | | | | | PRODUCTS - COMP/OP AGG | $ 1,000,000 |
| | OTHER: | | | | | | HIRED NONOWNED | $ 1,000,000 |
| | AUTOMOBILE LIABILITY | | | | | | COMBINED SINGLE LIMIT (Ea accident) | $ |
| | ANY AUTO | | | | | | BODILY INJURY (Per person) | $ |
| | OWNED AUTOS ONLY SCHEDULED AUTOS | | | | | | BODILY INJURY (Per accident) | $ |
| | HIRED AUTOS ONLY NON-OWNED AUTOS ONLY | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | | | | | | | $ |
| B | UMBRELLA LIAB X OCCUR | | | | | | EACH OCCURRENCE | $ 5,000,000 |
| | X EXCESS LIAB CLAIMS-MADE | X | | 01000576720 | 10/19/2017 | 10/19/2018 | AGGREGATE | $ 5,000,000 |
| | DED RETENTION $ | | | | | | | $ |
| | WORKERS COMPENSATION AND EMPLOYERS' LIABILITY Y / N | | | | | | PER STATUTE OTH-ER | |
| | ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? (Mandatory in NH) | N/A | | | | | E.L. EACH ACCIDENT | $ |
| | If yes, describe under DESCRIPTION OF OPERATIONS below | | | | | | E.L. DISEASE - EA EMPLOYEE | $ |
| | | | | | | | E.L. DISEASE - POLICY LIMIT | $ |
| A | Professional Liabili | | | ANE201122517 | 07/06/2017 | 07/06/2018 | | 2,000,000 |
| C | Pollution | | | CSP307247 | 07/07/2017 | 07/07/2018 | | 1,000,000 |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)
Additional Insured status applies per the attached form.

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| ESJ JI Operations, LLC 1111 Parrot Jungle Trail Miami, FL 33132 | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS. |
| | AUTHORIZED REPRESENTATIVE |

ACORD 25 (2016/03)  © 1988-2015 ACORD CORPORATION. All rights reserved.

The ACORD name and logo are registered marks of ACORD

AGENCY CUSTOMER ID: AIRPADV-01

LOC #: 1

BALBERTI

**ACORD**

## ADDITIONAL REMARKS SCHEDULE

Page 1 of 1

| AGENCY | NAMED INSURED |
|---|---|
| Hibbs - Hallmark & Co | AirPlay Adventures LLC<br>P O BOX 542<br>Lahaina, HI 96767 |

| POLICY NUMBER | | |
|---|---|---|
| SEE PAGE 1 | | |

| CARRIER | NAIC CODE | EFFECTIVE DATE: SEE PAGE 1 |
|---|---|---|
| SEE PAGE 1 | SEE P 1 | |

**ADDITIONAL REMARKS**

THIS ADDITIONAL REMARKS FORM IS A SCHEDULE TO ACORD FORM,

FORM NUMBER: ACORD 25   FORM TITLE: Certificate of Liability Insurance

$6,000,000 Excess Policy
Endurance American Specialty Insurance Company eff: 10/19/17 to 10/19/18
Policy #: ELD30000483800
Limits: $6,000,000 Occurrence/Aggregate

© 2008 ACORD CORPORATION. All rights reserved.

The ACORD name and logo are registered marks of ACORD



Administered by Hiscox Inc.
520 Madison Avenue 32nd Floor, New York, NY 10022
(646) 452-2353

---

### Endorsement 7

NAMED INSURED: Airplay Adventures, LLC

**E6149.4 Additional Insured Endorsement**
In consideration of the premium charged, and on the understanding this endorsement leaves all other terms, conditions, and exclusions unchanged, it is agreed the General Liability Occurence Coverage Part is/are amended as follows:

I.      The following definition is added to the end of Section III. Who is an insured:

    **Additional Insured**   means the person or organization listed below:

        ESJ JI Operations, LLC- 1111 Parrot Jungle Trail Miami, FL 33132
        ESJ JI Leasehold, LLC- 1111 Parrot Jungle Trail Miami, FL 33132
        Iconic Attractions Group, LLC - 1111 Parrot Jungle Trail Miami, FL 33132
        Weber Group, Inc.- 5233 Progress Way Sellersburg, IN 47172

        Coverage is available for **additional insureds** solely for their liability arising out of the **named insured's** negligence or of those acting on the **named insured's** behalf and not for any liability arising out of the sole negligence of the **additional insured**.

II.     In the preamble of Section III. Who is an insured, the words "**additional insured,**" are added after "**named insured,**".

III.    In Section VII. Definitions, the definition of "**You, your, or insured**" is amended to add the words "**additional insured,**" after "**named insured,**".

| | | | |
|---|---|---|---|
| Endorsement effective: | 07/06/2017 | Certificate No.: | ANE2011225.17 |
| Endorsement No: | 7 | Processed Date: | 07/10/2017 |
| Hiscox Inc. | | | |

Authorized Representative
Carl Bach

**ACORD**

AIRPADV-01                                                                                    BALBERTI

# CERTIFICATE OF LIABILITY INSURANCE

| DATE (MM/DD/YYYY) |
|---|
| 10/23/2017 |

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must have ADDITIONAL INSURED provisions or be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER<br>Hibbs - Hallmark & Co<br>PO Box 8357<br>Tyler, TX 75711 | CONTACT NAME: Beccah Alberti | | |
|---|---|---|---|
| | PHONE (A/C, No, Ext): (903) 561-8484 5651 | | FAX (A/C, No): (903) 561-8341 |
| | E-MAIL ADDRESS: beccah.alberti@hibbshallmark.com | | |
| | INSURER(S) AFFORDING COVERAGE | | NAIC # |
| | INSURER A : Hiscox Insurance Company Inc. | | |
| INSURED<br><br>AirPlay Adventures LLC<br>P O BOX 542<br>Lahaina, HI 96767 | INSURER B : Kinsale Ins. Co. | | 38920 |
| | INSURER C : Colony Ins Co | | 39993 |
| | INSURER D : | | |
| | INSURER E : | | |
| | INSURER F : | | |

## COVERAGES                    CERTIFICATE NUMBER:                    REVISION NUMBER:

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | | TYPE OF INSURANCE | ADDL INSD | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|---|
| A | X | COMMERCIAL GENERAL LIABILITY | X | | ANE201122517 | 07/06/2017 | 07/06/2018 | EACH OCCURRENCE | $ 1,000,000 |
| | | CLAIMS-MADE [X] OCCUR | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ 100,000 |
| | | | | | | | | MED EXP (Any one person) | $ |
| | | | | | | | | PERSONAL & ADV INJURY | $ 1,000,000 |
| | | GEN'L AGGREGATE LIMIT APPLIES PER: | | | | | | GENERAL AGGREGATE | $ 2,000,000 |
| | X | POLICY [ ] PRO-JECT [ ] LOC | | | | | | PRODUCTS - COMP/OP AGG | $ 1,000,000 |
| | | OTHER: | | | | | | HIRED NONOWNED | 1,000,000 |
| | | AUTOMOBILE LIABILITY | | | | | | COMBINED SINGLE LIMIT (Ea accident) | $ |
| | | ANY AUTO | | | | | | BODILY INJURY (Per person) | $ |
| | | OWNED AUTOS ONLY [ ] SCHEDULED AUTOS | | | | | | BODILY INJURY (Per accident) | $ |
| | | HIRED AUTOS ONLY [ ] NON-OWNED AUTOS ONLY | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | | | | | | | | $ |
| B | | UMBRELLA LIAB [X] OCCUR | X | | 01000576720 | 10/19/2017 | 10/19/2018 | EACH OCCURRENCE | $ 5,000,000 |
| | X | EXCESS LIAB [ ] CLAIMS-MADE | | | | | | AGGREGATE | $ 5,000,000 |
| | | DED [ ] RETENTION $ | | | | | | | $ |
| | | WORKERS COMPENSATION AND EMPLOYERS' LIABILITY Y/N | | | | | | [ ] PER STATUTE [ ] OTHER | |
| | | ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? (Mandatory in NH) | N/A | | | | | E.L. EACH ACCIDENT | $ |
| | | If yes, describe under DESCRIPTION OF OPERATIONS below | | | | | | E.L. DISEASE - EA EMPLOYEE | $ |
| | | | | | | | | E.L. DISEASE - POLICY LIMIT | $ |
| A | | Professional Liabili. | | | ANE201122517 | 07/06/2017 | 07/06/2018 | | 2,000,000 |
| C | | Pollution | | | CSP307247 | 07/07/2017 | 07/07/2018 | | 1,000,000 |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)
Additional Insured status applies per the attached form.

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| Iconic Attractions Group, LLC<br>1111 Parrot Jungle Trail<br>Miami, FL 33132 | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS. |
| | AUTHORIZED REPRESENTATIVE<br>*[signature]* |

ACORD 25 (2016/03)                                                          © 1988-2015 ACORD CORPORATION. All rights reserved.

The ACORD name and logo are registered marks of ACORD

**ACORD**

## ADDITIONAL REMARKS SCHEDULE                    Page  1  of  1

| AGENCY | NAMED INSURED |
|---|---|
| Hibbs - Hallmark & Co | AirPlay Adventures LLC. |
| | P.O BOX 542 |
| | Lahaina, HI 96767 |

| POLICY NUMBER | | |
|---|---|---|
| SEE PAGE 1 | | |

| CARRIER | NAIC CODE | |
|---|---|---|
| SEE PAGE 1 | SEE P 1 | EFFECTIVE DATE: SEE PAGE 1 |

### ADDITIONAL REMARKS

THIS ADDITIONAL REMARKS FORM IS A SCHEDULE TO ACORD FORM,

FORM NUMBER:   ACORD 25   FORM TITLE: Certificate of Liability Insurance

$6,000,000 Excess Policy
Endurance American Specialty Insurance Company eff. 10/19/17 to 10/19/18
Policy #: ELD30000483800
Limits: $6,000,000 Occurrence/Aggregate

© 2008 ACORD CORPORATION.  All rights reserved.
The ACORD name and logo are registered marks of ACORD



**HISCOX PRO**™    Administered by Hiscox Inc.
520 Madison Avenue 32nd Floor, New York, NY 10022
(646) 452-2353

---

Endorsement 7

NAMED INSURED: Airplay Adventures, LLC

**E6149.4 Additional Insured Endorsement**
In consideration of the premium charged, and on the understanding this endorsement leaves all other terms, conditions, and exclusions unchanged, it is agreed the General Liability Occurence Coverage Part is/are amended as follows:

I.    The following definition is added to the end of Section III. Who is an insured:

    **Additional Insured**    means the person or organization listed below:

        ESJ JI Operations, LLC- 1111 Parrot Jungle Trail Miami, FL 33132
        ESJ JI Leasehold, LLC- 1111 Parrot Jungle Trail Miami, FL 33132
        Iconic Attractions Group, LLC - 1111 Parrot Jungle Trail Miami, FL 33132
        Weber Group, Inc.- 5233 Progress Way Sellersburg, IN 47172

        Coverage is available for **additional insureds** solely for their liability arising out of the named insured's negligence or of those acting on the named insured's behalf and not for any liability arising out of the sole negligence of the **additional insured**.

II.    In the preamble of Section III. Who is an insured, the words "**additional insured,**" are added after "**named insured,**".

III.    In Section VII. Definitions, the definition of "**You, your, or insured**" is amended to add the words "**additional insured,**" after "**named insured,**".

| | | | |
|---|---|---|---|
| Endorsement effective: | 07/06/2017 | Certificate No.: | ANE2011225.17 |
| Endorsement No: | 7 | Processed Date: | 07/10/2017 |
| Hiscox Inc: | | | |

Authorized Representative
Carl Bach





## CAPITAL INVESTMENT SUMMARY
## OCTOBER 2017
### JUNGLE ISLAND, MIAMI, FL

| | |
|---|---:|
| Project and Construction Management, Materials Acquisition, Equipment Rental, Travel Expenses | 917,061.26 |
| Design, Engineering, Permitting | 181,124.22 |
| Insurance, Office Administration | 48,646.42 |
| **TOTAL** | **$1,146,831.90** |

### NOTES

Monday, Oct 23, 2017 09:54:13 AM GMT-7 - Accrual Basis

Note that all invoices for the previous quarter have not yet been received.  They are anticipated to be processed prior to issuing next month's report.

# EXHIBIT 42



October 24, 2017

**Jason R. Domark**
Direct Phone   305-358-2996
Direct Fax       305-720-2279
ckline@cozen.com

**VIA E-MAIL**

Genovese Joblove & Battista P.A.
Alfredo L. Gonzalez, Esq.
100 S.E. Second St.
44th Floor
Miami, FL 33131

> Re:   **Notice of Intent to Terminate License Agreement by and among Air Play Adventures, LLC ("Air Play") and GoZip, LLC ("GoZip" and together with Air Play, the "Licensee") and ESJ JI Leasehold, LLC, a Florida limited liability company (as assignee to Parrot Jungle and Gardens of Watson Island, Inc. and PJG Watson, LLC) ("Owner") dated September 21, 2015 (the "License Agreement").**

Dear Mr. Gonzalez:

We are in receipt of your letters dated October 20, 2017 and October 24, 2017. Unfortunately, your letters do not adequately address the deficiencies identified in Owner's notice of default to Licensee from this office dated October 17, 2017 ("Notice of Default"). As a result, pursuant to Section 8(a) of the License Agreement, this letter shall constitute written notice of Owner's intent to terminate if complete cure is not made within thirty (30) days of Owner's Notice of Default.

Owner has exercised its rights to demand financial information, including payment schedules and proof of funds, pursuant to Section 11 of the License Agreement and as adequate assurance that Licensee is capable of carrying out the contract which still remain outstanding. Among other things, we note that your letter does not provide any indication of when or how construction of the project will proceed, provide any proof that Licensee has obtained required insurances, provide any proof that contractors or subcontractors have been paid timely to date or any assurance that they will be paid timely in the future, solve Licensee's failure to pay past due rent, or provide the information Licensee is required to report under the License Agreement. We therefore reiterate Owner's request that Licensee immediately provide all information requested in Owner's Notice of Default. The statement in paragraph 12 of your October 20 letter that the "License Agreement does not obligate Licensee to provide Owner with any of this information" is wholly incorrect. Sections 11(c) and (d) require an annual statement, tax returns, financial statement and such other information as Owner may from time to time reasonably request, and

---

Southeast Financial Center    200 South Biscayne Boulevard    Suite 3000    Miami, FL 33131
305.704.5940    800.215.2137    305.704.5955 Fax    cozen.com

LEGAL\32989287\5

Section 8(a) makes Licensee's insolvency grounds for termination. This is tantamount to Owner being provided with adequate assurances of Licensee's financial capacity to proceed and complete the Project free of any unreasonable lien encumbrance risks.

On a similar issue, we note that the License Agreement was signed by Peter Winn as Manager for Air Play Adventures, LLC, a Hawaii limited liability company, on September 23, 2015, however your October 20 letter represents that by March 24, 2017 Mr. Domeck was the sole member of the company. Section 17(a) provides that any change of majority ownership or control of Licensee, without the prior written consent of Owner, is grounds for immediate termination. Owner hereby requests all corporate records for Air Play Adventures, LLC, including any LLC, operating or similar membership agreements, evidencing whether a change in majority ownership or control has occurred. Also, public records reveal that GoZip, LLC is no longer an entity in good standing in Hawaii as required pursuant to Section 9(b)(i) of the License Agreement. Please provide records showing the ownership status of GoZip, LLC and whether it remains active and in good standing.

In addition to the foregoing, we also provide the following information to address some of the issues raised in your letters.

Construction Delays – As provided in Owner's Notice of Default, Licensee has repeatedly and continuously failed to timely perform its construction obligations pursuant to the License Agreement. Licensee's attempt to blame these failures on the relocation of Tower 6 is unavailing. Only 2 of the ziplines are affected by Tower 6. The relocation of a single tower by approximately 15 feet does not justify a more than six month delay in the entire project, including the multiple other unaffected towers. Instead, it is Owner's understanding that Licensee's routine failure to pay contractors and subcontractors, including K-2 Engineering, is the primary basis for the extensive delay. Licensee's vague references to the "Additional Costs" for the relocation of Tower 6 – which costs Licensee was obligated and agreed to be responsible for – also do not justify Licensee's extensive delays.

Moreover, Licensee does not dispute that, with full knowledge of the relocation of Tower 6, it agreed to commence construction by September 5, 2017 and complete construction by February 5, 2018. Yet no construction has taken place. Licensee attempts to justify this by the impact of Hurricane Irma and by claiming that "a substantial amount of work" is taking place offsite. However, Hurricane Irma only closed access to the park for one week and no significant work has taken place since that time. Moreover, the park's closure to the public has provided Licensee with unobstructed access to commence construction. To the extent Licensee claims substantial engineering and fabrication work is taking place offsite, please provide specific evidence of said work, including what is being done, by whom, and where. Please include drawings, photos, receipts, and other documentary evidence.

In short, Owner has seen almost no progress on construction to date and rather than providing any evidence of construction or other work in your letters, Licensee has merely attempted to provide excuses for its delays. Failure to commence substantive construction within thirty (30) days of Owner's Notice of Default will result in termination.

Insurance Requirements — Owner is anxious to see construction commence and be completed, but it cannot allow Licensee or its contractors or subcontractors to enter and perform work at the park without proper insurance coverage. This is for the safety of everyone involved. Nevertheless, Licensee has failed to provide adequate evidence of umbrella liability, following form, following cover, or excess liability coverages. The COIs included in your October 24 letter suffer from multiple defects, including that they leave off the City of Miami as a named insured, do not provide worker's compensation coverage for employees of Air Play Attractions or ERI for work performed in Florida, and contain inconsistent representations as to excess liability coverage. Further, the Ohio and Washington policies you reference in your October 20 letter are not sufficient to provide complete coverage in Florida and do not satisfy the terms of the License Agreement. To the extent Licensee intends to rely on employees of Weber Group, we also do not have an adequate COI for those employees. As indicated in our letter, please also provide an updated COI for the design engineer.

In addition to the foregoing, Section 12(c) allows Owner to request, in its sole discretion and as a condition precedent to construction, any additional insurances coverages. In accordance with this section, Owner again requests that Licensee provide a payment and performance bond for the construction of the Ziplines in an amount satisfactory to Owner, or alternatively, that Licensee escrow sufficient monies to cover all contractor orders placed.

Monetary Breaches — Licensee is also in breach of several of the monetary provisions of the License Agreement. In your October 20 letter, you claim that Licensee has made all required payments and/or deposits to the general contractor (Weber Group). If this is so, please provide immediate proof of such payments. Similarly, you claim that all subcontractor payments are up to date; yet at the same time you argue that any issues for non-payment are solely between you and the subcontractors. However, Section 3(a)(ix) of the License Agreement with Owner requires Licensee to make timely payment for all labor, materials and work, and all professional and other services related to the project. If you have timely made all payments to subcontractors, please provide immediate proof of such payments.

In addition to payments to others, Licensee has failed to pay Rent to Owner. Licensee's estoppel certificate, upon which Owner relied, certifies to Owner that monthly rent in the amount of $16,666.67 had already commenced and had been paid through July 1, 2017. Licensee is bound by that representation and is estopped from now claiming a different set of facts.

Reporting Breaches — As stated in Owner's Notice of Default, Licensee is also in breach of the License Agreement's reporting requirements. Licensee has failed to provide requested construction schedules and appears to claim that none are available until it has commitments from its general contractor and subcontractors. This lack of commitments is extremely troubling and inconsistent with Licensee's claim that it is ready and able to commence construction. It also does not cure Licensee's failure to provide Owner with up-to-date construction schedules or any other current time line for the project.

Licensee has also failed to provide "financial summaries and evidence" of its Capital Investment on a periodic monthly basis. No demand by Owner is required for this reporting requirement. Nevertheless, having made a demand, Licensee has ten (10) days from the date of Owner's Notice of Default to provide evidence of its Capital Investment or the License Agreement

3

will be deemed terminated pursuant to Section 3(b) of the License Agreement. The sparse "Capital Investment Summary" you have provided with your October 24 letter is insufficient as it contains no evidence of any of the purported capital investments.

***

Failure to timely cure any of the breaches identified in Owner's Notice of Default or in this letter will result in immediate termination without further notice. Owner does not waive its right to immediately enforce any and all of its rights and remedies under the License Agreement or as available at law or equity (including its right to recover attorneys' fees), and all such rights are hereby reserved.

Regards,

COZEN O'CONNOR

Jason R. Domark

cc:    Elie Mimoun (*via email*)
       John Arrastia, Esq. (*via email*)
       *Email*: jarrastia@gjb-law.com
       Christian S. Bruno, Esq. (*via email*)

4

# EXHIBIT 43


COZEN
O'CONNOR

November 20, 2017

**Jason R. Domark**
Direct Phone    305-358-2996
Direct Fax       305-720-2279
jdomark@cozen.com

**VIA E-MAIL**

Genovese Joblove & Battista P.A.
Alfredo L. Gonzalez, Esq.
100 S.E. Second St.
44th Floor
Miami, FL 33131

Re:    **Notice of Termination of License Agreement by and among Air Play Adventures, LLC ("Air Play") and GoZip, LLC ("GoZip" and together with Air Play, the "Licensee") and ESJ JI Leasehold, LLC, a Florida limited liability company (as assignee to Parrot Jungle and Gardens of Watson Island, Inc. and PJG Watson, LLC) ("Owner") dated September 21, 2015 (the "License Agreement").**

Dear Mr. Gonzalez:

This letter constitutes written notice that, pursuant to Section 8 (a), Owner has terminated the License Agreement for Licensee's failure to timely cure all events of default identified in Owner's Notice of Default dated October 17, 2017. Additionally, despite Owner's repeated requests, Licensee has failed to provide proof that it remains solvent and/or that it has not had a change in majority ownership or control; thus entitling Owner to immediately terminate the License Agreement pursuant to Sections 8 (a) and 17 (a).

Owner reserves all of its rights related thereto, including a demand of Licensee to remove its property or surrender the construction site pursuant to Sections 2(d) and 8(a). Owner's instructions in this respect will be forthcoming.

Owner also reminds Licensee that certain of its responsibilities survive termination of the License Agreement, including but not limited to refraining from disparagement of Owner pursuant to Section 10(a) as well as Licensee's duty to cease use of and to return Owner's Confidential Information pursuant to Section 10 (b).

LEGAL\33391159\1

This letter shall not constitute a waiver of any of Owner's rights or remedies, all of which are specifically reserved.  Should you have any questions, please contact us directly.

Regards,

COZEN O'CONNOR

Jason R. Domark

cc:     Elie Mimoun (*via email*)
        John Arrastia, Esq. (*via email*)
        *Email*:  jarrastia@gjb-law.com
        Christian S. Bruno, Esq. (*via email*)

LEGAL\33391159\1